CONFIDENTIAL — SUBJECT TO COURT ORDER

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AURELIUS CAPITAL PARTNERS, LP and AURELIUS CAPITAL MASTER, LTD., | 07 Civ. 11327 (TPG) |
| Plaintiffs, | **DECLARATION OF MARK D. BRODSKY** |
| - against - | |
| THE REPUBLIC OF ARGENTINA, | |
| Defendant. | |

Mark D. Brodsky declares pursuant to 28 U.S.C. § 1746:

1.      I make this declaration in support of the motion of plaintiffs Aurelius Capital Partners, LP ("ACP") and Aurelius Capital Master, Ltd. ("ACM") (together, the "Aurelius Plaintiffs") for summary judgment.

2.      ACP is a limited partnership organized and existing under the laws of the State of Delaware. **REDACTED**

      ACM is an exempted company with limited liability incorporated in the Cayman Islands. **REDACTED**

Based on the knowledge of the Aurelius Plaintiffs' business matters that I have acquired in these capacities and my review of relevant business records and the other documents discussed below, I have personal knowledge of the following facts.

CONFIDENTIAL — SUBJECT TO COURT ORDER

## The Debt Securities Issued by the Republic of Argentina

3.      As explained below, the Aurelius Plaintiffs are the beneficial

owners of $56,925,000 in original principal amount of debt securities at issue in this

action issued by the Republic of Argentina, together with all accrued and unpaid interest

thereon, including capitalized interest.  The debt securities beneficially owned by the

Aurelius Plaintiffs are governed by the Fiscal Agency Agreement between the Republic

of Argentina and Bankers Trust Company, as Fiscal Agent, dated as of October 19, 1994

(the "Fiscal Agency Agreement").  Attached as Exhibit A is a true and correct copy of

the Fiscal Agency Agreement.

4.      ACP is the beneficial owner of the following debt securities at

issue in this action issued by the Republic of Argentina pursuant to the Fiscal Agency

Agreement, in the principal amounts stated:

>  (a)      $17,850,000 in original principal amount of the Global
> Bonds due June 19, 2018 (the "2018 Global Bonds"), bearing interest at
> 12.25%, ISIN No. US040114GG96; issued pursuant to the Fiscal Agency
> Agreement and a prospectus supplement dated May 28, 2001. Attached as
> Exhibit B is a true and correct copy of the prospectus supplement.

>  (b)      $13,303,000 in original principal amount of the Global
> Bonds due June 19, 2031 (the "2031 Global Bonds"), bearing interest at
> 12%, ISIN No. US040114GH79; issued pursuant to the Fiscal Agency
> Agreement and a prospectus supplement dated May 28, 2001 (Ex. B).

5.      ACM is the beneficial owner of the following debt securities at

issue in this action issued by the Republic of Argentina pursuant to the Fiscal Agency

Agreement, in the principal amounts stated:

>  (a)      $9,150,000 in original principal amount of the 2018 Global
> Bonds.

>  (b)      $16,622,000 in original principal amount of the 2031
> Global Bonds.

CONFIDENTIAL — SUBJECT TO COURT ORDER

6.     The debt securities listed above beneficially owned by the Aurelius Plaintiffs at issue in this action are referred to herein as the "Debt Securities."

### The Republic of Argentina's Defaults on Its Contractual Obligations Respecting the Debt Securities

7.     It is my understanding that on or about December 24, 2001, the Republic of Argentina declared a moratorium on the payment of interest and principal with respect to all of its external debt, including the debt securities issued pursuant to the Fiscal Agency Agreement. Since that time, the Republic of Argentina has made no payments of interest or principal on the Debt Securities beneficially owned by the Aurelius Plaintiffs.

8.     By Notice of Acceleration dated December 14, 2007, the Aurelius Plaintiffs declared the principal amounts of the Debt Securities that are beneficially owned by the Aurelius Plaintiffs to be immediately due and payable pursuant to the Fiscal Agency Agreement and the prospectus supplement. Attached as Exhibit C is a true and correct copy of the Notice of Acceleration. That notice was delivered to the Fiscal Agent on December 14, 2007, and pursuant to section 12 of the Fiscal Agency Agreement, was effective immediately. (*See* Ex. A, § 12, at 18.) Accordingly, the entire principal amounts of the Debt Securities that are beneficially owned by the Aurelius Plaintiffs, together with all accrued and unpaid interest thereon, including capitalized interest, are currently due and payable.

### The Aurelius Plaintiffs' Purchase of Their Beneficial Ownership in the Debt Securities

**REDACTED**

CONFIDENTIAL — SUBJECT TO COURT ORDER

**REDACTED**

_____

## The Aurelius Plaintiffs Receive Authorization to Sue

11.    Attached as Exhibit G are true and correct copies of authorization

documents dated December 6, 2007, issued by Cede & Co., the holder of record of the

Debt Securities and the nominee and alter ego of The Depository Trust Company.  Those

documents authorize Goldman Sachs, as Participant, "to commence and prosecute

litigation, arbitration, or other dispute resolution procedures" with respect to each of the

Debt Securities that the Aurelius Plaintiffs beneficially own.  (Ex. G.)

12.    Attached as Exhibit H are true and correct copies of authorization

letters dated December 7, 2007, from Goldman Sachs, as Participant, to the Aurelius

Plaintiffs.  Those letters authorize the Aurelius Plaintiffs, as beneficial owners of

$80,925,000 in original principal amount of debt securities,[1] together with all accrued

_____

[1]   The $80,925,000 in original principal amount of debt securities includes the
$56,925,000 in original principal amount of Debt Securities at issue in this action as
well as the $24,000,000 in original principal amount of 2018 Global Bonds and 2031
Global Bonds beneficially owned by the Aurelius Plaintiffs, upon which this Court
entered an Order on April 7, 2008 granting summary judgment to the Aurelius

CONFIDENTIAL — SUBJECT TO COURT ORDER

and unpaid interest, including capitalized interest, "to commence and prosecute

litigation, arbitration, or other dispute resolution procedures against the Republic of

Argentina." (Ex. H.)

### Tabular Summary of Identifying Information Respecting the Aurelius Plaintiffs' Beneficial Ownership of Debt Securities

13.    The basic identifying information set forth above concerning the

Aurelius Plaintiffs' beneficial ownership in the Debt Securities may be summarized as

follows:

Table 1

| | |
|---|---|
| Plaintiff and Beneficial Owner: | ACP |
| Face Value: | U.S. $17,850,000 |
| ISIN No. | US040114GG96 |
| Dates of Issuance: | June 19, 2001 |
| Date of Maturity: | June 19, 2018 |
| Interest Rate Payable: | 12.25% |
| Dates of Purchase: | October 10, 2007, November 27, 2007, November 28, 2007, November 29, 2007 |
| Date of Acceleraion | December 14, 2007 |
| Contract Document: | Fiscal Agency Agreement dated October 19, 1994 |

**REDACTED**

Plaintiffs against the Republic of Argentina in 07 Civ. 2715 (TPG).

**CONFIDENTIAL — SUBJECT TO COURT ORDER**

Table 2

| | |
|---|---|
| Plaintiff and Beneficial Owner: | ACP |
| Face Value: | U.S. $13,303,000 |
| ISIN No. | US040114GH79 |
| Date of Issuance: | June 19, 2001 |
| Date of Maturity: | June 19, 2031 |
| Interest Rate Payable: | 12% |
| Dates of Purchase: | October 11, 2007, October 12, 2007, October 16, 2007, November 30, 2007 |
| Date of Accleration | December 14, 2007 |
| Contract Document: | Fiscal Agency Agreement dated October 19, 1994 |

**REDACTED**

Table 3

| | |
|---|---|
| Plaintiff and Beneficial Owner: | ACM |
| Face Value: | U.S. $9,150,000 |
| ISIN No. | US040114GG96 |
| Date of Issuance: | June 19, 2001 |
| Date of Maturity: | June 19, 2018 |
| Interest Rate Payable: | 12.25% |
| Date of Purchase: | October 10, 2007, November 27, 2007, November 28, 2007 |
| Date of Acceleration: | December 14, 2007 |
| Contract Document: | Fiscal Agency Agreement dated October 19, 1994 |

**REDACTED**

CONFIDENTIAL — SUBJECT TO COURT ORDER

Table 4

| | |
|---|---|
| Plaintiff and Beneficial Owner: | ACM |
| Face Value: | U.S. $16,622,000 |
| ISIN No. | US040114GH79 |
| Date of Issuance: | June 19, 2001 |
| Date of Maturity: | June 19, 2031 |
| Interest Rate Payable: | 12% |
| Dates of Purchase: | October 11, 2007, October 12, 2007, October 16, 2007, November 27, 2007, November 30, 2007 |
| Date of Acceleration: | December 14, 2007 |
| Contract Document: | Fiscal Agency Agreement dated October 19, 1994 |

**REDACTED**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 28, 2008 at Old Greenwich, Connecticut.

_____

Mark D. Brodsky

EXHIBIT A - 1

FISCAL AGENCY AGREEMENT

between

THE REPUBLIC OF ARGENTINA

and

BANKERS TRUST COMPANY, Fiscal Agent

Dated as of October 19, 1994

ARG 0001

TABLE OF CONTENTS

Page

1.  Securities Issuable in Series . . . . . . . . . . . .    1

2.  Appointment of Fiscal Agent; Paying Agents . . . . . .    3

3.  Authentication . . . . . . . . . . . . . . . . . . .    3

4.  Registration, Transfers and Exchanges . . . . . . . .    4

5.  Global Securities . . . . . . . . . . . . . . . . . .    6

6.  Payment . . . . . . . . . . . . . . . . . . . . . . .    9

7.  Additional Amounts . . . . . . . . . . . . . . . . .   11

8.  Mutilated, Destroyed, Stolen or Lost Certificates . .   11

9.  Redemption and Purchases . . . . . . . . . . . . . .   12

10. Cancellation and Destruction . . . . . . . . . . . .   14

11. Negative Pledge and Covenants . . . . . . . . . . . .   14

12. Default; Acceleration of Maturity . . . . . . . . . .   17

13. Limit on Liability; Acceptance of Appointment . . . .   19

14. Expenses and Indemnity . . . . . . . . . . . . . . .   20

15. Successor Fiscal Agent . . . . . . . . . . . . . . .   20

16. Meetings of Holders of Securities; Modifications . . .   22

17. Further Issues . . . . . . . . . . . . . . . . . . .   26

18. Reports . . . . . . . . . . . . . . . . . . . . . . .   26

19. Forwarding of Notice; Inquiries . . . . . . . . . . .   27

20. Listings . . . . . . . . . . . . . . . . . . . . . .   27

21. Notices . . . . . . . . . . . . . . . . . . . . . . .   27

22. Consent to Service; Jurisdiction . . . . . . . . . .   28

23. Governing Law and Counterparts . . . . . . . . . . .   29

-i-

ARG 0002

                                                                    Page

24.  Headings . . . . . . . . . . . . . . . . . . . . . . . . . .  29


     Exhibit A - Form of Registered Security

-ii-

ARG 0003

THE REPUBLIC OF ARGENTINA

FISCAL AGENCY AGREEMENT dated as of October 19, 1994, between The Republic of Argentina (the "Republic") and Bankers Trust Company, a New York banking corporation, as fiscal agent.

1.    Securities Issuable in Series.  (a)  The Republic may issue its notes, securities, debentures or other evidences of indebtedness (the "Securities") in separate series from time to time (each such series of Securities being hereinafter referred to as a "Series" or the "Securities of a Series").  The aggregate principal amount of the Securities of all Series which may be authenticated and delivered under this Agreement and which may be outstanding at any time is not limited by this Agreement.  The text of the Securities of a Series delivered to the Fiscal Agent (as hereinafter defined) for authentication on original issuance pursuant to Section 3 of this Agreement shall establish (i) the specific designation of the Securities of such Series (which shall distinguish the Securities of such Series from all other Series); (ii) any limit on the aggregate principal amount of the Securities of such Series which may be authenticated and delivered under this Agreement (except for Securities authenticated and delivered upon registration of transfer of, or in exchange for, or in lieu of, other Securities of such Series pursuant to the provisions of this Agreement or of the Securities of such Series); (iii) the price or prices (expressed as a percentage of the aggregate principal amount thereof) at which the Securities of such Series will be issued; (iv) the date or dates on which the principal and premium, if any, of the Securities of such Series is payable; (v) the rate or rates (which may be fixed or floating) per annum at which the Securities of such Series shall bear interest, if any, the date or dates from which such interest, if any, shall accrue, the interest payment dates on which such interest shall be payable and the record dates for the determination of holders of the Securities of such Series to whom interest is payable; (vi) the place or places where the principal of, and premium, if any, and interest on the Securities of such Series are payable; (vii) the price or prices at which, the period or periods within which and the terms and conditions upon which Securities of such Series may be redeemed, in whole or in part, at the option of the Republic or otherwise; (viii) the obligation, if any, of the Republic to redeem, purchase or repay Securities of such Series pursuant to any sinking fund or analogous provisions and the price or prices at which, the

ARG 0004

period or periods within which, and the terms and conditions upon which Securities of such Series shall be redeemed, purchased or repaid, in whole or in part, pursuant to such obligation; (ix) the minimum denomination and any multiples thereof of the Securities of such Series, which may be in U.S. dollars, another foreign currency, units of two or more currencies or amounts determined by reference to an index; (x) the currency or currencies in which the principal, premium, if any, or interest on such Securities may be payable; (xi) the manner in which the amount of payments of principal, premium, if any, or interest on such Securities is to be determined and if such determination is to be made with reference to any index; (xii) any covenants or agreements of the Republic and events which give rise to the right of a holder of a Security of such Series to accelerate the maturity of such Security other than such covenants, agreements or events specified herein; and (xiii) any other terms of the Securities of such Series.  Securities may be issuable pursuant to warrants (if so provided in the text of such Securities) and the Fiscal Agent may act as warrant agent or in any similar capacity in connection therewith.

(b)  The Securities of a Series are to be issued in fully registered form only, without interest coupons, and will be issuable in the denominations specified in the text of the Securities of such Series, substantially in the form of Exhibit A hereto ("registered Securities").  The Securities of a Series may also have such additional provisions, omissions, variations or substitutions as are not inconsistent with the provisions of this Agreement, and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon as may be required to comply with any law or with any rules made pursuant thereto or with the rules of any securities exchange or governmental agency or as may, consistent herewith, be determined by the officials executing such Securities, as evidenced by their execution of such Securities.  All Securities of a particular Series shall be otherwise substantially identical except as to denomination and as provided herein.

(c)  The Securities will constitute (except as provided in Section 11 below) direct, unconditional, unsecured and unsubordinated obligations of the Republic and shall at all times rank pari passu and without any preference among themselves.  The payment obligations of the Republic under the Securities shall at all times rank at least equally with all its other present and future unsecured and unsubordinated External Indebtedness (as defined in this Agreement).

2

ARG 0005

2.   Appointment of Fiscal Agent: Paying Agents.
(a)   The Republic hereby appoints Bankers Trust Company, at
present having its office at 4 Albany Street, New York, New
York 10006 as fiscal agent, transfer agent, registrar and
principal paying agent of the Republic for the Securities,
upon the terms and conditions set forth herein.  Bankers
Trust Company accepts such appointments, and along with its
successors as such fiscal agent, is hereinafter referred to
as the "Fiscal Agent".  The Republic reserves the right to
appoint different fiscal agents for different series of
securities.

       (b)   The Republic may appoint one or more
additional agents (hereinafter called a "Paying Agent" or
the "Paying Agents") for the payment (subject to the
applicable laws and regulations) of the applicable payment
of principal, premium, if any, and interest or Additional
Amounts (as defined in Section 7 hereof), if any, on the
Securities at such place or places as the Republic may
determine pursuant to an agreement (each, a "Paying Agency
Agreement"); provided that the Republic will maintain at all
times until no Security is outstanding a Paying Agent (who
may be the Fiscal Agent) in the Borough of Manhattan, The
City of New York.  The Republic will keep the Fiscal Agent
informed as to the name, address, and telephone and
facsimile numbers of each Paying Agent appointed by it and
will notify the Fiscal Agent of the resignation of any
Paying Agent.  The Fiscal Agent shall arrange with each
Paying Agent for the payment, as provided herein, of the
principal and interest or Additional Amounts, if any, on the
Securities on terms previously approved in writing by the
Republic (further references herein to principal and
interest shall be deemed to also refer to any Additional
Amounts).

       3.   Authentication.  (a)  The Fiscal Agent shall,
upon delivery of the Securities to it by the Republic, and a
written order or orders to authenticate and deliver
Securities in a stated aggregate principal amount, (i)
authenticate and register not more than said aggregate
principal amount of Securities and deliver them in
accordance with the written order or orders of the Republic
and (ii) thereafter authenticate and register Securities and
deliver them in accordance with the provisions of Sections
4, 5 and 9 of this Agreement.  The total principal amount of
the Securities to be issued and outstanding at any time
shall not be limited hereby.

       (b)   The Fiscal Agent may, with the prior written
consent of the Republic, appoint by an instrument or
instruments in writing one or more agents (which may include

3

ARG 0006

itself) for the authentication of Securities of a Series
and, with such consent, vary or terminate any such
appointment upon written notice and approve any change in
the office through which any authenticating agent acts.  The
Republic (by written notice to the Fiscal Agent and the
authenticating agent whose appointment is to be terminated)
may also terminate any such appointment at any time.  The
Fiscal Agent hereby agrees to solicit written acceptances
from the entities concerned (in form and substance
satisfactory to the Republic) of such appointments.  In its
acceptance of such appointment, each such authenticating
agent shall agree to act as an authenticating agent pursuant
to the terms and conditions of this Agreement.

      (c)  Until definitive Securities of a Series are
prepared, the Republic may execute, and there shall be
authenticated and delivered in accordance with the
provisions hereof (in lieu of definitive Securities of such
Series), temporary Securities of such Series.  Such
temporary Securities of a Series shall be subject to the
same limitations and conditions and entitled to the same
rights and benefits as definitive Securities of such Series,
except as provided herein or therein.  Temporary Securities
of a Series shall be exchangeable for definitive Securities
of such Series when such definitive Securities are available
for delivery; and upon the surrender for exchange of such
temporary Securities of a Series, the Republic shall execute
and there shall be authenticated and delivered, in
accordance with the provisions of Sections 3 and 4 hereof,
in exchange for such temporary Securities of a Series, a
like aggregate principal amount of definitive Securities of
such Series and of like tenor.  The Republic shall pay all
charges, including (without limitation) stamp and other
taxes and governmental charges, incident to any exchange of
temporary Securities for definitive Securities.  All
temporary Securities shall be identified as such and shall
describe the right of the holder thereof to effect an
exchange for definitive Securities and the manner in which
such an exchange may be effected.

      4.  <u>Registration, Transfers and Exchanges</u>.  (a)
The Fiscal Agent, as agent of the Republic for such
purpose, will at all times keep at the office of the Fiscal
Agent in the Borough of Manhattan, The City of New York, a
register or registers for the registration and registration
of transfers and exchanges of Securities, in which shall be
entered the names and addresses of the registered holders of
Securities and the particulars of the Securities held by
such registered holders.  Subject to Section 5 hereof, upon
surrender for transfer of any Security of any Series at said
office, the Fiscal Agent shall authenticate, register and

4

deliver in the name of the transferee or transferees a new Security or Securities of any Series for a like aggregate principal amount. Subject to Section 5 hereof, upon surrender of any Security at said office for exchange, the Fiscal Agent shall authenticate, register and deliver in exchange for such Security a new Security or new Securities of the appropriate authorized denomination(s) and for a like aggregate principal amount in accordance with the provisions of the Securities.

(b)   All new Securities authenticated and delivered by the Fiscal Agent upon registration of transfer or in exchange for Securities of other denominations shall be so dated that neither gain nor loss of interest shall result from such registration of transfer or exchange.

(c)   All Securities presented or surrendered for registration of transfer, exchange or payment shall be accompanied by a written instrument or instruments of transfer in form satisfactory to the Fiscal Agent, duly executed by the registered holder or its attorney duly authorized in writing and with the signatures thereon duly guaranteed by a commercial bank or trust company having its principal office in The City of New York or by a member of the New York Stock Exchange.

(d)   The Fiscal Agent shall not impose any service charge on the registered holder on any such registration, transfer or exchange of Securities; however, the Republic may require of the party requesting such transfer or exchange, as a condition precedent to the exercise of any right of transfer or exchange contained in this Agreement or in the Securities, the payment of a sum sufficient to cover any stamp or other tax or other governmental charge payable in connection therewith.

(e)   The Republic, the Fiscal Agent and any Paying Agent may treat the person in whose name any Security is registered as the owner of such Security for the purpose of receiving payment of principal of and interest on such Security, and all other purposes whatsoever, whether or not such Security be overdue, and none of the Republic, the Fiscal Agent or any Paying Agent shall be affected by any notice to the contrary and any such payment shall be a good and sufficient discharge to the Republic, the Fiscal Agent and any Paying Agent for the amount so paid.

(f)   The Fiscal Agent shall not be required to register any transfer or exchange of Securities during the period from the Regular Record Date (as defined in such Securities) to the Interest Payment Date (as defined in such

5

ARG 0008

Securities) and for the purposes of any interest payment made in accordance with Section 6 hereof, such payment shall be made to those persons in whose names the Securities are registered on such Regular Record Date.

     5.  <u>Global Securities</u>.  The Securities of any Series may be issued in whole or in part in the form of one or more global securities ("Global Securities") that will be deposited with, or on behalf of, a depositary (the "Depositary") relating to such Series.  Global Securities may be issued only in fully registered form and in either temporary or definitive form.  Unless and until it is exchanged in whole or in part for Securities in definitive form, a Global Security may not be transferred except as a whole by the Depositary for such Global Security to a nominee of such Depositary or by a nominee of such Depositary to such Depositary or another nominee of such Depositary or by such Depositary or any nominee of such Depositary to a successor Depositary or any nominee of such successor.

     Upon the issuance of a Global Security, the Depositary for such Global Security will credit on its book-entry registration and transfer system the respective principal amounts of the Securities represented by such Global Security to the accounts of Persons that have accounts with such Depositary ("Participants").  The accounts to be credited shall be designated by the agents or underwriters with respect to such Securities or by the Republic if such Securities are offered and sold directly by the Republic.  Ownership of beneficial interests in a Global Security will be limited to Participants or Persons that may hold interests through Participants.  Ownership of beneficial interests in a Global Security will be shown on, and the transfer of that ownership will be effected only through, records maintained by the applicable Depositary (with respect to interests of Participants) and records of Participants (with respect to interests of Persons who hold through Participants).  Owners of beneficial interests in a Global Security (other than Participants) will not receive written confirmation from the applicable Depositary of their purchase.  Each beneficial owner is expected to receive written confirmation providing details of the transaction, as well as periodic statements of its holdings, from the Depositary (if such beneficial owner is a Participant) or from the Participant through which such beneficial owner entered into the transaction (if such beneficial owner is not a Participant).  The laws of some states require that certain purchasers of securities take physical delivery of such securities in definitive form.  Such limits and such

ARG 0009

laws may impair the ability to own, pledge or transfer beneficial interests in a Global Security.

So long as the Depositary for a Global Security, or its nominee, is the registered owner of such Global Security, such Depositary or such nominee, as the case may be, will be considered the sole owner or holder of the Securities represented by such Global Security for all purposes under this Agreement.  Except as specified below or with respect to the terms of Securities of a Series, owners of beneficial interests in a Global Security will not be entitled to have any of the individual Securities represented by such Global Security registered in their names, and will not receive or be entitled to receive physical delivery of any such Securities in definitive form and will not be considered the owners or holders thereof under such Securities or this Agreement.  Accordingly, each Person owning a beneficial interest in a Global Security must rely on the procedures of the Depositary for such Global Security and, if such Person is not a Participant, on the procedures of the Participant through which such Person owns its interest, to exercise any rights of a holder under the Securities or this Agreement.  The Republic understands that under existing industry practices, if the Republic requests any action of holders, or an owner of a beneficial interest in such Global Security desires to take any action which a holder is entitled to take under the Fiscal Agency Agreement, the Depositary for such Global Security would authorize the Participants holding the relevant interests to take such action, and such Participants would authorize beneficial owners owning through such Participants to take such action or would otherwise act upon the instructions of beneficial owners holding through them.

Payments of principal of and any premium and any interest on Securities registered in the name of a Depositary or its nominee will be made to the Depositary or its nominee, as the case may be, as the holder of the Global Security representing such Securities.  None of the Republic, any Paying Agent or the Fiscal Agent, in its capacity as registrar for such Debt Securities, will have any responsibility or liability for any aspect of the records relating to or payments made on account of beneficial interests in a Global Security or for maintaining, supervising or reviewing any records relating to such beneficial interests.

The Republic expects that the Depositary for a series of Securities or its nominee, upon receipt of any payment of principal, premium or interest in respect of a Global Security representing such Securities will credit

7

Participants' accounts with payments in amounts
proportionate to their respective beneficial interests in
the principal amount of such Global Security as shown on the
records of such Depositary.  The Republic also expects that
payments by Participants to owners of beneficial interests
in such Global Security held through such Participants will
be governed by standing instructions and customary
practices, as is now the case with securities held for the
accounts of customers in bearer form or registered in
"street name".  Such payments will be the responsibility of
such Participants.

        If at any time the Depositary notifies the
Republic that it is unwilling or unable to continue as
Depositary for the Securities, or if the Republic notifies
the Depositary that it will no longer continue as Depositary
for the Securities, or if at any time the Depositary ceases
to be a clearing agency registered under the United States
Securities Exchange Act of 1934, as amended, or otherwise
ceases to be eligible to be a Depositary, the Republic shall
appoint a successor Depositary with respect to such
Securities.  If a successor Depositary for such Securities
is not appointed by the Republic within 90 days after the
Republic receives such notice or becomes aware of such
ineligibility, or if the Depositary notifies the Fiscal
Agent or the Republic of the acceleration of the
indebtedness under the Securities in accordance with the
terms of the Securities, the Republic will execute, and the
Fiscal Agent upon receipt of such executed definitive
Securities will authenticate and deliver, Securities in
definitive registered form without coupons, in denominations
of U.S.$1,000 and integral multiples thereof (unless some
other denomination is specified in terms of the Securities
of a Series), in an aggregate principal amount equal to the
aggregate principal amount of the Global Securities.

        The Republic may at any time and in its sole
discretion determine not to have any of the Securities held
in the form of Global Securities.  In such event, the
Republic will execute, and the Fiscal Agent, upon receipt of
such executed definitive Securities will authenticate and
deliver, Securities in definitive registered form without
coupons, in denominations of U.S.$1,000 and integral
multiples thereof (unless some other denomination is
specified in terms of the Securities of a Series, in an
aggregate principal amount equal to the aggregate principal
amount of the Global Securities.

        Upon the exchange of the Global Securities for
Securities in definitive registered form the Global
Securities shall be canceled by the Fiscal Agent.

8

ARG 0011

Securities in definitive registered form issued in exchange
for the Global Securities pursuant to this section shall be
registered in such names as the Depositary, pursuant to
instructions from its direct or indirect participants or
otherwise, shall instruct the Fiscal Agent or the Republic.
The Fiscal Agent shall deliver such Securities in definitive
registered form to or as directed by the persons in whose
names such definitive registered Securities are so
registered and will direct all payments to be made in
respect of such Securities in definitive registered form to
the registered holders thereof on or after such exchange
regardless of whether such exchange occurred after the
record date for such payment.

All Securities in definitive registered form,
issued upon the exchange of the Global Securities, shall be
valid obligations of the Republic, evidencing the same debt,
and entitled to the same benefits under this Agreement, as
the Global Securities surrendered upon such exchange.

6.    Payment.    (a)    The Republic will pay to the
Fiscal Agent, the amounts, at the times and for the purposes
set forth herein and in the text of the Securities of a
Series, not later than 1:00 p.m. New York City time to an
account to be specified by the Fiscal Agent, on the day on
which the same shall become due, all amounts to be paid on
the Securities of such Series as required by the terms of
the Securities, and the Republic hereby authorizes and
directs the Fiscal Agent, from the funds so paid to it, to
make payments in respect of the Securities in accordance
with their terms and the provisions set forth below.  If any
date for payment in respect of a Security is not a Business
Day, such payment shall be made on the next following
Business Day.  "Business Day" means a day on which banking
institutions in The City of New York and at the applicable
place of payment are not authorized or obligated by law or
executive order to be closed.  The Fiscal Agent shall
arrange directly with any Paying Agent who may have been
appointed pursuant to the provisions of Section 2 hereof for
the payment from funds so paid by the Republic of the
principal of (and premium, if any) and any interest on the
Securities of such Series as set forth herein and in the
text of said Securities.  Notwithstanding the foregoing,
where the terms of such Securities expressly so provide and
the Republic so notifies the Fiscal Agent the Republic may
provide directly a Paying Agent with funds for the payment
of the principal thereof and premium and interest, if any,
payable thereon under an agreement with respect to such
funds containing substantially the same terms and conditions
set forth in this Section; and the Fiscal Agent shall have

9

no responsibility with respect to any funds so provided by the Republic to any such Paying Agent.

(b)    All payments with respect to the Global Securities shall be made by the Fiscal Agent to the Depositary in accordance with the regular procedures established from time to time by the Depositary.

(c)    Payment of principal and premium, if any, in respect of Securities in definitive registered form issued pursuant hereto shall be made at the office of the Fiscal Agent in the Borough of Manhattan, The City of New York, or at the office of any Paying Agent appointed by the Republic for such purpose pursuant to this Agreement against surrender of such Securities.    Any interest on Securities of a Series shall be paid, unless otherwise provided in the text of the Securities of such Series, to the persons in whose names such Securities are registered on the register maintained for such purposes at the close of business on the record dates designated in the text of the Securities of such Series.    If so provided with respect to the Securities of a Series, payments of interest due prior to or on maturity may be made by forwarding by post or otherwise delivering a check to the registered addresses of registered holders of Securities, or, at the option of the Republic, otherwise transferring funds to the registered holders of the Securities.    Such check shall be made payable to the order of the registered holder or, in the case of joint registered holders, to the order of all such joint holders (failing instructions from them to the contrary) and shall be sent to the address of that one of such joint holders whose name stands first in the register as one of such joint holders.    The Fiscal Agent shall mail or otherwise deliver such checks to the names and addresses of registered holders of Securities sufficiently in advance of the relevant due date for payment that receipt of such checks by registered holders on or before the due date is reasonably assured.

(d)    All money paid to the Fiscal Agent under Section 6(a) of this Agreement shall be held by it in a separate account from the moment when such money is received until the time of actual payment, in trust for the registered holders of Securities to be applied by the Fiscal Agent to payments due on the Securities at the time and in the manner provided for in this Agreement and the Securities.    Any money deposited with the Fiscal Agent for the payment in respect of any Security remaining unclaimed for two years after such principal or interest shall have become due and payable shall be repaid to the Republic upon written request without interest, and the registered holder

10

of Security may thereafter look only to the Republic for any payment to which such holder may be entitled.

      7.  <u>Additional Amounts</u>.  All payments of principal, premium, if any, and interest in respect of the Securities by the Republic will be made free and clear of, and without withholding or deduction for or on account of, any present or future taxes, duties, assessments or governmental charges of whatever nature imposed, levied, collected, withheld or assessed by or within the Republic or any authority therein or thereof having power to tax (together "Taxes"), unless such withholding or deduction is required by law.  In such event, the Republic shall pay such additional amounts ("Additional Amounts") as will result in receipt by the holders of Securities of such amounts of principal, premium and interest as would have been received by them had no such withholding or deduction been required, except that no such Additional Amounts shall be payable with respect to any Security:

    (a)    to a holder (or to a third party on behalf of a holder) where such holder is liable for such Taxes in respect of any Security by reason of his having some connection with the Republic other than the mere holding of such Security or the receipt of principal, premium or interest in respect thereof; or

    (b)    presented for payment more than 30 days after the Relevant Date, as defined herein, except to the extent that the holder thereof would have been entitled to Additional Amounts on presenting the same for payment on the last day of such period of 30 days.

      "Relevant Date" in respect of any Security means the date on which payment in respect thereof becomes due or (if the full amount of the money payable on such date has not been received by the Fiscal Agent on or prior to such due date) the date on which notice is duly given to the holders in the manner described in Section 21 below that such moneys have been so received and are available for payment.  Any reference herein to "principal" and/or "interest" shall be deemed to include any Additional Amounts which may be payable under the Securities.

      So long as any Security remains outstanding, the Republic covenants to maintain its membership in, and its eligibility to use the general resources of, the International Monetary Fund.

11

ARG 0014

8.    <u>Mutilated, Destroyed, Stolen or Lost Certificates</u>.    (a)    In case any Security certificate is mutilated, defaced, destroyed, stolen or lost, application for replacement shall be made to the Fiscal Agent who shall promptly transmit such application to the Republic.    Such application shall be accompanied by the mutilated or defaced certificate or receipt of proof, satisfactory to the Republic in its discretion, of the destruction, theft or loss of the certificate, and upon receipt by it of an indemnity satisfactory to the Republic and the Fiscal Agent, the Republic shall execute a new certificate of like tenor, and upon written instructions from the Republic the Fiscal Agent shall thereupon cancel the mutilated or defaced certificate if applicable and authenticate, register and deliver such new certificate in exchange for the mutilated or defaced certificate or in substitution for the destroyed, stolen or lost certificate.    Such new certificate will be so dated that neither gain nor loss in interest will result from such exchange or substitution.    All expenses associated with procuring such indemnity and with the preparation, authentication and delivery of a new certificate will be borne by the registered holder of the mutilated, defaced, destroyed, stolen or lost certificate.

(b)    Whenever any Security, alleged to have been lost, stolen or destroyed in replacement for which a new Security has been issued, is presented to the Fiscal Agent or any Paying Agent for payment at maturity or at redemption or for registration of transfer or exchange, the Fiscal Agent or the Paying Agent, as the case may be, shall immediately notify the Republic in respect thereof and shall deal with such Security in accordance with the Republic's instructions.

9.    <u>Redemption and Purchases</u>.    (a)    Unless otherwise permitted by the terms of the Securities of a Series, Securities will not be redeemable prior to maturity at the option of the Republic or the registered holders thereof.

(b)    The Republic hereby authorizes and directs the Fiscal Agent to administer the sinking fund with respect to the Securities of any Series having a mandatory sinking fund or similar provision in accordance with the provisions set forth in the terms of the Securities of such Series.    If the provisions of the Securities of a Series permit the Republic to redeem Securities of such Series at its option, then the Republic shall, unless otherwise provided in the terms of the Securities of such Series, give written notice to the Fiscal Agent of the principal amount of Securities of such Series to be so redeemed not less than 60 days prior to

12

the optional redemption date.  If the provisions of the
Securities of a Series permit the Republic to redeem
Securities of such Series only upon the occurrence or
satisfaction of a condition or conditions precedent thereto,
then prior to the giving of notice of redemption of the
Securities of such Series, the Republic shall deliver to the
Fiscal Agent a certificate stating that the Republic is
entitled to effect such redemption and setting forth in
reasonable detail a statement of facts showing that such
condition or conditions precedent have occurred or been
satisfied.  If the provisions of the Securities of a Series
obligate the Republic at the request of the holders to
redeem Securities of such Series upon the occurrence of
certain events (each hereinafter referred to as a
"Redemption Event"), then the Republic shall promptly
deliver written notice to the Fiscal Agent that a Redemption
Event has occurred.  Promptly after receiving written notice
of a Redemption Event, the Fiscal Agent shall deliver
written notice to each holder of the Securities of such
Series stating that a Redemption Event has occurred and that
such holder may tender its Securities by delivering written
notice of its election to tender for redemption, together
with the certificate or certificates for the Securities to
be redeemed, to the Fiscal Agent within 60 days of the
Fiscal Agent's notice (hereinafter referred to as the
"Option Period").  Thereafter, the Republic shall (i) in the
manner provided in the provisions of the Securities of such
Series and as contemplated by Section 6 hereof, arrange with
the Fiscal Agent (and each Paying Agent for the purpose, if
applicable) for the provision of funds sufficient to make
payments to such holders in respect of such redemptions, and
(ii) redeem such Securities within 60 days of the expiration
of the Option Period.  The Fiscal Agent shall provide the
Republic from time to time during and upon expiration of the
Option Period with reasonable detailed information as to
Securities tendered for redemption.

        All notices of redemption of or Redemption Events
relating to Securities of a Series to the holders thereof
shall be made in the name and at the expense of the Republic
and shall be given in accordance with the provisions
applicable thereto set forth in the terms of the Securities
of such Series.

        Whenever less than all the Securities of a Series
with the same interest rate and maturity at any time
outstanding are to be redeemed at the option of the
Republic, the particular Securities of such Series with such
interest rate and maturity to be redeemed shall be selected
not more than 60 days prior to the redemption date by the
Fiscal Agent from the outstanding Securities of such Series

13

ARG 0016

not previously called for redemption by such usual method as
the Fiscal Agent shall deem fair and appropriate, which
method may provide for the selection for redemption of
portions of the principal amount of registered Securities of
such Series the minimum denominations of which, if any, will
be specified in the terms of the Securities of such Series.
Upon any partial redemption of a registered Security of a
Series, the Fiscal Agent shall authenticate and deliver in
exchange therefor one or more registered Securities of such
Series, of any authorized denomination and like tenor as
requested by the holder thereof, in aggregate principal
amount equal to the unredeemed portion of the principal of
such Security.

(c)  The Republic may at any time purchase
Securities at any price in the open market or otherwise,
provided that in any such case such purchase or purchases
are in compliance with all relevant laws, regulations and
directives.  Securities so purchased by the Republic, may,
at the Republic's discretion, be held, resold or surrendered
to the Fiscal Agent for cancellation.  The Securities so
purchased, while held by or on behalf or for the benefit of
the Republic shall not entitle the registered holder thereof
to vote at any meetings of registered holders of Securities
and shall not be deemed to be outstanding for the purposes
of calculating quorums at meetings of the registered holders
of the Securities.  Notwithstanding the foregoing, the
Republic will not acquire any beneficial interest in any
Securities unless it gives prior written notice of each
acquisition to the Fiscal Agent.  The Fiscal Agent will be
entitled to rely without further investigation on any such
notification (or lack thereof).

(d)  If the Republic elects to cancel any
Securities when Securities have been issued in the form of a
Global Security, it may request the Fiscal Agent to instruct
the Depositary to reduce the outstanding aggregate principal
amount of the Global Securities in accordance with the
regular procedures of the Depositary in effect at such time.

10.  Cancellation and Destruction.  All Securities
which are paid at maturity or upon earlier repurchase, or
are mutilated, defaced or surrendered in exchange for other
certificates, shall be cancelled by the Fiscal Agent who
shall register such cancellation.  The Fiscal Agent shall,
as soon as practicable after the date of any such
cancellation, furnish the Republic with a certificate or
certificates stating the serial numbers and total number of
Securities that have been cancelled.  The Fiscal Agent shall
destroy all cancelled Securities in accordance with the
instructions of the Republic and shall furnish to the

14

ARG 0017

Republic, on a timely basis, certificates of destruction
stating the serial numbers, dollar value and total number of
all Securities destroyed hereunder.

11.  <u>Negative Pledge and Covenants</u>.  So long as
any Security remains outstanding, save for the exceptions
set forth below, the Republic will not create or permit to
subsist any lien, pledge, mortgage, security interest, deed
of trust, charge or other encumbrance or preferential
arrangement which has the practical effect of constituting a
security interest ("Lien") upon the whole or any part of its
assets or revenues to secure any Public External
Indebtedness of the Republic unless, at the same time or
prior thereto, the Republic's obligations under the
Securities either (i) are secured equally and ratably
therewith, or (ii) have the benefit of such other security,
guarantee, indemnity or other arrangement as shall be
approved by the holders of the Securities (as provided in
Section 16).

Notwithstanding the foregoing, the Republic may
permit to subsist:

(i)   any Lien upon property to secure Public
External Indebtedness of the Republic incurred for the
purpose of financing the acquisition of such property;
any renewal or extension of any such Lien which is
limited to the original property covered thereby and
which secures any renewal or extension of the original
secured financing;

(ii)  any Lien existing on such property at the
time of its acquisition to secure Public External
Indebtedness of the Republic and any renewal or
extension of any such Lien which is limited to the
original property covered thereby and which secures any
renewal or extension of the original secured financing;

(iii) any Lien created in connection with the
transactions contemplated by the Republic of Argentina
1992 Financing Plan dated June 23, 1992 sent to the
international banking community with the communication
dated June 23, 1992 from the Minister of Economy and
Public Works and Services of Argentina (the "1992
Financing Plan") and the implementing documentation
therefor, including any Lien to secure obligations
under the collateralized securities issued thereunder
(the "Par and Discount Bonds") and any Lien securing
indebtedness outstanding on the date hereof to the
extent required to be equally and rateably secured with
the Par and Discount Bonds;

15

ARG 0018

(iv)   any Lien in existence on the date of this Agreement;

(v)   any Lien securing Public External Indebtedness of the Republic issued upon surrender or cancellation of any of the Par and Discount Bonds or the principal amount of any indebtedness outstanding as of June 23, 1992, in each case, to the extent such Lien is created to secure such Public Indebtedness on a basis comparable to the Par and Discount Bonds;

(vi)   any Lien on any of the Par and Discount Bonds; and

(vii)   any Lien securing Public External Indebtedness incurred for the purpose of financing all or part of the costs of the acquisition, construction or development of a project provided that (a) the holders of such Public External Indebtedness expressly agree to limit their recourse to the assets and revenues of such project as the principal source of repayment of such Public External Indebtedness and (b) the property over which such Lien is granted consists solely of such assets and revenues.

For purposes of this Agreement:

"External Indebtedness" means obligations (other than the Securities) for borrowed money or evidenced by securities, debentures, notes or other similar instruments denominated or payable, or which at the option of the holder thereof may be payable, in a currency other than the lawful currency of the Republic provided that no Domestic Foreign Currency Indebtedness, as defined below, shall constitute External Indebtedness.

"Public External Indebtedness" means, with respect to the Republic, any External Indebtedness of, or guaranteed by, the Republic which (i) is publicly offered or privately placed in securities markets, (ii) is in the form of, or represented by, securities, notes or other securities or any guarantees thereof and (iii) is, or was intended at the time of issue to be, quoted, listed or traded on any stock exchange, automated trading system or over-the-counter or other securities market (including, without prejudice to the generality of the foregoing, securities eligible for PORTAL or a similar market for the trading of securities eligible for sale pursuant to Rule 144A under the U.S. Securities Act of 1933 (or any successor law or regulation of similar effect)).

16

ARG 0019

"Domestic Foreign Currency Indebtedness" means (i) the following indebtedness:  (a) Bonos del Tesoro issued under Decree No. 1527/91 and Decree No. 1730/91, (b) Bonos de Consolidación issued under Law No. 23,982 and Decree No. 2140/91, (c) Bonos de Consolidación de Deudas Previsionales issued under Law No. 23,982 and Decree No. 2140/91, (d) Bonos de la Tesorería a 10 Años de Plazo issued under Decree No. 211/92 and Decree No. 526/92, (e) Bonos de la Tesorería a 5 Años Plazo issued under Decree No. 211/92 nd Decree No. 526/92, (f) Ferrobonos issued under Decree No. 52/92 and Decree No. 526/92 and (g) Bonos de Consolidación de Regalías Hidrocarburíferas a 16 Años de Plaxo issued under Decree No 2284/92 and Decree No. 54/93; (ii) any indebtedness issued in exchange, or as replacement, for the indebtedness referred to in (i) above; and (iii) any other indebtedness payable by its terms, or which at the option of the holder thereof may be payable, in a currency other than the lawful currency of the Republic of Argentina which is (a) offered exclusively within the Republic of Argentine or (b) issued in payment, exchange, substitution, discharge or replacement of indebtedness payable in the lawful currency of the Republic of Argentine; provided that in no event shall the following indebtedness be deemed to constitute "Domestic Foreign Currency Indebtedness":  (1) Bonos Externos de la República Argentina issued under Law No. 19,686 enacted on June 15, 1972 and (2) any indebtedness issued by the Republic in exchange, or as replacement, for any indebtedness referred to (1) above.

12.  <u>Default: Acceleration of Maturity.</u>  If any of the following events ("Events of Default") with respect to the Securities of any Series occurs and is continuing:

(a)  Non-Payment:  the Republic fails to pay any principal of any of the Securities of such Series when due and payable or fails to pay any interest on any of the Securities of such Series when due and payable and such failure continues for a period of 30 days; or

(b)  Breach of Other Obligations:  the Republic does not perform or comply with any one or more of its other obligations in the Securities of such Series or in this Agreement, which default is incapable of remedy or is not remedied within 90 days after written notice of such default shall have been given to the Republic by the Fiscal Agent; or

(c)  Cross Default:  any event or condition shall occur which results in the acceleration of the maturity (other than by optional or mandatory prepayment or redemption) of the Securities of any other Series or of any

17

Public External Indebtedness of the Republic having an aggregate principal amount of U.S. $30,000,000 or more, or any default in the payment of principal of, or premium or prepayment charge (if any) or interest on, the Securities of any other Series or any such Public External Indebtedness having an aggregate principal amount of U.S. $30,000,000 or more, shall occur when and as the same shall become due and payable, if such default shall continue for more than the period of grace, if any, originally applicable thereto; or

(d)    Moratorium:  a moratorium on the payment of principal of, or interest on, the Public External Indebtedness of the Republic shall be declared by the Republic or;

(e)    Validity:  the validity of the Securities of such Series shall be contested by the Republic;

then the holders of not less than 25 percent in aggregate principal amount of the Securities of such Series by notice in writing to the Republic at the specified office of the Fiscal Agent shall declare the principal amount of all the Securities of such Series to be due and payable immediately, and, in the case of (a) and (d) above, each holder of Securities of such Series may by such notice in writing declare the principal amount of Securities of such Series held by it to be due and payable immediately, and upon any such declaration the same shall become and shall be immediately due and payable upon the date that such written notice is received by the Republic unless prior to such date all Events of Default in respect of all the Securities of such Series shall have been cured; provided that in the case of (b), (d) and (e) above, such event is materially prejudicial to the interests of the holders of the Securities of such Series, and provided further, that if, at any time after the principal of the Securities of such Series shall have been so declared due and payable, and before any sale of property under any judgment or decree for the payment of the monies due shall have been obtained or entered as hereinafter provided, the Republic shall pay or shall deposit with the Fiscal Agent a sum sufficient to pay all matured amounts of interest and principal upon all the Securities which shall have become due and otherwise than solely by declaration (with interest on overdue amounts of interest, to the extent permitted by law, and on such principal of each of the Securities at the rate of interest applicable thereto, to the date of such payment or deposit) and the expenses of the Fiscal Agent, and reasonable compensation to the Fiscal Agent, its agents, legal advisers, and any and all defaults under the Securities of such Series, other than the non-payment of principal on the

18

ARG 0021

Securities of such Series which shall have become due solely
by declaration, shall have been remedied, then, and in every
such case, the holders of 75 percent in aggregate principal
amount of the Securities of such Series then outstanding,
after a meeting of holders of Securities held in accordance
with the procedures described in Section 16 below, by
written notice to the Republic at the specified office of
the Fiscal Agent, may on behalf of the holders of all of the
Securities of such Series waive all defaults and rescind and
annul such declaration and its consequences: but no such
waiver or rescission and annulment shall extend to or shall
affect any subsequent default, or shall impair any right
consequent thereon.

13.    (a)    <u>Limit on Liability</u>.    In acting under
this Agreement the Fiscal Agent and any Paying Agent are
acting solely as agents of the Republic and do not assume
any obligation or relationship of agency or trust for or
with any of the holders of the Securities, except that all
funds held by the Fiscal Agent for payment of principal or
interest shall be held in trust, subject to the provisions
of Section 6.

(b)    <u>Acceptance of Appointment</u>.    The Fiscal Agent
and each Paying Agent accepts its obligations set forth in
or arising under this Agreement, the Paying Agency
Agreements and the Securities upon the terms and conditions
hereof and thereof, including the following, to all of which
the Republic agrees and to all of which the holders of the
Securities shall be subject:

(i)    the Fiscal Agent may consult as to legal
matters with lawyers selected by it, who may be
employees of or regular independent counsel to the
Republic, and the Fiscal Agent shall be protected and
shall incur no liability for action taken, or suffered
to be taken, with respect to such matters in good faith
and in accordance with the opinion of such lawyers; and

(ii)    the Fiscal Agent and each Paying Agent, and
their officers, directors and employees, may become the
holder of, or acquire any interest in, any Securities,
with the same rights that it or they would have if it
were not the Fiscal Agent or a Paying Agent hereunder,
or they were not such officers, directors, or
employers, and may engage or be interested in any
financial or other transaction with the Republic and
may act on, or as depository, trustee or agent for, any
committee or body of holders of Securities or other
obligations the Republic as freely as if it were not

19

ARG 0022

the Fiscal Agent or a Paying Agent hereunder or they were not such officers, directors, or employees.

14.  Expenses and Indemnity.  (a)  In connection with the Fiscal Agent's appointment and duties as Fiscal Agent, the Republic will pay the Fiscal Agent compensation agreed upon by them.  The Republic will indemnify the Fiscal Agent and each Paying Agent against any loss or liability and agrees to pay or reimburse the Fiscal Agent and each Paying Agent for any reasonable expense, which loss, liability or reasonable expense may be incurred by the Fiscal Agent or any Paying Agent by reason of, or in connection with, the Fiscal Agent's or any Paying Agent's appointment and duties as such, except as such result from the negligence, bad faith or wilful misconduct of the Fiscal Agent or any Paying Agent or their respective directors, officers, employees or agents.  In addition, the Republic shall pursuant to arrangements separately agreed upon by the Republic and the Fiscal Agent, transfer to the Fiscal Agent, upon presentation of substantiating documentation satisfactory to the Republic, amounts sufficient to reimburse the Fiscal Agent for certain out-of-pocket expenses reasonably incurred by it and by any Paying Agent in connection with their services.  The obligation of the Republic under this paragraph shall survive payment of the Securities and resignation or removal of the Fiscal Agent.

(b)  The Fiscal Agent and each Paying Agent agrees to indemnify and hold harmless the Republic against all direct claims, actions, demands, damages, costs, losses and liabilities (excluding consequential and punitive damages) arising out of or relating to the bad faith or wilful misconduct of the Fiscal Agent or any Paying Agent or their respective directors, officers, employees or agents.

15.  Successor Fiscal Agent.  (a)  The Republic agrees that there shall at all times be a Fiscal Agent hereunder, and that the Fiscal Agent shall be a bank or trust company organized and doing business under the laws of the United States of America or of the State of New York, in good standing and having a place of business in the Borough of Manhattan, The City of New York, and authorized under such laws to exercise corporate trust powers.

Any corporation or bank into which the Fiscal Agent hereunder may be merged or converted, or any corporation with which the Fiscal Agent may be consolidated, or any corporation or bank resulting from any merger, conversion or consolidation to which the Fiscal Agent shall sell or otherwise transfer all or substantially all of the corporate trust business of the Fiscal Agent, provided that

20

ARG 0023

it shall be qualified as aforesaid, shall be the successor
Fiscal Agent under this Agreement without the execution or
filing of any paper or any further act on the part of any of
the parties hereto, but subject to prior notice to and the
prior approval of the Republic.

      (b)   The Fiscal Agent may at any time resign by
giving written notice to the Republic of its resignation,
specifying the date on which its resignation shall become
effective (which shall not be less than 120 days after the
date on which such notice is given unless the Republic shall
agree to a shorter period); provided that no such notice
shall expire less than 30 days before or 30 days after the
due date for any payment of principal or interest in respect
of the Securities.  The Republic may remove the Fiscal Agent
at any time by giving written notice to the Fiscal Agent
specifying the date on which such removal shall become
effective.  Such resignation or removal shall only take
effect upon the appointment by the Republic of a successor
Fiscal Agent and upon the acceptance of such appointment by
such successor Fiscal Agent.  Any Paying Agent may resign or
may be removed at any time upon like notice, and the
Republic in any such case may appoint in substitution
therefor a new Paying Agent or Paying Agents.

      (c)   The appointment of the Fiscal Agent hereunder
shall forthwith terminate, whether or not notice of such
termination shall have been given, if at any time the Fiscal
Agent becomes incapable of performing its duties hereunder,
or is adjudged bankrupt or insolvent, or files a voluntary
petition on bankruptcy or makes an assignment for the
benefit of its creditors or consents to the appointment of a
liquidator or receiver of all or any substantial part of its
property or admits in writing its inability to pay or meet
its debts as they mature or suspends payment thereof, or if
a resolution is passed or an order made for the winding up
or dissolution of the Fiscal Agent, or if a liquidator or
receiver of the Fiscal Agent of all or any substantial part
of its property is appointed, or if any order of any court
is entered approving any petition filed by or against it
under the provisions of any applicable bankruptcy or
insolvency law or if any public officer takes charge or
control of the Fiscal Agent or its property or affairs for
the purposes of rehabilitation, conservation or liquidation.

      (d)   Prior to the effective date of any such
resignation or removal of the Fiscal Agent, or if the Fiscal
Agent shall become unable to act as such or shall cease to
be qualified as aforesaid, the Republic shall appoint a
successor Fiscal Agent, qualified as aforesaid.  Upon the
appointment of a successor Fiscal Agent and its acceptance

ARG 0024

of such appointment, the retiring Fiscal Agent shall, at the direction of the Republic and upon payment of its compensation and expenses then unpaid, deliver and pay over to its successor any and all securities, money and any other properties then in its possession as Fiscal Agent and shall thereupon cease to act hereunder.

Any successor Fiscal Agent appointed hereunder shall execute, acknowledge and deliver to its predecessor and to the Republic an instrument accepting such appointment hereunder, and thereupon such successor without any further act, deed or conveyance, shall become vested with all the authority, rights, powers, trusts, immunities, duties and obligations of such predecessor, with like effect as if originally named Fiscal Agent hereunder.

(e)    If the Fiscal Agent resigns or ceases to act as the Republic's fiscal agent in respect of the Securities pursuant to Section 15(c) of this Agreement, the Fiscal Agent shall only be entitled to annual fees otherwise payable to it under this Agreement on a pro rata basis for that period since the most recent anniversary of this Agreement during which the Fiscal Agent has acted as fiscal agent hereunder.  In the event that the Fiscal Agent ceases to act as the Republic's fiscal agent in respect of the Securities for any other reason, the Fiscal Agent shall be entitled to receive the full amount of the annual fees payable to it in respect of the Securities pursuant to Section 14 of this Agreement.

16.    <u>Meetings of Holders of Securities;</u> <u>Modifications</u>.    (a)    A meeting of registered holders of Securities of any Series may be called at any time and from time to time to make, give or take any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Agreement or the Securities of any Series to be made, given or taken by registered holders of Securities of any Series or to modify, amend or supplement the terms of the Securities of any Series or this Agreement as hereinafter provided.  The Fiscal Agent may at any time call a meeting of registered holders of Securities of any Series for any such purpose to be held at such time and at such place as the Fiscal Agent shall determine.  Notice of every meeting of registered holders of Securities of any Series, setting forth the time and the place of such meeting and in general terms the action proposed to be taken at such meeting, shall be given as provided in the terms of the Securities of any Series, not less than 30 nor more than 60 days prior to the date fixed for the meeting.  In case at any time the Republic or the registered holders of at least 10% in aggregate principal amount of the Outstanding

22

ARG 0025

Securities of any Series (as defined in subsection (d) of this Section) shall have requested the Fiscal Agent to call a meeting of the registered holders of Securities of any Series for any such purpose, by written request setting forth in reasonable detail the action proposed to be taken at the meeting, the Fiscal Agent shall call such meeting for such purposes by giving notice thereof.

To be entitled to vote at any meeting of registered holders of Securities of any Series, a person shall be a registered holder of Outstanding Securities of any Series or a person duly appointed by an instrument in writing as proxy for such a holder. Any person appointed by an instrument in writing as proxy for a registered holder need not be a registered holder of Outstanding Securities of any Series. At any meeting each registered holder shall be entitled to one vote for each of those amounts held by such holder which represent the lowest denomination in which Securities of such Series as to which such holder is a holder may be transferred. The persons entitled to vote a majority in principal amount of the Outstanding Securities of any Series shall constitute a quorum. At the reconvening of any meeting adjourned for a lack of a quorum, the persons entitled to vote 25% in principal amount of the Outstanding Securities of any Series shall constitute a quorum for the taking of any action set forth in the notice of the original meeting. The Fiscal Agent may make such reasonable and customary regulations as it shall deem advisable for any meeting of registered holders of Securities of any Series with respect to the appointment of proxies in respect of registered holders of Securities, the record date for determining the registered holders of Securities who are entitled to vote at such meeting (which date shall be set forth in the notice calling such meeting hereinabove referred to and which shall be not less than 30 nor more than 90 days prior to such meeting, the adjournment and chairmanship of such meeting) the appointment and duties of inspectors of votes, the submission and examination of proxies, certificates and other evidence of the right to vote, and such other matters concerning the conduct of the meeting as it shall deem appropriate.

(b)    (i)    At any meeting of registered holders of Securities of a Series duly called and held as specified above, upon the affirmative vote, in person or by proxy thereunto duly authorized in writing, of the registered holders of not less than 66 2/3% in aggregate principal amount of the Securities of any Series then Outstanding (or of such other percentage as may be set forth in the Securities of any Series with respect to the action being taken), or (ii) with the written consent of the owners of

23

ARG 0026

not less than 66 2/3% in aggregate principal amount of the Securities of any Series then Outstanding (or of such other percentage as may be set forth in the text of the Securities of any Series with respect to the action being taken), the Republic and the Fiscal Agent may modify, amend or supplement the terms of the Securities of any Series or this Agreement, in any way, and the registered holders of Securities of any Series may make, take or give any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Agreement or the Securities of any Series to be made, given, or taken by registered holders of Securities of any Series; provided, however, that no such action may, without the consent of the registered holder of each Security of such Series, (A) change the due date for the payment of the principal of (or premium, if any,) or any installment of interest on any Security of such Series, (B) reduce the principal amount of any Security of such Series, the portion of such principal amount which is payable upon acceleration of the maturity of such Security, the interest rate thereon or the premium payable upon redemption thereof, (C) change the coin or currency in which or the required places at which payment with respect to interest, premium or principal in respect of Securities of such Series is payable, (D) amend the definition of Redemption Event in the Securities of such Series or the procedures provided therefore, (E) shorten the period during which the Republic is not permitted to redeem the Securities of such Series if, prior to such action, the Republic is not permitted to do so, (F) reduce the proportion of the principal amount of Securities of such Series the vote or consent of the holders of which is necessary to modify, amend or supplement this Agreement or the terms and conditions of the Securities of such Series or to make, take or give any request, demand, authorization, direction, notice, consent, waiver or other action provided hereby or thereby to be made, taken or given, or (G) change the obligation of the Republic to pay additional amounts.

The Fiscal Agent and the Republic may agree, without the consent of the registered holders of Securities of any Series, to (i) any modification of any provisions of the Fiscal Agency Agreement which is of a formal, minor or technical nature or is made to correct a manifest error and (ii) any other modification (except as mentioned in this Agreement), and any waiver or authorization of any breach or proposed breach, of any of the provisions of this Agreement which is in the opinion of the Fiscal Agent not materially prejudicial to the interests of the registered holders of Securities. Any such modification, authorization or waiver shall be binding on the registered holders of Securities of any Series and, if the Fiscal Agent so requires, such

24

ARG 0027

modification shall be notified to the registered holders of
Securities of any Series as soon as practicable.

It shall not be necessary for the vote or consent
of the registered holders of the Securities of any Series to
approve the particular form of any proposed modification,
amendment, supplement, request, demand, authorization,
direction, notice, consent, waiver or other action, but it
shall be sufficient if such vote or consent shall approve
the substance thereof.    -

(c)   Any instrument given by or on behalf of any
registered holder of a Security in connection with any
consent to or vote for any such modification, amendment,
supplement, request, demand, authorization, direction,
notice, consent, waiver or other action will be irrevocable
once given and will be conclusive and binding on all
subsequent registered holders of such Security or any
Security issued directly or indirectly in exchange or
substitution therefor or in lieu thereof.  Any such
modification, amendment, supplement, request, demand,
authorization, direction, notice, consent, waiver or other
action with respect to the Securities of a Series will be
conclusive and binding on all registered holders of
Securities of such Series, whether or not they have given
such consent or cast such vote, and whether or not notation
of such modification, amendment, supplement, request,
demand, authorization, direction, notice, consent, waiver or
other action is made upon the Securities of such Series.
Notice of any modification or amendment or, supplement to,
or request, demand, authorization, direction, notice,
consent, waiver or other action with respect to the
Securities of such Series or this Agreement (other than for
purposes of curing any ambiguity or of curing, correcting or
supplementing any defective provision hereof or thereof)
shall be given to each registered holder of Securities of
such Series, in all cases as provided in the Securities of
such Series.

Securities of any Series authenticated and
delivered after the effectiveness of any such modification,
amendment, supplement, request, demand, authorization,
direction, notice, consent, waiver or other action with
respect to such Series may bear a notation in the form
approved by the Fiscal Agent and the Republic as to any
matter provided for in such modification, amendment,
supplement, request, demand, authorization, direction,
notice, consent, waiver or other action.  New Securities
modified to conform, in the opinion of the Fiscal Agent and
the Republic, to any such modification, amendment,
supplement, request, demand, authorization, direction,

25

ARG 0028

notice, consent, waiver or other action may be prepared by the Republic, authenticated by the Fiscal Agent (or any authenticating agent appointed pursuant to Section 3 hereof) and delivered in exchange for Outstanding Securities of any Series.

(d)  For purposes of the provisions of this Agreement and the Securities of any Series, any Security authenticated and delivered pursuant to this Agreement shall, as of any date of determination, be deemed to be "Outstanding", except:

(i)  Securities of any Series theretofore cancelled by the Fiscal Agent or delivered to the Fiscal Agent for cancellation or held by the Fiscal Agent for reissuance but not reissued by the Fiscal Agent; or

(ii)  Securities of any Series which have become due and payable at maturity or otherwise and with respect to which monies sufficient to pay the principal thereof, premium, if any, and any interest thereon shall have been made available to the Fiscal Agent;

provided, however, that in determining whether the registered holders of the requisite principal amount of Outstanding Securities of any Series are present at a meeting of registered holders of Securities for quorum purposes or have consented to or voted in favor of any request, demand, authorization, direction, notice, consent, waiver, amendment, modification or supplement hereunder, Securities of any Series owned directly or indirectly by the Republic shall be disregarded and deemed not to be Outstanding.

17.  Further Issues.  The Republic may from time to time, without notice to or the consent of the registered holders of the Securities of a Series, create and issue further securities ranking pari passu with the Securities of such Series in all respects (or in all respects except for the payment of interest accruing prior to the issue date of such further securities or except for the first payment of interest following the issue date of such further securities) and so that such further securities shall be consolidated and form a single series with the Securities of such Series and shall have the same terms as to status, redemption or otherwise as the Securities.

18.  Reports.  (a)  The Fiscal Agent shall furnish to the Republic such reports as may be required by the Republic relative to the Fiscal Agent's performance under

26

ARG 0029

this Agreement.  The Republic may, whenever it deems it necessary, inspect books and records maintained by the Fiscal Agent pursuant to this Agreement, if any.

(b)  The Fiscal Agent shall (on behalf of the Holders) submit such reports or information as may be required from time to time in relation to the issue and purchase of Securities by applicable law, regulations and guidelines promulgated by the United States government.

(c)  The Republic covenants to notify the Fiscal Agent in writing immediately on becoming aware of any Event of Default or any event or circumstance which could with the giving of notice or lapse of time become an Event of Default (a "Potential Event of Default").

(d)  The Republic will send to the Fiscal Agent, on or before December 31 in each year (beginning with December 31, 1994), and within 14 days after any written notice by the Fiscal Agent, a certificate of the Republic signed by a duly authorized official of the Republic to the effect that, having made all reasonable inquiries, to the best knowledge of such duly authorized official, no Event of Default or Potential Event of Default has occurred and is continuing on the date of such certificate or, if an Event of Default or a Potential Event of Default has occurred, the circumstances surrounding it and the steps that the Republic has taken or proposes to take to remedy it.

(e)  The Republic will send to the Fiscal Agent as soon as practicable after being so requested by the Fiscal Agent a certificate of the Republic, signed by a duly authorized official of the Republic stating the aggregate principal amount of the Securities held by or on behalf of the Republic at the date of such certificate.

19.  _Forwarding of Notice: Inquiries_.  (a)  If the Fiscal Agent shall receive any notice or demand addressed to the Republic pursuant to the provisions of the Securities, the Fiscal Agent shall promptly forward such notice or demand to the Republic.

(b)  The Fiscal Agent shall respond promptly to any inquiries received from any registered holder of Securities regarding the matters covered by paragraphs (b), (c) or (d) of Section 18 of this Agreement.

20.  _Listings_.  In the event that the terms of the Securities of any Series provide for a listing on any stock exchange, the Republic agrees to use all reasonable endeavors to maintain the listing of the Securities on such

27

ARG 0030

exchange. If, however, it is unable to do so, having used such endeavors, or if the maintenance of such listing is agreed by the Fiscal Agent to be unduly onerous and the Fiscal Agent is satisfied that the interests of registered holders of the Securities would not thereby be materially prejudiced, it will instead use all reasonable endeavors to obtain and maintain a listing of the Securities on such other stock exchange or exchanges as it may decide.

21. <u>Notices</u>. (a) Any communications from the Republic to the Fiscal Agent with respect to this Agreement shall be addressed to Bankers Trust Company, 4 Albany Street, New York, New York 10006, Fax No.: 212-250-6961 or 212-250-6392, Tel. No.: 212-250-6571 and any communications from the Fiscal Agent to the Republic with respect to this Agreement shall be addressed to the Subsecretaría de Financiamiento, Hipolito Yrigoyen 250, Piso 10 - Oficina 1001, 1310 - Buenos Aires, Attention: Deuda Externa, Fax No.: 011-54-1-349-6080, Tel. No.: 011-541-349-6242 (or such other address as shall be specified in writing by the Fiscal Agent or by the Republic, as the case may be) and shall be delivered in person or sent by first class prepaid post or by facsimile transmission subject, in the case of facsimile transmission, to confirmation by telephone to the foregoing addresses. Such notice shall take effect in the case of delivery in person, at the time of delivery, in the case of delivery by first class prepaid post seven (7) business days after dispatch and in the case of delivery by facsimile transmission, at the time of confirmation by telephone.

(b) All notices to the registered holders of Securities of a Series will be published in such publications at such locations as any of the Securities of such Series are listed for the period of time of such listing and as otherwise provided pursuant to the terms of the Securities of such Series. If at any time publication in any such publication is not practicable, notices will be valid if published in an English language newspaper with general circulation in the respective market regions as the Republic with the approval of the Fiscal Agent, shall determine. [In addition, notices will be published in Spanish in a newspaper of general circulation in Argentina, as the Republic shall determine.] Any such notice shall be deemed to have been given on the date of such publication or, if published more than once or on different dates, on the first date on which publication is made. Written notice will also be given to the Depositary, if at the time of such notice any of the Securities is represented by a Global Security.

28

ARG 0031

22.   <u>Consent to Service; Jurisdiction</u>.  The Republic hereby appoints Banco de la Nación Argentina, at its office located at 299 Park Avenue, New York, New York 10171, and, if such person is not maintained by the Republic as its agent for such purpose, the Republic will appoint CT Corporation System to act as its agent for such purpose] as its authorized agent (the "Authorized Agent") upon whom process may be served in any action arising out of or based on the Securities or this Agreement by the holder of any Security which may be instituted in any state or federal court in The City of New York, and expressly accepts the jurisdiction of any such court in respect of such action. Such appointment shall be irrevocable until all amounts in respect of the principal of and any interest due and to become due on or in respect of all the Securities have been provided to the Fiscal Agent pursuant to the terms hereof, except that, if for any reason, such Authorized Agent ceases to be able to act as Authorized Agent or to have an address in the Borough of Manhattan, The City of New York, the Republic will appoint another person in the Borough of Manhattan, The City of New York, selected in its discretion, as such Authorized Agent.  Prior to the date of issuance of any Securities hereunder, the Republic shall obtain the consent of Banco de la Nación Argentina to its appointment as such Authorized Agent, a copy of which acceptance it shall provide to the Fiscal Agent.  The Republic shall take any and all action, including the filing of any and all documents and instruments, that may be necessary to continue such appointment or appointments in full force and effect as aforesaid.  Upon receipt of such service of process, the Authorized Agent shall advise the Subministry of Finance promptly by telecopier at 011-54-1-349-6080.  Service of process upon the Authorized Agent at the address indicated above, as such address may be changed within the Borough of Manhattan, The City of New York by notice given by the Authorized Agent to each party hereto, shall be deemed, in every respect, effective service of process upon the Republic.  The Republic hereby irrevocably and unconditionally waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any aforesaid action arising out of or in connection with this Agreement brought in any such court has been brought in an inconvenient forum.  Neither such appointment nor such acceptance of jurisdiction shall be interpreted to include actions brought under the United States federal securities laws.  This appointment and acceptance of jurisdiction is intended to be effective upon execution of this agreement without any further act by the Republic before any such court and introduction of a true copy of this Agreement into evidence shall be conclusive and final evidence of such waiver.

29

ARG 0032

Notwithstanding the foregoing, any action arising out of or based on the Securities may be instituted by the holder of any Security in any competent court in the Republic of Argentina.

The Republic hereby irrevocably waives and agrees not to plead any immunity from the jurisdiction of any such court to which it might otherwise be entitled in any action arising out of or based on the Securities or this Agreement by the holder of any Security.

23.  <u>Governing Law and Counterparts</u>.  This Agreement shall be governed by, and interpreted in accordance with, the laws of the State of New York.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

24.  <u>Headings</u>.  The headings for the sections of this Agreement are for convenience only and are not part of this Agreement.

ARG 0033

IN WITNESS WHEREOF, the parties hereto have executed this Fiscal Agency Agreement as of the date first above written.

THE REPUBLIC OF ARGENTINA

By: /s/ Noemi LaGreca
Name:  Noemi LaGreca
Title: Financial
   Representative of
      Argentina in the
      United States

BANKERS TRUST COMPANY

By: /s/ Wanda Camacho
Name:  Wanda Camacho
Title: Assistant
   Secretary

31

ARG 0034

EXHIBIT A - 2

EXHIBIT A

FORM OF REGISTERED SECURITY

[Form of Face
of Security]

[If the Security is a global Security, insert a legend
relating to limitations on the transferability of such
global Security in such form as may be required by the U.S.
Depositary.]

[INSERT ANY LEGEND(S) REQUIRED BY THE INTERNAL REVENUE CODE]

THE REPUBLIC OF ARGENTINA

[Title of Series of Securities]

No. R-_____                              [Principal Amount]

Issue Price:

Original Issue Date:

Maturity Date:

Currency of Denomination:

Option to Receive Payments
in Specified Currency:            _____ Yes    _____ No

Authorized Denominations:

Form:                             ( ) Book-Entry
                                  ( ) Certificated

Initial Interest
Payment Date:

Interest Rate:

Interest Rate Reset:              ( ) The Interest Rate may not
                                  be changed prior to
                                  Maturity Date.

ARG 0035

( )  The Interest Rate may be
changed prior to Stated
Maturity (see attached).

Optional Reset Dates
(if applicable):

Interest Payment Dates:

Optional Extension of
Maturity Date:                    _____Yes  _____No

    Final Maturity:

Total Amount of OID:

Yield to Maturity:

Initial Accrual Period OID:

.Optional Redemption:              _____Yes  _____No

    Optional Redemption Dates:

    If applicable as described above, the Redemption Price
    shall initially be        % of the principal amount of
    this Security to be redeemed and shall decline at each
    anniversary of the Initial Redemption Date by        % of
    the principal amount to be redeemed until the
    Redemption Price is 100% of such principal amount;
    provided, however, that if this Security is a Discount
    Note (as defined below), the Redemption Price shall be
    the Amortized Face Amount (as defined below) of this
    Note.

Optional Repayment:               _____Yes  _____No

    Optional Repayment Dates:

    Optional Repayment Prices:

Conversion into or
Exchange for
Other Securities                  ( )  This Security may not be
                                       converted into or
                                       exchanged for other
                                       securities.

                                  ( )  This Security may be
                                       converted into or

2

ARG 0036

exchanged for _____
[specify securities].

Terms of Conversion
or Exchange
(if applicable):

Indexed Note:    _____ Yes (see attached) _____ No

Exchange Rate Agent:

Other Terms:              _____ Yes _____ No

A-3

ARG 0037

THE REPUBLIC OF ARGENTINA (herein called the "Republic"), for value received, hereby promises to pay to

or registered assigns, the principal sum of _____ U.S. Dollars (U.S.$ _____ ) [other currency] on _____ [If the Security is to bear interest prior to maturity, insert--, and to pay interest thereon from _____ or from the most recent Interest Payment Date to which interest has been paid or duly provided for, [specify frequency] in arrears on _____ [and _____ ] in each year, commencing _____ (each an "Interest Payment Date"), at the rate [of _____ % per annum] [to be determined in accordance with the provisions hereinafter set forth], until the principal hereof is paid or made available for payment. The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date will, as provided in the Fiscal Agency Agreement hereinafter referred to, be paid to the person (the "registered Holder") in whose name this Security (or one or more predecessor Securities) is registered in the register of such Securities maintained pursuant to the Fiscal Agency Agreement at the close of business on the date (whether or not a business day) [, as the case may be] (each a "Regular Record Date") [,] [ _____ calendar days] next preceding such Interest Payment Date; provided, however, that the first payment of interest on any Security originally issued on a date between a Regular Record Date and an Interest Payment Date or on an Interest Payment Date will be made on the Interest Payment Date following the next succeeding Regular Record Date to the registered Holder on such next succeeding Regular Record Date. Any such interest not so punctually paid or duly provided for will forthwith cease to be payable to the registered Holder on such Regular Record Date and may either be paid to the person in whose name this Security (or one or more predecessor Securities) is registered at the close of business on a special record date for the payment of such interest to be fixed by the Republic, notice whereof shall be given to registered Holders of Securities of this Series not less than 10 days prior to such special record date, or be paid at any time in any other lawful manner [not inconsistent with the requirements of any securities exchange on which the Securities of this series may be listed, and upon such notice as may be required by such exchange.]

[Insert floating interest rate provisions, if applicable.]

[If the Security is not to bear interest prior to maturity, insert--(the "Stated Maturity"). The principal of

A-4

ARG 0038

this Security shall not bear interest except in the case of a default in payment of principal upon acceleration, upon redemption or at Stated Maturity.]

Principal of (and premium, if any, on) [and interest payable at maturity or upon earlier redemption or repayment in respect of] this Security shall be payable in immediately available funds against surrender hereof at the corporate trust office of the Fiscal Agent hereinafter referred to and at the offices of such other Paying Agents as the Republic shall have appointed pursuant to the Fiscal Agency Agreement. Payments of principal of (and premium, if any[, on]) [and interest on] this Security shall be made in same-day funds in accordance with the foregoing and subject to applicable laws and regulations, by [(if the Republic so elects) transfer to an account denominated in U.S. dollars which is maintained by the payee with [any] [a] bank [located in _____]. If the Republic does not so elect, payments of principal (and premium, if any) shall be made against surrender of this Security [if applicable, insert--, and payments of interest shall be made,] by] forwarding by post or otherwise delivering a check [on or before the due date for such payment] to the registered address of the registered Holder of this Security. [If applicable, insert payment provisions for Securities denominated in a currency other than U.S. dollars]. This Security is a direct obligation of the Republic and does not have the benefit of any separate undertaking of other government entities (including Banco Central). The Republic covenants that until all amounts in respect of the principal and interest due and to become due on or in respect of this Security have been paid as provided herein or in the Fiscal Agency Agreement, it will at all times maintain offices or agencies in the Borough of Manhattan, The City of New York for the payment of the principal of [and premium, if any[, on]) [and interest on] the Securities as herein provided.

Reference is hereby made to the further provisions of this Security set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

Unless the certificate of authentication hereon has been executed by the Fiscal Agent by manual signature, this Security shall not be valid or obligatory for any purpose.

A-5

ARG 0039

IN WITNESS WHEREOF, the Republic has caused this instrument to be duly executed.

Dated:

THE REPUBLIC OF ARGENTINA

By_____
                [Title]

Attest:

_____
        [Title]

Date of Authentication:

This is one of the Securities of the series designated therein referred to in the within-mentioned Fiscal Agency Agreement.

BANKERS TRUST COMPANY,
as Fiscal Agent

By_____
        Authorized Signatory

A-6

ARG 0040

[Form of reverse
of Security]

This Security is one of a duly authorized issue of securities of the Republic (herein called the "Securities") issued and to be issued in one or more series in accordance with a Fiscal Agency Agreement, dated as of _____ (herein called the "Fiscal Agency Agreement"), between the Republic and Bankers Trust Company, as Fiscal Agent (herein called the "Fiscal Agent"), which term includes any successor fiscal agent under the Fiscal Agency Agreement), copies of which Fiscal Agency Agreement are on file and available for inspection at the corporate trust office of the Fiscal Agent in the Borough of Manhattan, The City of New York. This Security is one of the Securities of the Series designated on the face hereof[, limited in aggregate principal amount to U.S.$_____]. The Fiscal Agency Agreement may be amended from time to time in accordance with the terms thereof.

The Securities will constitute the direct, unconditional, unsecured and unsubordinated obligations of the Republic. Each Series will rank _pari passu_ with each other Series, without any preference one over the other by reason of priority of date of issue or currency of payment or otherwise, and at least equally with all other present and future unsecured and unsubordinated External Indebtedness (as defined in the Fiscal Agency Agreement) of the Republic.

The Securities of this Series are issuable only in fully registered form. The Securities are issuable in [the] authorized denomination[s] of [currency/U.S.$_____ [and [any integral multiple thereof] [integral multiples of [currency/U.S.$_____ above that amount]].

Until all amounts in respect of the principal and interest due and to become due on or in respect of this Security have been paid, the Republic shall maintain in the Borough of Manhattan, The City of New York, an office or agency where Securities may be surrendered for registration of transfer or exchange. The Republic has initially appointed the corporate trust office of the Fiscal Agent as its agent in the Borough of Manhattan, The City of New York, for such purpose and has agreed to cause to be kept at such office a register in which subject to such reasonable regulations as it may prescribe, the Republic will provide for the registration of Securities and of transfers of Securities. The Republic reserves the right to vary or terminate the appointment of the Fiscal Agent as security

A-7

ARG 0041

registrar or transfer agent or to appoint additional or other registrars or transfer agents or to approve any change in the office through which any security registrar or any transfer agent acts, provided that there will at all times be a security registrar in the Borough of Manhattan, The City of New York.

Subject to the provisions on the face hereof concerning transfer restrictions, the transfer of a Security is registrable on the aforementioned register upon surrender of such Security at the corporate trust office of the Fiscal Agent duly endorsed by, or accompanied by a written instrument of transfer in form attached hereto duly executed by, the registered Holder thereof or his attorney duly authorized in writing.  Upon such surrender of this Security for registration of transfer, the Republic shall execute, and the Fiscal Agent shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Securities, dated the date of authentication thereof, of any authorized denominations and of a like aggregate principal amount.

Subject to the provisions on the face hereof concerning transfer restrictions, at the option of the registered Holder upon request confirmed in writing, Securities may be exchanged for Securities of any authorized denominations and of a like aggregate principal amount, upon surrender of the Securities to be exchanged at the corporate trust office of the Fiscal Agent.  Any registration of transfer or exchange will be effected upon the Fiscal Agent being satisfied with the documents of title and identity of the person making the request and subject to such reasonable regulations as the Republic may from time to time agree with the Fiscal Agent.  Whenever any Securities are so surrendered for exchange, the Republic shall execute, and the Fiscal Agent shall authenticate and deliver, the Securities which the registered Holder making the exchange is entitled to receive.  The new Security issued upon such exchange shall be so dated that neither gain nor loss of interest shall result from such exchange.  [If the Security is a permanent global Security, insert--Notwithstanding the foregoing, the exchange of this Security is subject to certain limitations set forth in the Fiscal Agency Agreement and on the face hereof.]

[In the event of a redemption of the Securities of this series in part, the Republic shall not be required (i) to register the transfer of or exchange any Security during a period beginning at the opening of business 15 days before, and continuing until, the date notice is given identifying the Securities to be redeemed, or (ii) to

A-8

ARG 0042

register the transfer of or exchange any Security, or
portion thereof, called for redemption.]

All Securities issued upon any registration of
transfer or exchange of Securities shall be the valid
obligation of the Republic evidencing the same indebtedness
and entitled to the same benefits this Security has at the
time of such registration of transfer or exchange.

No service charge shall be made for any
registration of transfer or exchange, but the Republic may
require payment of a sum sufficient to cover any tax or
other governmental charge payable in connection therewith,
other than an exchange in connection with a partial
redemption of a Security not involving any registration of a
transfer.

Prior to due presentment of this Security for
registration of transfer, the Republic, the Fiscal Agent and
any agent of the Republic or the Fiscal Agent may treat the
person in whose name this Security is registered as the
owner hereof for all purposes, whether or not this Security
is overdue, and neither the Republic nor the Fiscal Agent
nor any such agent shall be affected by notice to the
contrary.

In any case where the due date or the payment of
the principal of (and premium, if any[, on]) [or interest
on] any Security[, or the date fixed for redemption of any
Security,] shall be, at any place from which any check in
respect thereof is to be mailed or where such Security is to
be surrendered for payment [or, in the case of payments by
transfer, where such transfer is to be made], a day on which
banking institutions [If the Securities are denominated in
U.S. dollars, insert--in The City of New York] [If the
Securities are denominated in a currency other than U.S.
Dollars, insert--in [name of financial center of the country
in whose currency the securities are denominated] are
authorized or obligated by law to close [If the Securities
are denominated in a currency other than U.S. Dollars,
insert--or a day on which banking institutions in [name of
non-U.S. financial center] are not carrying out transactions
in [name of non-U.S. currency]], then such payment need not
be made on such date at such place but may be made on the
next succeeding day at such place which is not a day on
which banking institutions are authorized or obligated by
law to close, with the same force and effect as if made on
the date for such payment payable in respect of any such
delay.

λ-9

ARG 0043

The Republic shall provide to the Fiscal Agent at
its principal office in the Borough of Manhattan, The City
of New York, prior to each date on which a payment on or in
respect of the Securities of this series shall become due,
monies in such amounts which (together with any amounts then
held by the Fiscal Agent and available for the purpose) are
sufficient to make such payment. Any monies provided by the
Republic to the Fiscal Agent for the payment on or in
respect of the Securities of this series and remaining
unclaimed at the end of two years after such payment shall
have become due shall then be returned to the Republic, and
upon the return of such monies all liabilities of the Fiscal
Agent with respect thereto shall cease, without, however,
limiting in any way any obligation the Republic may have to
pay the principal of (or premium, if any[, on]) [or interest
on] this Security as the same shall become due.

So long as any Security remains outstanding, save
for the exceptions set forth in the Fiscal Agency Agreement,
the Republic will not create or permit to subsist, or permit
Banco Central to create or permit to subsist, any lien,
pledge, mortgage, security interest, deed of trust, charge
or other encumbrance or preferential arrangement which has
the practical effect of constituting a security interest
("Lien") upon the whole or any part of its assets or
revenues to secure any Public External Indebtedness (as
defined in the Fiscal Agency Agreement) of the Republic or
Banco Central unless, at the same time or prior thereto, the
Republic's obligations under the Securities either (i) are
secured equally and ratably therewith, or (ii) have the
benefit of such other security, guarantee, indemnity or
other arrangement as shall be approved by not less than 66
2/3% of the registered holders of Securities of any Series
then outstanding.

If an Event of Default (as defined in the Fiscal
Agency Agreement) occurs and is continuing then the holders
of not less than 25 percent in aggregate principal amount of
the Securities of this Series, by notice in writing to the
Republic at the specified office of the Fiscal Agent, shall
declare the principal amount of all the Securities of this
Series to be due and payable as set forth in the Fiscal
Agency Agreement.

All payments of principal, premium, if any, and
interest on this Security by the Republic will be made free
and clear of, and without withholding or deduction for or on
account of, any present or future taxes, duties, assessments
or governmental charges of whatever nature imposed,
collected, withheld or assessed by or within the Republic or
any authority therein or thereof having power to tax

A-10

ARG 0044

(together "Taxes"), unless such withholding or deduction is required by law. In such event, the Republic shall pay such Additional Amounts as will result in receipt by the holders of Securities of this Series of such amounts of principal, premium and interest which would have been received by them had no such withholding or deduction been required, save for the exceptions set forth in the Fiscal Agency Agreement.

So long as any Security remains outstanding, the Republic covenants to maintain its membership in, and its eligibility to use the general resources of, the International Monetary Fund.

[The Securities of this Series will not be subject to any sinking fund and will not be redeemable except as described below.]

[The Securities of this Series are subject to redemption upon not less than 30 days' notice given as hereinafter provided, (if applicable, insert--(1) on _____ in any year commencing with the year _____ and ending with the year _____ through operation of the sinking fund for this series at a redemption price equal to 100% of the principal amount, (2)] [at any time [on or after _____, 19__], as a whole or in part, at the election of the Republic, at the following redemption prices (expressed as percentages of the principal amount of the Securities to be redeemed): If redeemed [on or before _____, ___%, _____ of the years indicated,

| Year | Redemption Price | Year | Redemption Price |
|------|------------------|------|------------------|
|      |                  |      |                  |

and thereafter at a redemption price equal to ___% of the principal amount, and (3)] under the circumstances described in the next succeeding paragraph at a redemption price equal to 100% of the principal amount of the Securities to be redeemed, together in each case with accrued interest (except if the redemption date is an Interest Payment Date) to the redemption date, but interest installments on Securities that are due on or prior to such redemption date will be payable to the holders of such Securities of record at the close of business on the relevant Record Dates referred to above; provided, that if the redemption date occurs between a Record Date and an Interest Payment Date, the interest due and payable will be paid to the holders of

A-11

ARG 0045

such Securities of record at the close of business on such Record Date. [Partial redemptions must be in an amount not less than U.S.$_____ principal amount of Securities.]

[As and for a sinking fund for the retirement of the Securities of this Series, the Republic will, until all Securities of this Series are paid or payment thereof provided for, deposit with the Fiscal Agent, prior to _____ in each year, commencing in ____ and ending in ____, an amount in cash sufficient to redeem on such _____ [not less than U.S.$_____ and not more than] U.S.$_____ principal amount of Securities of this Series at the redemption price specified above for redemption through operation of the sinking fund. [The minimum amount of any sinking fund payment as specified in this Paragraph is herein referred to as a "mandatory sinking fund payment", and any payment in excess of such minimum amount is herein referred to as an "optional sinking fund payment".] The cash amount of any [mandatory] sinking fund payment is subject to reduction as provided below. Each sinking fund payment shall be applied to the redemption of Securities in this Series on such _____ as herein provided. [The right to redeem Securities of this Series through optional sinking fund payments shall not be cumulative and to the extent not availed of on any sinking fund redemption date will terminate.]]

[Notwithstanding the foregoing, the Republic may not, prior to _____, redeem any Securities of this Series as [and optional sinking fund payment] contemplated by the preceding paragraph as a part of, or in anticipation of, any refunding operation by the application, directly or indirectly, of monies borrowed having an interest cost to the Republic (calculated in accordance with general accepted financial practice) of less than ___% per annum.]

[Securities of this Series acquired or redeemed by the Republic otherwise than through [mandatory] sinking fund payments may be credited against subsequent [mandatory] sinking fund payments otherwise required to be made [in the inverse order in which they become due].]

[The Republic (i) may deliver outstanding Securities of this Series (other than any previously called for redemption) and (ii) may apply as a credit Securities of this series which have been redeemed otherwise than through the application of [mandatory] sinking fund payments, in each case in satisfaction of all or any part of any [mandatory] sinking fund payment and the amount of such [mandatory] sinking fund payment shall be reduced accordingly.]

A-12

[In the case of any partial redemption of Securities of this Series pursuant to the sinking fund or at the option of the Republic, the Securities to be redeemed shall be selected by the Fiscal Agent not more than 60 days prior to the redemption date from the outstanding Securities not previously called for redemption, by such method as the Fiscal Agent shall deem fair and appropriate and which may provide for the selection for redemption of portions (equal to U.S.$_____ or any integral multiple thereof) of the principal amount of Securities of a denomination larger than U.S.$_____ ].

[This Security shall be redeemed, at the option of the registered Holder thereof, upon the occurrence, on or after _____, of a Redemption Event (as hereinafter defined), at the redemption price equal to 100% of the principal amount of this Security, together with interest accrued thereon to the date of redemption; provided, however, that the right of the registered Holder to present this Security [if the Security is a permanent global Security, insert--, or evidence of ownership of the Securities represented by this permanent global Security (as hereinafter provided),] for redemption shall, if the Republic gives a Notice of Redemption Event (as hereinafter defined), terminate upon expiration of the Option Period (as hereinafter defined) relating to such Redemption Event. In the event of the occurrence of more than one Redemption Event, each such Redemption Event shall be deemed to confer upon the registered Holder of this Security a separate right of redemption.]

[The Republic agrees that, if a Redemption Event occurs, it will promptly give written notice thereof to the Fiscal Agent (a "Notice of Redemption Event"). Promptly after receiving such Notice of Redemption Event, the Fiscal Agent shall give written notice to the registered Holder of this Security (a "Notice of Right to Tender") stating that a Redemption Event has occurred and including a form of notice (a "Redemption Notice") pursuant to which the registered Holder of this Security may elect to cause redemption. The Republic may, but shall not be obligated to, fix a record date for the purpose of determining the registered Holders of Securities of this series entitled to elect to cause redemption of any such Holder elects to cause redemption of this Security, deliver the Redemption Notice, together with the certificate or certificates representing the Securities to be redeemed [if the Security is a permanent global Security, insert--, or evidence of ownership of the Securities represented by this permanent global Security (as hereinafter provided),] to the Fiscal Agent within a period of 60 days (the "Option Period") of the date of the Notice

A-13

ARG 0047

of Right to Tender, and (ii) the Republic shall select a date for redemption (the "Redemption Date"), which shall be within 60 days from the end of the Option Period, and, on the Redemption Date, shall redeem the Securities tendered for redemption within the Option Period.  At least 10 days prior to the Redemption Date, the Republic shall [(i)] deliver notice of the Redemption Date in the manner provided for herein to each registered Holder who requested redemption[, or (ii) publish notice of the Redemption Date in the manner provided for herein, as the case may be].]

[If the Security is a permanent global Security, insert--It is understood that, notwithstanding the foregoing provisions relating to redemption at the option of a registered Holder and without otherwise limiting any right of any other registered Holder to act by agent or proxy, the Fiscal Agent may treat a person authorized, in a manner satisfactory to the Fiscal Agent, by the U.S. Depositary to take action in respect of a portion of this permanent global Security as the registered Holder of such portion of such Security and may make arrangements satisfactory to it, the Republic and the U.S. Depositary in connection with this partial redemption of this permanent global Security.]

[Insert description of those events, if any, which constitute Redemption Events.]

[If notice of redemption has been given in the manner set forth herein, the Securities so to be redeemed shall become due and payable on the redemption date specified in such notice and upon presentation and surrender of the Securities [if the Security is a permanent global Security, insert--, or evidence of ownership of the Securities represented by this permanent global Security satisfactory to the Fiscal Agent,] at the place or places specified in such notice, the Securities shall be paid and redeemed by the Republic at the places, in the manner and currency and at the redemption price herein specified together with accrued interest (unless the redemption date is an Interest Payment Date) to the redemption date.  From and after the redemption date, if monies for the redemption of Securities called for redemption shall have been made available at the corporate trust office of the Fiscal Agent for redemption on the redemption date, the Securities called for redemption shall cease to bear interest, and the only right of the holder of such securities shall be to receive payment of the redemption price together with accrued interest (unless the redemption date is an Interest Payment Date) to the redemption date as aforesaid.  If monies for the redemption of the Securities are not made available for payment until after the redemption date, the Securities

A-14

ARG 0048

called for redemption shall not cease to bear interest until
such monies have been so made available.]

[Any Security which is to be redeemed only in part
shall be surrendered with, if the Republic or the Fiscal
Agent so requires, due endorsement by, or a written
instrument of transfer in form satisfactory to the Republic
and the Fiscal Agent duly executed by, the holder thereof or
such holder's attorney duly authorized in writing, and the
Republic shall execute, and the Fiscal Agent shall
authenticate and deliver to the registered Holder of such
Security without service charge, a new Security or
Securities of this Series, of any authorized denomination as
required by such Holder, in aggregate principal amount equal
to and in exchange for the unredeemed portion of the
principal of the Security so surrendered.]

A meeting of registered holders of Securities of
this Series may be called at any time and from time to time
to make, give or take any request, demand, authorization,
direction, notice, consent, waiver or other action provided
by the Fiscal Agency Agreement or the Securities of this
Series to be made, given or taken by registered holders of
Securities of this Series or to modify, amend or supplement
the terms of the Securities of this Series or the Fiscal
Agency Agreement as hereinafter provided.  The Fiscal Agent
may at any time call a meeting of registered holders of
Securities of this Series for any such purpose to be held at
such time and at such place as the Fiscal Agent shall
determine.  Notice of every meeting of registered holders of
Securities of this Series, setting forth the time and the
place of such meeting and in general terms the action
proposed to be taken at such meeting, shall be given as
provided in the terms of the Securities of this Series, not
less than 30 nor more than 60 days prior to the date fixed
for the meeting.  In case at any time the Republic or the
registered holders of at least 10% in aggregate principal
amount of the Outstanding Securities of this Series (as
defined in the Fiscal Agency Agreement) shall have requested
the Fiscal Agent to call a meeting of the registered holders
of Securities of this Series for any such purpose, by
written request setting forth in reasonable detail the
action proposed to be taken at the meeting, the Fiscal Agent
shall call such meeting for such purposes by giving notice
thereof.

At any meeting of registered holders of Securities
duly called and held as specified above, upon the
affirmative vote, in person or by proxy thereunto duly
authorized in writing, of the registered holders of not less
than 66-2/3% [or ___ %] in aggregate principal amount of the

A-15

ARG 0049

Securities of this Series then Outstanding, or (ii) with the written consent of the registered holders of not less than 66-2/3% [or ___ %] in aggregate principal amount of the Securities of this Series then Outstanding, the Republic [and the Fiscal Agent] may modify, amend or supplement the terms or provisions contained in the Securities of this Series, in any way, and the registered holders of Securities of this Series may make, take or give any request, demand, authorization, direction, notice, consent, waiver or other action provided by the Fiscal Agency Agreement or the Securities of this Series to be made, given, or taken by registered holders of Securities of this Series; _provided, however,_ that no such action may, without the consent of the registered holder of each Security, (A) change the due date for the payment of the principal of or any installment of interest on any Security, (B) reduce the principal amount of any Security, the portion of such principal amount which is payable upon acceleration of the maturity of such Security or the interest rate thereon, (C) change the coin or currency in which or the required places at which payment with respect to interest or principal in respect of the Securities of this Series is payable, (D) reduce the proportion of the principal amount of Securities of this Series the vote or consent of the holders of which is necessary to modify, amend or supplement this Agreement or the terms and conditions of the Securities of this Series or to make, take or give any request, demand, authorization, direction, notice, consent, waiver or other action provided hereby or thereby to be made, taken or given, or (E) change the obligation of the Republic to pay additional amounts.

The Fiscal Agent and the Republic may agree, without the consent of the registered holders of Securities of this Series to (i) any modification of any provisions of the Fiscal agency Agreement which is of a formal, minor or technical nature or is made to correct a manifest error and (ii) any other modification (except as mentioned in the Fiscal Agency Agreement), and any waiver or authorization of any breach or proposed breach, of any of the provisions of the fiscal Agency Agreement which is in the opinion of the Fiscal Agent not materially prejudicial to the interests of the registered holders of Securities. Any such modification, authorization or waiver shall be binding on the registered holders of Securities of this Series and, if the Fiscal Agent so requires, such modification shall be notified to the registered holders of Securities of this Series as soon as practicable.

All notices to the registered holders of Securities will be published in such publications at such locations as any of the Securities are listed for the period

A-16

ARG 0050

of time of such listing and as otherwise provided pursuant
to the terms of the Securities of this Series.  If at any
time publication in any such publication is not practicable,
notices will be valid if published in an English language
newspaper with general circulation in the respective market
regions as the Republic with the approval of the Fiscal
Agent, shall determine.  In addition, notices will be
published in Spanish in a newspaper of general circulation
in Argentina, as the Republic shall determine.  Any such
notice shall be deemed to have been given on the date of
such publication or, if published more than once or on
different dates, on the first date on which publication is
made.

No reference herein to the Fiscal Agency Agreement
and no provision of this Security or of the Fiscal Agency
Agreement shall alter or impair the obligation of the
Republic to pay the principal of (and premium, if any[, on])
[and interest on] this Security at the times, place and
rate, and in the coin or currency, herein prescribed.

Claims against the Republic for payment in respect
of the Securities of this Series and interest payments
thereon shall be prescribed and become void unless made
within 10 years (in the case of principal) and 5 years (in
the case of interest) from the appropriate Relevant Date in
respect thereof.

This Security shall be governed by and construed
in accordance with the laws of the State of New York, except
with respect to authorization and execution by the Republic.

The Republic has in the Fiscal Agency Agreement
irrevocably submitted to the jurisdiction of any New York
state or federal court sitting in the Borough of Manhattan,
The City of New York and the courts of the Republic of
Argentina (the "Specified Courts") over any suit, action, or
proceeding against it or its properties, assets or revenues
with respect to the Securities of this Series or the Fiscal
Agency Agreement (a "Related Proceeding").  The Republic has
in the Fiscal Agency Agreement waived any objection to
Related Proceedings in such courts whether on the grounds of
venue, residence or domicile or on the ground that the
Related Proceedings have been brought in an inconvenient
forum.  The Republic agrees that a final non-appealable
judgment in any such Related Proceeding (the "Related
Judgment") shall be conclusive and binding upon it and may
be enforced in any Specified Court or in any other courts to
the jurisdiction of which the Republic is or may be subject
(the "Other Courts"), by a suit upon such judgment.

A-17

ARG 0051

The Republic has in the Fiscal Agency Agreement agreed that (i) service of all writs, process and summonses in any Related Proceeding or any action or proceeding to enforce or execute any Related Judgment brought against it in the State of New York may be made upon Banco de la Nación Argentina, presently located at 299 Park Avenue, New York, New York 10171, and, if such person is not maintained by the Republic as its agent for such purpose, the Republic will appoint CT Corporation System to act as its agent for such purpose.

To the extent that the Republic or any of its revenues, assets or properties shall be entitled, in any jurisdiction in which any Specified Court is located, in which any Related Proceeding may at any time be brought against it or any of its revenues, assets or properties, or in any jurisdiction in which any Specified Court or Other Court is located in which any suit, action or proceeding may at any time be brought solely for the purpose of enforcing or executing any Related Judgment, to any immunity from suit, from the jurisdiction of any such court, from set-off, from attachment prior to judgment, form attachment in aid of execution of judgment, from execution of a judgment or from any other legal or judicial process or remedy, and to the extent that in any such jurisdiction there shall be attributed such an immunity, the Republic has irrevocably agreed not to claim and has irrevocably waived such immunity to the fullest extent permitted by the laws of such jurisdiction (and consents generally for the purposes of the Foreign Sovereign Immunities Act to the giving of any relief or the issue of any process in connection with any Related Proceeding or Related Judgment), provided that such waiver shall not be effective (i) with respect to the assets which constitute freely available reserves pursuant to Article 6 of the Convertibility Law (the "Convertibility Law"), the amount, composition and investment of which will be reflected on the balance sheet and accounting statement of Banco Central consistently prepared pursuant to Article 5 of the Convertibility Law and (ii) with respect to property of the public domain located in the territory of The Republic of Argentina or property owned by the Republic and located in its territory which is dedicated to the purpose of an essential public service, and provided further that such agreement and waiver, insofar as it relates to any jurisdiction other than a jurisdiction in which a Specified Court is located, is given solely for the purpose of enabling the Fiscal Agent or a holder of Securities of this Series to enforce or execute a Related Judgment. The waiver of immunities referred to herein constitutes only a limited and specific waiver for the purpose of the Securities of this Series and the Fiscal Agency Agreement and under no

A-18

ARG 0052

circumstances shall it be interpreted as a general waiver of
the Republic or a waiver with respect to proceedings
unrelated to the Securities of this Series or the Fiscal
Agency Agreement.

Unless the certificate of authentication hereon
has been executed by the Fiscal Agent by manual signature,
this Security shall not be entitled to any benefit under the
Fiscal Agency Agreement or be valid or obligatory for any
purpose.

A-19

ARG 0053

EXHIBIT B - 1

Listing Supplement to Prospectus Supplement dated May 28, 2001

*EC 396221*
*EC 396227*

# The Republic of Argentina

*Argentine peso-denominated Bonds due 2008 ("New AR$ Bonds")*
*U.S. dollar-denominated Global Bonds due 2008 ("2008 Global Bonds")*    *EC 396229*
*U.S. dollar-denominated Global Bonds due 2018 ("2018 Global Bonds")*
*U.S. dollar-denominated Global Bonds due 2031 ("2031 Global Bonds")*    *EC 396225*

The New AR$ Bonds, 2008 Global Bonds, 2018 Global Bonds and 2031 Global Bonds (collectively, the "New Bonds") will be direct, unconditional and general unsecured obligations of Argentina that will bear interest from the settlement date of June 19, 2001 at the rates set out below and will not be redeemable prior to maturity (although they may amortize to the extent described below).

- The New AR$ Bonds will (a) bear interest at 10.00% per annum to September 19, 2004 and 12.00% per annum thereafter, payable on March 19 and September 19 of each year, commencing on September 19, 2001, (b) pay principal in full at maturity on September 19, 2008 and (c) pay interest and principal in Argentine pesos, unless the holder elects to receive payments in U.S. dollars (in which case payment will be made in U.S. dollars at the ratio of one U.S. dollar to one Argentine peso regardless of changes in foreign exchange rates).

- The 2008 Global Bonds will (a) bear interest at 7.00% per annum to June 19, 2004 and 15.50% per annum thereafter, payable on June 19 and December 19 of each year, commencing on December 19, 2001, (b) pay principal in six equal semi-annual installments on June 19 and December 19 of each year, commencing on June 19, 2006, with the final installment being payable on December 19, 2008, and (c) pay interest and principal in U.S. dollars.

- The 2018 Global Bonds will (a) bear interest at 12.25% per annum, payable on June 19 and December 19 of each year, commencing on December 19, 2006 (interest accrued on or before June 19, 2006 will be capitalized semi-annually on June 19 and December 19 of each year through June 19, 2006), (b) pay principal (including interest capitalized through June 19, 2006) in five equal semi-annual installments on June 19 and December 19 of each year, commencing on June 19, 2016, with the final installment being payable on June 19, 2018, and (c) pay interest and principal in U.S. dollars.

- The 2031 Global Bonds will (a) bear interest at 12.00% per annum, payable on June 19 and December 19 of each year, commencing on December 19, 2006 (interest accrued on or before June 19, 2006 will be capitalized semi-annually on June 19 and December 19 of each year through June 19, 2006), (b) pay principal (including interest capitalized through June 19, 2006) in full at maturity on June 19, 2031 and (c) pay interest and principal in U.S. dollars.

---

The New Bonds are being issued in exchange for bonds of various series listed on the inside cover of this Listing Supplement (collectively, the "Eligible Bonds") pursuant to the recently concluded Invitation referred to in the Prospectus Supplement dated May 28, 2001. Argentina expects to issue AR$837,841,854 aggregate principal amount of New AR$ Bonds, U.S.$9,083,177,142 aggregate principal amount of 2008 Global Bonds, U.S.$5,724,282,542 aggregate principal amount of 2018 Global Bonds, and U.S.$8,073,396,571 aggregate principal amount of 2031 Global Bonds. These amounts do not include any New Bonds that Argentina expects to issue pursuant to separate exchanges with various state-owned banks that may settle at or some time after the settlement of the Invitation.

This Listing Supplement is based on information that is publicly available or that has been supplied by Argentina unless otherwise expressly stated. After having made all reasonable queries, Argentina confirms that it accepts responsibility for the information it has provided in this Listing Supplement. This Listing Supplement is attached to and must be read in conjunction with the Prospectus Supplement dated May 28, 2001. Together this Listing Supplement and the Prospectus Supplement dated May 28, 2001 form one document.

Application has been made to list the New Bonds on the Luxembourg Stock Exchange, and application will be made to list the New Bonds on the Buenos Aires Stock Exchange and on the *Mercado Abierto Electrónico*.

---

Neither the Securities and Exchange Commission nor any other regulatory body has approved or disapproved of these securities or pass upon the accuracy or adequacy of this Listing Supplement, the prospectus supplement or the prospectus to which it relates. Any representation to the contrary is a criminal offense.

---

*The joint lead managers for the Invitation are, in alphabetical order:*

| | | |
|---|---|---|
| Banco de Galicia y Buenos Aires* | BBVA Banco Francés** | Credit Suisse First Boston** |
| HSBC** | JPMorgan** | Salomon Smith Barney** |
| | Santander Central Hispano Investment** | |

*The co-managers for the Invitation are, ranked in accordance with Argentine market making rules:*

| | | |
|---|---|---|
| BankBoston N.A.** | ING Bank N.V.** | Bank of America N.T. & S.A.** |

\*    acting as joint lead manager only outside the United States.
\*\*    acting as joint lead manager or co-manager (directly or through an affiliate) within and outside the United States.

June 19, 2001

The following is a list of each series of Eligible Bonds, broken down into four subgroups:

**"ARS Eligible Bonds"** (exchangeable for New AR$ Bonds or 2008 Global Bonds in the Invitation):
*Bonos de Consolidación de Deudas Previsionales en Moneda Nacional Segunda Serie* ("Bocon Pre 3 Bonds")
*Bonos de Consolidación en Moneda Nacional Primera Serie* ("Bocon Pro 1 Bonds")
*Bonos de Consolidación en Moneda Nacional Segunda Serie* ("Bocon Pro 3 Bonds")
*Bonos de Consolidación en Moneda Nacional Tercera Serie* ("Bocon Pro 5 Bonds")
8.75% Bonds due 2002 ("Eurobonds AR$ 2002")
11.750% Bonds due 2007 ("Eurobonds AR$ 2007")

**"2008 Eligible Bonds"** (exchangeable for 2008 Global Bonds in the Invitation):
*Bonos Externos* due 2002 ("Bonex 1992")
8.75% *Bonos del Tesoro a Mediano Plazo* due 2002 ("Bontes 2002")
11.75% *Bonos del Tesoro a Mediano Plazo* due 2003 ("Bontes 2003")
*Bonos del Tesoro a Mediano Plazo* due 2003 ("Bontes TV")
11.25% *Bonos del Tesoro a Mediano Plazo* due 2004 ("Bontes 2004")
12.125% *Bonos del Tesoro a Mediano Plazo* due 2005 ("Bontes 2005")
11.75% *Bonos del Tesoro a Mediano Plazo* due 2006 ("Bontes 2006")
Floating Rate Notes due 2004 ("Eurobonds FRN 2004")
Floating Rate Bonds due 2005 ("FRBs")
Spread-Adjusted Notes due November 30, 2002 ("SPANs")
Floating Rate Accrual Notes due 2005 ("FRANs")
Bocon Pre 3 Bonds
*Bonos de Consolidación de Deudas Previsionales en Dólares Estadounidenses Segunda Serie* ("Bocon Pre 4 Bonds")
Bocon Pro 1 Bonds
*Bonos de Consolidación en Dólares Estadounidenses Primera Serie* ("Bocon Pro 2 Bonds")
Bocon Pro 3 Bonds
*Bonos de Consolidación en Dólares Estadounidenses Segunda Serie* ("Bocon Pro 4 Bonds")
Bocon Pro 5 Bonds
*Bonos de Consolidación en Dólares Estadounidenses Tercera Serie* ("Bocon Pro 6 Bonds")
*Bonos de Consolidación de Regalías Hidrocarburíferas* due December 2008 ("Bocon Hidrocarburos")
8.375% Global Bonds due 2003 ("Global Bonds 2003")
11.00% Global Bonds due 2005 ("Global Bonds 2005")
11.00% Global Bonds due 2006 ("Global Bonds 2006")
Eurobonds AR$ 2002
Eurobonds AR$ 2007
*Pagarés o Bonos del Gobierno a Tasa Variable (Encuesta)* due July 14, 2001 ("Bonos-Pagaré July 2001 (Encuesta)")
*Pagarés o Bonos del Gobierno a Tasa Variable (Badlar)* due July 14, 2001 ("Bonos-Pagaré July 2001 (Badlar)")
*Pagarés o Bonos del Gobierno a Tasa Variable (Encuesta)* due November 2, 2001 ("Bonos-Pagaré November 2001 (Encuesta)")
*Pagarés o Bonos del Gobierno a Tasa Variable (Badlar)* due November 2, 2001 ("Bonos-Pagaré November 2001 (Badlar)")
*Pagarés o Bonos del Gobierno a Tasa Variable* due April 24, 2002 ("Bonos-Pagaré April 2002")
*Pagarés o Bonos del Gobierno a Tasa Variable* due August 22, 2002 ("Bonos-Pagaré August 2002")
*Pagarés o Bonos del Gobierno a Tasa Variable* due October 30, 2002 ("Bonos-Pagaré October 2002")
*Pagarés o Bonos del Gobierno a Tasa Variable* due February 16, 2004 ("Bonos-Pagaré February 2004" and, together with Bonos-Pagaré July 2001 (Encuesta), Bonos-Pagaré July 2001 (Badlar), Bonos-Pagaré November 2001 (Encuesta), Bonos-Pagaré November 2001 (Badlar), Bonos-Pagaré April 2002, Bonos-Pagaré August 2002, and Bonos-Pagaré October 2002, the "Bonos-Pagaré")

**"2018 Eligible Bonds"** (exchangeable for 2018 Global Bonds in the Invitation):
Collateralized Fixed Rate Bonds due 2023 (U.S.D. Par Series L ) ("Par Bonds")
Collateralized Floating Rate Bonds due 2023 (U.S.D. Discount Series L) ("Discount Bonds")
11.75% Global Bonds due 2009 ("Global Bonds 2009")
11.375% Global Bonds due 2010 ("Global Bonds 2010")
12.375% Global Bonds due 2012 ("Global Bonds 2012")
11.75% Global Bonds due 2015 ("Global Bonds 2015")
11.375% Global Bonds due 2017 ("Global Bonds 2017")

**"2031 Eligible Bonds"** (exchangeable for 2031 Global Bonds in the Invitation):
12.125% Global Bonds due 2019 ("Global Bonds 2019")
12.00% Global Bonds due 2020 ("Global Bonds 2020")
9.75% Global Bonds due 2027 ("Global Bonds 2027")
10.25% Global Bonds due 2030 ("Global Bonds 2030")
12.00% Global Bonds due 2031 ("Global Bonds 2031")
9.9375% *Bonos del Tesoro a Mediano Plazo* due 2027 ("Bontes 2027")

A "series" of Eligible Bonds refers to each issue of Eligible Bonds listed above.  A "series" of New Bonds refers to each issue of New Bonds listed on the cover page of this listing supplement.

1

ANNEX A

## RESULTS OF THE INVITATION

Argentina expects to issue pursuant to the Invitation AR$837,841,854 aggregate principal amount of New AR$ Bonds, U.S.$9,083,177,142 aggregate principal amount of 2008 Global Bonds, U.S.$5,724,282,542 aggregate principal amount of 2018 Global Bonds, and U.S.$8,073,396,571 aggregate principal amount of 2031 Global Bonds, and expects to pay an aggregate amount of U.S.$484,342,164 in cash for accrued but unpaid interest on certain Eligible Bonds exchanged pursuant to the Invitation. Each series of New Bonds will be issued in minimum denominations of AR$1 or U.S.$1, as applicable

The foregoing amounts do not include any New Bonds that Argentina expects to issue pursuant to separate exchanges with various state-owned banks that may settle at or some time after the settlement of the Invitation.

In addition, the foregoing amounts do not include approximately U.S.$2.0 billion aggregate principal amount of bonds that Argentina expects to issue pursuant to a concurrent invitation conducted only in Argentina. None of these bonds are New Bonds.

The New Bonds have been accepted for clearance through Euroclear and Clearstream, Luxembourg. Argentina expects to issue the New Bonds on June 19, 2001.

| | CUSIP | ISIN | Common Code |
|---|---|---|---|
| New AR$ Bonds | None | XS0130278467 | 13027846 |
| 2008 Global Bonds | 040114GF1 | US04011GF14 | 13027897 |
| 2018 Global Bonds | 040114GG9 | US040114GG96 | 13027935 |
| 2031 Global Bonds | 040114GH7 | US040114GH79 | 13027994 |

The following table sets forth, with respect to each series of Eligible Bonds accepted for exchange for New Bonds of a series:

- the Clearing Price for those Eligible Bonds for purposes of the Invitation (in U.S.$ or AR$ as applicable)

- the New Bond Issue Price for those New Bonds for purposes of the Invitation (in U.S.$ or AR$ as applicable)

- the aggregate original principal amount of those Eligible Bonds accepted for exchange for those New Bonds (in U.S.$ or AR$ as applicable)

- the aggregate principal amount of those New Bonds to be issued pursuant to the Invitation in exchange for those Eligible Bonds (in U.S.$ or AR$ as applicable), and

- the aggregate original principal amount of Eligible Bonds outstanding after the Invitation and the concurrent Argentine invitation (in U.S.$ or AR$ as applicable)

2

## AR$ Eligible Bonds Exchanged for New AR$ Bonds pursuant to the Invitation

| Series of Eligible Bonds | Clearing Price per AR$100 original principal amount of Eligible Bonds | New Bond Issue Price per AR$100 principal amount of New AR$ Bonds | Aggregate original principal amount of Eligible Bonds accepted for exchange for New AR$ Bonds | Aggregate principal amount of New AR$ Bonds to be issued in exchange for Eligible Bonds | Aggregate original principal amount of Eligible Bonds outstanding after the Invitation and the concurrent Argentine invitation |
|---|---|---|---|---|---|
| Bocon Pre 3 Bonds* | $36.80 | $78.32 | $65.836,582 | $30,934,451 | $325,449,339 |
| Bocon Pro 1 Bonds* | $57.30 | $78.32 | $908,039,700 | $664,334,458 | $1,014,148,960 |
| Bocon Pro 3 Bonds* | $65.00 | $78.32 | $900.000 | $746,936 | $3,497,106 |
| Bocon Pro 5 Bonds* | $62.00 | $78.32 | $10,933,692 | $8,655,372 | $326,158,565 |
| Eurobonds AR$ 2002* | $93.90 | $78.32 | $78,807,500 | $94,484,478 | $160,032,500 |
| Eurobonds AR$ 2007* | $82.00 | $78.32 | $36,950,000 | $38,686,159 | $89,160,000 |

*The indicated bonds were also eligible for exchange for 2008 Global Bonds. See chart "2008 Eligible Bonds Exchanged for 2008 Global Bonds pursuant to the Invitation" below.

3

## 2008 Eligible Bonds Exchanged for 2008 Global Bonds pursuant to the Invitation

| Series of Eligible Bonds | Clearing Price per U.S.$100 or AR$100 original principal amount of Eligible Bonds | New Bond Issue Price per U.S.$100 principal amount of 2008 Global Bonds | Aggregate original principal amount of Eligible Bonds accepted for exchange for 2008 Global Bonds | Aggregate principal amount of 2008 Global Bonds to be issued in exchange for Eligible Bonds | Aggregate original principal amount of Eligible Bonds outstanding after the Invitation and the concurrent Argentine invitation |
|---|---|---|---|---|---|
| Bonex 1992 | $23.50 | $78.55 | $1,994,600 | $596,729 | $1,721,368,200 |
| Bontes 2002 | $96.00 | $78.55 | $116,003,000 | $141,773,235 | $2,204,573,000 |
| Bontes 2003 | $96.20 | $78.55 | $515,862,586 | $631,775,694 | $1,712,043,143 |
| Bontes TV | $93.60 | $78.55 | $150,066,000 | $178,818,305 | $413,286,000 |
| Bontes 2004 | $92.20 | $78.55 | $774,792,656 | $909,431,988 | $1,541,088,160 |
| Bontes 2005 | $91.00 | $78.55 | $625,726,751 | $724,903,046 | $2,135,270,737 |
| Bontes 2006 | $86.50 | $78.55 | $1,623,650,430 | $1,787,979,148 | $984,413,380 |
| Eurobonds FRN 2004 | $90.00 | $78.55 | $59,100,000 | $67,714,831 | $230,900,000 |
| FRBs | $88.50 | $78.55 | $841,074,000 | $606,472,712 | $4,740,883,000 |
| SPANs | $98.00 | $78.55 | $18,366,000 | $22,913,659 | $134,876,000 |
| FRANs | $93.00 | $78.55 | $529,382,000 | $626,766,724 | $470,618,000 |
| Bocon Pre 3 Bonds** | $36.75 | $78.55 | $7,070,093 | $3,307,777 | $325,449,339 |
| Bocon Pre 4 Bonds | $39.50 | $78.55 | $33,713,694 | $16,953,419 | $2,329,221,075 |
| Bocon Pro 1 Bonds** | $57.30 | $78.55 | $359,870,122 | $262,515,057 | $1,014,148,960 |
| Bocon Pro 2 Bonds | $59.50 | $78.55 | $184,328,226 | $139,624,820 | $794,176,874 |
| Bocon Pro 4 Bonds | $86.50 | $78.55 | $63,502,073 | $69,929,082 | $801,930,085 |
| Bocon Pro 5 Bonds** | $62.00 | $78.55 | $115,396,403 | $91,083,091 | $326,158,565 |
| Bocon Pro 6 Bonds | $71.20 | $78.55 | $124,125,469 | $112,510,932 | $583,627,684 |
| Bocon Hidrocarburos | $72.50 | $78.55 | $25,766,791 | $23,782,207 | $23,086,635 |
| Global Bonds 2003 | $88.50 | $78.55 | $75,368,000 | $84,914,932 | $1,948,839,000 |
| Global Bonds 2005 | $88.25 | $78.55 | $30,885,000 | $34,698,934 | $877,297,000 |

| Series of Eligible Bonds | Clearing Price per U.S.$100 or AR$100 original principal amount of Eligible Bonds | New Bond Issue Price per U.S.$100 principal amount of 2008 Global Bonds | Aggregate original principal amount of Eligible Bonds accepted for exchange for 2008 Global Bonds | Aggregate principal amount of 2008 Global Bonds to be issued in exchange for Eligible Bonds | Aggregate original principal amount of Eligible Bonds outstanding after the Invitation and the concurrent Argentine invitation |
|---|---|---|---|---|---|
| Global Bonds 2006 | $85.50 | $78.55 | $74,108,000 | $80,664,980 | $1,216,217,000 |
| Eurobonds AR$ 2002** | $93.00 | $78.55 | $31,260,000 | $37,010,568 | $160,032,500 |
| Eurobonds AR$ 2007** | $82.00 | $78.55 | $277,530,000 | $289,719,410 | $89,160,000 |
| Bonos-Pagaré July 2001 (Encuesta) | $101.65 | $78.55 | $366,100,000 | $473,762,763 | $292,680,000 |
| Bonos-Pagaré November 2001 (Encuesta) | $101.05 | $78.55 | $676,570,000 | $870,367,899 | $98,970,000 |
| Bonos-Pagaré April 2002 | $98.50 | $78.55 | $188,255,000 | $236,067,696 | $89,750,000 |
| Bonos-Pagaré August 2002 | $97.30 | $78.55 | $51,600,000 | $63,916,995 | $187,400,000 |
| Bonos-Pagaré October 2002 | $101.00 | $78.55 | $343,000,000 | $441,031,190 | $7,000,000 |
| Bonos-Pagaré February 2004 | $95.30 | $78.55 | $43,000,000 | $52,169,319 | $48,500,000 |

None of the Bocon Pro 3 Bonds**, Bonos-Pagaré July 2001 (Badlar) or Bonos-Pagaré November 2001 (Badlar) were accepted for exchange for 2008 Global Bonds pursuant to the Invitation.

** The indicated bonds were also eligible for exchange for New AR$ Bonds. See chart "AR$ Eligible Bonds Exchanged for New AR$ Bonds pursuant to the Invitation" above.

5

## 2018 Eligible Bonds Exchanged for 2018 Global Bonds pursuant to the Invitation

| Series of Eligible Bonds | Clearing Price per U.S.$100 or AR$100 original principal amount of Eligible Bonds | New Bond Issue Price per U.S.$100 principal amount of 2018 Global Bonds | Aggregate original principal amount of Eligible Bonds accepted for exchange for 2018 Global Bonds | Aggregate principal amount of 2018 Global Bonds to be issued in exchange for Eligible Bonds | Aggregate original principal amount of Eligible Bonds outstanding after the Invitation and the concurrent Argentine invitation |
|---|---|---|---|---|---|
| Par Bonds | $69.50 | $73.25 | $637,990,000 | $605,328,394 | $4,054,350,000 |
| Discount Bonds | $76.00 | $73.25 | $370,181,000 | $384,078,581 | $1,085,437,000 |
| Global Bonds 2009 | $80.50 | $73.25 | $297,292,000 | $326,716,802 | $1,452,708,000 |
| Global Bonds 2010 | $78.75 | $73.25 | $120,926,000 | $130,005,767 | $879,074,000 |
| Global Bonds 2012 | $82.00 | $73.25 | $608,038,000 | $680,670,522 | $985,914,000 |
| Global Bonds 2015 | $79.25 | $73.25 | $1,392,738,000 | $1,506,818,929 | $1,009,630,000 |
| Global Bonds 2017 | $79.00 | $73.25 | $1,938,495,000 | $2,090,663,547 | $2,636,505,000 |

## 2031 Eligible Bonds Exchanged for 2031 Global Bonds pursuant to the Invitation

| Series of Eligible Bonds | Clearing Price per U.S.$100 or AR$100 original principal amount of Eligible Bonds | New Bond Issue Price per U.S.$100 principal amount of 2031 Global Bonds | Aggregate original principal amount of Eligible Bonds accepted for exchange for 2031 Global Bonds | Aggregate principal amount of 2031 Global Bonds to be issued in exchange for Eligible Bonds | Aggregate original principal amount of Eligible Bonds outstanding after the Invitation and the concurrent Argentine invitation |
|---|---|---|---|---|---|
| Global Bonds 2019 | $82.00 | $70.70 | $1,181,839,000 | $1,370,732,649 | $251,658,000 |
| Global Bonds 2020 | $81.50 | $70.70 | $1,067,154,000 | $1,230,170,450 | $182,846,000 |
| Global Bonds 2027 | $69.75 | $70.70 | $2,396,473,000 | $2,364,271,453 | $1,138,613,000 |
| Global Bonds 2030 | $70.50 | $70.70 | $975,495,000 | $972,735,465 | $274,505,000 |
| Global Bonds 2031 | $81.00 | $70.70 | $1,086,420,000 | $1,244,696,181 | $88,580,000 |
| Bontes 2027 | $69.75 | $70.70 | $902,923,000 | $890,790,373 | $224,487,000 |

7

Prospectus Supplement to Prospectus dated May 22, 2001

# The Republic of Argentina

Invites the Owners of

## Each Series of Bonds listed on the inside cover
### (Collectively, the "Eligible Bonds")

to submit, in an electronic, separate modified Dutch auction for each series of Eligible Bonds, offers to exchange

## AR$ Eligible Bonds (as defined on the inside cover) of each series
for
## Argentine peso-denominated Bonds due 2008 (the "New AR$ Bonds")

## 2008 Eligible Bonds (as defined on the inside cover) of each series
for
## U.S. dollar-denominated Global Bonds due 2008 (the "2008 Global Bonds")

## 2018 Eligible Bonds (as defined on the inside cover) of each series
for
## U.S. dollar-denominated Global Bonds due 2018 (the "2018 Global Bonds")

and

## 2031 Eligible Bonds (as defined on the inside cover) of each series
for
## U.S. dollar-denominated Global Bonds due 2031 (the "2031 Global Bonds")

The aggregate original principal amount of all Eligible Bonds is approximately U.S.$66.7 billion.

The Internet addresses for the Invitation Websites through which exchange offers can be submitted electronically are:
http://primedebt.csfb.com/argentinaexchange and https://exchange.jpmorgan.com

> **THE INVITATION WILL EXPIRE AT 4:00 P.M. (NEW YORK CITY TIME) ON FRIDAY, JUNE 1, 2001, UNLESS EXTENDED OR EARLIER TERMINATED (THE "EXPIRATION DATE").**

Application has been made to list the New AR$ Bonds, the 2008 Global Bonds, the 2018 Global Bonds and the 2031 Global Bonds (collectively, the "New Bonds") on the Luxembourg Stock Exchange, and application will be made to list each series of the New Bonds on the Buenos Aires Stock Exchange and on the *Mercado Abierto Electrónico*.

Neither the Securities and Exchange Commission nor any other regulatory body has approved or disapproved of these securities or passed upon the accuracy or adequacy of this prospectus supplement or the prospectus to which it relates. Any representation to the contrary is a criminal offense.

*The joint lead managers for the Invitation are, in alphabetical order:*

| | | |
|---|---|---|
| Banco de Galicia y Buenos Aires | BBVA Banco Francés | Credit Suisse First Boston |
| HSBC | JPMorgan | Salomon Smith Barney |
| | Santander Central Hispano Investment | |

*The co-managers for the Invitation are, ranked in accordance with Argentine market making rules:*

| | | |
|---|---|---|
| Deutsche Bank S.A. | BankBoston N.A. | ING Bank N.V. |
| Bank of America N.T. & S.A. | | ABN AMRO Bank N.V. |

his prospectus supplement, the accompanying prospectus and the related electronic letters of transmittal are together :ferred to as the "Invitation Materials." Transactions contemplated by the Invitation Materials are referred to as the Invitation."

he following is a list of each series of Eligible Bonds, broken down into four subgroups:

ARS Eligible Bonds" (exchangeable for New ARS Bonds or 2008 Global Bonds in the Invitation):
onos de Consolidación de Deudas Previsionales en Moneda Nacional Segunda Serie ("Bocon Pre 3 Bonds")
onos de Consolidación en Moneda Nacional Primera Serie ("Bocon Pro 1 Bonds")
onos de Consolidación en Moneda Nacional Segunda Serie ("Bocon Pro 3 Bonds")
onos de Consolidación en Moneda Nacional Tercera Serie ("Bocon Pro 5 Bonds")
75% Bonds due 2002 ("Eurobonds ARS 2002")
.750% Bonds due 2007 ("Eurobonds ARS 2007")

2008 Eligible Bonds" (exchangeable for 2008 Global Bonds in the Invitation):
onos Externos due 2002 ("Bonex 1992")
75% Bonos del Tesoro a Mediano Plazo due 2002 ("Bontes 2002")
:.75% Bonos del Tesoro a Mediano Plazo due 2003 ("Bontes 2003")
.25% Bonos del Tesoro a Mediano Plazo due 2003 ("Bontes TV")
:.125% Bonos del Tesoro a Mediano Plazo due 2004 ("Bontes 2004")
.75% Bonos del Tesoro a Mediano Plazo due 2005 ("Bontes 2005")
.75% Bonos del Tesoro a Mediano Plazo due 2006 ("Bontes 2006")
oating Rate Notes due 2004 ("Eurobonds FRN 2004")
oating Rate Bonds due 2005 ("FRBs")
oread-Adjusted Notes due November 30, 2002 ("SPANs")
oating Rate Accrual Notes due 2005 ("FRANs")
ocon Pre 3 Bonds
onos de Consolidación de Deudas Previsionales en Dólares Estadounidenses Segunda Serie ("Bocon Pre 4 Bonds")
ocon Pro 1 Bonds
onos de Consolidación en Dólares Estadounidenses Primera Serie ("Bocon Pro 2 Bonds")
ocon Pro 3 Bonds
onos de Consolidación en Dólares Estadounidenses Segunda Serie ("Bocon Pro 4 Bonds")
ocon Pro 5 Bonds
onos de Consolidación en Dólares Estadounidenses Tercera Serie ("Bocon Pro 6 Bonds")
onos de Consolidación de Regalías Hidrocarburíferas due December 2008 ("Bocon Hidrocarburos")
375% Global Bonds due 2003 ("Global Bonds 2003")
.00% Global Bonds due 2005 ("Global Bonds 2005")
.00% Global Bonds due 2006 ("Global Bonds 2006")
urobonds ARS 2002
urobonds ARS 2007
agarés o Bonos del Gobierno a Tasa Variable (Encuesta) due July 14, 2001 ("Bonos-Pagaré July 2001 (Encuesta)")
agarés o Bonos del Gobierno a Tasa Variable (Badlar) due July 14, 2001 ("Bonos-Pagaré July 2001 (Badlar)")
agarés o Bonos del Gobierno a Tasa Variable (Encuesta) due November 2, 2001 ("Bonos-Pagaré November 2001 (Encuesta)")
agarés o Bonos del Gobierno a Tasa Variable (Badlar) due November 2, 2001 ("Bonos-Pagaré November 2001 (Badlar)")
agarés o Bonos del Gobierno a Tasa Variable due April 24, 2002 ("Bonos-Pagaré April 2002")
agarés o Bonos del Gobierno a Tasa Variable due August 22, 2002 ("Bonos-Pagaré August 2002")
agarés o Bonos del Gobierno a Tasa Variable due October 30, 2002 ("Bonos-Pagaré October 2002")
agarés o Bonos del Gobierno a Tasa Variable due February 16, 2004 ("Bonos-Pagaré February 2004" and, together with Bonos-
garé July 2001 (Encuesta), Bonos-Pagaré July 2001 (Badlar), Bonos-Pagaré November 2001 (Encuesta), Bonos-Pagaré November
01 (Badlar). Bonos-Pagaré April 2002, Bonos-Pagaré August 2002, and Bonos-Pagaré October 2002, the "Bonos-Pagaré")

2018 Eligible Bonds" (exchangeable for 2018 Global Bonds in the Invitation):
llateralized Fixed Rate Bonds due 2023 (U.S.D. Par Series L )) ("Par Bonds")
llateralized Floating Rate Bonds due 2023 (U.S.D. Discount Series L)) ("Discount Bonds")
75% Global Bonds due 2009 ("Global Bonds 2009")
375% Global Bonds due 2010 ("Global Bonds 2010")
375% Global Bonds due 2012 ("Global Bonds 2012")
75% Global Bonds due 2015 ("Global Bonds 2015")
375% Global Bonds due 2017 ("Global Bonds 2017")

31 Eligible Bonds" (exchangeable for 2031 Global Bonds in the Invitation):
125% Global Bonds due 2019 ("Global Bonds 2019")
)0% Global Bonds due 2020 ("Global Bonds 2020")
;% Global Bonds due 2027 ("Global Bonds 2027")
:5% Global Bonds due 2030 ("Global Bonds 2030")
)0% Global Bonds due 2031 ("Global Bonds 2031")
75% Bonos del Tesoro a Mediano Plazo due 2027 ("Bontes 2027")

The 2008 Global Bonds, the 2018 Global Bonds and the 2031 Global Bonds are collectively called the "New U.S.$ Global Bonds" in this prospectus supplement. A "series" of Eligible Bonds refers to each issue of Eligible Bonds listed above. A "series" of New Bonds refers to each issue of New Bonds listed on the cover page of this prospectus supplement.

# TABLE OF CONTENTS

Prospectus Supplement

**Page**

**To Whom it May Concern:** TO GENERATE THIS TOC FOR THE PROSPECTU.S. SUPPLEMENT (THE S-PAGES), PLEASE ONLY U.S.E ONE HEADING STYLE "SUPP TITLE" Please bear in mind that if you update the page numbers using the F9 key, you might need to input manually the "S-" before each page number.

Introduction ......................................................................................................................................
Certain Legal Restrictions ................................................................................................................. i
Summary ........................................................................................................................................... ii
Recent Developments ....................................................................................................................... S-1
Terms of the Invitation ..................................................................................................................... S-13
The Eligible Bonds ........................................................................................................................... S-23
Description of the New Bonds .......................................................................................................... S-37
Clearance and Settlement ................................................................................................................. S-41
Taxation ............................................................................................................................................ S-48
Plan of Distribution .......................................................................................................................... S-53
Jurisdictional Restrictions ................................................................................................................ S-60
Forward-Looking Statements ........................................................................................................... S-61
Validity of the New Bonds ............................................................................................................... S-66
General Information .......................................................................................................................... S-66
Certain Defined Terms ...................................................................................................................... S-67
                                                                                                                                                     S-69

Annex A – Clearing Reference Numbers for Eligible Bonds .......................................................... A-1
Annex B – Hypothetical Calculation ............................................................................................... B-1
Annex C – Description of the Issuer ................................................................................................ I

Prospectus

About this Prospectus ........................................................................................................................
Incorporation of Certain Documents by Reference ......................................................................... 2
Use of Proceeds ................................................................................................................................ 3
Description of Securities ................................................................................................................... 3
  Description of Securities ................................................................................................................ 3
  Description of Warrants .................................................................................................................. 3
  Governing Law ............................................................................................................................... 12
  Jurisdiction, Consent to Service, Enforceability and Immunities from Attachment ..................... 12
Taxation ............................................................................................................................................ 12
Plan of Distribution .......................................................................................................................... 13
Official Statements ........................................................................................................................... 15
Validity of the Securities .................................................................................................................. 16
Authorized Representative ................................................................................................................ 16
Further Information ........................................................................................................................... 17
Where You Can Find More Information ........................................................................................... 17
                                                                                                                                                     17

i

# INTRODUCTION

When you make your investment decision, you should rely only on the information contained or incorporated by reference in this prospectus supplement and the accompanying prospectus. The Republic of Argentina ("Argentina") has not authorized anyone to provide you with information that is different. This document may only be used where it is legal to offer and sell these securities. The information in this prospectus supplement and the accompanying prospectus may only be accurate as of the date of this prospectus supplement or the accompanying prospectus, as applicable.

All references in this document to the websites (the "Invitation Websites") which can be accessed through the Internet addresses http://primedebt.csfb.com/argentinaexchange and https://exchange.jpmorgan.com are inserted as inactive textual references to these "uniform resource locators" or "URLs" and are for your informational reference only. Information on the Invitation Websites is not incorporated by reference in this document.

Argentina does not assume responsibility for the information that appears on the Invitation Websites other than the Invitation Materials and Argentina's Annual Report for 1999 on Form 18-K, which was filed with the U.S. Securities and Exchange Commission (the "SEC") on September 29, 2000, and all amendments thereto, hypothetical information and assumptions as described in this prospectus supplement (as modified from time to time) and other information that Argentina has authorized for display on the Invitation Websites under the dealer managers agreement described in this prospectus supplement, and does not intend for that information to be incorporated by reference in this document.

Argentina is furnishing this prospectus supplement and the accompanying prospectus to you solely for use in the context of Argentina's Invitation to exchange Eligible Bonds for New Bonds. After having made all reasonable queries, Argentina confirms that:

- the information contained in this prospectus supplement and the accompanying prospectus is true and correct in all material respects and is not misleading as of the date of this prospectus supplement or the accompanying prospectus, as applicable

- it holds the opinions and intentions expressed in this prospectus supplement and the accompanying prospectus

- to the best of its knowledge and belief, it has not omitted other facts, the omission of which makes this prospectus supplement or the accompanying prospectus as a whole misleading as of the date of this prospectus supplement or the accompanying prospectus, as applicable, and

- it accepts responsibility for the information it has provided in this prospectus supplement and the accompanying prospectus.

Argentina is a foreign sovereign state. Consequently, it may be difficult for you to obtain or realize upon judgments of courts in the United States against Argentina. See "Description of Securities—Jurisdiction, Consent to Service, Enforceability and Immunities from Attachment," in the accompanying prospectus.

The New Bonds that Argentina issues to holders of Eligible Bonds in the United States are being offered under Argentina's registration statements (file nos. 333-13120 and 13536) filed with the SEC under the Securities Act of 1933 (the "Act"). The accompanying prospectus is part of the registration statement filed with the SEC on May 18, 2001 (file no. 333-13536) that went effective on May 22, 2001. The accompanying prospectus provides you with a general description of the debt securities that Argentina may offer, and this prospectus supplement contains specific information about the terms of the Invitation and the New Bonds. This prospectus supplement also adds, updates or changes information provided or incorporated by reference in the accompanying prospectus. Consequently, before you participate in the Invitation, you should read this prospectus supplement together with the accompanying prospectus as well as the documents incorporated by reference in this prospectus supplement and the accompanying prospectus. Those documents (which include Argentina's Annual Report for 1999 on Form 18-K

and all amendments thereto) contain information regarding Argentina, the New Bonds and other matters. You can inspect those documents at the offices of the SEC listed in this prospectus supplement under "General Information—Where You Can Find More Information."

None of Argentina, any joint lead manager, any co-manager, the settlement agent or the Luxembourg exchange agent have expressed any opinion as to whether the terms of the Invitation are fair. None of Argentina, any joint lead manager, any co-manager, the settlement agent or the Luxembourg exchange agent make any recommendation that you offer to exchange your Eligible Bonds or refrain from doing so pursuant to the Invitation, and no one has been authorized by Argentina, any joint lead manager, any co-manager, the settlement agent or the Luxembourg exchange agent to make any such recommendation. You must make your own decision as to whether to offer to exchange Eligible Bonds or refrain from doing so, and, if you do offer to exchange Eligible Bonds, the principal amount of Eligible Bonds to offer to exchange and the offer price at which you make your offer.

Argentina intends to conduct the exchange of Eligible Bonds for New Bonds through the use of electronic media. In order to participate in the exchange of Eligible Bonds for New Bonds, you are required to:

- consent to tender or to have tendered on your behalf a letter of transmittal in electronic form only and

- consent to accept electronic delivery of all required documents in connection with the exchange.

You may incur certain costs in connection with tendering the electronic letter of transmittal and receiving delivery of documents in electronic form (for example, online time and printing) and have possible risks of system outages and other technical failure. Argentina reserves the right to reject any electronic letter of transmittal not received in the appropriate electronic form. If you encounter technical difficulties in submitting your electronic letter of transmittal during the Submission Periods discussed in this prospectus supplement, you may contact either Credit Suisse First Boston at 1-800-820-1653 (in the U.S.) or collect at 1-212-325-4219 (outside the U.S.) (for assistance with the Invitation Website accessed through http://primedebt.csfb.com/argentinaexchange) or JPMorganExchange at 1-877-217-2484 (in the U.S.) or collect at 1-212-552-4083 (outside the U.S.) (for assistance with the Invitation Website accessed through https://exchange.jpmorgan.com). Argentina cannot assure you, however, that you will be assisted successfully or that Argentina will receive or accept your electronic letter of transmittal if you do not submit it in proper electronic form.

Until forty days after the Announcement Date, all dealers effecting transactions in the New Bonds in the United States, whether or not participating in this distribution, may be required to deliver a copy of this prospectus supplement and the accompanying prospectus. This is in addition to the obligation of these dealers to deliver a prospectus when acting as underwriters and in connection with this distribution with respect to their unsold allotments or subscriptions.

## CERTAIN LEGAL RESTRICTIONS

The distribution of the Invitation Materials and the transactions contemplated by the Invitation Materials may be restricted by law in certain jurisdictions. If the Invitation Materials come into your possession, you are required by Argentina to inform yourself of and to observe all of these restrictions. The Invitation Materials do not constitute, and may not be used in connection with, an offer or solicitation in any place where offers or solicitations are not permitted by law. If a jurisdiction requires that the Invitation be made by a licensed broker or dealer and any joint lead manager, or any co-manager or any affiliate of any joint lead manager or any co-manager, is a licensed broker or dealer in that jurisdiction, the Invitation shall be deemed to be made by such joint lead manager or such co-manager or such affiliate on behalf of Argentina in that jurisdiction. For more information, see "Jurisdictional Restrictions" in this prospectus supplement.

# SUMMARY

*This summary highlights information contained elsewhere in this prospectus supplement. It is not complete and may not contain all the information that you should consider before offering Eligible Bonds in exchange for New Bonds. You should read the entire prospectus supplement and the accompanying prospectus carefully.*

The Internet addresses for the Invitation Websites through which exchange offers can be submitted electronically are http://primedebt.csfb.com/argentinaexchange and https://exchange.jpmorgan.com.

## The Invitation

The Invitation......................................... Argentina is inviting holders of Eligible Bonds to submit, in a separate modified Dutch auction for each series of Eligible Bonds, offers to exchange AR$ Eligible Bonds of each series for newly issued New AR$ Bonds, 2008 Eligible Bonds of each series for newly issued 2008 Global Bonds, 2018 Eligible Bonds of each series for newly issued 2018 Global Bonds and 2031 Eligible Bonds of each series for newly issued 2031 Global Bonds.

The Invitation expires at 4:00 P.M., New York City time, on June 1, 2001, unless Argentina in its sole discretion extends it or terminates it earlier. We refer to the date on which the Invitation expires as the "Expiration Date."

Argentina will announce the results of the Invitation at or around 8:30 A.M., New York City time, on the first Trading Day following the Expiration Date or before, or as soon as possible thereafter.

Argentina intends to conduct the exchange of Eligible Bonds for the New Bonds through the use of electronic media as described in this prospectus supplement.

For your convenience, the clearing reference numbers for the Eligible Bonds of each series, including tranches thereof, are set forth in Annex A to this prospectus supplement.

Original Principal Amount
Currently Outstanding .................. The original principal amount of each series of Eligible Bonds currently outstanding (taking into account any amortizations) as of the date hereof is:

| Series | Original Principal Amount Currently Outstanding | |
|---|---|---|
| Bocon Pre 3 Bonds | AR$ | 398,356,014 |
| Bocon Pre 4 Bonds | U.S.$ | 2,362,934,769 |
| Bocon Pro 1 Bonds | AR$ | 2,282,058,782 |
| Bocon Pro 2 Bonds | U.S.$ | 978,505,100 |
| Bocon Pro 3 Bonds | AR$ | 4,397,106 |
| Bocon Pro 4 Bonds | U.S.$ | 865,432,158 |
| Bocon Pro 5 Bonds | AR$ | 452,488,660 |

S-1

| | | |
|---|---|---|
| Bocon Pro 6 Bonds | U.S.$ | 707,753,153 |
| Bocon Hidrocarburos | U.S.$ | 488,534,426 |
| Bonex 1992 | U.S.$ | 1,723,362,800 |
| Bonos-Pagaré July 2001 (Encuesta) | U.S.$ | 820,180,000 |
| Bonos-Pagaré July 2001 (Badlar) | U.S.$ | 111,500,000 |
| Bonos-Pagaré November 2001 (Encuesta) | U.S.$ | 1,184,790,000 |
| Bonos-Pagaré November 2001 (Badlar) | U.S.$ | 21,500,000 |
| Bonos-Pagaré April 2002 | U.S.$ | 400,000,000 |
| Bonos-Pagaré August 2002 | U.S.$ | 400,000,000 |
| Bonos-Pagaré October 2002 | U.S.$ | 1,200,000,000 |
| Bonos-Pagaré February 2004 | U.S.$ | 150,000,000 |
| Bontes 2002 | U.S.$ | 2,324,876,000 |
| Bontes 2003 | U.S.$ | 2,227,905,729 |
| Bontes 2004 | U.S.$ | 2,315,880,816 |
| Bontes 2005 | U.S.$ | 2,760,997,488 |
| Bontes 2006 | U.S.$ | 2,608,063,810 |
| Bontes 2027 | U.S.$ | 1,127,410,000 |
| Bontes TV | U.S.$ | 749,285,000 |
| Par Bonds | U.S.$ | 4,692,340,000 |
| Discount Bonds | U.S.$ | 1,455,618,000 |
| Eurobonds AR$ 2002 | AR$ | 270,100,000 |
| Eurobonds AR$ 2007 | AR$ | 403,640,000 |
| Eurobonds FRN 2004 | U.S.$ | 300,000,000 |
| FRBs | U.S.$ | 5,581,957,000 |
| FRANs | U.S.$ | 1,000,000,000 |
| SPANs | U.S.$ | 153,242,000 |
| Global Bonds 2003 | U.S.$ | 2,024,207,000 |
| Global Bonds 2005 | U.S.$ | 908,182,000 |
| Global Bonds 2006 | U.S.$ | 1,290,325,000 |
| Global Bonds 2009 | U.S.$ | 1,750,000,000 |
| Global Bonds 2010 | U.S.$ | 1,000,000,000 |
| Global Bonds 2012 | U.S.$ | 1,593,952,000 |
| Global Bonds 2015 | U.S.$ | 2,402,701,000 |
| Global Bonds 2017 | U.S.$ | 4,575,000,000 |
| Global Bonds 2019 | U.S.$ | 1,433,497,000 |
| Global Bonds 2020 | U.S.$ | 1,250,000,000 |
| Global Bonds 2027 | U.S.$ | 3,535,086,000 |
| Global Bonds 2030 | U.S.$ | 1,250,000,000 |
| Global Bonds 2031 | U.S.$ | 1,175,000,000 |

"AR$" in this prospectus supplement means Argentine pesos, the lawful currency of Argentina.

The "original principal amount" of any series of Eligible Bonds means the principal amount of such Eligible Bonds at the time of their issuance, ignoring any amortization of principal or capitalization of interest.

Trading of the New Bonds.............. The New Bonds will begin trading after the announcement of the Invitation results.

S-2

**New Bonds and Interest to be
Received Pursuant to Exchange
Offers** ............................................. You will receive, in exchange for each U.S.$1.00 or AR$1.00 in original
principal amount of Eligible Bonds of any series exchanged, New Bonds
of the appropriate series having a principal amount (in the appropriate
currency) equal to:

$$\frac{\text{Clearing Price x Scaling Factor}}{\text{New Bond Issue Price}}$$

where:

- the Clearing Price for that series of Eligible Bonds and the
  New Bond Issue Price for that series of New Bonds will be
  selected as described below, and

- the scaling factor for the FRBs is 0.64000 and the scaling
  factor for all other Eligible Bonds is 1.00000.

In addition, you will receive an amount in cash equal to the accrued but
unpaid interest on your Eligible Bonds accepted for exchange to but not
including the Settlement Date (except that you will not receive this cash
amount for any exchanged Bocon Pre 3 Bonds, Bocon Pre 4 Bonds,
Bocon Pro 1 Bonds, Bocon Pro 2 Bonds, Bocon Pro 3 Bonds, Bocon Pro
4 Bonds, Bocon Pro 5 Bonds, Bocon Pro 6 Bonds, Bocon Hidrocarburos
or Bonex 1992, which we collectively call "Bocon and Bonex Bonds" in
this prospectus supplement, since the Clearing Prices for those Eligible
Bonds will reflect accrued interest).

**Selection of New Bond Coupons,
New Bond Issue Prices,
Minimum Clearing Prices** .............. At or around 9:00 A.M., New York City time, on the Expiration Date,
Argentina will select in its sole discretion and announce:

- the coupons applicable to each series of New Bonds

- the price that will serve as the "New Bond Issue Price" per
  U.S.$100 or AR$100 principal amount for each series of
  New Bonds, and

- the price that will serve as the "Minimum Clearing Price"
  per U.S.$100 or AR$100 original principal amount for each
  series of Eligible Bonds.

Argentina currently expects to set the coupons for the New Bonds at
below market rates and accordingly expects to set the New Bond Issue
Price for each New Bond at a substantial discount to its principal amount.

**Selection of Clearing Prices;
Announcement Date** ...................... After reviewing the Exchange Offers made in the Invitation, Argentina
will, at or around 8:30 A.M., New York City time, on the first Trading
Day after the Expiration Date (or as soon thereafter as possible), or
before, select in its sole discretion and announce the "Clearing Price" per
AR$100 original principal amount for each series of Eligible Bonds being

S-3

exchanged for New AR$ Bonds and the "Clearing Price" per U.S.100 or AR$100 original principal amount for each series of Eligible Bonds being exchanged for New U.S.$ Global Bonds.  Argentina will not be permitted to select a Clearing Price for any series of Eligible Bonds that is below the Minimum Clearing Price for that series.

We refer to the Trading Day following the Expiration Date as the "Announcement Date," although Argentina will be free to announce the results of the Invitation before the Announcement Date.

Minimum Issue Size.........................  Argentina will not issue New Bonds of any series pursuant to the Invitation unless it issues at least U.S.$1,000,000,000 in aggregate principal amount (or, in the case of the New AR$ Bonds, AR$500,000,000 in aggregate principal amount) of that series.  Argentina reserves the right, in its sole discretion, not to issue any New Bonds, or not to issue New Bonds of any given series, or to issue New Bonds of one or more series and not another, pursuant to the Invitation.

Competitive and Noncompetitive Offers; Minimum Offer Amount...  Your Exchange Offer may be either:

- a "competitive offer" which specifies a minimum price that you would accept as the Clearing Price or

- a "noncompetitive offer" which does not specify any such minimum price.

The minimum aggregate principal amount of each series of Eligible Bonds that you can offer to tender in an Exchange Offer (whether you submit a competitive or a noncompetitive offer) is U.S.$250,000 or AR$250,000.

In addition, in order to reduce errors and irregularities in the inputting of competitive offers into the Invitation Websites, the Invitation Websites will not accept competitive offers that specify Offer Prices above U.S.$110 or AR$110 per U.S. $100 or AR$100 original principal amount for any series of Eligible Bonds.

Most but not all of the Bocon and Bonex Bonds trade in the market at prices that include accrued interest, and most but not all of the other Eligible Bonds trade in the market at prices that exclude accrued interest. In the Invitation, we will treat all Bocon and Bonex Bonds as though they trade at prices that include accrued interest and all of the other Eligible Bonds as though they trade at prices that exclude accrued interest. Accordingly, if you submit a competitive offer, please remember that:

- the Offer Price you specify for Bocon and Bonex Bonds should include accrued interest even if your series does not trade that way in the market, and

- the Offer Price you specify for other Eligible Bonds should exclude accrued interest even if your series does not trade that way in the market.

Income Tax Consequences ............ Please see the section entitled "Taxation" for important information regarding the possible tax consequences to Bondholders who exchange Eligible Bonds for New Bonds.

Markets................................................ Argentina is making the Invitation only in those jurisdictions where it is legal to make such offers. See "Certain Legal Restrictions," "Plan of Distribution" and "Jurisdictional Restrictions."

Concurrent Invitation...................... Concurrently with the Invitation, Argentina is inviting the holders of Bonos-Pagaré, Bontes TV, Eurobonds FRN 2004 and Bontes 2002 domiciled in Argentina to exchange them for U.S. dollar-denominated Bonos-Pagaré due 2006 (the "New Bonos-Pagaré") (the "New Bonos-Pagaré Invitation"). The New Bonos-Pagaré will be governed by Argentine law, and the New Bonos-Pagaré Invitation is being conducted in Argentina only in a transaction exempt from the registration requirements of the U.S. federal securities laws pursuant to Regulation S under the Act. U.S. persons (as defined in Regulation S) may not participate in the New Bonos-Pagaré Invitation. For more information about the New Bonos-Pagaré Invitation, see "Terms of the Invitation—Concurrent Invitation."

### The New Bonds

### Common Terms

Issuer......................................... The Republic of Argentina.

Additional Amounts........................ Argentina will make payments of principal and interest in respect of the New Bonds without withholding or deduction for or on account of any present or future Argentine taxes, duties, assessments or governmental charges of whatever nature except as set forth in "Description of Securities—Additional Amounts" in the accompanying prospectus.

Further Issues.............................. Argentina may, from time to time, create and issue further bonds having the same terms as and ranking equally with any series of the New Bonds in all respects and such further bonds will be consolidated and form a single series with the appropriate series of the New Bonds.

Claim to Full Principal................ Despite the fact that Argentina expects to set the coupons for the New Bonds at below market rates and accordingly expects to set the New Bond Issue Prices at substantial discounts to principal amount, the New Bonds will represent a claim to their full principal (plus accrued and unpaid interest) at maturity or upon earlier acceleration in accordance with the terms thereof.

Form and Settlement...................... Argentina will issue the New Bonds in the form of one or more fully registered global securities registered in the name of a nominee of The Depository Trust Company, or "DTC" (in the case of the New U.S.$ Global Bonds) or a common depositary for Clearstream Banking, société anonyme, Luxembourg ("Clearstream, Luxembourg") and the Euroclear System ("Euroclear") (in the case of the New AR$ Bonds) and deposit the securities with a custodian for DTC (in the case of the New U.S.$ Global Bonds) or a common depositary for Clearstream, Luxembourg and Euroclear (in the case of the New AR$ Bonds). You may hold a beneficial interest in the securities through Clearstream, Luxembourg or Euroclear, or, in the case of the New U.S.$ Global Bonds, DTC, directly as a participant in one of those systems or indirectly through financial institutions that are participants in any of those systems.

As an owner of a beneficial interest in the global securities, you will generally not be entitled to have your New Bonds registered in your name, will not be entitled to receive certificates in your name evidencing the New Bonds and will not be considered the holder of any New Bonds under the fiscal agency agreement for the New Bonds.

Listing ...................................... Application has been made to list the New Bonds on the Luxembourg Stock Exchange, and application will be made to list the New Bonds on the Buenos Aires Stock Exchange and on the *Mercado Abierto Electrónico*.

### The New AR$ Bonds

Securities Offered ........................... Argentine peso-denominated Bonds due September 19, 2008.

Interest .......................................... The New AR$ Bonds will bear interest from the Settlement Date to September 19, 2004 at a per annum rate equal to the initial New AR$ Bond coupon selected by Argentina at or around 9:00 A.M., New York City time, on the Expiration Date (the "AR$ Coupon"), and from September 19, 2004 to September 19, 2008 at a per annum rate equal to the stepped up New AR$ Bond coupon selected by Argentina at or around 9:00 A.M., New York City time, on the Expiration Date (the "AR$ Step-Up Coupon"). Argentina will pay interest semi-annually in arrears on March 19 and September 19 of each year, commencing on September 19, 2001. Payments of interest will be made in Argentine pesos, unless the holder of the New AR$ Bonds elects to receive payment in U.S. dollars (in which case payment will be made in U.S dollars at the ratio of one U.S. dollar to one Argentine peso regardless of changes in foreign exchange rates).

Maturity .......................................... Argentina may not redeem the New AR$ Bonds before maturity. At maturity, Argentina will repay the principal amount of the New AR$ Bonds in full. Payment of principal will be made in Argentine pesos, unless the holder of the New AR$ Bonds elects to receive payment in U.S. dollars (in which case payment will be made in U.S dollars at the ratio of one U.S. dollar to one Argentine peso regardless of changes in foreign exchange rates).

### The New U.S.$ Global Bonds

#### *The 2008 Global Bonds*

Securities Offered ........................... U.S. dollar-denominated Global Bonds due December 19, 2008.

Interest .......................................... The 2008 Global Bonds will bear interest from the Settlement Date to June 19, 2004 at a per annum rate equal to the initial 2008 Global Bond coupon selected by Argentina at or around 9:00 A.M., New York City time, on the Expiration Date (the "2008 Coupon"), and from June 19, 2004 to December 19, 2008 at a per annum rate equal to the stepped up 2008 Global Bond coupon selected by Argentina at or around 9:00 A.M., New York City time, on the Expiration Date (the "2008 Step-Up Coupon"). Argentina will pay interest semi-annually in arrears on June 19 and December 19 of each year, commencing on December 19, 2001.

Maturity .......................................... Argentina may not redeem the 2008 Global Bonds before maturity, but will be required to pay principal in six equal semi-annual installments on June 19 and December 19 of each year, commencing on June 19, 2006.

### The 2018 Global Bonds

**Securities Offered** ........................... U.S. dollar-denominated Global Bonds due June 19, 2018.

**Interest** ............................................... The 2018 Global Bonds will bear interest from the Settlement Date at a per annum rate equal to the 2018 Global Bond coupon selected by Argentina at or around 9:00 A.M., New York City time, on the Expiration Date (the "2018 Coupon"). Argentina will pay interest semi-annually in arrears on June 19 and December 19 of each year, commencing on December 19, 2006. Interest accruing on or before June 19, 2006 will be capitalized (*i.e.*, added to principal) semi-annually on each June 19 and December 19, from December 19, 2001, to June 19, 2006.

**Maturity** ........................................... Argentina may not redeem the 2018 Global Bonds before maturity, but will be required to pay the then current principal of the 2018 Global Bonds (including interest capitalized for the first five years) in five equal semi-annual installments on June 19 and December 19 of each year, commencing on June 19, 2016. As a result of interest capitalization for the first five years, the principal amount of the 2018 Global Bonds subject to amortization will be larger than their original principal amount.

### The 2031 Global Bonds

**Securities Offered** ........................... U.S. dollar-denominated Global Bonds due June 19, 2031.

**Interest** ............................................... The 2031 Global Bonds will bear interest from the Settlement Date at a per annum rate equal to the 2031 Global Bond coupon selected by Argentina at or around 9:00 A.M., New York City time, on the Expiration Date (the "2031 Coupon"). Argentina will pay interest semi-annually in arrears on June 19 and December 19 of each year, commencing on December 19, 2006. Interest accruing on or before June 19, 2001 will be capitalized (*i.e.*, added to principal) semi-annually on each June 19 and December 19, from December 19, 2001, to June 19, 2006.

**Maturity** ........................................... Argentina may not redeem the 2031 Global Bonds before maturity. At maturity, Argentina will repay the then current principal of the 2031 Global Bonds in full. As a result of interest capitalization for the first five years, the principal amount of the 2031 Global Bonds at maturity will be larger than their original principal amount.

## PROCEDURES FOR THE INVITATION

*This summary of procedures for the Invitation is qualified in its entirety by, and should be read together with, the more detailed information appearing elsewhere in this prospectus supplement. The various dates and times in this summary are based on Argentina's current schedule; those dates and times are subject to change in Argentina's sole discretion.*

May 24, 2001 ................................................... Invitation commences.

May 24, 2001 through June 1, 2001 ................... The Invitation Websites will permit you and custodians, joint lead managers and co-managers to prepare electronic letters of transmittal relating to one or more offers to exchange (each, an "Exchange Offer") Eligible Bonds for New Bonds at any time while the Invitation is open and to save such electronic letters of transmittal in draft form.

Your Exchange Offer may be either:

- a "competitive offer" which specifies a minimum price that you would accept as the Clearing Price or

- a "noncompetitive offer" which does not specify any such minimum price.

Electronic letters of transmittal in connection with noncompetitive offers may be submitted at any time following announcement of the terms of the Invitation through 4:00 P.M., New York City time, on June 1, 2001 (the "Noncompetitive Submission Period").

Electronic letters of transmittal in connection with competitive offers may only be submitted following the announcement of the Minimum Clearing Prices at or around 9:00 A.M. through 4:00 P.M., New York City time, on June 1, 2001 (the "Competitive Submission Period" and, together with the Noncompetitive Submission Period, the "Submission Periods").

You may elect which Invitation Website you prefer to use. You should submit each Exchange Offer only once, through the Invitation Website that you choose.

At or around 9:00 A.M., New York City
time, June 1, 2001 ............................................. Argentina selects, in its sole discretion, and announces the Minimum Clearing Price for each series of Eligible Bonds, the coupons applicable to each series of New Bonds and the New Bond Issue Price for each series of New Bonds.

The Competitive Submission Period begins immediately thereafter. You, or a custodian, joint lead manager or co-manager acting on your behalf (as described in this prospectus supplement), must submit electronic letters of transmittal to one of the Invitation Websites.

You may submit an electronic letter of transmittal in any of the

S-9

following ways:

*Exchange Offers with respect to Eligible Bonds held in Euroclear and Clearstream, Luxembourg*

An electronic letter of transmittal relating to Eligible Bonds held in Euroclear or Clearstream, Luxembourg may be submitted by:

- a direct participant in one of these clearing systems who has delivered Bond Instructions (as defined herein) to Euroclear or Clearstream, Luxembourg, or

- a beneficial owner who has instructed the direct participant holding the Eligible Bonds on his or her behalf in Euroclear or Clearstream, Luxembourg, to deliver Bond Instructions, but only if such Bond Instructions have in fact been delivered.

Alternatively, you may request a joint lead manager or a co-manager (each joint lead manager or co-manager, a "Dealer Manager"), who is under no obligation to act on your behalf, to submit an electronic letter of transmittal on your behalf. Argentina will not require a Dealer Manager acting on your behalf to deliver Bond Instructions prior to the end of the Submission Periods. However, Euroclear and/or Clearstream, Luxembourg must receive Bond Instructions with respect to any such Exchange Offers accepted by Argentina no later than two Trading Days after the Announcement Date.

Direct participants in Euroclear or Clearstream, Luxembourg must include a reference code in the remarks field on the Bond Instructions, preferably a subaccount reference to the beneficial owner for the direct participant's account at Euroclear or Clearstream, Luxembourg (no more than 16 characters). Any reference code entered on the Bond Instructions must also be entered on the electronic letter of transmittal at the elected Invitation Website. To the extent that the direct participant is not entering orders on the Invitation Websites, the reference code for each Bond Instruction should be transmitted to the person who is entering orders on behalf of the beneficial owner. **Any Bond Instruction that for any reason cannot be promptly and unmistakably reconciled with an electronic letter of transmittal will be deemed invalid by Argentina.**

*Exchange Offers with respect to Eligible Bonds held in DTC*

If you desire to submit an Exchange Offer with respect to Eligible Bonds held through DTC, you must arrange for those Eligible Bonds to be transferred to a Euroclear or Clearstream, Luxembourg account. If you do not have an account at Euroclear or Clearstream, Luxembourg and you do not know how to arrange for such a transfer, you should telephone a Dealer Manager for assistance in submitting your Exchange Offer. Once your Eligible Bonds have been transferred to a Euroclear or Clearstream, Luxembourg account, you may then submit an electronic letter of transmittal and deliver Bonds Instructions in accordance with the procedures

S-10

described above for Eligible Bonds held in Euroclear and
Clearstream, Luxembourg.

### Exchange Offers with respect to Eligible Bonds held in Caja de Valores or CRYL

If you hold Eligible Bonds in *Caja de Valores S.A.* ("*Caja de Valores*") or *Central de Registro y Liquidaciones* ("CRYL"), the registration and settlement center of the *Banco Central de la República Argentina*, you may submit an electronic letter of transmittal for Exchange Offers relating to such Eligible Bonds only through a Dealer Manager acting on your behalf.

Although the Dealer Managers are under no obligation to act on your behalf, once a Dealer Manager tenders an Exchange Offer on your behalf this Dealer Manager will become responsible for the delivery of any Eligible Bonds accepted by Argentina with respect to such Exchange Offer to such Dealer Manager's fiduciary account at Euroclear or Clearstream, Luxembourg no later than two Trading Days after the Announcement Date. Each Dealer Manager will establish its own fiduciary account at Euroclear and/or Clearstream, Luxembourg and will require you to deliver your Eligible Bonds specified in such Exchange Offer to this account, at the time specified at its own discretion, which may be either after the Announcement Date or before the Announcement Date, but in no event later than two Trading Days after the Announcement Date. In addition, a Dealer Manager may impose additional conditions or procedures before acting on your behalf in this manner.

Each Dealer Manager will then be responsible for delivering Bond Instructions to Euroclear or Clearstream, Luxembourg with respect to your Eligible Bonds no later than two Trading Days after the Announcement Date. New Bonds issued with respect to these Exchange Offers will be delivered to the Dealer Manager's account at Euroclear or Clearstream, Luxembourg and it will be the Dealer Manager's responsibility to transfer them into the account that you specify.

### Exchange Offers with respect to Certificated Eligible Bonds

If you hold certificated Bonex 1992, Par Bonds, Discount Bonds or FRBs (the "Certificated Eligible Bonds") not held through Euroclear, Clearstream, Luxembourg, Caja de Valores or CRYL, you may submit electronic letters of transmittal and tender those securities under the procedures described in this prospectus supplement under "Terms of the Invitation—Invitation Procedures—Exchange Offers with Respect to Certificated Eligible Bonds."

### Exchange Offers with respect to Bonos-Pagaré in the Form of Pagarés

If you hold Bonos-Pagaré in the form of pagarés (*i.e.* promissory notes), you may submit electronic letters of transmittal and tender

S-11

those securities under the procedures described in this prospectus supplement under "Terms of the Invitation—Invitation Procedures—Exchange Offer with Respect to Bonos-Pagaré in the Form of Pagarés."

### Luxembourg Holders

If you are in Luxembourg, you may contact and instruct the Luxembourg exchange agent to submit an electronic letter of transmittal on your behalf or have an electronic letter of transmittal submitted according to one of the methods described above.

For more information with respect to Exchange Offer procedures, see "Terms of the Invitation—Invitation Procedures—Procedures for Submitting Exchange Offers."

| | |
|---|---|
| 4:00 P.M., New York City time, June 1, 2001... | The Submission Periods end and the Invitation expires, unless Argentina extends it or terminates it earlier in its sole discretion. You may no longer submit electronic letters of transmittal. Each Exchange Offer and corresponding electronic letter of transmittal will become irrevocable at this time. |
| At or around 8:30 A.M., New York City time, or as soon as possible thereafter, June 4, 2001, or before................... | Argentina determines in its sole discretion whether to accept any Exchange Offers and, if so, the applicable Clearing Prices for Eligible Bonds of each series being exchanged for New Bonds of each series and the aggregate original principal amount of Eligible Bonds of each series to be acquired in exchange for New Bonds of each series. |
| | Argentina announces the results of the Invitation. Trading in New Bonds on a when-issued basis will commence following the announcement of the results of the Invitation. |
| June 6, 2001................... | With respect to Exchange Offers for Eligible Bonds held in Euroclear or Clearstream, Luxembourg, the Dealer Managers who have submitted such Exchange Offers on behalf of Bondholders must ensure that Bond Instructions have been submitted for all such Exchange Offers accepted by Argentina. |
| | With respect to Exchange Offers for Eligible Bonds previously held in *Caja de Valores* or CRYL, Dealer Managers who have submitted such Exchange Offers on behalf of Bondholders must have received into their fiduciary accounts at Euroclear and/or Clearstream, Luxembourg the Eligible Bonds specified in such Exchange Offers and accepted by Argentina, and must have submitted Bond Instructions to Euroclear or Clearstream, Luxembourg with respect to these Eligible Bonds. |
| June 19, 2001................... | Settlement of the Invitation. Delivery of New Bonds and appropriate cash payments. We refer to the date on which the Invitation settles as the "Settlement Date." |

S-12

# RECENT DEVELOPMENTS

## Recent Political Developments

Following the election of President Fernando de la Rúa, the new Government was forced to confront the challenges of dealing with the enduring economic recession and of trying to broker political consensus on critical issues relating to the economy, legal reforms and social programs. In this regard, the new Government experienced a series of serious conflicts among the various parties that make up *Alianza* and between *Alianza* and other parties represented in Congress. These conflicts escalated into defections from the Executive branch and bitter public acrimony during the last quarter of 2000 and the first quarter of 2001.

On October 5, 2000, President de la Rúa replaced several ministers and combined the Ministry of Economy and the Ministry of Infrastructure under the leadership of Minister of Economy José Luis Machinea. The following day, Vice President Carlos Alvarez resigned. Argentine law does not require that there be a Vice President, and President de la Rúa has not scheduled vice-presidential elections.

Further changes in the composition of the cabinet occurred in 2001. On March 2, 2001, José Luis Machinea resigned as Minister of Economy after having failed to restart Argentina's sluggish economy. Two days later, President de la Rúa selected Ricardo Lopez Murphy to succeed Mr. Machinea. After Mr. Lopez Murphy announced plans to reduce education and other spending in an effort to reduce the fiscal deficit, the Ministers of Education, the Interior and Social Affairs (most of them members of the *Frepaso* party, which favors greater spending on social programs) resigned on March 19, 2001 in protest of the proposed cuts. On the same day, 2001, Mr. Lopez Murphy resigned in response to the lack of political support for the proposed spending reductions. He was replaced on March 20, 2001 by Domingo Cavallo, who previously served as Minister of Economy under former President Carlos Menem.

On April 25, 2001, President de la Rúa removed Pedro Pou as president of Banco Central and appointed Roque Maccarone as Banco Central's interim president, pending Congressional approval. President de la Rúa's decision followed a recommendation for Mr. Pou's removal issued by a bicameral congressional commission on April 24, 2001, which followed a two month investigation into allegations that Mr. Pou had failed to adequately investigate evidence of money-laundering at Argentine banks. Mr. Pou opposed certain Government initiatives, including several proposals to increase the liquidity of the Argentina banking system by altering Banco Central's reserve requirements, and a proposal to modify the Convertibility Law (see "—Recent Legislation and Other Government Initiatives"). Mr. Maccarone served as president of the state-owned Banco de la Nación Argentina under former President Menem.

The enduring recession and political instability during this period have adversely affected investor confidence in Argentina. These events coincided with a serious downturn in global investor sentiment generally, marked by significant declines in international equity markets, pronounced investor risk aversion and a decrease in investor confidence in emerging markets. As a result, Argentina's cost of borrowing has increased significantly and the country has found few opportunities to effectively raise capital in the international markets. Additionally, significant amounts of Argentina's debt will become due and payable over the next twelve months (see "—Public Sector Debt"). If, as a result of current market conditions, Argentina is unable to successfully raise capital to meet its debt obligations, or to extend their maturity, its short- and medium-term liquidity would be materially and adversely affected.

## International Monetary Fund Package

On December 18, 2000, Argentina announced a U.S.$39.7 billion assistance package involving a broad-based group of lenders. The largest amount of this package is to be provided by the International Monetary Fund, or IMF, which approved a letter of intent setting forth the terms of its assistance on January 12, 2001. Pursuant to this

letter, the IMF increased Argentina's standby credit facility from U.S.$7.2 billion to U.S.$13.7 billion, U.S.$2.7 billion of which are available under a supplemental reserve facility.

The assistance package also includes:

- commitments for U.S.$2.5 billion in loans from each of the World Bank and the Inter-American Development Bank during the 2001-2003 period

- a loan arrangement of up to U.S.$1.0 billion from the government of Spain

- agreements in principle from institutional investors in Argentina, which consist primarily of Argentine pension funds, to purchase an aggregate of U.S.$3.0 billion in Argentine government securities in 2001

- agreements from Argentine local banks to supply Argentina in 2001 with U.S.$10.0 billion in financing through domestic auctions of *Bonos-Pagaré* (promissory notes), *Bonos del Tesoro* or *Bontes* (treasury bonds), and *Letras de Tesorería or Letes* (short term treasury bills), including a commitment to achieve by December 31, 2001, a U.S.$150million net annual increase in the stock of *Letes* outstanding to U.S.$5.1 billion, and

- U.S.$7.0 billion in reduced financing costs which are expected to result from Argentina's exchange of its existing debt securities for instruments with longer maturities, through a series of exchange offers.

Of the total assistance package, U.S.$15.6 billion have been made available to date. These funds have been made available as follows:

- To date, the IMF has disbursed a total of U.S.$5.0 billion, of which U.S.$2.1 billion were disbursed in December 2000 and an additional U.S.$2.9 billion were disbursed in January 2001

- On March 16, 2001, the IADB disbursed U.S.$200 million

- On March 30, 2001, the government of Spain disbursed U.S.$506 million

- To date, institutional investors in Argentina have purchased U.S.$1.1 billion in Argentine government securities.

- To date, Argentine local banks have purchased U.S.$150 million in new Bonos-Pagaré, and currently maintain a stock of U.S.$4.4 billion in Letes.

- On February 21, 2001, Argentina completed an international and a local exchange offer, which resulted in the refinancing of U.S.$4.2 billion of Argentine debt to achieve longer maturities (see "— Public Sector Debt").

Argentina expects that an additional U.S.$8.5 billion will be made available under the assistance package by December 2001, including an additional U.S.$3.8 billion under the IMF's standby credit facility. Additionally, under the assistance package, Argentina's total financing needs for 2001 are estimated at U.S.$26.6 billion.

Under the letter of intent announced on December 18, 2000, the Republic has agreed to:

- meet certain fiscal deficit targets for 2001, including a fiscal deficit target for the entire year of U.S.$6.5 billion

- eliminate its fiscal deficit by 2005

- freeze federal and provincial spending for five years, and

- limit federal transfers to the provinces.

During the first quarter of 2001, however, Argentina continued to struggle with recession and lagging tax collections that resulted in a fiscal deficit that exceeded the IMF's targets. On May 3, 2001, the Republic and the IMF agreed on a revised letter of intent that:

- forecasts GDP growth of between 2.0% and 2.5%

- requires Banco Central to restore minimum banking reserve requirements to 20% from 18% by the end of the year

- schedules disbursements of U.S.$1.3 billion of the IMF facility by the end of May 2001, and

- maintains a fiscal deficit target of U.S.$6.5 billion for the year 2001.

The revised letter of intent will allow disbursements from the IMF and other participants in the assistance package, such as the World Bank and the Inter American Development Bank, to continue as scheduled.

### Recent Legislation and Other Government Initiatives

On November 20, 2000, the governors all of Argentina's provinces except one, and the Chief of Government of the City of Buenos Aires, signed an agreement with the federal government to limit primary and public spending for the next five years. The agreement contains a clause allowing the federal government to approve spending increases under extreme circumstances in which essential services are threatened. Pursuant to this agreement, the federal government will also provide an additional U.S.$225 million for social programs in the provinces in 2001. The Congress ratified this agreement on December 7, 2000.

On November 27, 2000, the fiscal solvency law was amended to require the federal government and the provincial governments to eliminate their fiscal deficits by 2005. Previously, the deadline had been 2003.

On December 12, 2000, the Congress approved Argentina's 2001 budget. The budget assumes real GDP growth of 2.5%, a 0.5% increase in prices of goods and services and a fiscal deficit (on a cash basis and including the surplus of Banco Central) of U.S.$6.5 billion. This assumed deficit equals 2.2% of assumed nominal GDP and conforms to the fiscal solvency law as modified on November 27, 2000.

On December 29, 2000, President de la Rúa signed a series of decrees, effecting the economic and policy changes contemplated as part of the assistance package and letter of intent with the IMF. These decrees include:

- A decree enacting a number of reforms to the Argentine pension system. Pursuant to this decree, the state-run system will be gradually eliminated, a "universal fund" will provide pension payments to workers in the informal economy, and the retirement age for women will be raised from 60 to 65. (Women who retire before age 65 will receive a reduced pension payment.)

- A decree allowing Argentine citizens to choose between the union-run health insurance system and a private system in order to increase competition in this sector of the Argentine economy. On January 3, 2001, the labor unions obtained a federal court order blocking implementation of this decree. The federal government has appealed this order.

On March 28, 2001, President de la Rúa temporarily suspended implementation of these decrees in order to reach for a compromise with groups opposed to these decrees.

On December 29, 2000, President de la Rúa also signed a decree approving a public works master plan designed to improve roads, railroad facilities and city infrastructure. On this same day, he also vetoed a Congressional change to the Republic's 2001 budget that would have eliminated the 12% cut in federal salaries proposed in the budget submitted to the Congress.

On March 22, 2001, immediately after his appointment, Minister Cavallo submitted to Congress a law that would grant the executive branch wide powers to deal with Argentina's economic situation, including unilateral authority to implement measures to reduce the Republic's 2001 budget deficit by U.S.$3.0 billion. On March 23, 2001, Congress passed the Competitiveness Law, which enacted Minister Cavallo's proposal for a new tax to be imposed on credits and debits made on checking accounts held with financial institutions. The Law confers upon the executive branch authority to set the applicable tax rate on checking account transactions, but provides that it may not exceed 0.6%. Additionally, it directs that the revenues generated from this tax be used towards the establishment of an Emergency Fund, to be administered by the executive branch for safeguarding the Republic's public credit, and for restoring the competitiveness of the Republic's economy.

On March 29, 2001, Congress passed the Law of Delegation of Legislative Authority, which delegated to the executive branch until March 1, 2002 broad powers to make governmental structural reforms and to confront the Republic's current economic conditions. The executive is given discretion under the Law to restructure government administrative entities, privatize autonomous or discrete governmental agencies, deregulate the capital and insurance markets, repeal laws affecting the functioning of public entities, and make amendments to the Law of Ministries. To address current economic conditions, the executive is granted authority to cut taxes, create or eliminate tax exemptions (subject to certain exceptions), modify tax and other revenue collection mechanisms, and amend laws to further deregulate the economy, except that it may not unilaterally modify the Convertibility Law. In exercising the delegated functions, Congress provided that the executive may not create new taxes nor increase public spending. Additionally, it may not order layoffs of public personnel, nor reduce public salaries or retirement compensation.

On April 16, 2001, Minister Cavallo submitted to Congress a legislative proposal that would modify the Convertibility Law in the following respect: effective the day following the date on which the European euro and U.S. dollar achieve parity in terms of value, the Argentine peso would no longer be convertible for U.S. dollars on a one-to-one basis, but rather, each peso would be convertible for the U.S. dollar equivalent of the simple value average of one U.S. dollar and one European euro.

The Government has stated that the proposal is not an abandonment of the convertibility regime that has prevailed since the Convertibility Law was enacted more than ten years ago, but rather a logical modification in light of the introduction of the euro in January of 1999. Additionally, the Government has consistently rejected the notion that the proposed change is designed to effect a devaluation of the peso, noting that the law would only take effect if and when the euro reaches parity with the U.S. dollar. Congress is currently considering the Government's proposal.

The Government has sought to increase liquidity in the banking system in order to stimulate lending and consequent economic growth. On April 17, 2001, the Government issued a decree calling for changes to Banco Central's charter in order to improve the liquidity of the Argentine banking system. In particular, the Government's decree allows Banco Central to pay interest on deposits made by banks to meet their minimum reserve requirements, allows banks to meet their reserve requirements in either local or foreign currency (depending on the currency in which the client deposit is denominated), and permits banks to fulfill reserve requirements using cash on hand or government bonds, as well as with funds they have deposited at Banco Central. For these changes to take effect, Banco Central must issue enabling regulations. Congress is separately studying the Government's decree.

On April 23, 2001, President de la Rúa signed several decrees designed to reduce the expenditures of the Social Security Administration. These decrees eliminate "Pago Directo Pymes," which are additional payments made to some workers, provide for the retroactive payment (in twelve installments rather than in a lump sum) of retirement benefits that accrue while a worker's paperwork is being processed, and set a minimum-salary requirement of 100 pesos for certain beneficiaries of the Republic's unemployment insurance and labor risk laws. Additionally, on May 11, 2001, President de la Rúa gave Mr. Caro Figueroa, a member of Minister Cavallo's party and vice-chief of the Cabinet, supervisory authority over the Social Security Administration. In May 2001, the

Government also adopted week-long postponements in the payment of certain benefits, which will reduce the advances that the Treasury must make to the Social Security Administration.

The government has taken a series of tax-reform initiatives since the passage of the Competitiveness Law and the Law of Delegation of Legislative Authority. During the months of April and May 2001, the Government announced several changes to IVA, a value-added tax, and to income taxes. The IVA on entertainment-related goods and services was increased to 21%, and a series of IVA exemptions were eliminated, including an exemption on the sale of newspapers and magazines. In order to encourage business investment, the IVA on the sale and import of capital goods was reduced to 10.5%. Other notable tax-reform initiatives include a new capital gains tax of 15% on the sale, by natural persons, of stock of companies not listed on a stock exchange, a program to cut taxes for the garment industry, which has been severely affected by the recession.

In May 2001, following disappointing tax collection results for the first quarter of 2001 (see "—Public Sector Accounts"), the Government raised the tax rate on checking account transactions, originally set at 0.25%, to 0.4%. Subject to certain restrictions, taxpayers may deduct additional tax payments resulting from this increase from IVA and income taxes owed. Exempted from this tax are certain checking account transactions associated with exports, including foreign currency transfers into Argentina and crediting of letters of credit as a form of payment.

On May 11, 2001, President de la Rúa signed a decree by which the Administración Federal de Ingresos Públicos (the "AFIP"), the agency that administers the Republic's tax collection and customs, was placed under the authority of the Ministry of Economy. This transfer is expected to facilitate the implementation of policies designed to increase the Republic's revenues. Among the Government's initiatives in this regard is a renewed effort to detect tax evaders through the use of a new fiscal intelligence mechanism, and improved customs controls.

On May 16, 2001, in response to a constitutional challenge filed by a consumer association, a judge issued an order suspending application of the increase in IVA on cable television which the Government had adopted in April 2001. The judge expressed no opinion as to the constitutionality of the increase in IVA, but issued the suspension order to consider whether the executive branch had unconstitutionally usurped legislative authority by adopting the measure. Other challenges to the constitutionality of the increases in IVA adopted by the Government are expected.

**Gross Domestic Product and Economy**

During 2000, Argentine gross domestic product failed to meet the Government's projections, shrinking by 0.5% for the year. The fishing, construction and agriculture sectors experienced particularly weak performance during this period. A reduction in global demand that resulted primarily from an 8.3% drop in fixed gross domestic investment contributed to the shortfall in gross domestic product. Additionally, public and private consumption fell 0.4% and 0.1% respectively. Partially offsetting these factors was an increase in exports of 1.8%, which was accompanied by an increase in imports of 0.2%.

During the first quarter of 2001, the industrial production index decreased 3.0%, on a seasonally adjusted basis, as compared to the first quarter of 2000. In April 2001, the industrial production index decreased 1.7% as compared to April 2000, and it increased 1.2% as compared to March 2001, in both cases on a seasonally adjusted basis. The sectors of the economy that have showed the greatest increase in industrial production have been the agrochemical industry, and those dealing with the production of plastic raw materials and industrial gases. On the other hand, the fabric, tire and cotton-production industries showed the most marked decline.

**Inflation**

During 2000, the consumer price index decreased 0.9% and the wholesale price index increased 3.8%, primarily due to increases in oil prices. During the first quarter of 2001, the consumer price index increased 0.7% and the wholesale price index decreased 0.6%. In April 2001, the consumer price index increased 0.7%, and the wholesale price index decreased 0.1%.

**Employment and Labor**

In October 2000, the national unemployment rate fell to 14.7% from 16.0% in May 2000, due primarily to a decrease in the participation rate. Unemployment and underemployment continue to create serious social problems in Argentina, and remain an obstacle to economic growth.

**Trade Balance**

During 2000, exports increased by 12.5% to U.S.$26.3 billion (measured on an f.o.b. basis) as compared to 1999, due to increased demand in Brazil which was spurred by the recovery of the Brazilian economy. The oil, gas and industrial production sectors showed the largest increase in exports. Total imports during 2000 decreased by 1.4% to U.S.$25.1 billion (measured on a c.i.f. basis) as compared to 1999. During 2000, exports to Mercosur countries increased by 18.7% to U.S.$8.4 billion (measured on an f.o.b. basis) as compared to the previous year, due to increased Brazilian demand. During 2000, imports from Mercosur countries increased by 14.3% to U.S.$7.2 billion (measured on a c.i.f. basis) as compared to 1999, due to increased imports of intermediate, capital and consumer goods.

During the first quarter of 2001, exports increased by 3.7% to U.S.$5.9 billion (measured on an f.o.b. basis) as compared to the same period of 2000, due mainly to a 3% rise in the prices of Argentine goods sold abroad. Primary and industrial products showed the largest increase in exports, while only agricultural products showed a decrease. During this same period, total imports decreased by 2.9% to U.S.$5.7 billion (measured on a c.i.f basis) as compared to the same period of 2000, due to a 2% drop in the prices of foreign goods sold in Argentina. Intermediate and consumer goods showed the largest increase in imports, while capital goods showed the largest decrease. During the first quarter of 2001, exports to Mercosur countries increased by 0.9% to U.S.$1.9 billion (measured on an f.o.b. basis) and imports from Mercosur countries increased by 6.2% to U.S.$1.6 billion (measured on a c.i.f. basis), in both cases as compared to the same period for the year 2000. The industry sector showed the largest increase in exports to Mercosur countries, while agricultural products and fuels showed a decrease in exports to Mercosur countries. The largest decrease in imports from Mercosur countries was seen with respect to capital goods, while the largest increase in imports from Mercosur countries was seen with respect to fuels and consumer goods.

As of May 18, 2001, the Government had confirmed 676 cases of foot-and-mouth disease, including several cases in the provinces of Entre Ríos and Corrientes. Additionally, two cases found close to the city of Carmen de Patagones, south of the Colorado River, suggest that the disease may spread to the Patagonia region, which has so far been free of the disease without vaccination. The European Union, the United States, Canada and Chile banned imports of Argentine beef soon after the first cases of foot-and-mouth disease were reported in March 2001. During the first quarter of 2001, beef exports decreased by more than 60%, and the slaughter of cattle fell by 6%, in both cases as compared to first quarter of 2000. In April 2001, the Government announced plans to vaccinate approximately 49 million cattle, comprising nearly all of Argentina's cattle. The plan, which the Government expects to complete by July 10, 2001, is estimated to cost approximately U.S.$80 million. In April 2001, the Government also loosened strict restrictions on herd movement it had imposed the previous month. Additionally, it adopted sanitary requirements for the entry of meat-related products into various regions of the country, and designated points of entry and quality control for such regions. As of May 18, 2001, the Government was vaccinating approximately 12 million cattle per month, and since March 2000, it had vaccinated approximately 28 million cattle. As a result of its vaccination program, the Government expects to be free of the disease by the middle of 2004. The Government has been conducting discussions with representatives of the European Union regarding the ban on imports of Argentine beef, and it expects to conduct similar discussion with representatives of the United States and Canada.

Among other initiatives that have been adopted by the Government is a lowering of tariffs on imports of capital goods from 14% to 0%, in order to stimulate capital investment, and an increase of tariffs on imports of consumer goods, originally ranging from 15% to 35%, to a uniform 35% on all such goods.

**Balance of Payments**

Argentina had a current account deficit for 2000 of U.S.$9.4 billion, 24.8% lower than the current account deficit for 1999. This decrease was primarily attributable to a decrease in Argentina's trade deficit. Argentina had a capital account surplus for 2000 (including errors and omissions) of U.S.$8.9 billion, 34.6% lower than the capital account surplus for 1999. The decrease in the capital account surplus was mainly the result of decreased foreign direct investment.

**Financial Sector**

Despite recessionary conditions, total deposits in Argentina's banking system increased by 6.8% during 2000. As of March 30, 2001, total deposits (36.9% of which were in Argentine pesos and 63.1% of which were in U.S. dollars) in the banking system equaled U.S.$81.2 billion, a decrease of 2.82% from the level recorded on December 28, 2000. As of April 30, 2001, total deposits (37.0% of which were in Argentine pesos and 63.0% of which were in U.S. dollars) in the banking system equaled U.S.$80.5 billion, a decrease of 3.6% from the level recorded on December 28, 2000, and a decrease of 0.9% from the level recorded on March 30, 2001.

On April 30, 2001, prime rates in Argentina were 24.5% for 30-day loans in Argentine pesos and 15.8% for 30-day loans in U.S. dollars.

**Monetary Base and Reserves**

The economic recession had a negative impact on Argentina's monetary base and international reserves in 2000. As of December 31, 2000, the monetary base (consisting of currency in circulation and money held at Banco Central to meet liquidity requirements) was U.S.$24.6 billion, a 4.4% decrease from the level recorded on December 31, 1999. On December 31, 2000, gross international reserves at Banco Central (including approximately U.S.$1.3 billion of public bonds) stood at U.S.$26.5 billion, a 3.0% decrease from the December 31, 1999 level.

As of April 30, 2001, the monetary base had decreased 4.9% to U.S.$20.4 billion and gross international reserves at Banco Central (including approximately U.S.$1.8 billion of public funds) had decreased 4.3% to U.S.$22.4 billion, in each case as compared to March 30, 2001.

On April 3, 2001, Banco Central reduced the minimum reserve requirements for banks from 20% to 18%. Pursuant to a revised letter of intent agreed with the IMF on May 4, 2001, Banco Central will restore the minimum reserve requirements to 20% by the end of the year. On April 9, 2001, Banco Central announced that local banks could use U.S.$2.0 billion worth of government bonds they had committed to buy to satisfy their reserve requirements. These bonds purchases were completed by April 12, 2001.

**Public Sector Accounts**

During 2000, Argentina recorded a fiscal deficit of U.S.$6.6 billion (calculated by subtracting Banco Central's surplus of U.S.$347 million from the deficit of U.S.$6.9 billion of the non-financial public sector). The Government's efforts to reduce the fiscal deficit in 2000 were hampered by the weakness of domestic demand and the continued decline in consumer prices. Despite the introduction of a sizable package of tax increases in January 2000, overall revenues, including social security contributions, rose by only 3.1% during 2000. As a result, despite the Government's efforts to contain primary spending, in September 2000 Argentina and the IMF agreed to revise Argentina's fiscal deficit target for 2000 from U.S.$4.7 billion to U.S.$5.3 billion. Argentina's December 15, 2000 letter of intent with the IMF provided for a further increase in the fiscal deficit target for 2000, to U.S.$6.7 billion. Argentina met this revised target by a margin of U.S.$110.6 million.

During the first quarter of 2001, Argentina recorded a fiscal deficit of U.S.$3.1 billion, that surpassed the first quarter target agreed with the IMF by U.S.$1.0 billion. The fiscal deficit for the first quarter of 2001 reflects U.S.$126.3 million in one-time expenses associated with the Government's restructuring program. The Republic's fiscal deficit for the first quarter, excluding these one-time expenses, was U.S.$3.0 billion. This revised fiscal deficit

reflected a 50.3% increase over the fiscal deficit that Argentina registered for the first quarter of 2000. This increase was due primarily to a decrease in tax revenues coupled with an increase in current expenditures brought about by higher interest payments.

In April 2001, tax collections decreased 9.1% to U.S.$3.5 billion, as compared to April 2000, and they increased 6.5% as compared to March 2001. These changes in the overall level of tax collections were driven primarily by variations in the collection of IVA and income taxes.

**Public Sector Debt**

As of December 31, 2000, total gross public debt was U.S.$128.0 billion. Approximately U.S.$122.3 billion, or 95.6% of this amount, were denominated in currencies other than the peso, principally in U.S. dollars. As of December 31, 2000, total net public debt (total gross public debt minus total government financial assets related to debt operations, such as United States Treasury bills held as collateral for Brady bonds) was U.S.$119.2 billion. Between December 31, 1999 and December 31, 2000, total gross public debt increased by 5% and total net public debt increased by 7.4%. These increases are attributable primarily to the bonds and notes the Republic issued to finance its fiscal deficit.

As of May 19, 2001, the Government projected amortizations of medium- and long-term debt of U.S$3.4 billion and U.S.$2.6 billion for the third and fourth quarters of 2001, respectively, and of U.S.$2.8 billion and U.S.$7.4 billion for the first and second quarters of 2002, respectively. As of the same date, the Government projected amortizations of short-term debt of U.S.$4.8 billion for the remainder of 2001.

During 2000, Argentina issued U.S.$22.0 billion of debt (including U.S.$5.4 billion of debt issued in exchange offers), including:

- U.S.$6.3 billion of U.S. dollar-denominated global bonds (including U.S.$2.4 billion of debt issued in an exchange offer)

- U.S.$4.9 billion of euro-denominated bonds

- U.S.$1.1 billion of yen-denominated bonds, and

- U.S.$9.7 billion of debt issued in the domestic market in the form of Bontes (including U.S.$3.0 billion Bontes issued in an exchange offer), Bonos-Pagaré and a net increase in the stock of Letes.

As of May 17, 2001, Argentina had issued U.S.$9.71 billion of debt (including U.S.$4.2 billion of debt issued in exchange offers) in 2001, including:

- U.S.$2.77 billion of U.S. dollar-denominated global bonds (including U.S.$1.6 billion of debt issued in an exchange offer)

- U.S.$470.0 million of euro-denominated debt, and

- U.S.$6.47 billion of debt issued in the domestic market (including U.S.$3.0 billion in Bontes, a net decrease in the stock of Letes of U.S.$237 million and an increase in Bonos-Pagaré of U.S.$150 million).

The following tables set forth in greater detail the debt issued by Argentina during 2001:

**Medium and Long Term Debt Issued in the International Markets**

| Security | Issue Date | Amount | Offering |
|---|---|---|---|

| | | (in millions of USD) | Price |
|---|---|---|---|
| Global Bonds 2031 (U.S.$)................... | January 31, 2001 | 500 | 99.28% |
| 10% Bonds due 2007 (euro)(1)............ | February 22, 2001 | 470 | 99.35% |
| Global Bonds 2012 (U.S.$).................. | February 7, 2001 | 1594 | 100.00% |
| Global Bonds 2031 (U.S.$)................... | February 28, 2001 | 250 | 96.51% |
| Global Bonds 2031 (U.S.$)................... | March 30, 2001 | 225 | 91.59% |
| Global Bonds 2031 (U.S.$)................... | April 26, 2001 | 200 | 91.59% |

(1)   Issued under Argentina's U.S.$15 billion Medium-Term Note Program.

## Medium and Long Term Debt Issued in the Local Market

| Security | Issue Date | Amount (in millions of USD) | Offering Price | Maturity | Coupon |
|---|---|---|---|---|---|
| *Bontes 2006* (U.S.$)... | February 7, 2001 | 2,608.1 | 100.00% | May 15, 2006 | 11.75% |
| *Bontes 2005* (U.S.$)... | March 30, 2001 | 420.0 | 93.10% | May 21, 2005 | 12.125% |
| *Pagaré-Bono* 2003 (U.S.$) ..................... | February 13, 2001 | 150.0 | 100.00% | February 4, 2003 | Auction + 4.35% (1) |
| 10.5% Bonds due 2018 (USD)............... | February 26, 2001 | 50.5 | 100.00% | December 30, 2018 | 10.50% |
| 9% Bonds due 2002 (U.S.$) ..................... | April 16, 2001 | 2,000.0 | 100.00% | April 16, 2002 | 9.00% |
| Floating Rate Bonds due 2003 (U.S.$)........ | April 24, 2001 | 380.0 | 100.00% | April 24, 2003 | Badlar + 4.05% (2) |
| Floating Rate Bonds due 2004 (U.S.$)........ | May 10, 2001 | 906.2 | 100.00% | May 10, 2004 | Auction + 4.95% (3) |
| Floating Rate Bonds due 2004 (U.S.$)........ | May 10, 2001 | 93.8 | 100.00% | May 10, 2004 | Badlar + 2.98% (4) |

(1)   Auction is the local Argentine interest rate for time deposits of less than U.S.$1 million, which on the date of issuance was 6.47%.
(2)   Badlar is the local Argentine interest rate for deposits in excess of U.S.$1 million, which on the date of issuance was 6.47%.
(3)   Auction is the local Argentine interest rate for time deposits of less than U.S.$1 million, which on the date of issuance was 11.78%.
(4)   Badlar is the local Argentine interest rate for time deposits in excess of U.S.$1 million, which on the date of issuance was 12.49%.

Additionally, Argentina has short-term obligations as follows:

- U.S.$4.4 billion in Letes currently outstanding that will all mature prior to March 2002, representing a net decrease of U.S.$237 over the amount outstanding as of December 31, 2000, and

- on February 15, 2001, Argentina issued U.S.$52.0 million in Letras FFDP maturing May 11, 2001, for an issue price of 98%, and on May 8, 2001, it issued an additional U.S.$50.0 million in Letras FFDP maturing on August 7, 2001, for an issue price of 96.95%.

On May 6, 2001, the Government announced that it had reached an agreement in principle with several investment banks to conduct an offer to exchange certain of Argentina's short-term debt obligations for longer-term bonds. On May 16, President de la Rúa signed a decree authorizing the exchange offer. The Government expects the voluntary exchange, the terms of which have not been finalized, to be made on market terms.

On November 21, 2000, Moody's Investors Service, Inc. revised Argentina's outlook from stable to negative, citing the country's high financing needs. On March 19, 2001, Standard and Poor's placed Argentina on negative credit watch, citing the growing risks that the current political crisis posed for the Republic's economic program. On March 20, 2001, Fitch downgraded the Republic's long-term foreign currency debt rating from "BB" to "BB-", and the Republic's long-term local currency debt rating from "BB+" to "BB", due to the current political crisis. Fitch also placed the Republic on Rating Watch Negative, in light of the difficulties President de la Rúa may face in assembling new coalitions to support his economic program. On March 26, 2001, Standard and Poor's downgraded the Republic's long-term local currency debt rating from "BB" to "B+", and the Republic's long-term foreign currency debt rating from "BB-" to "B+". The Republic's short-term currency debt ratings were left unchanged. On March 28, 2001, Moody's downgraded the Republic's foreign currency rating for bonds and notes from "B1" to "B2", and the Republic's foreign-currency rating for bank deposits from "B2" to "B3." It also downgraded the rating for local-currency securities from "B1" to "B2", and kept the Republic under review for possible further downgrades citing similar concerns to those expressed by Standard and Poor's and Fitch. On March 28, 2001, Fitch downgraded the Republic's long-term foreign currency debt ratings from "BB-" to "B+", and the Republic's long-term local currency debt rating from "BB" to "B+." Fitch noted that the downgrades reflect the difficulty the Argentine public sector can be expected to face in the coming months in accessing market sources of funding at reasonable cost. Additionally, Fitch kept the Republic on Rating Watch Negative. On May 8, 2001, Standard and Poor's further downgraded the Republic's long-term debt ratings, for both local and foreign currency, from "B+" to "B", and the Republic's short-term debt ratings, for both local and foreign currency, from "B" to "C."

S-22

## TERMS OF THE INVITATION

Argentina is inviting owners of Eligible Bonds, also referred to as "Bondholders," to submit, on the terms and subject to the conditions of this prospectus supplement and the related electronic letters of transmittal, offers to exchange AR$ Eligible Bonds for newly issued New AR$ Bonds, 2008 Eligible Bonds for newly issued 2008 Global Bonds, 2018 Eligible Bonds for newly issued 2018 Global Bonds and 2031 Eligible Bonds for newly issued 2031 Global Bonds. Each such offer is referred to as an "Exchange Offer." The terms of each series of the New Bonds are described later in this document under the heading "Description of the New Bonds."

### Purpose of the Invitation

The Invitation is part of a broader program of Argentina to manage its liabilities. In addition, the issuance of the New Bonds is intended to provide liquid, sovereign risk benchmarks for Argentina.

### Calculation of Exchange Ratios

#### New Bonds and Interest to be Received Pursuant to Exchange Offers

If you make an offer to exchange a series of Eligible Bonds for a series of New Bonds pursuant to the Invitation and Argentina accepts your Exchange Offer, you will receive, in exchange for each U.S.$1.00 or AR$1.00 in original principal amount of Eligible Bonds exchanged, New Bonds of the appropriate series having a principal amount (in the appropriate currency) equal to:



$$\frac{\text{Clearing Price} \times \text{Scaling Factor}}{\text{New Bond Issue Price}}$$

where:

- the Clearing Price for that series of Eligible Bonds and the New Bond Issue Price for that series of New Bonds will be selected as described under "—Selection of Clearing Prices" and "—Selection of New Bond Coupons, New Bond Issue Prices and Minimum Clearing Prices" below, and

- the scaling factor for the FRBs is 0.64000 and the scaling factor for all other Eligible Bonds is 1.00000.

Because Argentina will issue New Bonds only in integral multiples of U.S.$1.00 or AR$1.00, the principal amount of New Bonds of any series that will be issued to any exchanging holder, if not an integral multiple of U.S.$1.00 or AR$1.00, will be rounded up or down to the nearest U.S.$1.00 or A$1.00.

In addition to New Bonds, you will receive an amount in cash (in the currency of the applicable series of Eligible Bonds) equal to the accrued but unpaid interest on your Eligible Bonds accepted for exchange to but not including the Settlement Date (except that you will not receive this cash amount for any exchanged Bocon and Bonex Bonds, since the Clearing Prices for those bonds will reflect accrued interest).

#### Selection of New Bond Coupons, New Bond Issue Prices and Minimum Clearing Prices

At or around 9:00 A.M., New York City time, on the Expiration Date, Argentina will select in its sole discretion and announce:

- the coupons applicable to each series of New Bonds

- the price that will serve as the "New Bond Issue Price" per U.S.$100 or AR$100 original principal amount for each series of New Bonds, and

- the price that will serve as the "Minimum Clearing Price" per U.S.$100 or AR$100 original principal amount for each series of Eligible Bonds.

Argentina currently expects to set the coupons for the New Bonds at below market rates and accordingly expects to set the New Bond Issue Price for each New Bond at a substantial discount to its principal amount.

Immediately after Argentina announces this information, holders may begin to submit competitive Exchange Offers.

### Selection of Clearing Prices

After reviewing the Exchange Offers made in the Invitation, Argentina will, at or around 8:30 A.M., New York City time, on the first Trading Day after the Expiration Date (or as soon thereafter as possible), or before, select in its sole discretion and announce the "Clearing Price" per U.S.$100 or AR$100 original principal amount for each series of Eligible Bonds being exchanged for New Bonds and the "Clearing Price" per U.S.$100 or AR$100 original principal amount for each series of Eligible Bonds being exchanged for New AR$ Bonds.

"Trading Day" means a day other than a Saturday, a Sunday or a day on which the New York Stock Exchange is not open for trading.

Argentina will not be permitted to select a Clearing Price for any series of Eligible Bonds that is below the Minimum Clearing Price or above the Maximum Offer Price for that series.

### Announcements

Argentina will make all of the foregoing announcements on the Invitation Websites and by press release issued to Bloomberg News and the Reuters News Service, which we refer to as the "News Services."

## Methodology Generally; No Recommendation

The New Bond Issue Prices and Clearing Prices selected by Argentina will have no necessary relationship to actual value. You should independently analyze the value of each series of New Bonds and each series of Eligible Bonds and make an independent assessment of the terms of the Invitation. None of Argentina, any joint lead manager, any co-manager, the settlement agent or the Luxembourg exchange agent has expressed any opinion as to whether the terms of the Invitation are fair. None of Argentina, any joint lead manager, any co-manager, the settlement agent or the Luxembourg exchange agent makes any recommendation that you offer to exchange Eligible Bonds or refrain from offering to do so pursuant to the Invitation, and no one has been authorized by Argentina, any joint lead manager, any co-manager, the settlement agent or the Luxembourg exchange agent to make any such recommendation.

## Hypothetical Calculation

We have set forth in Annex B a hypothetical New Bond Issue Price, a hypothetical Clearing Price and a resulting hypothetical principal amount of New Bonds that might be received in exchange for each U.S.$1.00 or AR$1.00 in principal amount of Eligible Bonds in the Invitation. Hypothetical amounts like these will also be displayed on the Invitation Websites. These amounts are for illustrative purposes only. Actual amounts will differ from these hypothetical figures, and that difference may be material.

## Invitation Procedures

### General

The Invitation will be conducted pursuant to a separate modified Dutch auction process for each series of Eligible Bonds. You may make your offer in the form of a competitive or a noncompetitive offer.

*Competitive Offers*

You may submit one or more competitive offers by checking the appropriate box on either Invitation Website with respect to any series of Eligible Bonds during the Competitive Submission Period. Competitive offers must specify:

- the series and original principal amount of Eligible Bonds that you are offering to exchange pursuant to your competitive offer

- a minimum price for those Eligible Bonds that you are willing to accept as the Clearing Price applicable to those Eligible Bonds (this minimum offer price is your "Offer Price"), and

- in the case of the AR$ Eligible Bonds, whether you want to exchange those AR$ Eligible Bonds for New AR$ Bonds or 2008 Global Bonds.

If your competitive offer is accepted by Argentina, you will be entitled to the benefit of the applicable Clearing Price for your Eligible Bonds, even if you specified an Offer Price lower than that Clearing Price in your competitive offer.

The original principal amount of each series of Eligible Bonds you may offer for exchange in a competitive offer must be an integral multiple of the minimum denomination of the Eligible Bond offered, and cannot be less than U.S.$250,000 or AR$250,000.

The Invitation Websites will not accept competitive offers that specify:

- Offer Prices below the applicable Minimum Clearing Price or

- an offered original principal amount of Eligible Bonds below the minimum threshold of U.S.$250,000 or AR$250,000.

In addition, in order to reduce errors and irregularities in the inputting of competitive offers into the Invitation Websites, the Invitation Websites will not accept competitive offers that specify Offer Prices above U.S.$110 or AR$110 per U.S. $100 or AR$100 original principal amount for any series of Eligible Bonds.

Any competitive offer to exchange a particular series of Eligible Bonds must be expressed in the manner indicated for that series in the following table:

| Eligible Bonds | Manner of Expressing Competitive Offers |
|---|---|
| Bontes 2005<br>Bontes 2006<br>Bontes 2027<br>Par Bonds<br>Discount Bonds<br>Eurobonds AR$ 2007<br>FRANs<br>Global Bonds 2005<br>Global Bonds 2006<br>Global Bonds 2009<br>Global Bonds 2010<br>Global Bonds 2012<br>Global Bonds 2015<br>Global Bonds 2017<br>Global Bonds 2019 | in U.S. dollars as a price per U.S.$100 or AR$ 100 in original principal amount and in increments of U.S.$0.25 or AR$0.25; exclude accrued interest |

| Eligible Bonds | Manner of Expressing Competitive Offers |
|---|---|
| Global Bonds 2020<br>Global Bonds 2027<br>Global Bonds 2030<br>Global Bonds 2031 | |
| Bocon Pro 3<br>Bocon Pro 4 | in U.S. dollars or Argentine pesos as a price per U.S.$100 or AR$100 original principal amount and in increments of U.S.$0.25 or AR$0.25; include capitalized and accrued interest |
| FRBs | In U.S. dollars as a price per U.S.$100 of remaining, unamortized original principal amount and in increments of U.S.$0.10; exclude accrued interest |
| Bontes 2002<br>Bontes 2003<br>Bontes 2004<br>Eurobonds AR$ 2002<br>Eurobonds FRN 2004<br>Global Bonds 2003<br>Bontes TV<br>SPANs<br>Bonos-Pagaré April 2002<br>Bonos-Pagaré August 2002<br>Bonos-Pagaré October 2002<br>Bonos-Pagaré February 2004 | in U.S. dollars as a price per U.S.$100 or AR$0.10 original principal amount and in increments of U.S.$0.10 or AR$0.10; exclude accrued interest |
| Bonos-Pagaré July 2001 (Encuesta)<br>Bonos-Pagaré July 2001 (Badlar)<br>Bonos-Pagaré November 2001 (Encuesta)<br>Bonos-Pagaré November 2001 (Badlar) | in U.S. dollars as a price per U.S.$100 original principal amount and in increments of U.S.$0.05; exclude accrued interest |
| Bocon Pro 1 Bonds<br>Bocon Pro 2 Bonds<br>Bocon Pro 5 Bonds<br>Bocon Pro 6 Bonds<br>Bocon Hidrocarburos | in U.S. dollars or Argentine pesos as a price per U.S.$100 or AR$100 original principal amount and in increments of U.S.$0.10 or AR$0.10; include capitalized and accrued interest |
| Bonex 1992 | in U.S. dollars as a price per U.S.$100 of remaining principal amount and in increments of U.S.$0.05; include accrued interest |
| Bocon Pre 3 Bonds<br>Bocon Pre 4 Bonds | in U.S. dollars or Argentine pesos as a price per U.S.$100 or AR$100 original principal amount and in increments of U.S.$0.05 or AR$0.05; include capitalized and accrued interest |

Most but not all of the Bocon and Bonex Bonds trade in the market at prices that include accrued interest, l most but not all of the other Eligible Bonds trade in the market at prices that exclude accrued interest. In the

Invitation, we will treat all Bocon and Bonex Bonds as though they trade at prices that include accrued interest and all of the other Eligible Bonds as though they trade at prices that exclude accrued interest. Accordingly, if you submit a competitive offer, please remember that:

- **the Offer Price you specify for Bocon and Bonex Bonds should include accrued interest even if your series does not trade that way in the market, and**

- **the Offer Price you specify for other Eligible Bonds should exclude accrued interest even if your series does not trade that way in the market.**

### *Noncompetitive Offers*

You may submit a noncompetitive offer during the Noncompetitive Submission Period that does not designate an Offer Price by:

- checking the appropriate box on either Invitation Website with respect to any series of Eligible Bonds

- specifying the series and original principal amount of Eligible Bonds that you are offering to exchange pursuant to your noncompetitive offer, and

- in the case of the AR$ Eligible Bonds, the series of New Bonds that you would like to exchange for those AR$ Eligible Bonds.

AR$ Eligible Bonds can be exchanged against the New AR$ Bonds or the 2008 Global Bonds.

If Argentina accepts your noncompetitive offer, you will be entitled to the benefit of the applicable Clearing Price.

The original principal amount of each series of Eligible Bonds you may offer for exchange in a noncompetitive offer must be an integral multiple of the minimum denomination of the Eligible Bond offered and cannot be less than U.S.$250,000 or AR$250,000. The Invitation Websites will not accept noncompetitive offers that specify an offered original principal amount of Eligible Bonds below the minimum threshold of U.S.$250,000 or AR$250,000.

### *Procedures for Submitting Exchange Offers*

If you desire to submit an Exchange Offer, you must submit, or arrange to have submitted, a duly completed letter of transmittal electronically via either of the Invitation Websites, during the Submission Period relevant to that Exchange Offer.

- The Noncompetitive Submission Period began on May 24, 2001 and will end at 4:00 P.M., New York City time, on the Expiration Date

- The Competitive Submission Period will begin following the announcement of the Minimum Clearing Prices for each series of New Bonds at or around 9:00 A.M., New York City time, on the Expiration Date and will end at 4:00 P.M., New York City time, on the Expiration Date.

You may elect which Invitation Website you prefer. **You should submit each Exchange Offer only once through the Invitation Website that you choose.** These websites are only accessible by password, which you may obtain by accessing either of the Invitation Websites' URLs and applying for a password. You may submit an electronic letter of transmittal only via these Websites. You cannot revoke an Exchange Offer after the Invitation as expired.

Any Bondholder, other than Argentina, may submit one or more Exchange Offers. You will have to make the required confirmations in the "Electronic Delivery of Offering Documents" section of the Invitation Websites in order to submit an electronic letter of transmittal.

Argentina intends to conduct the exchange of Eligible Bonds for New Bonds through the use of electronic media. In order to participate in the exchange of Eligible Bonds for New Bonds, you are required to:

- consent to tender or to have tendered on your behalf a letter of transmittal in electronic form only, and

- consent to accept electronic delivery of all required documents in connection with the exchange.

You may incur certain costs in connection with tendering the electronic letter of transmittal and receiving delivery of documents in electronic form (for example, online time and printing) and have possible risks of system outages and other technical failure. Argentina reserves the right to reject any electronic letter of transmittal not received in the appropriate electronic form. If you encounter technical difficulties in submitting your electronic letter of transmittal, you may contact either Credit Suisse First Boston at 1-800-820-1653 (in the U.S.) or collect at 1-212-325-4219 (outside the U.S.) (for assistance with the Invitation Website accessed through http://primedebt.csfb.com/argentinaexchange) or JPMorganExchange at 1-877-217-2484 (in the U.S.) or collect at 1-212-552-4083 (outside the U.S.) (for assistance with the Invitation Website accessed through https://exchange.jpmorgan.com).

You may submit an Exchange Offer in any of the following ways:

*Exchange Offers with respect to Eligible Bonds held in Euroclear and Clearstream, Luxembourg*

An electronic letter of transmittal for an Exchange Offer may be submitted by:

- a direct participant in Euroclear or Clearstream, Luxembourg who has delivered Bond Instructions to Euroclear or Clearstream, Luxembourg in accordance with the deadlines specified by Euroclear or Clearstream, Luxembourg, or

- a beneficial owner who has instructed the direct participant holding Eligible Bonds on his or her behalf in Euroclear or Clearstream, Luxembourg to deliver such Bond Instructions, but only if such Bond Instructions have in fact been delivered.

Alternatively, you may request that a Dealer Manager submit an electronic letter of transmittal on your behalf to the Invitation Websites. In order to do this, you will need to communicate your request to a Dealer Manager, who is under no obligation to act on your behalf and may impose additional conditions on an offer to exchange made in this manner. Argentina will not require any Bondholder making an Exchange Offer through a Dealer Manager or any Dealer Manager submitting an electronic letter of transmittal on its own behalf to deliver Bond Instructions prior to the end of the Submission Periods. However, the Bondholder, or the Dealer Manager from whose Euroclear or Clearstream, Luxembourg account the Eligible Bonds will be debited, must deliver to Euroclear or Clearstream, Luxembourg, and Euroclear or Clearstream, Luxembourg must receive, Bond Instructions with respect to any such Exchange Offers accepted by Argentina no later than two Trading Days after the Announcement Date. In addition, any Dealer Manager submitting offers on your behalf must include your (or such Dealer Manager's, as the case may be), Euroclear or Clearstream, Luxembourg account information in the electronic letter of transmittal.

Direct participants in Euroclear or Clearstream, Luxembourg must include a reference code in the remarks field on the Bond Instructions, preferably a

subaccount reference to the beneficial owner for the direct participant's account at Euroclear or Clearstream, Luxembourg (no more than 16 characters). Any reference code entered on the Bond Instructions must also be entered on the electronic letter of transmittal at the elected Invitation Website. To the extent that the direct participant is not entering orders on the Invitation Websites, the reference code for each Bond Instruction should be transmitted to the person who is entering orders on behalf of the beneficial owner. Any Bond Instruction that for any reason cannot be promptly and unmistakably reconciled with an electronic letter of transmittal will be deemed invalid by Argentina.

"Bond Instructions" means:

- irrevocable instructions to:

    - block any attempt to transfer your Eligible Bonds on or prior to the Settlement Date, and

    - debit your account on the Settlement Date in respect of all your Eligible Bonds, or in respect of such lesser portion of your Eligible Bonds as are accepted for exchange by Argentina, upon receipt of an instruction by the settlement agent to receive your Eligible Bonds for Argentina,

    - subject in each case to the automatic withdrawal of the irrevocable instruction in the event that the Invitation is terminated by Argentina prior to 4:00 P.M., New York City time, on the Expiration Date, in each case as notified to Euroclear or Clearstream, Luxembourg by the settlement agent on or before the Settlement Date

- an irrevocable authorization to disclose the name of the direct account holder and information about the foregoing instructions, and

- a confirmation that the direct participant or beneficial owner is concurrently delivering an electronic letter of transmittal submitting an Exchange Offer with respect to your Eligible Bonds through one of the Invitation Websites.

Bond Instructions must be delivered by encrypted electronic mail or according to Euroclear's and Clearstream, Luxembourg's normal procedures and deadlines set forth below in "Terms of the Invitation—Deadline for Submission of Bond Instructions". If you are not a direct participant in Euroclear or Clearstream, Luxembourg submitting an Exchange Offer, you must ensure that the Bond Instructions transmitted through the Euroclear or Clearstream, Luxembourg direct participant can be reconciled with your Exchange Offer. To the extent that Bond Instructions cannot be reconciled with your Exchange Offer, your Exchange Offer may be deemed not to have been properly submitted.

For your convenience, the clearing reference numbers for the Eligible Bonds of each series are set forth in Annex A to this prospectus supplement.

### Exchange Offers with respect to Eligible Bonds held in DTC

If you desire to submit an Exchange Offer with respect to Eligible Bonds held through DTC, you must arrange for those Eligible Bonds to be transferred to a Euroclear or Clearstream, Luxembourg account. If you do not have an account at Euroclear or Clearstream, Luxembourg and you do not know how to arrange for such a transfer, you should telephone the Dealer Managers for assistance in submitting your Exchange Offer. Once your Eligible Bonds have been transferred to a Euroclear or Clearstream, Luxembourg account, you may then submit an electronic letter of transmittal in accordance with the procedures described above for Eligible Bonds held in Euroclear and Clearstream, Luxembourg.

### *Exchange Offers with respect to Eligible Bonds held in Caja de Valores or CRYL*

If you hold Eligible Bonds in Caja de Valores or CRYL, you may submit an electronic letter of transmittal for Exchange Offers relating to such Eligible Bonds through a Dealer Manager acting on your behalf.

Although the Dealer Managers are under no obligation to act on your behalf, once a Dealer Manager tenders an Exchange Offer on your behalf this Dealer Manager will become responsible for the delivery of any Eligible Bonds accepted by Argentina with respect to such Exchange Offer to such Dealer Manager's fiduciary account at Euroclear or Clearstream, Luxembourg no later than two Trading Days after the Announcement Date. Each Dealer Manager will establish its own fiduciary account at Euroclear and/or Clearstream, Luxembourg and will require you to deliver your Eligible Bonds specified in such Exchange Offer to this account at the time specified at its own discretion, which may be either after the Announcement Date or before the Announcement Date, but in no event later than two Trading Days after the Announcement Date. In addition, a Dealer Manager may impose additional conditions or procedures before acting on your behalf in this manner.

Each Dealer Manager will then be responsible for delivering Bond Instructions to Euroclear or Clearstream, Luxembourg with respect to your Eligible Bonds no later than two Trading Days after the Announcement Date. New Bonds issued with respect to these Exchange Offers will be delivered to the Dealer Manager's accounts at Euroclear or Clearstream, Luxembourg and it will be the Dealer Manager's responsibility to transfer them into the account that you specify.

### *Exchange Offers with Respect to Certificated Eligible Bonds*

If you desire to submit an Exchange Offer with respect to Certificated Eligible Bonds not held through Euroclear, Clearstream, Luxembourg, Caja de Valores or CRYL, you must deliver those Certificated Eligible Bonds, together with Certificated Security Instructions to Citibank, N.A., 5 Carmelite Street, London EC4Y0PA, attention: Agency and Trust Services – Argentina Exchange, telephone: 44-207-508-3867. You may then submit an electronic letter of transmittal in accordance with any of the methods described above.

"Certificated Security Instructions" means, together with the delivery of Certificated Eligible Bonds endorsed in blank, irrevocable instructions to (a) hold those Certificated Eligible Bonds (or any portion thereof, as the case may be) until the Announcement Date, if not accepted for exchange, or the Settlement Date, if accepted for exchange, and (b) cancel those Certificated Eligible Bonds or return those Certificated Eligible Bonds to the Bondholders that delivered them, as the case may be, in accordance with the instructions provided by Argentina.

### *Exchange Offer with Respect to Bonos-Pagaré in the Form of Pagarés*

If you hold Bonos-Pagaré in the form of pagarés, you may submit electronic letters of transmittal for Exchange Offers relating to such Eligible Bonds only through a Dealer Manager acting on your behalf.

If you hold Bonos-Pagaré in the form of pagarés, the Dealer Manager will require you to deliver your Eligible Bonds specified in such Exchange Offer to the Ministry of Economy of Argentina at the following address no later than two Trading Days following the Announcement Date:

Ministerio de Economía
Hipólito Yrigoyen 250
Piso 10
1310 Buenos Aires
Argentina

Attn: Juan Ferreira

Each Dealer Manager will then be responsible for delivering Bond Instructions to Euroclear or Clearstream, Luxembourg with respect to your Eligible Bonds no later than two Trading Days after the Announcement Date. New Bonds issued with respect to these Exchange Offers will be delivered to the Dealer Manager's accounts at Euroclear or Clearstream, Luxembourg and it will be the Dealer Manager's responsibility to transfer them into the account that you specify.

In addition, the Dealer Managers may impose additional conditions or procedures before acting on your behalf in this manner.

*Luxembourg Holders*

If you are in Luxembourg, you may contact and instruct the Luxembourg exchange agent to submit an electronic letter of transmittal on your behalf or have an electronic letter of transmittal submitted according to one of the methods described above.

If you hold your Eligible Bonds through a custodian, you may contact that custodian to discuss which of the above options can be used by your custodian to submit offers on your behalf. Alternatively, if you wish to have a Dealer Manager submit an electronic letter of transmittal on your behalf, you will need to communicate your request to that Dealer Manager, who is under no obligation to act on your behalf and may impose additional conditions on an Exchange Offer made in this manner.

With respect to Exchange Offers for Eligible Bonds held in Euroclear, Clearstream, Luxembourg, *Caja de Valores* or CRYL, the Dealer Managers who have submitted such Exchange Offers on behalf of Bondholders must ensure that Bond Instructions have been submitted for all such Exchange Offers accepted by Argentina no later than two Trading Days following the Announcement Date.

In the event that your custodian or Euroclear or Clearstream, Luxembourg participant is unable to submit an electronic letter of transmittal on your behalf, you should telephone the Dealer Managers for assistance in submitting your Exchange Offer.

In any case, you are responsible for arranging the timely delivery of the electronic letter of transmittal.

None of Argentina, the Dealer Managers, the settlement agent or the Luxembourg exchange agent will be responsible for the communication of Exchange Offers by:

- Bondholders to the direct participant in Euroclear or Clearstream, Luxembourg through which they hold Eligible Bonds, or

- the direct participant to an Invitation Website.

If you exchange Eligible Bonds directly via an Invitation Website or through a Dealer Manager, you will not be obligated to pay brokerage commissions, solicitation fees or transfer taxes with respect to that exchange. If you hold Eligible Bonds through a broker, dealer, commercial bank or financial institution, you should consult with that institution as to whether it will charge any service fees.

S-31

EXHIBIT B – 2

.

*Irrevocability; Withdrawal Rights*

Each Exchange Offer and corresponding electronic letter of transmittal will become irrevocable at 4:00 P.M., New York City time, on the Expiration Date. However, any Exchange Offer and corresponding electronic letter of transmittal may be withdrawn or revised prior to 4:00 P.M., New York City time, on the Expiration Date by editing or deleting the electronic letter of transmittal at the Invitation Website on which it was originally submitted. If you wish to so amend or withdraw your electronic letter of transmittal, you must use the same user name and the same password under which you submitted your prior electronic letter of transmittal. If you have requested that a joint lead manager, a co-manager or a custodian submit an electronic letter of transmittal on your behalf and you would like to withdraw or revise your Exchange Offer, you should contact that joint lead manager, co-manager or a custodian and request it to so withdraw or revise the corresponding letter of transmittal prior to 4:00 P.M., New York City time, on the Expiration Date via the Invitation Websites. You should note, however, that joint lead managers, co-managers or custodians may impose earlier deadlines for withdrawing or revising an electronic letter of transmittal in accordance with their procedures. If Argentina terminates the Invitation without accepting any Exchange Offers, all Exchange Offers and electronic letters of transmittal shall automatically be deemed to be withdrawn. If Argentina accepts any Exchange Offers, any Exchange Offers not so accepted, together with the corresponding electronic letters of transmittal, shall automatically be deemed to be withdrawn.

*Discretion on the Part of Argentina; Selection of Clearing Prices and Principal Amounts*

Argentina reserves the right not to accept any Exchange Offers in its sole discretion. If Argentina determines to accept any Exchange Offers submitted pursuant to the Invitation, it will, at or around 8:30 A.M., or as soon as possible thereafter, New York City time, on the Announcement Date, or before, select in its sole discretion and announce on the Invitation Websites and by press release to the News Services:

- the Clearing Price per AR$100 original principal amount for each series of Eligible Bonds accepted to be exchanged for New AR$ Bonds and the Clearing Price per U.S.$100 or AR$100 original principal amount for each series of Eligible Bonds accepted to be exchanged for New U.S.$ Global Bonds, provided that the Clearing Price for a series of Eligible Bonds may not be below the applicable Minimum Clearing Price for Eligible Bonds of that series

- the aggregate original principal amount of Eligible Bonds of each series (which could be zero) to be exchanged for New Bonds of each series

- the aggregate principal amount of New Bonds of each series to be issued in the Invitation, and

- if applicable, information concerning any proration of Eligible Bonds offered to be exchanged in the Invitation.

You may obtain such information by contacting the Luxembourg exchange agent, any joint lead manager or any co-manager.

In addition, Argentina will notify the Luxembourg Stock Exchange and the Buenos Aires Stock Exchange of the results of the Invitation.

*Acceptance of Offers; Proration*

Once Argentina selects the applicable Clearing Prices and principal amounts as described above, Argentina will accept all properly submitted offers to exchange Eligible Bonds of a given series for New Bonds of a given series in the following order of priority:

- first, Exchange Offers that are noncompetitive offers, and

- second, Exchange Offers that specify Offer Prices at or below the applicable Clearing Price.

If, with respect to offers to exchange any series of Eligible Bonds for a series of New Bonds, Argentina decides to exchange less than the maximum amount that it could exchange at the selected Clearing Price, Argentina may, in its sole discretion, decrease, pro rata, the Eligible Bonds of that series that it will accept for exchange for New Bonds of that series pursuant to otherwise acceptable competitive offers that specified an Offer Price equal to the Clearing Price. Thereafter, if the Clearing Price applicable to such offers is the Minimum Clearing Price applicable to such offers and Argentina has already decreased to zero the amount of Eligible Bonds of that series that it will accept for exchange for New Bonds of that series pursuant to competitive offers, Argentina may, in its sole discretion, decrease, pro rata, the Eligible Bonds of that series that it will accept for exchange for New Bonds of that series pursuant to otherwise acceptable noncompetitive offers.

If your Exchange Offer is accepted by Argentina, you will be entitled to the benefit of the applicable Clearing Price, even if you specified an Offer Price lower than the applicable Clearing Price or made a noncompetitive offer.

Once Argentina has announced on the Invitation Websites and by press release issued to the News Services the acceptance of any Exchange Offers in accordance with the terms of the Invitation, Argentina's acceptance will be irrevocable. Exchange Offers, as so accepted, shall constitute binding obligations of the submitting Bondholders and Argentina to settle the exchange, in the manner described under "Settlement" below.

### No Participation by Argentina

Argentina may not submit any Exchange Offers.

### Participation by Argentine Governmental Agencies

Argentine governmental agencies will be only permitted to submit noncompetitive Exchange Offers.

"Argentine governmental agency" means any governmental agency, including the *Banco Central de la República Argentina*, any institution under the direct or indirect control of Argentina or any Argentine governmental agency acting at the direction of, or on behalf of, Argentina. Regulation of financial institutions in Argentina by regulatory authorities of Argentina does not constitute control for this purpose.

### Participation by the Joint Lead Managers and Co-Managers

The joint lead managers and co-managers will be permitted to submit competitive or noncompetitive Exchange Offers as Bondholders or on behalf of Bondholders. Argentina will not require a joint lead manager or a co-manager acting on your behalf to deliver Bond Instructions prior to the end of the Submission Periods. However, Euroclear and/or Clearstream, Luxembourg must receive Bond Instructions with respect to any such Exchange Offers accepted by Argentina no later than two Trading Days after the Announcement Date.

### Irregularities

All questions regarding the validity, form and eligibility, including time of receipt or revocation or revision, of any electronic letter of transmittal or Exchange Offer will be determined by Argentina in its sole discretion, which determination will be final and binding. Argentina reserves the absolute right to reject any and all letters of transmittal and Exchange Offers not in proper form or for which any corresponding agreement by Argentina to exchange would, in the opinion of Argentina's counsel, be unlawful. Argentina reserves the absolute right to waive any of the conditions of the Invitation or defects in letters of transmittal and Exchange Offers. None of Argentina, any joint lead manager, any co-manager, the settlement agent or the Luxembourg exchange agent shall be under any duty to give notice to you, as the offering Bondholders, of any irregularities in letters of transmittal, Exchange Offers or exchanges, nor shall any of them incur any liability for the failure to give such notice.

*Term of Invitation, Termination, Amendments*

The Invitation will expire at 4:00 P.M., New York City time, on the Expiration Date, unless Argentina in its sole discretion extends it or terminates it earlier.

At any time before Argentina announces on the Announcement Date the acceptance of any Exchange Offers on the Invitation Websites and by press release issued to the News Services, Argentina may, in its sole discretion:

- terminate the Invitation, including with respect to Exchange Offers submitted prior to the time of the termination

- extend the Invitation past the originally scheduled Expiration Date, or

- amend the Invitation from time to time in any fashion.

### Minimum Issue Size

Argentina will not issue New Bonds of any series pursuant to the Invitation unless it issues at least U.S.$1,000,000,000 in aggregate principal amount (or, in case of the New AR$ Bonds, AR$500,000,000 in aggregate principal amount) of that series. Argentina reserves the right, in its sole discretion, not to issue any New Bonds, or not to issue New Bonds of any given series, or to issue New Bonds of one or more series and not another, pursuant to the Invitation.

### Minimum Offer Amount

The minimum principal amount of each series of Eligible Bonds that you can offer to tender in an Exchange Offer (whether you submit a competitive or a noncompetitive offer) is U.S.$250,000 or AR$250,000.

### Concurrent Invitation

Concurrently with the Invitation, Argentina is inviting the holders of Bonos-Pagaré, Bontes TV, Eurobonds FRN 2004 and Bontes 2002 domiciled in Argentina to exchange them for New Bonos-Pagaré. The New Bonos-Pagaré will be governed by Argentine law, and the New Bonos-Pagaré Invitation is being conducted in Argentina only in a transaction exempt from the registration requirements of the U.S. federal securities laws pursuant to Regulation S under the Act. U.S. persons (as defined in Regulation S) may not participate in the New Bonos-Pagaré Invitation.

The New Bonos-Pagaré Invitation will be similar to this Invitation in that, among other things, it will have the same Submission Periods, Expiration Date, Announcement Date and Settlement Date.

The New Bonos-Pagaré Invitation will be different from this Invitation in that, among other things:

- holders of the new Bonos-Pagaré will be able to elect whether they will hold their securities in the form of a bond or a pagaré, and will be able to change the form in which they hold them at any interest payment date

- the New Bonos-Pagaré held in the form of pagarés will not be listed on any stock exchange or the *Mercado Abierto Electrónico*, but the New Bonos-Pagaré held in the form of bonds will be listed on the Buenos Aires Stock Exchange and the *Mercado Abierto Electrónico*

- the New Bonos-Pagaré' coupon rate, yield and payment dates will not be the same as for the New Bonds

S-34

- the issue price and minimum clearing prices for the New Bonos-Pagaré Invitation will not necessarily be the same as the New Bond Issue Prices and Minimum Clearing Prices for the Invitation

- the New Bonos-Pagaré Invitation will be conducted through the Argentine over-the-counter securities market's electronic communications network ("MAESOP"), and

- the New Bonos-Pagaré have not been registered under the Act and may not be offered or sold in the United States absent registration or on applicable exemption from the registration requirements.

## Publication

Information about the Invitation will be displayed on the Invitation Websites and, to the extent provided in this prospectus supplement, issued by press release to the News Services. In addition, Argentina will publish notices in the *Wall Street Journal*, the *Financial Times* and the *Luxemburger Wort* regarding the Invitation. These notices will, among other things, set forth the names of the joint lead managers, the co-managers, the settlement agent and the Luxembourg exchange agent.

## Deadline for Submission of Bond Instructions

For any Exchange Offers that you may submit through Euroclear (other than Exchange Offers submitted by a Dealer Manager on your behalf), Euroclear has established Bond Instruction deadlines on the Expiration Date of (a) 10:00 A.M., Central European time (or 4:00 A.M., New York City time), for Bond Instructions delivered by tested telex or free format Swift and (b) 5:00 P.M., Central European time (or 11:00 A.M., New York City time) for Bond Instructions delivered by formatted Swift (message type MT 553) or by Euclid PC 5.0 or Euclid server 3.10. For further questions concerning Euclid PC 5.0 and Euclid server 3.10, please contact the Euroclear Euclid help desk at +32(2)224-1433.

For any Exchange Offers that you may submit through Clearstream, Luxembourg (other than Exchange Offers submitted by a Dealer Manager on your behalf), Clearstream, Luxembourg has established the single deadline on the Expiration Date for Bond Instructions in all forms of 12:00 noon, Central European time (or 6:00 A.M., New York City time).

By the second Trading Day after the Announcement, any Dealer-Manager who has submitted an Exchange Offer on your behalf must ensure that Bond Instructions have been submitted for all Exchange Offers submitted by them and accepted by Argentina. Any Dealer-Manager who fails to timely provide proper account information or valid Bond Instructions will have the relevant New Bonds put into an escrow account to enable timely settlement of the Exchange Offer. Any costs incurred in connection with the opening and maintaining of the escrow account will be charged to the Dealer Managers that fail to provide such information or Bond Instructions in time, on a pro rata basis according to their respective usage of the escrow account.

## Settlement

The Settlement Date for the Invitation will be 12th Trading Day following the Expiration Date. Under the current schedule, the Settlement Date will be June 19, 2001.

On the Settlement Date:

- if Argentina has accepted your Exchange Offer, you, as the identified account holder, or Euroclear or Clearstream, Luxembourg, on your behalf, as the case may be, must deliver to Argentina good and marketable title to your Eligible Bonds, free and clear of all liens, charges, claims, encumbrances, interests, rights of third parties and restrictions of any kind and

- in return you will receive:

- solely by credit to the Euroclear or Clearstream, Luxembourg account in which your Eligible Bonds being exchanged were held or, in the case of Certificated Eligible Bonds, to the Euroclear or Clearstream, Luxembourg account instructed by you at the time of delivery of the Certificated Eligible Bonds, the New Bonds to which you are entitled, and

- solely by same-day credit to the Euroclear or Clearstream, Luxembourg account in which your Eligible Bonds being exchanged were held, the cash to which you are entitled pursuant to the terms of the Invitation.

The determination by Argentina of the exchange ratios and any other calculation or quotation made with respect to the Invitation shall be conclusive and binding on you, absent manifest error.

## Market for the Eligible Bonds and New Bonds

Argentina intends to cancel substantially all Eligible Bonds acquired by it pursuant to the Invitation. Accordingly, the exchange of Eligible Bonds of any series pursuant to the Invitation will reduce the aggregate principal amount of Eligible Bonds of the applicable series that otherwise might trade in the market, which could adversely affect the liquidity and market value of the remaining Eligible Bonds of that series not offered or accepted pursuant to the Invitation. Eligible Bonds not exchanged pursuant to the Invitation will remain outstanding. After the Invitation, Argentina intends to continue to list on the Luxembourg Stock Exchange, Buenos Aires Stock Exchange and the *Mercado Abierto Electrónico* those unexchanged, outstanding Eligible Bonds that are currently listed on such stock exchanges.

Each series of New Bonds is a new issue of securities with no established trading market. Argentina has been advised by the joint lead managers and the co-managers that they intend to make a market in the New Bonds but are not obligated to do so and may discontinue market making at any time without notice. Argentina has made application to list the New Bonds on the Luxembourg Stock Exchange and will make application to list the New Bonds on the Buenos Aires Stock Exchange and on the *Mercado Abierto Electrónico*. No assurance can be given as to the liquidity of the trading market for any series of the New Bonds. The price at which each series of the New Bonds will trade in the secondary market is uncertain.

## THE ELIGIBLE BONDS

The following description does not purport to be complete and is qualified in its entirety by the applicable documentation for the Eligible Bonds, copies of which may be obtained from the settlement agent and, in the case of the Eligible Bonds listed on the Luxembourg Stock Exchange, the Luxembourg exchange agent.

Each of the Eligible Bonds (except for the Bono-Pagarés, the SPANs, the Bontes 2003, the FRBs, the Bontes 2005, the Bontes 2006, the Bocon and Bonex Bonds, U.S.$250,000,000 principal amount of the Global Bonds 2009, the Global Bonds 2012, the Bontes 2027 and U.S.$425,000,000 principal amount of the Global Bonds 2031) is listed on the Luxembourg Stock Exchange. Each of the Eligible Bonds (except for the Bono-Pagarés) is listed on the Buenos Aires Stock Exchange, quoted or listed on the *Mercado Abierto Electrónico* and eligible for clearance and settlement through *Caja de Valores*.

The aggregate outstanding principal balance of all Eligible Bonds is approximately U.S.$66.7 billion.

The following chart sets forth certain summary information with respect to each series of outstanding Eligible Bonds:

| Eligible Bonds | Original Principal Amount Currently Outstanding | | Interest Rate | Interest Payments Dates | Maturity |
|---|---|---|---|---|---|
| Bocon Pre 3 Bonds | AR$ | 398,356,014 | Floating monthly, rate applicable to savings deposits published daily by Banco Central. | Monthly, as of October 1, 1998 | September 1, 2002 |
| Bocon Pre 4 Bonds | U.S.$ | 2,362,934,769 | Floating monthly; LIBOR flat | Monthly, as of October 1, 1998 | September 1, 2002 |
| Bocon Pro 1 Bonds | AR$ | 2,282,058,782 | Floating monthly, rate applicable to savings deposits published daily by Banco Central | Monthly, as of May 1, 1997 | April 1, 2007 |
| Bocon Pro 2 Bonds | U.S.$ | 978,505,100 | Floating monthly LIBOR flat | Monthly, as of May 1, 1997 | April 1, 2007 |
| Bocon Pro 3 Bonds | AR$ | 4,397,106 | Floating monthly; rate applicable to savings deposits published daily by Banco Central | Monthly, as of January 28, 2001 | December 28, 2010 |
| Bocon Pro 4 Bonds | U.S.$ | 865,432,158 | Floating monthly, LIBOR flat | Monthly, as of January 28, 2001 | December 28, 2010 |
| Bocon Pro 5 Bonds | AR$ | 452,488,660 | Floating quarterly; rate applicable to savings deposits published daily by Banco Central | January 15, April 15, July 15 and October 15 | April 15, 2007 |
| Bocon Pro 6 | U.S.$ | 707,753,153 | Floating quarterly, | January 15, April 15, | April 15, 2007 |

| Eligible Bonds | | Original Principal Amount Currently Outstanding | Interest Rate | Interest Payments Dates | Maturity |
|---|---|---|---|---|---|
| Bonds | | | LIBOR | July 15 and October 15 | |
| Bocon Hidrocarburos | U.S.$ | 488,534,426 | Capitalized for the first 72 months; monthly LIBOR flat | Monthly, as of January 2, 1999 | December 2, 2008 |
| Bonex 1992 | U.S.$ | 1,723,362,800 | Floating 180 days, LIBOR flat | March 15 and September 15 | September 15, 2002 |
| Bono Pagarés July 2001 (Encuesta) | U.S.$ | 820,180,000 | Encuesta + 600 BP | Monthly, as of August 14, 1999 | July 14, 2001 |
| Bono Pagarés July 2001 (Badlar) | U.S.$ | 111,500,000 | BADLAR + 500 BP | Monthly, as of August 14, 1999 | July 14, 2001 |
| Bono Pagarés November 2001 | U.S.$ | 1,184,790,000 | Encuesta + 521 | Monthly, as of December 2, 1999 | November 2, 2001 |
| Bono Pagarés November 2001 (Badlar) | U.S.$ | 21,500,000 | BADLAR + 410 BP | Monthly, as of December 2, 1999 | November 2, 2001 |
| Bono Pagarés April 2002 | U.S.$ | 400,000,000 | Encuesta + 400 | Monthly, as of May 24, 2000 | April 24, 2002 |
| Bono Pagarés August 2002 | U.S.$ | 400,000,000 | Encuesta + 330 | Monthly, as of September 22, 20 | August 22, 2002 |
| Bono Pagarés October 2002 | U.S.$ | 1,200,000,000 | Encuesta + 580 | Monthly, as of November 30, 200 | October 30, 2002 |
| Bono Pagarés February 2004 | U.S.$ | 150,000,000 | Encuesta + 435 | Monthly, as of March 16, 2000 | February 16, 2004 |
| Bontes 2002 | U.S.$ | 2,324,876,000 | 8.75% | May 9 and November 9 | May 9, 2002 |
| Bontes 2003 | U.S.$ | 2,227,905,729 | 11.75% | May 21 and November 21 | May 21, 2003 |
| Bontes 2004 | U.S.$ | 2,315,880,816 | 11.25% | May 24 and November 24 | May 24, 2004 |
| Bontes 2005 | U.S.$ | 2,760,997,488 | 12.125% | May 21 and November 21 | May 21, 2005 |
| Bontes 2006 | U.S.$ | 2,608,063,810 | 11.75% | May 15 and November 15 | May 15, 2006 |

S-38

| Eligible Bonds | Original Principal Amount Currently Outstanding | | Interest Rate | Interest Payments Dates | Maturity |
|---|---|---|---|---|---|
| Bontes 2027 | U.S.$ | 1,127,410,000 | 9.9375% | March 19 and September 19 | September 19, 2027 |
| Bontes TV | U.S.$ | 749,285,000 | 3.20% plus floating rate equal to three-month LIBOR or nominal rate resulting from average of interest rates reported by Banco Central's offer rate survey for U.S. dollar loans of 30 to 59 days, whichever is higher. | January 21, April 21, July 21 and October 21 | July 21, 2003 |
| Par Bonds | U.S.$ | 4,692,340,000 | 4% to 3/94; 4.25% to 3/95; 5% to 3/96; then + 0.25% annually to 3/31/99, then 6% | May 31 and November 30 | March 31, 2023 |
| Discount Bonds | U.S.$ | 1,455,618,000 | Floating semi-annual LIBOR + 81.25 BP | May 31 and November 30 | March 31, 2023 |
| Eurobonds AR$ 2002 | AR$ | 270,100,000 | 8.75% | January 10 and July 10 | July 10, 2002 |
| Eurobonds AR$ 2007 | AR$ | 403,640,000 | 11.75% | February 12 and August 12 | February 12, 2007 |
| Eurobonds FRN 2004 | U.S.$ | 300,000,000 | Floating quarterly LIBOR + 575 BP | January 6, April 6, July 6 and October 6 | April 6, 2004 |
| FRBs | U.S.$ | 5,581,957,000 | Floating semi-annual LIBOR + 81.25 BP | March 31 and September 30 | March 31, 2005 |
| FRANs | U.S.$ | 1,000,000,000 | Coupon rate linked to Argentine 11% 10/9/06 Bonds, Argentine 9.75% 9/19/27 Bonds and 30-year U.S. Treasury Bonds. | April 10 and October 10 | April 10, 2005 |
| SPANs | U.S.$ | 153,242,000 | 5.75% plus a spread determined in an auction process | May 31 and November 30 | November 30, 2002 |
| Global Bonds 2003 | U.S.$ | 2,024,207,000 | 8.375% | June 20 and December 20 | December 20, 2003 |
| Global Bonds | U.S.$ | 908,182,000 | 11.00% | June 4 and December 4 | December 4, |

| Eligible Bonds | Original Principal Amount Currently Outstanding | | Interest Rate | Interest Payments Dates | Maturity |
|---|---|---|---|---|---|
| 2005 | | | | | 2005 |
| Global Bonds 2006 | U.S.$ | 1,290,325,000 | 11.00% | April 9 and October 9 | October 9, 2006 |
| Global Bonds 2009 | U.S.$ | 1,750,000,000 | 11.75% | April 7 and October 7 | April 7, 2009 |
| Global Bonds 2010 | U.S.$ | 1,000,000,000 | 11.375% | March 15 and September 15 | March 15, 2010 |
| Global Bonds 2012 | U.S.$ | 1,593,952,000 | 12.375% | February 21 and August 21 | February 21, 2012 |
| Global Bonds 2015 | U.S.$ | 2,402,701,000 | 11.75% | June 15 and December 15 | June 15, 2015 |
| Global Bonds 2017 | U.S.$ | 4,575,000,000 | 11.375% | January 30 and July 30 | January 30, 2017 |
| Global Bonds 2019 | U.S.$ | 1,433,497,000 | 12.125% | February 25 and August 25 | February 25, 2019 |
| Global Bonds 2020 | U.S.$ | 1,250,000,000 | 12% | February 1 and August 1 | February 1, 2020 |
| Global Bonds 2027 | U.S.$ | 3,535,086,000 | 9.75% | March 19 and September 19 | September 19, 2027 |
| Global Bonds 2030 | U.S.$ | 1,250,000,000 | 10.25% | January 21 and July 21 | July 21, 2030 |
| Global Bonds 203; | U.S.$ | 1,175,000,000 | 12% | January 31 and July 31 | January 31, 2031 |

_____
\*    Aggregate Amount Outstanding.

## DESCRIPTION OF THE NEW BONDS

*This prospectus supplement describes the terms of these securities in greater detail than the prospectus and may provide information that differs from the prospectus. If the information in this prospectus supplement differs from the prospectus, you should rely on the information in this prospectus supplement.*

*Argentina will issue the New Bonds under the fiscal agency agreement, dated as of October 19, 1994, between Argentina and Bankers Trust Company, as fiscal agent, registrar, transfer agent and principal payment agent. The information contained in this section and in the prospectus summarizes some of the terms of the New Bonds and the fiscal agency agreement. Because this is a summary, it does not contain all of the information that may be important to you as a potential investor in the New Bonds. Therefore, Argentina urges you to read the fiscal agency agreement and the form of the securities in making your investment decision. Argentina has filed or will file copies of these documents with the United States Securities and Exchange Commission and will also file copies of these documents at the offices of the fiscal agent and the Luxembourg listing agent.*

**General Terms Common to All New Bonds**

The New Bonds will:

- pay interest and principal to persons in whose names the New Bonds are registered at the close of business on the fifteenth calendar day preceding the corresponding payment date

- not be redeemable before maturity (although they may amortize to the extent described below) and not be entitled to the benefit of any sinking fund

- be direct, unconditional and general unsecured obligations of Argentina

- rank equal in right of payment with all of Argentina's payment obligations relating to unsecured and unsubordinated external indebtedness

- be represented by one or more global securities in fully registered form only, without coupons

- be available in definitive form only under certain limited circumstances, and

- be issued with coupons at below market rates and accordingly be issued at New Bond Issue Prices that represent substantial discounts to principal amount.

**General Terms of the New ARS Bonds**

The New ARS Bonds will:

- mature at par on September 19, 2008

- bear interest accruing from and including the Settlement Date to but excluding September 19, 2004 at a rate per annum equal to the ARS Coupon and from and including September 19, 2004 to but excluding September 19, 2008 at a rate per annum equal to the ARS Step-Up Coupon, computed on the basis of a 360-day year of twelve 30-day months

- pay interest in arrears on March 19 and September 19 of each year, commencing on September 19, 2001

- pay principal in full at maturity

- pay interest and principal in Argentine pesos, unless the holder of the New AR$ Bonds elects to receive payment in U.S. dollars (in which case payment will be made in U.S dollars at the ratio of one U.S. dollar to one Argentine peso regardless of changes in foreign exchange rates)

- be issued in denominations of AR$1.00 and integral multiples thereof, and

- be registered in the name of a nominee of and deposited with a common depositary for Euroclear and Clearstream, Luxembourg and recorded on, and transferred through, the records maintained by Euroclear and Clearstream, Luxembourg.

## General Terms Common to the New U.S.$ Global Bonds

The New U.S.$ Global Bonds will:

- be issued in denominations of U.S.$1.00 and integral multiples thereof, and

    - be registered in the name of a nominee of DTC and recorded on, and transferred through, the records maintained by DTC and its participants, including Euroclear and Clearstream, Luxembourg.

## General Terms of the 2008 Global Bonds

The 2008 Global Bonds will:

- mature at par on December 19, 2008

- bear interest accruing from and including the Settlement Date to but excluding, June 19, 2004 at a rate per annum equal to the 2008 Coupon and from and including June 19, 2008 to but excluding December 19, 2008 at a rate per annum equal to the 2008 Step-Up Coupon, computed on the basis of a 360-day year of twelve 30-day months

- pay interest in arrears in U.S. dollars on June 19 and December 19 of each year, commencing on December 19, 2001, and

- pay principal in U.S. dollars in six equal semi-annual installments on June 19 and December 19 of each year, commencing on June 19, 2006.

The following table sets forth the dates of amortization payments for the 2008 Global Bonds, the percentage of outstanding principal to be paid on each such date and the percentage of principal that will remain outstanding following each such date:

| Date | Percentage of Outstanding Principal To Be Paid | Percentage of Principal Outstanding Following Payment |
|---|---|---|
| June 19, 2006 | 16.66% | 83.33% |
| December 19, 2006 | 16.66% | 66.66% |
| June 19, 2007 | 16.66% | 50.0% |
| December 19, 2007 | 16.66% | 33.33% |

| | | |
|---|---|---|
| June 19, 2008 | 16.66% | 16.66% |
| December 19, 2008 | 16.66% | 0.0% |

**General Terms of the 2018 Global Bonds**

The 2018 Global Bonds will:

- mature at par on June 19, 2018

- bear interest accruing from and including the Settlement Date to but excluding June 19, 2018 at a rate per annum equal to the 2018 Coupon, computed on the basis of a 360-day year of twelve 30-day months, but interest accrued on or before June 19, 2006 will be capitalized (*i.e.*, added to principal) semi-annually on each June 19 and December 19, from December 19, 2001, to June 19, 2006,

- pay interest in arrears on the principal amount outstanding from time to time (including capitalized interest), in U.S. dollars, on June 19 and December 19 of each year, commencing on December 19, 2006, and

- pay the then current principal (including interest capitalized through June 19, 2006) in U.S. dollars in five equal semi-annual installments on June 19 and December 19 of each year, commencing on June 19, 2016.

The following table sets forth the dates of amortization payments for the 2018 Global Bonds, the percentage of outstanding principal to be paid on each such date and the percentage of principal that will remain outstanding following each such date:

| Date | Percentage of Outstanding Principal To Be Paid | Percentage of Principal Outstanding Following Payment |
|---|---|---|
| June 19, 2016 | 20% | 80% |
| December 19, 2016 | 20% | 60% |
| June 19, 2017 | 20% | 40% |
| December 19, 2017 | 20% | 20% |
| June 19, 2018 | 20% | 0% |

You should note that the 2018 Global Bonds are unsecured while any Par Bonds and Discount Bonds that may be exchanged for 2018 Global Bonds are secured with respect to the payment of principal at their maturity and approximately twelve months of interest. Therefore, if you exchange any Par Bonds or Discount Bonds into 2018 Global Bonds you will lose the benefit of the collateral backing those Par Bonds or Discount Bonds.

## General Terms of the 2031 Global Bonds

The 2031 Global Bonds will:

- mature at par on June 19, 2031

- bear interest accruing from and including the Settlement Date to but excluding June 19, 2031 at a rate per annum equal to the 2031 Coupon, computed on the basis of a 360-day year of twelve 30-day months, but interest accrued on or before June 19, 2006 will be capitalized (*i.e.*, added to principal) semi-annually on each June 19 and December 19, from December 19, 2001, to June 19, 2006

- pay interest in arrears on the principal amount outstanding from time to time (including capitalized interest), in U.S. dollars, on June 19 and December 19 of each year, commencing on December 19, 2006, and

- pay the then current principal (including interest capitalized through June 19, 2006) in U.S. dollars at maturity.

## Payment of Principal and Interest

If any date for an interest or principal payment is a day on which the law at the place of payment permits or requires banking institutions to close, Argentina will make the payment on the next banking day at such place. Argentina will treat such payments as if they were made on the due date, and no interest on the New AR$ Bonds will accrue as a result of the delay in payment.

### New U.S.$ Global Bonds

Argentina will make payments of principal and interest on the New U.S.$ Global Bonds in U.S. dollars to DTC, or to its nominee, as the registered owner of the New U.S.$ Global Bonds, which will receive the funds for distribution to the holders. Argentina expects that the holders will be paid in accordance with the procedures of DTC and its participants. Neither Argentina nor the fiscal agent, which will act as Argentina's principal paying agent pursuant to the fiscal agency agreement, shall have any responsibility or liability for any aspect of the records of, or payments made by, DTC or its nominee, or any failure on the part of DTC in making payments to holders of the New Bonds from the funds it receives.

### New AR$ Bonds

Argentina will make payments of principal and interest on the New AR$ Bonds to the common depositary for Euroclear and Clearstream, Luxembourg, or its nominee, as the registered owner of the New AR$ Bonds, which will receive the funds for distribution to the holders. Neither Argentina nor the fiscal agent, which will act as Argentina's principal paying agent pursuant to the fiscal agency agreement, shall have any responsibility or liability for any aspect of the records of, or payments made by, the common depositary for Euroclear and Clearstream, Luxembourg, or any failure on the part of the common depositary for Euroclear and Clearstream, Luxembourg in making payments to holders of the New AR$ Bonds from the funds it receives.

Argentina will make payments of interest and principal in Argentine pesos, unless you elect to receive payment in U.S. dollars (in which case payment will be made in U.S dollars at the ratio of one U.S. dollar to one Argentine peso regardless of changes in foreign exchange rates). If you do not make a timely currency election, Argentina will make the interest or principal payment in Argentine pesos.

To make a currency election, you must notify the clearing system (Euroclear or Clearstream, Luxembourg) through which you hold your New AR$ Bonds in accordance with its applicable procedures, in each case no later than the close of business on the fifth Business Day following the record date for the applicable payment.

Each currency election in respect of any payment of principal or interest of New AR$ Bonds will be irrevocable with respect to such payment.

### Claim to Full Principal

Despite the fact that Argentina expects to set the coupons for the New Bonds at below market rates and accordingly expects to set the New Bond Issue Prices at substantial discounts to principal amount, the New Bonds will represent a claim to their full principal (plus accrued and unpaid interest) at maturity or upon earlier acceleration in accordance with the terms thereof.

### Paying Agents and Transfer Agent

Until each series of the New Bonds are paid, Argentina will maintain a paying agent in New York City. Argentina has initially appointed Bankers Trust Company, 4 Albany Street, New York, New York 10006, to serve as its paying agent and transfer agent in New York City. However, Argentina has not appointed a paying agent and transfer agent for the New Bonds in Luxembourg. Argentina will appoint those agents if it issues New Bonds in definitive form in the limited circumstances described in this prospectus supplement under "—Definitive Securities." Argentina will promptly provide notice of the termination or appointment of, or of any change in the office of, any paying agent or transfer agent.

### Minimum Issue Size

The aggregate principal amount of each series of New U.S.$ Global Bonds issuable upon the exchange of Eligible Bonds for New Bonds may not be less than U.S.$1,000,000,000 in the aggregate and the aggregate principal amount of New AR$ Bonds issuable upon exchange of Eligible Bonds for New Bonds may not be less than U.S.$500,000,000. Argentina reserves the right, in its sole discretion, not to issue any New Bonds or not to issue New Bonds of a given series, or to issue New Bonds of one or more series and not another, pursuant to the Invitation.

### Further Issues

Argentina may, without the consent of holders of the New Bonds, create and issue additional debt securities having the same terms and conditions as any series of the New Bonds. Argentina may also consolidate the additional debt securities to form a single series with any outstanding series of New Bonds.

### Notices

Argentina will publish all notices in English in London in the *Financial Times*, in New York City in the *Wall Street Journal*, and, as long as the New Bonds are listed on the Luxembourg Stock Exchange, in Luxembourg in the *Luxemburger Wort*.

If at any time publication in any of the above newspapers is not practicable, Argentina will publish notices in an English language newspaper with general circulation in the market regions, as determined by Argentina. If, in the case of Luxembourg, publication in the *Luxemburger Wort* is not practicable, Argentina will publish notices in another daily newspaper with general circulation in Luxembourg.

Any notice shall be deemed to have been given on the date of its publication or, if published more than once on different dates, on the first date on which it is published.

**Registration and Book-Entry System**

*New U.S.$ Global Bonds*

Argentina will issue each series of New U.S.$ Global Bonds in the form of one or more fully registered global securities registered in the name of a nominee of DTC. Financial institutions, acting as direct and indirect participants in DTC, will represent your beneficial interests in the global securities. These financial institutions will record the ownership and transfer of your beneficial interests through book-entry accounts, eliminating the need for physical movement of securities.

If you wish to purchase securities under the DTC system, you must either be a direct participant in DTC or make your purchase through a direct participant in DTC. Direct participants include securities brokers and dealers, banks, trust companies, clearing corporations and certain other organizations which have accounts with DTC. Euroclear and Clearstream, Luxembourg participate in DTC through their New York depositaries. Indirect participants are securities brokers and dealers, banks and trust companies that do not have an account with DTC, but that clear through or maintain a custodial relationship with a direct participant. Thus, indirect participants have access to the DTC system through direct participants. *Caja de Valores* indirectly participates in DTC through its accounts at Euroclear and Clearstream, Luxembourg. The laws of some jurisdictions require that certain persons take physical delivery of securities in definitive form. Such laws may impair the ability to transfer beneficial interests in the New Bonds to such persons. The SEC has on file a set of the rules applicable to DTC and its participants.

In sum, you may elect to hold your beneficial interests in the global security:

- in the United States, through DTC

- in Europe, through Euroclear or Clearstream, Luxembourg

- in Argentina, through *Caja de Valores*, or

- through organizations that participate in such systems.

DTC may grant proxies or authorize its participants (or persons holding beneficial interests in the New U.S.$ Global Bonds through these participants) to exercise any rights of a holder or take any other actions that a holder is entitled to take under the fiscal agency agreement or the New U.S.$ Global Bonds. Euroclear's or Clearstream, Luxembourg's ability to take actions as a holder under the New U.S.$ Global Bonds or the fiscal agency agreement will be limited by the ability of their respective depositaries to carry out these actions for them through DTC. Euroclear, Clearstream, Luxembourg and *Caja de Valores* will take such actions only in accordance with their respective rules and procedures.

*New AR$ Bonds*

Argentina will issue the New AR$ Bonds in the form of a fully registered security registered in the name of nominee of a common depositary of Euroclear and Clearstream, Luxembourg. Financial institutions, acting as irect and indirect participants in either Euroclear or Clearstream, Luxembourg, will represent your beneficial iterests in the security. These financial institutions will record the ownership and transfer of your beneficial iterests through book-entry accounts, eliminating the need for physical movement of securities.

If you wish to hold securities under the Euroclear and Clearstream, Luxembourg system, you must either be lirect participant in Euroclear or Clearstream, Luxembourg or hold through a direct participant in Euroclear or :arstream, Luxembourg. Direct participants include securities brokers and dealers, banks, trust companies, aring corporations and certain other organizations which have accounts with Euroclear or Clearstream, xembourg. Indirect participants are securities brokers and dealers, banks and trust companies that do not have an ount with Euroclear or Clearstream, Luxembourg, but that clear through or maintain a custodial relationship with

a direct participant. Thus, indirect participants have access to the Euroclear and Clearstream, Luxembourg system through direct participants. The laws of some jurisdictions require that certain persons take physical delivery of securities in definitive form. Such laws may impair the ability to transfer beneficial interests in the New AR$ Bonds to such persons.

In sum, you may elect to hold your beneficial interests in the global security:

- in Europe or Argentina, through Euroclear or Clearstream, Luxembourg, or

- through organizations that participate in such systems.

**Definitive Securities**

Argentina will issue securities in definitive form in exchange for a global security only if:

- The depositary notifies Argentina that it is unwilling, unable or no longer qualified to continue to act as depositary or, in the case of DTC, ceases to be a clearing agency registered under the U.S. Securities Exchange Act of 1934 at a time when it is required to be and Argentina does not appoint a successor depositary or clearing agency within 90 days, or

- at any time Argentina decides it no longer wishes to have all or part of the New Bonds represented by global securities.

If Argentina issues definitive securities, they will have the same terms and authorized denominations as the global securities. Principal and interest will be payable at the offices of the fiscal agent in New York City or of the Luxembourg paying agent, which Argentina will appoint in the event it issues definitive securities. You may present definitive securities for transfer or exchange at the corporate trust office of the fiscal agent in New York City according to the procedures in the Fiscal Agency Agreement, or at the offices of the Luxembourg transfer agent, which Argentina will appoint in the event it issues definitive securities. When you surrender a security for transfer or exchange, the fiscal agent or the Luxembourg transfer agent, as the case may be, will authenticate and deliver to you a security or securities of the appropriate form and denomination and of the same aggregate principal amount as the security you are surrendering. You will not be charged a fee for the registration of transfers or exchanges of definitive securities. However, you may be charged for any stamp, tax or other governmental charge that must be paid in connection with the transfer, exchange or registration. Argentina, the fiscal agent and any other agent of Argentina may treat the person in whose name any definitive security is registered as the owner of such security for all purposes.

If any definitive security becomes mutilated, destroyed, stolen or lost, you can have it replaced by delivering the security or the evidence of its loss, theft or destruction to the fiscal agent. Argentina and the fiscal agent may require you to sign an indemnity under which you agree to pay Argentina, the fiscal agent and any other agent for any losses they may suffer relating to the security that was mutilated, destroyed, stolen or lost. Argentina and the fiscal agent may also require you to present other documents or proof. After you deliver these documents, if neither Argentina nor the fiscal agent has notice that a bona fide purchaser has acquired the security you are exchanging, Argentina will execute, and the fiscal agent will authenticate and deliver to you, a substitute security with the same terms as the security you are exchanging. You will be required to pay all expenses and reasonable charges associated with the replacement of the mutilated, destroyed, stolen or lost security.

## CLEARANCE AND SETTLEMENT

*The information in this section concerning Euroclear, Clearstream, Luxembourg, Caja de Valores, and DTC and their book-entry systems has been obtained from sources Argentina believes to be reliable. Argentina makes no representation or warranty with respect to this information, other than that it has been accurately extracted and/or summarized from those sources.*

Arrangements have been made with each of Euroclear, Clearstream, Luxembourg, *Caja de Valores* and, for the New U.S.$ Global Bonds, DTC to facilitate initial issuance of each series of the New Bonds. Transfers within Euroclear, Clearstream, Luxembourg, *Caja de Valores*, and DTC will be in accordance with the usual rules and operating procedures of the relevant system. Cross-market transfers between investors who hold or who will hold any series of New U.S.$ Global Bonds through DTC and investors who hold or will hold any series of New U.S.$ Global Bonds through Euroclear, Clearstream, Luxembourg and/or *Caja de Valores* will be effected in DTC through the respective depositaries of Euroclear and Clearstream, Luxembourg.

Although Euroclear, Clearstream, Luxembourg, *Caja de Valores* and, for the New U.S.$ Global Bonds, DTC have agreed to the following procedures to facilitate transfers of interests in any series of the New Bonds among participants in Euroclear, Clearstream, Luxembourg, *Caja de Valores* and DTC, as applicable, they are under no obligation to perform or to continue to perform these procedures and these procedures may be discontinued at any time. Neither Argentina nor the fiscal agent will have any responsibilities for the performance by Euroclear, Clearstream, Luxembourg, *Caja de Valores* or DTC or their respective participants or indirect participants of their respective obligations under the rules and procedures governing their operations.

**The Clearing Systems**

*Clearstream, Luxembourg*

Clearstream, Luxembourg (formerly Cedelbank) is incorporated under the laws of Luxembourg as a professional depositary.

Clearstream, Luxembourg holds securities for its participating organizations and facilitates the clearance and settlement of securities transactions between its participants through electronic book-entry changes in accounts of its participants, thereby eliminating the need for physical movement of certificates. Clearstream, Luxembourg provides to its participants, among other things, services for safekeeping, administration, clearance and settlement of internationally traded securities and securities lending and borrowing.

Clearstream, Luxembourg interfaces with domestic markets in several countries. As a professional depositary, Clearstream, Luxembourg is subject to regulation by the Luxembourg Monetary Institute. Clearstream, Luxembourg participants are financial institutions round the world, including the joint lead managers, other securities brokers and dealers, banks, trust companies and clearing corporations and certain other organizations. Indirect access to Clearstream, Luxembourg is also available to others that clear through or maintain a custodial relationship with a Clearstream, Luxembourg participant either directly or indirectly.

Distributions with respect to New Bonds held beneficially through Clearstream, Luxembourg will be credited to cash accounts of Clearstream, Luxembourg participants in accordance with its rules and procedures to the extent received by the depositary for Clearstream, Luxembourg.

*Euroclear*

Euroclear was created in 1968 to hold securities for its participants and to clear and settle transactions between its participants through simultaneous electronic book-entry delivery against payment, thereby eliminating the need for physical movement of certificates and any risk from lack of simultaneous transfers of securities and b.

Euroclear provides various other services, including securities lending and borrowing, and interfaces with domestic markets in several countries. Euroclear is operated by Euroclear Bank S.A./N.V. (the "Euroclear Operator") under contract with Euro-Clear Clearance Systems, S.C., a Belgian cooperative corporation (the "Cooperative"). All operations are conducted by the Euroclear Operator, and all Euroclear securities clearance accounts and Euroclear cash accounts are accounts with the Euroclear Operator, not the Cooperative. The Cooperative establishes policy for Euroclear on behalf of Euroclear participants. Euroclear participants include banks (including central banks), the joint lead managers, other securities brokers and dealers and other professional financial intermediaries. Indirect access to Euroclear is also available to others that clear through or maintain a custodial relationship with a Euroclear participant, either directly or indirectly.

Because the Euroclear Operator is a Belgian banking corporation, Euroclear is regulated and examined by the Belgian Banking Commission.

Securities clearance accounts and cash accounts with the Euroclear Operator are governed by the Terms and Conditions Governing Use of Euroclear and the related Operating Procedures of the Euroclear System, and applicable Belgian law, which are referred to as the "Terms and Conditions." The Terms and Conditions govern transfers of securities and cash within Euroclear, withdrawals of securities and cash from Euroclear, and receipts of payments with respect to securities in Euroclear. All securities in Euroclear are held on a fungible basis without attribution of specific certificates to specific securities clearance accounts. The Euroclear Operator acts under the Terms and Conditions only on behalf of Euroclear participants, and has no record of or relationship with persons holding through Euroclear participants.

Distributions with respect to New Bonds held beneficially through Euroclear will be credited to the cash accounts of Euroclear participants in accordance with the Terms and Conditions, to the extent received by the depositary for Euroclear.

### Caja de Valores

Caja de Valores, a corporation organized under the laws of Argentina, is, with the exception of CRYL, currently the only authorized securities clearing house in Argentina. Caja de Valores is owned by The Buenos Aires Stock Exchange, Mercado de Valores and provincial exchanges and it is regulated by the Comisión Nacional de Valores (the National Securities Commission of Argentina, or the "CNV").

Caja de Valores acts as a clearing house for securities trading, provides central depositary facilities for securities and acts as transfer and paying agent. It also handles settlement of securities transactions carried out on The Buenos Aires Stock Exchange. All securities in Caja de Valores are held on a fungible basis without attribution of specific securities to specific accounts. Accounts at Caja de Valores are opened only in the name of its participants, primarily financial institutions and stock brokers, which may, in turn, request Caja de Valores to open sub-accounts in the name of such participants' customers. In general Caja de Valores only acts on behalf of its participants and has no direct relationship with such participants' customers.

The CNV allows Caja de Valores to carry out clearing transactions with securities admitted to be settled through Clearstream, Luxembourg even though such securities are not physically deposited in Caja de Valores, provided that such securities must have been previously approved by the CNV to be publicly offered in the Republic or otherwise exempted from such approval (as in the case of the New Bonds).

### DTC

DTC is a limited-purpose trust company organized under the laws of the State of New York, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code and a "clearing agency" registered pursuant to the provisions of Section 17A of the Exchange Act.

DTC was created to hold securities for its participants and to facilitate the clearance and settlement of transactions between its participants through electronic book-entry changes in accounts of its participants, thereby

eliminating the need for physical movement of certificates. DTC participants include the global coordinator, the joint lead managers, the U.S. depositaries, the fiscal agent, securities brokers and dealers, banks, trust companies and clearing corporations and may in the future include certain other organizations. Indirect access to the DTC system is also available to others that clear through or maintain a custodial relationship with a DTC participant, either directly or indirectly.

Transfers of ownership or other interests in New U.S.$ Global Bonds in DTC may be made only through DTC participants. In addition, beneficial owners of New U.S.$ Global Bonds in DTC will receive all distributions of principal of and interest on the New U.S.$ Global Bonds from the fiscal agent through such DTC participant.

## Initial Settlement

### New U.S.$ Global Bonds

Upon the issuance of the New U.S.$ Global Bonds, DTC or its custodian will credit, on its internal system, the respective principal amount of the individual beneficial interests represented by the book-entry security to the accounts of persons who have accounts with DTC. Ownership of beneficial interests in the New U.S.$ Global Bonds will be limited to persons who have accounts with direct account holders, including Euroclear and Clearstream, Luxembourg, or indirect account holders, including *Caja de Valores*. Ownership of beneficial interests in the New U.S.$ Global Bonds will be shown on, and the transfer of that ownership will be effected only through, records maintained by DTC or its nominee, with respect to interests of direct account holders, and the records of direct account holders, with respect to interests of indirect DTC accountholders.

Euroclear and Clearstream, Luxembourg will hold omnibus positions on behalf of their participants through customers' securities accounts for Euroclear and Clearstream, Luxembourg on the books of their respective depositaries, which in turn will hold positions in customers' securities accounts in the depositaries' names on the books of DTC.

New U.S.$ Global Bonds that Argentina will issue pursuant to Exchange Offers will be credited to the securities custody accounts of persons who hold New U.S.$ Global Bonds through DTC (other than through accounts at Euroclear and Clearstream, Luxembourg) on the Settlement Date and to persons who hold New U.S.$ Global Bonds through Euroclear, Clearstream, Luxembourg or *Caja de Valores* on the business day following the Settlement Date.

### New AR$ Bonds

Investors receiving New AR$ Bonds must hold their New AR$ Bonds through Euroclear or Clearstream, Luxembourg accounts or through direct account holders, including *Caja de Valores*, and must follow the settlement procedures applicable to conventional Eurobonds in registered form. New AR$ Bonds will be credited to the securities custody accounts of Euroclear holders on the business day following the settlement date against payment for value on the settlement date and of Clearstream, Luxembourg holders on the settlement date against payment in he same-day funds.

## Secondary Market Trading

Since the purchaser determines the place of delivery, it is important for you to establish at the time of a secondary market trade the location of both the purchaser's and seller's accounts to ensure that settlement can be on e desired value date.

### Trading Between DTC Accountholders

Secondary market trading of New U.S.$ Global Bonds represented by the book-entry security between C accountholders will trade in DTC's settlement system and will therefore settle in same-day funds.

*Trading Between Euroclear and/or Clearstream, Luxembourg Participants*

Secondary market trading between Clearstream, Luxembourg participants and/or Euroclear participants will be settled using the procedures applicable to conventional Eurobonds in same-day funds.

*Trading Between DTC Seller and Clearstream, Luxembourg or Euroclear Purchaser*

When interests are to be transferred from the account of a DTC accountholder to the account of a Clearstream, Luxembourg participant or a Euroclear participant, the purchaser will send instructions to Clearstream, Luxembourg or Euroclear through a Clearstream, Luxembourg or Euroclear participant at least one business day prior to settlement. Clearstream, Luxembourg or Euroclear will instruct its respective depositary to receive the beneficial interest against payment. Payment will include interest accrued on the beneficial interest in the New Bonds from and including the last interest payment date to and excluding the settlement date. Payment will then be made by the depositary to the DTC accountholder's account against delivery of the interest in the New U.S.$ Global Bonds. After settlement has been completed, the interest will be credited to the respective clearing system, and by the clearing system, in accordance with its usual procedures, to the Clearstream, Luxembourg participant's or Euroclear participant's account. The securities credit will appear the next day, European time. The cash debit will be back-valued to, and the interest of the New U.S.$ Global Bonds will accrue from, the value date, which will be the preceding day when settlement occurs in New York. If settlement is not completed on the intended value date, that is, if the trade fails, the Clearstream, Luxembourg or Euroclear cash debit will be valued instead as of the actual settlement date.

Clearstream, Luxembourg participants and Euroclear participants will need to make available to the respective clearing system the funds necessary to process same-day funds settlement. The most direct means of doing so is to preposition funds for settlement either from cash on hand or existing lines of credit, as participants would for any settlement occurring within Clearstream, Luxembourg or Euroclear. Under this approach, participants may take on credit exposure to Clearstream, Luxembourg or Euroclear until the interests in the New Bonds are credited to their accounts one day later.

As an alternative, if Clearstream, Luxembourg or Euroclear has extended a line of credit to a Clearstream, Luxembourg or Euroclear participant, the participant may elect not to preposition funds and allow that credit line to be drawn upon to finance settlement. Under this procedure, Clearstream, Luxembourg participants or Euroclear participants purchasing interests in the New U.S.$ Global Bonds would incur overdraft charges for one day, assuming they cleared the overdraft when the interests in the New U.S.$ Global Bonds were credited to their accounts. However, interest on the book-entry security would accrue from the value date. Therefore, in many cases the investment income on the interest in the New Bonds earned during that one-day period may substantially reduce or offset the amount of the overdraft charges, although this result will depend on each participant's particular cost of funds.

Since the settlement is taking place during New York business hours, DTC accountholders can employ their usual procedures for transferring New U.S.$ Global Bonds to the respective depositaries of Clearstream, Luxembourg or Euroclear for the benefit of Clearstream, Luxembourg participants or Euroclear participants. The sale proceeds will be available to the DTC seller on the settlement date. Thus, to DTC accountholders, a cross-market sale transaction will settle no differently from a trade between two DTC accountholders.

Finally, day traders that use Clearstream, Luxembourg or Euroclear to purchase interests in the New U.S.$ Global Bonds from DTC accountholders for delivery to Clearstream, Luxembourg participants or Euroclear participants should note that these trades will automatically fail on the sale side unless affirmative action is taken. At least three techniques should be readily available to eliminate this potential problem:

- borrowing through Clearstream, Luxembourg or Euroclear for one day, until the purchase side of the day trade is reflected in their Clearstream, Luxembourg or Euroclear accounts, in accordance with the clearing system's customary procedures

- borrowing the interests in the United States from a DTC accountholder no later than one day prior to settlement, which would give the interests sufficient time to be reflected in their Clearstream, Luxembourg or Euroclear account in order to settle the sale side of the trade, or

- staggering the value date for the buy and sell sides of the trade so that the value date for the purchase from the DTC accountholder is at least one day prior to the value date for the sale to the Clearstream, Luxembourg participant or Euroclear participant.

*Trading Between Euroclear or Clearstream, Luxembourg Seller and DTC Purchaser*

Due to time zone differences in their favor, Clearstream, Luxembourg and Euroclear participants may employ their customary procedures for transactions in which interests in the New U.S.$ Global Bonds are to be transferred by the respective clearing system, through its respective depositary, to a DTC accountholder. The seller must first send instructions to Euroclear or Clearstream, Luxembourg through a participant, at least one business day prior to settlement. Clearstream, Luxembourg or Euroclear will instruct its respective depositary to credit the interest in the New U.S.$ Global Bonds to the DTC accountholder's account against payment. Payment will include interest accrued on the beneficial interest in the New U.S.$ Global Bonds from and including the last interest payment date to and excluding the settlement date. The payment will then be reflected in the account of the Clearstream, Luxembourg participant or Euroclear participant the following day. Receipt of the cash proceeds in the Clearstream, Luxembourg or Euroclear participant's account will be back-valued to the value date, which will be the preceding day, when settlement occurs in New York. If the Clearstream, Luxembourg or Euroclear participant has a line of credit in its clearing system and elects to draw on such line of credit in anticipation of receipt of the sale proceeds in its account, the back-valuation may substantially reduce or offset any overdraft charges incurred over that one-day period. If settlement is not completed on the intended value date, that is, if the trade fails, receipt of the cash proceeds in the Clearstream, Luxembourg or Euroclear participant's account would instead be valued as of the actual settlement date.

*Trading Between DTC, Euroclear, Clearstream, Luxembourg and Caja de Valores Participants*

If you hold New Bonds through participant accounts in Euroclear, Clearstream, Luxembourg or, in the case of the New U.S.$ Global Bonds, DTC, secondary market trading with *Caja de Valores* participants will be settled using the same rules and operating procedures as if you were trading with any other Clearstream, Luxembourg participant.

If you are a participant in *Caja de Valores*, you will have to make arrangements with *Caja de Valores* and Clearstream, Luxembourg to preposition funds or New Bonds to complete settlement and make sure that trades will not fail.

## TAXATION

*The following discussion summarizes certain U.S. federal income and estate and Argentine tax considerations that may be relevant to you if you invest in New Bonds. This summary is based on laws, regulations, rulings and decisions now in effect in the United States and on laws and regulations in effect in Argentina and may change. Any change could apply retroactively and could affect the continued validity of this summary.*

*This summary does not describe all of the tax considerations that may be relevant to you or your situation, particularly if you are subject to special tax rules. You should consult your tax adviser about the tax consequences of holding New Bonds, including the relevance to your particular situation of the considerations discussed below, as well as of state, local or other tax laws.*

### Argentine Taxation

The following discussion summarizes certain aspects of Argentine federal income taxation that may be relevant to you if you are Non-Resident Holder of Eligible Bonds and offer those Eligible Bonds for exchange pursuant to the Invitation. For the purposes of this summary, you are a Non-Resident Holder if you are a holder of Eligible Bonds or New Bonds who is an individual that is a non-resident of Argentina or a legal entity that is neither organized in, nor maintains a permanent establishment in Argentina. This summary may also be relevant to you if you are a Non-Resident Holder of New Bonds in connection with the holding and disposition of the New Bonds. The summary is based on Argentine laws, rules and regulations now in effect, all of which may change.

This summary is not intended to constitute a complete analysis of the income tax consequences under Argentine law of the exchange of Eligible Bonds for New Bonds pursuant to the Invitation or the receipt, ownership or disposition of the New Bonds, in each case if you are a non-resident of Argentina, nor to describe any of the tax consequences that may be applicable to you if you are a resident of Argentina.

If (a) you exchange Eligible Bonds for New Bonds and cash pursuant to the Invitation, and (b) you are a Non-Resident Holder, the receipt of New Bonds will not result in any withholding or other Argentine taxes. The exchange of Eligible Bonds for New Bonds pursuant to the Invitation will not be subject to any stamp or other similar Argentine taxes.

Under Argentine law, as currently in effect, if you are a Non-Resident Holder of New Bonds, interest and principal payments on the New Bonds will not be subject to Argentine income or withholding tax.

If you are a Non-Resident Holder and you obtain capital gains resulting from any trades of New Bonds effected between or in respect of accounts maintained by or on behalf of you will not be subject to Argentine income or other Argentine taxes where you have no connection with Argentina other than as a holder of an interest in New Bonds.

If you are a Non-Resident Holder, payments of interest and principal on New Bonds to you, and any gain realized upon the disposition of New Bonds by you, will not be subject to Argentine estate tax.

### United States Federal Income and Estate Taxation

The following discussion summarizes certain U.S. federal income and estate tax considerations that may be relevant to you if you invest in New Bonds. This summary deals only with holders that hold Eligible Bonds or New Bonds as capital assets and that acquire New Bonds pursuant to the Invitation. It does not address tax considerations that may be relevant to you if you are an investor that is subject to special tax rules, such as a bank, thrift, real estate investment trust, tax-exempt organization, regulated investment company, life insurance company, dealer or trader in securities, currencies or commodities, trader in securities that makes a mark-to-market election with respect to the New Bonds, a person that holds Eligible Bonds or will hold New Bonds as a hedge against interest rate or currency risk or as a position in a "straddle" or conversion transaction or other integrated investment or a person whose

"functional currency" is not the U.S. dollar. This summary is based on laws, regulations, rulings and decisions in effect on the date of this Prospectus Supplement, all of which are subject to change, possibly with retroactive effect. No assurances can be given that any such changes will not affect the accuracy of the discussion set forth herein.

You should consult your own tax advisors in determining the tax treatment of the exchange of Eligible Bonds pursuant to the Invitation and of the acquisition, ownership and sale of New Bonds, including the relevance to your particular situation of the tax considerations discussed below and of any relevant state, local or other tax laws.

Except as discussed under the headings "Non-United States Holders" and "Backup Withholding and Information Reporting," this discussion applies only to United States Holders. You are a United States Holder if you are:

- an individual citizen or resident of the United States

- a domestic corporation, or

- any other person that is subject to U.S. federal income tax on a net income basis in respect of the Eligible Bonds or the New Bonds.

**United States Holders**

*Exchange of Eligible Bonds for New Bonds*

An exchange of Eligible Bonds for New Bonds will be considered to be a modification of the Eligible Bonds. The tax consequences of such a modification will depend on whether the modification is considered to be significant. As discussed below, in general, if the modification is significant, the exchange will be a taxable transaction. If it is not significant, the exchange will not be taxable to you except with respect to any payments of accrued qualified stated interest that you receive in respect of the Eligible Bonds, which will be taxable as ordinary income. As used herein the term "qualified stated interest" generally means the stated interest payable with respect to the Eligible Bonds, except with respect to the Bocon Pre 3 Bonds, the Bocon Pre 4 Bonds, the Bocon Pro 1 Bonds, the Bocon Pro 2 Bonds, the Bocon Pro 3 Bonds and the Bocon Pro 4 Bonds, for which none of the interest is "qualified stated interest," and the Par Bonds, for which interest in excess of 4% is not "qualified stated interest."

Under the applicable U.S. Treasury regulations, a modification will be considered significant if, based on all the facts and circumstances, the legal rights or obligations that are altered and the degree to which they are altered are economically significant. Although the matter is not entirely free from doubt with respect to all the Eligible Bonds, Argentina intends to treat the exchange for U.S. federal income tax purposes as a significant modification of the Eligible Bonds because a number of material substantive terms of the Eligible Bonds (e.g., interest rate basis, yield, payment schedules or currency of denomination) will change as a result of the exchange. This treatment is based in part on the current market conditions as of the date of this prospectus supplement. If such market conditions on the issue date of the bonds differ appreciably from current market conditions, an exchange of the Bontes 2006, Global Bonds 2005 or Global Bonds 2006 for 2008 Global Bonds may not qualify as a significant modification and therefore may be treated as a non-taxable exchange for U.S. federal income tax purposes. See the discussion below under "United States Holders—Possible Characterization as a Non-Taxable Exchange" for a description of the U.S. federal income tax considerations that may be relevant in the event such an exchange is not treated as a significant modification. By accepting New Bonds, you agree to the treatment of the exchange described in this paragraph and you further agree to report for U.S. federal income tax purposes all income or loss with respect to the Eligible Bonds and the New Bonds in accordance with this characterization. Except as otherwise indicated, the remainder of this summary assumes that the exchange will be treated as a significant modification.

Subject to the limitations described below regarding Eligible Bonds in bearer form, you will recognize gain or loss in connection with the exchange equal to the difference, if any, between your adjusted basis in the Eligible Bonds you exchange (taking into account original issue discount ("OID"), if any, on the Eligible Bonds that has

accrued in the year of the exchange) and the amount you realize on the exchange. The amount you realize on the exchange will be equal to the issue price (determined as described below) of the New Bonds you receive in the exchange plus the amount of cash you receive in the exchange. Except to the extent attributable to accrued but unpaid qualified stated interest (including payments thereof), accrued market discount, or, if you exchange Argentine peso denominated Eligible Bonds for New Bonds, changes in exchange rates during your holding period for such Argentine peso denominated Eligible Bonds, and subject to the limitations described below regarding Eligible Bonds in bearer form, gain or loss recognized on the exchange of Eligible Bonds will be capital gain or loss and will be long term capital gain or loss if you held the Eligible Bonds for more than one year. Gain or loss attributable to accrued but unpaid qualified stated interest, market discount (to the extent not previously included in income) and changes in exchange rates during your holding period for any Argentine peso denominated Eligible Bonds that you exchange for New Bonds will be taxed as ordinary income. If you hold Eligible Bonds in bearer form, you may be subject to limitations on your ability to treat any gain realized on the exchange of these Eligible Bonds for New Bonds as capital gain and to deduct any losses realized on such exchange unless you hold the Eligible Bonds in accordance with certain specified procedures. Your basis in the New Bonds received in the exchange will be equal to their issue price.

*Taxation of New Bonds*

Interest on the New Bonds

Payments of "qualified stated interest" on the New Bonds will generally be subject to United States taxation as ordinary income at the time such payments accrue or are received in accordance with your method of accounting for tax purposes. For the New AR$ Bonds and the 2008 Global Bonds, the "qualified stated interest" means the interest payable with respect to the New AR$ Bonds or the 2008 Global Bonds at a rate equal to the AR$ Coupon or the 2008 Coupon. For the 2018 Global Bonds and the 2031 Global Bonds, none of the interest payable thereunder is "qualified stated interest."

If you use the cash method of tax accounting and you receive payments of qualified stated interest pursuant to the terms of a New AR$ Bond in Argentine pesos, the amount of interest income you will realize generally will be the U.S. dollar value of the Argentine peso payment based on the exchange rate in effect on the date you receive the payment, regardless of whether you convert the payment into U.S. dollars. If you are an accrual-basis United States Holder, the amount of interest income you will realize will be based on the average exchange rate in effect during the interest accrual period (or with respect to an interest accrual period that spans two taxable years, at the average exchange rate for the partial period within the taxable year). Alternatively, as an accrual-basis United States Holder, you may elect to translate all interest income on the New AR$ Bonds at the spot rate on the last day of the accrual period (or the last day of the taxable year, in the case of an accrual period that spans more than one taxable year) or on the date that you receive the interest payment if that date is within five business days of the end of the accrual period. If you make this election, you must apply it consistently to all debt instruments from year to year and you cannot change the election without the consent of the Internal Revenue Service. If you use the accrual method of accounting for tax purposes, you will recognize foreign currency gain or loss on the receipt of an interest payment in Argentine pesos if the exchange rate in effect on the date the payment is received differs from the rate applicable to a previous accrual of that interest income. This foreign currency gain or loss will be treated as ordinary income or loss, but generally will not be treated as an adjustment to interest income received on the New AR$ Bonds.

There are no clear rules that govern the treatment of debt securities that are denominated in foreign currencies and that provide for payments that are contingent as to amount and, accordingly, the treatment of a United States Holder's right to elect to receive a fixed amount of U.S. dollars as a payment in respect of a New AR$ Bond is not entirely free from doubt. Because there are no rules that require that such contingent payments be taken into account before they become fixed, such a United States Holder should recognize additional interest income at the time that it makes such an election in an amount equal to the excess of the U.S. dollar amount received over the U.S. dollar value of the Argentine peso amount accrued in respect of such payment. It is possible, however, that the Internal Revenue Service would take a different view. In particular, the Internal Revenue Service has indicated that it is considering adopting rules comparable to those applicable to non-foreign currency debt securities that provide for contingent payments, which could affect the timing and the character of income recognized by a United States

Holder with respect to the New AR$ Bonds. Accordingly, United States Holders of New AR$ Bonds should consult their tax advisors regarding the treatment of the New AR$ Bonds.

The New Bonds will be issued with OID and will be subject to the special tax accounting rules for obligations issued with OID. You should be aware that, as described in greater detail below, you generally will be required to include that OID in ordinary gross income for United States federal income tax purposes as its accrues, before you receive the cash attributable to that income.

The difference between the issue price of the New Bonds and their "stated redemption price at maturity" will be the amount of OID on the New Bonds. The "stated redemption price at maturity" of a New Bond will be the stated principal amount of the New Bond plus all payments provided under the terms of the New Bond other than "qualified stated interest" payments (as described above). Thus, in the case of the New AR$ Bonds and the 2008 Global Bonds, interest in excess of the AR$ Coupon and the 2008 Coupon will be included in the stated redemption price at maturity and, in the case of the 2018 Global Bonds and the 2031 Global Bonds, all interest will be included in the stated redemption price at maturity.

In general, regardless of whether you use the cash or the accrual method of tax accounting, you will be required to include in ordinary gross income the sum of any "daily portions" of OID on the New Bonds for all days during the taxable year that you own the New Bonds. The daily portions of OID on a New Bond will be determined by allocating to each day in any accrual period a ratable portion of the OID allocable to that accrual period. Accrual periods may be any length and may vary in length over the term of the New Bonds, provided that no accrual period is longer than one year and each scheduled payment of principal or interest occurs on either the final day or the first day of an accrual period. The amount of OID on a New Bond allocable to each accrual period will be determined by:

- multiplying the "adjusted issue price" (as defined below) of the New Bonds at the beginning of the accrual period by the "yield to maturity" (as defined below) of such New Bonds (appropriately adjusted to reflect the length of the accrual period), and

- subtracting from that product the amount of "qualified stated interest" (as described above) payable on the New Bonds that is allocable to that accrual period.

In the case of a New AR$ Bond, you should determine the U.S. dollar amount includible as OID for each accrual period by calculating the amount of OID allocable to each accrual period in Argentine pesos using the constant yield method as described above and translating that Argentine peso amount into U.S. dollars in the same manner as qualified stated interest accrued by accrual-basis United States Holders, as described above. Upon the receipt of an amount attributable to OID (whether in connection with a payment of an amount that is not qualified stated interest or the sale or retirement of the New AR$ Bond), you will recognize ordinary income or loss measured by the difference between the amount received (translated into U.S. dollars at the exchange rate in effect on the date of receipt or on the date of disposition of the New AR$ Bond, as the case may be) and the amount accrued (using the exchange rate applicable to such previous accrual).

The "issue price" of the New Bonds will be their fair market value on their issue date if a substantial amount of the New Bonds is traded on an established securities market. It is anticipated that a substantial amount of the New Bonds will be traded on an established securities market and, accordingly the issue price of the New Bonds will be their fair market value on their issue date. A debt instrument is considered to be traded on an established securities market if, at any time during the 60-day period ending 30 days after the issue date of the debt instrument, the debt instrument appears on a system of general circulation (including computer listings disseminated to subscribing brokers, dealers or traders) that provides a reasonable basis to determine fair market value by disseminating either recent price quotations (including rates, yields or other price information) of one or more identified brokers, dealers or traders or actual prices (including rates, yields or other pricing information) of recent sales transactions. The "adjusted issue price" of a New Bond at the beginning of any accrual period will generally be the sum of its issue price (generally including accrued interest, if any) and the amount of OID allocable to all prior accrual periods, reduced by the amount of all payments other than payments of qualified stated interest (if any)

made with respect to such New Bond in all prior accrual periods. The "yield to maturity" of a New Bond will be the discount rate (appropriately adjusted to reflect the length of accrual periods) that causes the present value of all payments on the New Bond to equal the issue price of such New Bond.

<u>Disposition of the New Bonds</u>

You will generally recognize gain or loss on the sale, exchange or other disposition of the New Bonds in an amount equal to the difference between the amount you realize on such sale, exchange or other disposition (less any accrued qualified stated interest, which will be taxable as ordinary interest income) and your adjusted basis in the New Bonds. In general, your adjusted basis in New Bonds will be equal to the adjusted issue price of such New Bonds determined as discussed above under "United States Holders—Taxation of New Bonds—Interest on the New Bonds." Except as discussed below with respect to foreign currency gain or loss, the gain or loss that you recognize on the sale, exchange or retirement of a New Bond generally will be capital gain or loss and will be long-term capital gain or loss if you have held the New Bond for more than one year on the date of disposition.

Notwithstanding the foregoing, the gain or loss that you recognize on the sale, exchange or retirement of a New AR$ Bond generally will be treated as ordinary income or loss to the extent that the gain or loss is attributable to changes in exchange rates during the period in which you held the New AR$ Bond. This foreign currency gain or loss will not be treated as an adjustment to interest income that you receive on the New AR$ Bond.

Your initial tax basis for a New AR$ Bond will be the U.S. dollar value of the New AR$ Bond issue price on the New AR$ Bond's issue date calculated at the exchange rate in effect on that date. If you sell or exchange a New Bond for a foreign currency, or receive foreign currency on the retirement of a New Bond, the amount you will realize for U.S. tax purposes generally will be the dollar value of the foreign currency that you receive calculated at the exchange rate in effect on the date the foreign currency note is disposed of or retired.

*Possible Characterization as a Non-Taxable Exchange*

If, contrary to the discussion above, the exchange of Eligible Bonds that you hold is not deemed to result in a significant modification, you would not be required to recognize gain or loss on the exchange, except with respect to payments of accrued qualified stated interest received in respect of Eligible Bonds. Your basis in the New Bonds would be the same as your basis in the Eligible Bonds immediately before the exchange. Your holding period for the New Bonds would include your holding period for the exchanged Eligible Bonds.

If the exchange is not considered to be a taxable exchange, the New Bonds would be treated as having an issue price equal to the "adjusted issue price" (as defined above under "United States Holders—Taxation of New Bonds—Interest on the New Bonds") of the Eligible Bonds that you exchange. If the "stated redemption price at maturity" (as defined under "United States Holders—Taxation of New Bonds—Interest on the New Bonds") of the New Bonds that you receive in the exchange exceeds their issue price by more than a de minimis amount, the New Bonds that you receive generally would be treated as issued with OID. Any such New Bonds would have less OID than other New Bonds of the same series that are issued in a taxable exchange for a different series of Eligible Bonds. Because all New Bonds of a series will trade fungibly, if a particular exchange of Eligible Bonds a for New Bonds is not considered to be a taxable exchange, a secondary market holder of New Bonds that is unable to determine for which series the Eligible Bonds that it holds were issued may be required as a practical matter to assume that it holds Eligible Bonds that were issued in a taxable exchange (*i.e.* the bonds that have a greater amount of OID).

You should consult your tax advisors with regard to the U.S. federal income tax consequences to you of exchanging Eligible Bonds for New Bonds.

**Non-United States Holders**

Subject to the discussion of backup withholding below, if you are, with respect to the United States, a foreign corporation or nonresident alien individual (a "Non-United States Holder"), the interest income and gains that you derive in respect of the Eligible Bonds and the New Bonds generally will be exempt from U.S. federal

S-57

income taxes, including withholding tax. However, to receive this exemption you may be required to satisfy certain certification requirements (described below under "Backup Withholding and Information Reporting") of the Internal Revenue Service to establish that you are a non-United States holder.

Even if you are a Non-United States Holder, you may still be subject to U.S. federal income taxes on any interest income, including OID, you derive in respect of the New Bonds if:

- you are an insurance company carrying on a U.S. insurance business to which the interest is attributable within the meaning of the U.S. Internal Revenue Code, or

- you have an office or other fixed place of business in the United States to which the interest is attributable and the interest either

  - is derived in the active conduct of a banking, financing or similar business within the United States, or

  - is received by a corporation the principal business of which is in trading stocks or securities for its own account and you are otherwise engaged in a U.S. trade or business.

If you are a Non-United States Holder, any gain you realize on a sale or exchange of the Eligible Bonds or the New Bonds generally will be exempt from U.S. federal income tax, including withholding tax, unless:

- such gain is effectively connected with the conduct of your trade or business within the United States, or

- if you are an individual, you are present in the United States for a total of 183 days or more during the taxable year in which such gain is realized and either

  - such gain is attributable to your office or fixed place of business maintained in the United States, or

  - you have a tax home in the United States.

A New Bond held by an individual holder who at the time of death is a non-resident alien will not be subject to U.S. federal estate tax.

**Backup Withholding and Information Reporting**

In general, information reporting requirements will apply to the accrual of OID and to payments in respect of the Eligible Bonds or New Bonds (including payments of OID) within the United States if you are not a corporation, and backup withholding at a rate of 31% will apply to such payments if you fail to provide an accurate taxpayer identification number or you are notified by the Internal Revenue Service that you have failed to report all interest and dividends required to be shown on your federal income tax return.

Backup withholding and information reporting will not apply to payments made by Argentina or any agent thereof (acting in such capacity) to you if you are a Non-United States Holder so long as either (i) if you are the beneficial owner, you certify to Argentina or its agent, under penalties of perjury, that you are Non-United States Holder and provide your name, address and taxpayer identification number or (ii) you have otherwise established an exemption, and provided that neither Argentina nor its agent has actual knowledge that you are not a Non-United States Holder or that the conditions of any exemption are not in fact satisfied.

Backup withholding and information reporting will not apply to the sale of New Bonds effected outside the United States by a foreign office of a foreign broker, provided that such broker (i) derives less than 50 percent of its gross income for certain periods from the conduct of a trade or business in the United States, (ii) is not a controlled

foreign corporation for United States federal income tax purposes and (iii) is not a foreign partnership that, at any time during its taxable year, is 50 percent or more (by income or capital interest) owned by U.S. persons or is engaged in the conduct of a U.S. trade or business. If you receive payment of such amounts outside the United States from a foreign office of any other broker, the payment will not be subject to backup withholding tax, but will be subject to information reporting requirements unless (i) you are the beneficial owner and such broker has documentary evidence in its records that you are a Non-United States Holder or (ii) you otherwise establish an exemption, and provided that the broker does not have actual knowledge that you are not a Non-United States Holder or that the conditions of any exemption are not in fact satisfied.

## PLAN OF DISTRIBUTION

Argentina has entered into a dealer managers agreement with Banco Galicia y Buenos Aires S.A., Banco Río de la Plata S.A. (a member of the Santander Central Hispano Group), BBVA Banco Francés S.A., Credit Suisse First Boston Corporation, HSBC Bank Argentina S.A., J.P. Morgan Securities Inc., and Salomon Smith Barney Inc. as the joint lead managers, and the other financial entities listed as co-managers on the cover page of this prospectus supplement. The joint lead managers and these financial institutions are collectively referred to as the "dealer managers" in this section. Pursuant to the dealer managers agreement, Argentina has:

- retained the dealer managers to act, directly or through affiliates, on behalf of Argentina as dealer managers in connection with the Invitation

- agreed to pay the dealer managers fees equal to 0.55% of the aggregate principal amount of New Bonds issued pursuant to accepted Exchange Offers

- agreed to reimburse the dealer managers for certain of their out-of-pocket expenses in connection with the Invitation, and

- agreed to indemnify the dealer managers and their affiliates against certain liabilities, including liabilities under the U.S. Securities Act of 1933, as amended.

At any given time, the dealer managers may trade the Eligible Bonds or other debt securities of Argentina for their own accounts or for the accounts of customers and may accordingly hold a long or short position in the Eligible Bonds or other securities of Argentina.

The dealer managers have obtained from the SEC an exemption from Rule 101 of Regulation M under the United States Securities Exchange Act of 1934, as amended, with respect to the trading activities of the dealer managers and certain of their affiliates in connection with the offering.

If any joint lead manager or co-manager acquires any New Bonds pursuant to the Invitation, it may resell the New Bonds from time to time in one or more transactions, including negotiated transactions, at a fixed public offering price or at varying prices to be determined at the time of sale.

The New Bonds are each a new issue of securities with no established trading market. Argentina has been advised by the dealer managers that the dealer managers intend to make a market in the New Bonds but are not obligated to do so and may discontinue market making at any time without notice. No assurance can be given as to the liquidity of the trading market for the New Bonds.

Argentina estimates that its share of the total expenses of the Invitation, excluding fees and commissions, will be approximately U.S.$1,500,000.

Argentina has retained Deutsche Bank AG to act as settlement agent in connection with the Invitation and Deutsche Bank Luxembourg S.A. to act as Luxembourg exchange agent in connection with the Invitation.

Argentina has agreed to:

- pay the settlement agent and the Luxembourg exchange agent customary fees for their services

- reimburse the settlement agent and the Luxembourg exchange agent for certain of their out-of-pocket expenses in connection with the Invitation, and

- indemnify the settlement agent and the Luxembourg exchange agent against certain liabilities, including liabilities under the U.S. Securities Act of 1933, as amended.

## JURISDICTIONAL RESTRICTIONS

The distribution of the Invitation Materials and the transactions contemplated by the Invitation Materials may be restricted by law in certain jurisdictions. Persons into whose possession the Invitation Materials come are required by Argentina to inform themselves of and to observe any of these restrictions.

The Invitation Materials do not constitute, and may not be used in connection with, an offer or solicitation by anyone in any jurisdiction in which an offer or solicitation is not authorized or in which the person making an offer or solicitation is not qualified to do so or to any person to whom it is unlawful to make an offer or solicitation.

In any jurisdiction in which the Invitation is required to be made by a licensed broker or dealer and in which any joint lead manager or any dealer manager or any affiliate thereof is so licensed, it shall be deemed to be made by the that joint lead manager or that dealer manager or its respective affiliate on behalf of Argentina.

**Bahamas**

For assistance in connection with the Invitation, you may contact J.P. Morgan Securities Inc. or Credit Suisse First Boston Corporation, at the telephone numbers listed on the back cover page of this prospectus supplement. If you have any questions about this Invitation and/or doubts about its terms and conditions, you should consult with your stockbroker, bank manager, counsel and attorney, accountant or other financial adviser. None of Argentina, the joint lead managers or the co-managers have expressed any opinion as to whether the terms of the Invitation are fair.

You should be aware that

- we can give no assurance regarding the liquidity of the trading market for the New Bonds

- the price at which the New Bonds may trade in the secondary market is uncertain, and

- the price of the New Bonds, as well as the value of your overall investment, may go down as well as up.

Argentina accepts responsibility for the information it has provided in this prospectus supplement. To the best of the knowledge and belief of Argentina (which has taken all reasonable care to ensure that this is the case), the information contained in the prospectus supplement is in accordance with the facts and does not omit anything likely to affect the import of this information.

If you are a Bahamian resident, you are subject to Bahamian Exchange Control Regulations.

**Belgium**

The Invitation has not been notified to or approved by the *Commission bancaire et financière/Commissie voor het Bank-en Financiewezen.* Accordingly,

- the New Bonds may not be offered or sold, and

- the Invitation Materials may not be distributed, directly or indirectly, to any person in Belgium other than the following, acting for their own account:

  - the Belgian State, the Regions and Communities (*Communautés/Gemeenschappen*)

  - the European Central Bank

- the National Bank of Belgium

- the *Fonds des Rentes/Rentenfonds*

- the *Fonds de protection des dépôts et des instruments financiers/Beschermingsfonds voor deposito's en financiële instrumenten*

- the *Caisse de Dépôts et Consignations/Deposito-en Consignatiekas*

- authorized, licensed or registered credit institutions

- securities firms and portfolio managers

- collective investment institutions

- insurance and reinsurance companies and pension funds

- holding companies

- licensed Belgian coordination centers, and

- Belgian or foreign companies listed on a Belgian or a foreign regulated exchange with a consolidated net worth in excess of Euro 25 million, within the meaning of Article 3.2 of the Royal Decree of July 7, 1999, relating to the public nature of certain transactions aiming at solicitation of savings funds.

**Bermuda**

The applicable provisions of the Investment Business Act 1998 must be complied with in respect of anything done in or from within Bermuda in relation to the Invitation.

**Brazil**

The New Bonds may not be offered or sold to the public in Brazil. Accordingly, the Invitation has not been submitted to the *Comisão de Valores Mobiliários* for approval. Documents relating to the Invitation as well as the information contained therein, may not be supplied to the public, as a public offering in Brazil or be used in connection with any offer for subscription or sale of New Bonds to the public in Brazil.

**Canada**

*Provinces*

The New Bonds may only be offered to investors located in the provinces of Ontario and Québec.

*Resale Restrictions*

The distribution of the New Bonds in Canada will be made only on a private placement basis and will be exempt from the requirement that Argentina prepare and file a prospectus with the relevant Canadian securities regulatory authorities. Accordingly, any resale of the New Bonds must be made in accordance with applicable securities laws which may require resales to be made in accordance with exemptions from registration and prospectus requirements. Purchasers are advised to seek legal advice prior to any resale of the New Bonds.

*Representations of Purchasers*

Each Canadian investor who purchases New Bonds will be deemed to have represented to Argentina, the dealer managers and any dealer who offers or sells New Bonds to such purchaser that:

- the offer and sale of the New Bonds was made exclusively through the Invitation and was not made through an advertisement of the New Bonds in any printed media of general and regular paid circulation, radio, television or any other form of advertising

- such purchaser has reviewed the terms referred to above under "Resale Restrictions"

- where required by law, such purchaser is purchasing as principal and not as agent, and

- such purchaser or any ultimate purchaser for which such purchaser is acting as agent is not an individual and is entitled under applicable Canadian securities laws to purchase such New Bonds without the benefit of a prospectus qualified under such securities laws

  - and in the case of a purchaser located in Ontario, such purchaser is a person to which a dealer registered as an international dealer in Ontario may offer or sell New Bonds, and

  - in the case of a purchaser located in Québec, such purchaser is a "sophisticated purchaser" within the meaning of the *Securities Act* (Québec).

*Language of Documents*

Each Canadian investor, by submitting an offer, acknowledges that it is such investor's express wish that all documents evidencing or relating in any way to the sale of the New Bonds be drawn up in the English language only. *Chaque investisseur Canadien en soumettant une offre, reconnaît que c'est à sa volonté expresse que tous les documents faisant foi ou se rapportant de quelque manière que ce soit à la vente des Obligations Globales soient rédigés en anglais seulement.*

*Exchange Rate*

The official rate for the Argentinian peso against the Canadian dollar as reported by the Bank of Canada was approximately AR$1.5452 = C$1.00 on May 23, 2001.

## France

The New Bonds may not be offered or sold to the public in France. Accordingly, the Invitation has not been submitted to the *Commission des Opérations de Bourse* nor to the Ministry of the Economy for approval. Any documents relating to the Invitation as well as the information contained in the Invitation may not be supplied to the public in France or used in connection with any offer for subscription or sale of New Bonds to the public in France.

## Germany

No Sales Prospectus has been published according to the German Securities Sales Prospectus Act (*Wertpapier-Verkaufsprospektgesetz*). Accordingly, the Invitation is only made to persons who purchase and/or sell securities (as principal or agent) as part of their profession or business. Recipients of this Invitation confirm that they purchase and/or sell securities (as principal or agent) as part of their profession and business and agree that they have not and will not pass on the Invitation to persons in Germany except to persons who purchase and/or sell securities (as principal or agent) as part of their profession or business.

S-63

**Hong Kong**

With respect to persons in Hong Kong, the Invitation is only made to and is only capable of acceptance by persons whose business involves the acquisition, disposal or holding of securities, whether as principal or agent.

The joint lead managers, the dealer managers and Argentina have agreed that they have not issued and will not issue any invitation or advertisement relating to the New Bonds in Hong Kong (unless permitted to do so by the securities laws of Hong Kong), other than with respect to New Bonds which are intended to be disposed of

- to persons outside Hong Kong, or

- only to persons whose business involves the acquisition, disposal or holding of securities, whether as principal or agent.

**Italy**

The public will not be solicited in connection with the Invitation, and none of the joint lead managers or the co-managers will offer, sell or deliver any New Bonds in Italy and or distribute copies of this prospectus supplement, the accompanying prospectus or any offering documents relating to the New Bonds in Italy, unless such activities

- are carried out by or through intermediaries authorized to perform investment services in Italy

- do not qualify as solicitation of investment

- are preceded and followed by communications to the Commissione Nazionale per le Società e la Borsa, if required by applicable Italian laws and regulations, and

- are carried out in compliance with applicable banking regulations, including any relevant limitations which the Bank of Italy may impose upon the offer or sale of bonds in Italy.

**The Netherlands**

The New Bonds may not be offered, sold, transferred or delivered in or from the Netherlands as part of their initial distribution or at any time thereafter, directly or indirectly, other than to

- banks

- pension funds

- insurance companies

- securities firms

- investment institutions

- central governments

- large international and supranational institutions, and

- other comparable entities, including, among others, treasuries and finance companies of large enterprises, which trade or invest in securities in the conduct of a profession or trade.

Individuals or legal entities who or which do not trade or invest in securities in the conduct of their profession or trade may not participate in the Invitation, and this Invitation may not be considered an offer or the prospect of an offer to sell or exchange New Bonds.

## Portugal

This Invitation has not been registered with the Portuguese Stock Exchange Commission and, therefore, the New Bonds may not be offered or sold publicly in Portugal. In addition, the Invitation Materials may not be publicly distributed in Portugal.

## Republic of Korea

None of the New Bonds may be offered, sold or delivered, directly or indirectly, or offered or sold to any person for re-offering or resale, directly or indirectly, in the Republic of Korea or to any resident of Korea except pursuant to applicable laws and regulations of Korea.

For a period of one year from the issue date of the New Bonds, no holder of the New Bonds who is in Korea or is resident of Korea may transfer the New Bonds in Korea or to any resident of Korea unless such transfer involves all of the New Bonds held by it. In addition, no offer to exchange the Eligible Bonds for the New Bonds may be made, directly or indirectly, in Korea or to any resident of Korea except pursuant to applicable laws and regulations of Korea.

## Spain

The Invitation has not been registered with the National Securities Market Commission and, therefore, no New Bonds may be publicly offered, sold or delivered, nor any public offer in respect of Eligible Bonds made, nor may any prospectus or any other offering or publicity material relating to the Invitation or the New Bonds be distributed, in the Kingdom of Spain by Argentina or the Dealer Managers or any other person on their behalf, except in compliance with Spanish law and regulations.

## Switzerland

The Invitation is made in Switzerland on the basis of a private placement, not as a public offering, and the New Bonds will not be listed on the SWX Swiss Exchange. The Invitation does not, therefore, constitute a prospectus in the sense of Art. 1156 of the Swiss Federal Code of Obligations or Arts. 32 ss. of the Listing Rules of the SWX Swiss Exchange.

## The United Arab Emirates

The Invitation is not intended to constitute an offer, sale or delivery of New Bonds under the laws of the United Arab Emirates. The New Exchange Securities, New Bonds have not been and will not be registered under U.A.E. Central Bank Circular 22/99, Federal Law No. 4 of 2000 Concerning the Emirates Securities and Commodities Authority and the Emirates Securities and Commodities Exchange, or with the U.A.E. Central Bank, the Dubai Financial Market, the Abu Dhabi Securities Department or with any other U.A.E. exchanges.

## The United Kingdom

The applicable provisions of the Financial Services Act 1986 must be complied with in respect of anything done in relation to the Invitation in, from or otherwise involving the United Kingdom.

## Uruguay

This offering constitutes a private placement and will not be registered with the Central Bank of Uruguay.

S-65

## FORWARD-LOOKING STATEMENTS

Argentina has made forward-looking statements in this document and in the accompanying prospectus and the documents that Argentina incorporates by reference in this document and the accompanying prospectus. Statements that are not historical facts are forward-looking statements. These statements are based on Argentina's current plans, estimates, assumptions and projections. Therefore, you should not place undue reliance on them. Forward-looking statements speak only as of the date they are made, and Argentina undertakes no obligation to update any of them in light of new information or future events.

Forward-looking statements involve inherent risks. Argentina cautions you that many factors could affect the future performance of the Argentine economy. These factors include, but are not limited to:

- External factors, such as:

  - interest rates in financial markets outside Argentina

  - the impact of changes in the credit ratings of Argentina, and

  - decisions of international financial institutions, such as the International Monetary Fund, regarding the terms of their financial assistance to Argentina.

- Internal factors, such as:

  - general economic and business conditions in Argentina

  - present and future exchange rates of the Argentine currency

  - foreign currency reserves

  - the ability of the Argentine Government to enact key economic reforms

  - the level of domestic debt

  - domestic inflation

  - the level of foreign direct and portfolio investment, and

  - the level of Argentine domestic interest rates.

## VALIDITY OF THE NEW BONDS

The validity of the New Bonds will be passed upon for Argentina by Cleary, Gottlieb, Steen & Hamilton, New York, New York, United States counsel to Argentina, and by the *Procurador del Tesoro de la Nación* of Argentina and for the joint lead managers and the co-managers by Sullivan & Cromwell, New York, New York, United States counsel to the joint lead managers and the co-managers, and by Bruchou, Fernandez Madero, Lombardi & Mitrani, Buenos Aires, Argentina, Argentine counsel to the joint lead managers and the co-managers.

As to all matters of Argentine law, Cleary, Gottlieb, Steen & Hamilton may rely on the opinion of the *Procurador del Tesoro de la Nación*, and Sullivan & Cromwell may rely on the opinion of Bruchou, Fernandez Madero, Lombardi & Mitrani. As to all matters of United States law, the *Procurador del Tesoro de la Nación* may

S-66

rely on the opinion of Cleary, Gottlieb, Steen & Hamilton, and Bruchou, Fernandez Madero, Lombardi & Mitrani may rely on the opinion of Sullivan & Cromwell.

## GENERAL INFORMATION

### Recent Developments

Except as described in this prospectus supplement, no material change in Argentina's financial position has occurred since September 29, 2000.

### Due Authorization

Argentina (a) has authorized the creation and issue of the New Bonds pursuant to Decree No. 648, dated May 16, 2001, of the National Executive Power, and (b) will authorize the Invitation pursuant to a resolution of the Ministry of Economy of the Republic to be issued prior to the beginning of the Submission Periods and a resolution of the Secretary of the Treasury and the Secretary of Finance of the Republic of Argentina to be issued prior to the Settlement Date.

### Listing and Listing Agent; Luxembourg Exchange Agent

Application has been made to list the New Bonds on the Luxembourg Stock Exchange, and application will be made to list the New Bonds on the Buenos Aires Stock Exchange and on the *Mercado Abierto Electrónico*, Argentina's over-the-counter market. The Luxembourg listing agent is Kredietbank S.A. Luxembourgeoise, 43, Boulevard Royal, L-2955 Luxembourg (telephone: (352) 4797-3933).

Argentina has appointed a Luxembourg exchange agent in connection with the Invitation. The Luxembourg exchange agent, from each of whom copies of the Invitation Materials and Argentina's Annual Report for 1999 on Form 18-K and all amendments thereto may be obtained in Luxembourg is Deutsche Bank Luxembourg SA, 2, Boulevard Konrad Adenauer, L-1115 Luxembourg (telephone (352) 421-221).

Argentina has not appointed a Luxembourg paying and transfer agent for the New Bonds. If Argentina were to issue New Bonds in definitive form in the limited circumstances described in this prospectus supplement, Argentina will appoint such an agent in Luxembourg, where definitive New Bonds could be presented for payment and/or transfer. Pending the appointment of a Luxembourg paying or transfer agent, Kredietbank S.A. Luxembourgeoise, the Luxembourg listing agent for the New Bonds, will act as intermediary in Luxembourg between you and Argentina.

### Litigation

Neither Argentina nor any Argentine governmental agency is involved in any litigation or arbitration or administrative proceedings relating to claims or amounts that are material in the context of the Invitation or issue of the New Bonds and that would materially and adversely affect Argentina's ability to meet its obligations under the New Bonds and the fiscal agency agreement with respect to the New Bonds. No such litigation or arbitration or administrative proceedings are pending or, so far as Argentina is aware, threatened.

### Documents Relating to the New Bonds

Copies of the registration statements referred to above under "Introduction," which include the forms of the fiscal agency agreement and the dealer manager agreement, and forms of the New Bonds may be inspected during normal business hours on any day, except Saturdays, Sundays and public holidays, at the offices of the listing agent in Luxembourg, as long as the New Bonds are listed on the Luxembourg Stock Exchange.

**Where You Can Find More Information**

Argentina has filed its annual report for 1999 on Form 18-K and its amendments with the SEC. You may request copies of this annual report, including all amendments thereto and its various exhibits, free of charge, by contacting the Office of the Financial Representative of Argentina, 1901 L Street N.W., Suite 606, Washington, D.C. 20036, Attn: Noemí La Greca (telephone (202) 466-3021 and facsimile (202) 463-8793). In addition, you may review Argentina's annual report on Form 18-K for 1999, including all amendments thereto, on the Invitation Websites.

Each additional amendment to Form 18-K or each subsequent annual report on Form 18-K that Argentina files with the SEC after the date of this prospectus supplement but before the end of the offering of the New Bonds is considered part of and incorporated by reference in this prospectus supplement. You can request copies of these documents and the Invitation, upon payment of a duplicating fee, by writing to the SEC. You may also read and copy these documents at the SEC's public reference room in Washington, D.C. or at the SEC's regional offices:

Room 1024, Judiciary Plaza
450 Fifth Street, N.W.
Washington, D.C. 20549

Seven World Trade Center
New York, NY 10048

500 West Madison Street, Suite 1400
Chicago, Illinois 60661-2511

You may call the SEC at 1-800-SEC-0330 for further information. You may obtain a copy of all those documents, free of charge, at the office of the listing agent and any paying and transfer agent in Luxembourg.

You may inspect copies of the fiscal agency agreement and the applicable forms of the New Bonds during normal business hours on any weekday (except public holidays) at the offices of the fiscal agent and the paying agents.

**Clearing**

Each series of New Bonds have been accepted for clearance through Euroclear, Clearstream, Luxembourg and, in the case of the New U.S.$ Global Bonds, DTC.

## CERTAIN DEFINED TERMS

The terms listed below are defined on the pages indicated below:

Announcement Date .................................................................. S-4
AR$ Coupon .............................................................................. S-7
AR$ Eligible Bonds ....................................................... inside cover
AR$ Step-Up Coupon ................................................................. S-7
Bocon and Bonex Bonds ........................................................... S-3
Bond Instructions ..................................................................... S-29
*Caja de Valores* ...................................................................... S-11
Certificated Eligible Bonds ..................................................... S-11
Certificated Security Instructions .......................................... S-30
Clearing Price ........................................................................... S-3
Clearstream, Luxembourg ........................................................ S-6
Competitive Submission Period ............................................... S-9
CRYL ....................................................................................... S-11
Discount Bonds ............................................................. inside cover
DTC ........................................................................................... S-6
Eligible Bonds ............................................................... inside cover
Euroclear ................................................................................... S-6
Exchange Offer .......................................................................... S-9
Expiration Date ...................................................................... cover
Invitation Websites ...................................................................... i
Minimum Clearing Price ........................................................... S-3
New AR$ Bonds ............................................................ inside cover
New Bonds ............................................................................. cover
New Bond Issue Price ................................................................ S-3
New Bonos-Pagaré .................................................................... S-5
New Bonos-Pagaré Invitation .................................................. S-5
News Services .......................................................................... S-24
New US$ Global Bonds ................................................. inside cover
Noncompetitive Submission Period .......................................... S-9
Offer Price ................................................................................ S-5
Series ............................................................................. inside cover
Settlement Date ....................................................................... S-12
Submission Periods .................................................................. S-9
Trading Day ............................................................................. S-26
2008 Coupon .............................................................................. S-7
2008 Eligible Bonds ...................................................... inside cover
2008 Step-Up Coupon ............................................................... S-7
2008 Global Bonds ........................................................ inside cover
2018 Coupon .............................................................................. S-8
2018 Eligible Bonds ...................................................... inside cover
2018 Global Bonds ........................................................ inside cover
2031 Coupon .............................................................................. S-8
2031 Eligible Bonds ...................................................... inside cover
2031 Global Bonds ........................................................ inside cover

**CLEARING REFERENCE NUMBERS**                                    ANNEX A

| | CUSIP | Common Code | ISIN |
|---|---|---|---|
| Bocon Pre 3 Bonds .................................... | None | 004590520 | ARP04981DH91 |
| Bocon Pre 4 Bonds .................................... | None | 004590619 | ARP04981DG19 |
| Bocon Pro 1 Bonds .................................... | None | 004316347 | ARP04981BV04 |
| Bocon Pro 2 Bonds .................................... | None | 004309979 | ARP04981BA66 |
| Bocon Pro 3 Bonds .................................... | None | None | ARARGE031781 |
| Bocon Pro 4 Bonds .................................... | None | 009172521 | ARARGE031773 |
| Bocon Pro 5 Bonds .................................... | None | 009592342 | ARARGE032185 |
| Bocon Pro 6 Bonds .................................... | None | 009650636 | ARARGE032177 |
| Bocon Hidrocarburos .................................. | None | 007821859 | ARARGE030114 |
| Bonos-Pagaré July 2001 (Encuesta) .............. | None | None | ARARGE032433 |
| Bonos-Pagaré July 2001 (Badlar)................... | None | None | ARARGE 032425 |
| Bonos-Pagaré November 2001 (Encuesta) ...... | None | None | ARARGE032474 |
| Bonos-Pagaré November 2001 (Badlar) .......... | None | None | ARARGE032482 |
| Bonos-Pagaré April 2002 .............................. | None | None | ARARGE032714 |
| Bonos-Pagaré August 2002 ........................... | None | None | ARARGE032862 |
| Bonos-Pagaré October 2002 .......................... | None | None | ARARGE032953 |
| Bonos-Pagaré February 2004.......................... | None | None | None |
| Bonex 1992 .............................................. | None | 005082285 | ARARGE030122 |
| Bontes 2002 .............................................. | None | 007635923 | ARARGE031633 |
| Bontes 2003 .............................................. | None | 010824354 | ARARGE032573 |
| Bontes 2004 .............................................. | None | 009776443 | ARARGE032409 |
| Bontes 2005 .............................................. | None | 010824427 | ARARGE032581 |
| Bontes 2006 .............................................. | None | 012371969 | ARARGE033076 |
| Bontes 2027 .............................................. | None | 009281215 | ARARGE032136 |
| Bontes TV ................................................ | None | 008939411 | ARARGE032086 |
| Par Bonds................................................. | None | 004311914 | XS0043119147 |
| Discount Bonds.......................................... | None | 004311817 | XS0043118172 |
| Eurobonds AR$ 2002 (144A) ........................ | 040114AT7 | 008213186 | US040114AT71 |
| Eurobonds AR$ 2002 (Reg S) ....................... | None | 007815590 | USP8055KAP05 |
| Eurobonds AR$ 2007 (144A) ........................ | 040114AS9 | 008239606 | US040114AS98 |
| Eurobonds AR$ 2007 (Reg S) ....................... | None | 007358270 | USP0450KAB90 |
| Eurobonds FRN 2004 (144A) ........................ | 04011MA59 | None | US04011MAS98 |
| Eurobonds FRN 2004 (Reg S) ....................... | 04011NA57 | 009590684 | US04011NAS71 |
| Bearer FRBs (temporary/permanent global)...... | None | 004312023 | XS004312023-6 |
| Registered FRBs (permanent global)............... | None | 004312058 | XS004312058-2 |
| Bearer FRBs (definitive) ............................. | None | 004312066 | XS004312066-2 |
| Registered FRBs (definitive) ........................ | None | 004312082 | XS004312082-2 |
| FRANs ................................................... | 040114AX8 | 008607184 | US040114AX83 |
| SPANs ................................................... | 040114AW0 | 008307385 | US040114AW01 |
| Global Bonds 2003 ..................................... | 040114AH3 | 004785428 | US040114AH34 |
| Global Bonds 2005 ..................................... | 040114AZ3 | 009272780 | US040114AZ32 |
| Global Bonds 2006 ..................................... | 040114AN0 | 007022140 | US040114AN02 |
| Global Bonds 2009 ..................................... | 040114BE9 | 009639713 | US040114BE93 |
| Global Bonds 2010 ..................................... | 040114FC9 | 010909899 | US040114FC91 |
| Global Bonds 2012 ..................................... | 040114GD6 | 012425040 | US040114GD65 |
| Global Bonds 2015 ..................................... | 040114GA2 | 011259197 | US040114GA27 |
| Global Bonds 2017 ..................................... | 040114AR1 | 007321473 | US040114AR16 |
| Global Bonds 2019 ..................................... | 040114BC3 | 009515755 | US040114BC38 |
| Global Bonds 2020 ..................................... | 040114FB1 | 010730554 | US040114FB19 |
| Global Bonds 2027 ..................................... | 040114AV2 | 008010129 | US040114AV28 |
| Global Bonds 2030 ..................................... | 040114GB0 | 011453040 | US040114GB00 |

1

Global Bonds 2031 ................................................    P8055KGV1         012370750         USP8055GGV19

EXHIBIT B – 3

ANNEX B

## HYPOTHETICAL CALCULATION

*This Annex is not complete and is qualified in its entirety by the more detailed description contained in the Prospectus Supplement. If there is any conflict between the information contained in this Annex and the description contained in the Prospectus Supplement, the description contained in the Prospectus Supplement shall control.*

The following chart shows you how Argentina will use a particular hypothetical Clearing Price and New Bond Issue Price to derive a resulting hypothetical principal amount of New Bonds that might be received in exchange for each U.S.$1.00 or AR$1.00 in principal amount of Eligible Bonds in the Invitation. The hypothetical amounts do not relate to any particular series of Eligible Bonds or New Bonds and are not an indication of Argentina's current expectations as to the Clearing Prices and New Bond Issue Prices that it will ultimately select in the Invitation. This information is given for illustrative purposes only. **Actual amounts will differ, and that difference may be material.**

| | A Hypothetical Exchange of a Hypothetical Series of Eligible Bonds for a Hypothetical Series of New Bonds |
|---|---|
| Hypothetical Clearing Price per U.S.$100 or AR$100 | $82.50 |
| Hypothetical New Bond Issue Price per U.S.$100 or AR$100 | $75.00** |
| Hypothetical principal amount of New Bonds to be issued in exchange for each U.S.$1 or AR$1 in original principal amount of Eligible Bonds* | $1.10*** |

---

\*  Principal amount of New Bonds of any series to be issued in exchange for each U.S.$1.00 or AR$1.00 in original principal amount of Eligible Bonds of any series =

applicable Clearing Price x scaling factor
applicable New Bond Issue Price

where the scaling factor for the FRBs is 0.64000 and the scaling factor for all other Eligible Bonds is 1.00000. In addition, you will receive an amount in cash equal to the accrued but unpaid interest on your Eligible Bonds accepted for exchange to but excluding the Settlement Date (except that you will not receive this cash amount for any exchanged Bocon Pre 3 Bonds, Bocon Pre 4 Bonds, Bocon Pro 1 Bonds, Bocon Pro 2 bonds, Bocon Pro 3 Bonds, Bocon Pro 4 Bonds, Bocon Pro 5 Bonds, Bocon Pro 6 Bonds or Bonex 1992 since the Clearing Prices and resulting exchange ratios will reflect accrued interest).

\*\*  Argentina currently expects to set the coupons for the New Bonds at below market rates and accordingly expects to set the New Bond Issue Prices for the New Bonds at substantial discounts to principal amount.

\*\*\*  Assumes the Eligible Bonds being exchanged are not FRBs. If those Eligible Bonds were FRBs, the hypothetical principal amount would be 0.64000 times this amount, or $0.704.

B-1

2

Description of the Issuer                                      ANNEX C

The Republic of Argentina
Table of Contents

| | Page |
|---|---|
| CURRENCY OF PRESENTATION | 1 |
| SUMMARY | 2 |
| THE REPUBLIC OF ARGENTINA | 3 |
| Territory and Population | 3 |
| Government and Political Parties | 3 |
| Foreign Affairs and International Organizations | 5 |
| THE ARGENTINE ECONOMY | 7 |
| Introduction | 7 |
| Revised Methodologies for Calculating Gross Domestic Product and Balance of Payments | 9 |
| History and Background | 10 |
| Deregulation of the Economy and Privatizations | 12 |
| Gross Domestic Product | 16 |
| Principal Sectors of the Economy | 18 |
| Employment and Labor | 22 |
| Poverty | 25 |
| Environment | 26 |
| FOREIGN TRADE AND BALANCE OF PAYMENTS | 28 |
| Balance of Payments | 28 |
| Foreign Trade | 28 |
| Foreign Investment | 30 |
| MONETARY SYSTEM | 35 |
| The Central Bank | 36 |
| Financial Sector | 36 |
| Liquidity and Credit Aggregates | 37 |
| Inflation | 40 |
| Foreign Exchange Rates and International Reserves | 42 |
| Securities Markets | 42 |
| PUBLIC SECTOR FINANCES | 43 |
| Overview | 46 |
| Public Sector Accounts | 46 |
| The 2000 Budget | 46 |
| Social Security Reform | 53 |
| PUBLIC SECTOR DEBT | 53 |
| Overview | 54 |
| Debt Management Policy | 54 |
| Description of Debt and Debt Restructuring | 59 |
| DEBT RECORD | 68 |

3

## CURRENCY OF PRESENTATION

References in this annual report to "dollars," "U.S. dollars," "U.S.$" and "$" are to the currency of the United States of America. References to "pesos" and "Ps." are to Argentine pesos. For purposes of this annual report, Argentina has converted historical amounts translated into dollars at historical rates of exchange. Argentina has converted all amounts as of January 1, 1992 or for periods prior to January 1, 1992 presented in this annual report and stated in pesos from australes at a rate of 10,000 australes to one peso.

Prior to December 1989, Argentina imposed exchange controls on its foreign exchange market. Since December 1989, Argentina has had a freely floating exchange rate for all foreign currency transactions. Argentina devalued its currency at various times during the 30 years prior to April 1, 1991. Since April 1, 1991, the effective date of the Convertibility Law (as defined below), the Argentine currency has been freely convertible into dollars. Under the Convertibility Law, Argentina's central bank, Banco Central de la República Argentina, referred to in this annual report as the "Central Bank," must:

> maintain a reserve in foreign currencies, gold and certain federal government bonds denominated in foreign currencies equal to or greater than the amount of outstanding Argentine currency and

> buy or sell dollars to any person at a rate of one peso per dollar.

The following table sets forth, for the periods indicated, the period-end, average, high and low exchange rate for the purchase of dollars, expressed in nominal pesos per dollar. The Federal Reserve Bank of New York does not report a noon buying rate for pesos.

|  | Exchange Rate | | | |
|---|---|---|---|---|
|  | High | Low | Average(1) | Period end |
| 1995.............. | 1.0000 | 0.9990 | 1.0000 | 1.0000 |
| 1996.............. | 1.0000 | 1.0000 | 1.0000 | 1.0000 |
| 1997.............. | 1.0000 | 1.0000 | 1.0000 | 1.0000 |
| 1998.............. | 1.0000 | 1.0000 | 1.0000 | 1.0000 |
| 1999.............. | 1.0000 | 1.0000 | 1.0000 | 1.0000 |
| 2000(2)............ | 1.0000 | 1.0000 | 1.0000 | 1.0000 |

(1)   Used for national accounts purposes. Based on monthly average exchange rates.
(2)   Figure is as of June 30, 2000.
Source:  Banco de la Nación Argentina.

All references in this annual report to the "Government" are to the federal Government of the Republic of Argentina.

**Tables in this report may not add due to rounding.**

# SUMMARY

*The following summary is qualified in its entirety by, and should be read in conjunction with, the more detailed information appearing elsewhere in this report.*

| | 1995 | 1996 | 1997 | 1998 | 1999(1) |
|---|---|---|---|---|---|
| **THE ECONOMY** | (billions of dollars unless otherwise indicated) | | | | |
| Gross Domestic Product ("GDP") | | | | | |
| Real (in billions of 1993 pesos) | Ps. 243.19 | Ps. 256.63 | Ps. 277.44 | Ps. 288.20 | Ps. 279.22 |
| (rate of change from prior year) | (2.8)% | 5.5% | 8.1% | 3.9% | (3.1)% |
| Nominal | $ 258.03 | $ 272.15 | $ 292.86 | $ 298.13 | $ 283.13 |
| Consumer Price Index ("CPI")(rate of change from prior year) | 1.6% | 0.2% | 0.3% | 0.7% | (1.8)% |
| Unemployment rate (as of May 31 of each year) | 18.4% | 17.1% | 16.1% | 13.2% | 14.5% |
| Balance of payments(2) | | | | | |
| Trade balance | $ 2.36 | $ 1.76 | $ (2.12) | $ (3.01) | $ (.78) |
| Current account | $ (4.94) | $ (6.47) | $ (12.04) | $ (14.70) | $ (12.29) |
| Capital account | $ 6.52 | $ 12.00 | $ 16.60 | $ 18.20 | $ 13.95 |
| Change in gross international reserves(3) | $ (0.10) | $ 3.88 | $ 3.27 | $ 3.44 | $ 1.20 |
| Gross international reserves (at end of period)(4) | $ 18.51 | $ 21.54 | $ 24.31 | $ 26.52 | $ 27.83 |
| **PUBLIC FINANCE** | | | | | |
| Public sector revenues (excluding privatization proceeds) | $ 47.97 | $ 46.42 | $ 54.26 | $ 56.41 | $ 54.83 |
| % of GDP | 18.6% | 17.0% | 18.6% | 18.9% | 19.4% |
| Public sector expenditures (excluding interest payments) | $ 46.44 | $ 47.37 | $ 53.10 | $ 53.92 | $ 53.95 |
| % of GDP | 18.0% | 17.4% | 18.1% | 18.1% | 19.1% |
| Primary balance before privatizations | $ 1.54 | $ (0.95) | $ 1.16 | $ 2.49 | $ 0.88 |
| % of GDP | 0.6% | 0.4% | 0.4% | 0.8% | 0.3% |
| Overall balance (including privatizations) | $ (1.37) | $ (5.19) | $ (4.28) | $ (4.07) | $ (4.77) |
| % of GDP | (0.5)% | (1.9)% | (1.5)% | (1.4)% | (1.7)% |
| **PUBLIC DEBT(5)** | | | | | |
| Peso-denominated public debt(6) | $ 5.88 | $ 8.17 | $ 10.29 | $ 8.99 | $ 8.14 |
| Net foreign currency-denominated Public debt | 77.67 | 85.49 | 87.83 | 96.54 | 102.80 |
| Total net public debt | $ 83.55 | $ 93.66 | $ 98.12 | $ 105.51 | $ 110.94 |
| Total net public debt as % of GDP(7) | 32.4% | 34.4% | 33.5% | 35.4% | 39.2% |

(1)   Preliminary figures.
(2)   Import and export figures are measured on an FOB basis. See "Foreign Trade and Balance of Payments—Balance of Payments."
(3)   Reflects changes in gross international reserves, excluding public bonds. See "Foreign Trade and Balance of Payments—Balance of Payments."
(4)   Includes holdings in gold, foreign currencies and Government notes.
(5)   Figures for 1995 through 1997 were prepared by the Ministry of Economy.
(6)   Figures for 1995 and 1996 include only public bonds denominated in pesos. Figures for 1997 through 1999 include all public debt denominated in pesos.
(7)   Calculated in U.S. dollars, with GDP converted at the year-end exchange rate.
Sources:  Instituto Nacional de Estadísticas y Censos, referred to in this annual report as the National Institute of Statistics and Census or INDEC, Ministry of Economy and the Central Bank.

## THE REPUBLIC OF ARGENTINA

### Territory and Population

The Republic of Argentina consists of 23 provinces and the federal capital of Buenos Aires. Located in the southeastern sector of the South American continent, Argentina is the second largest country in Latin America in terms of territory, covering approximately 2.8 million square kilometers (1.1 million square miles) or 3.8 million square kilometers (1.5 million square miles) if territorial claims in the Antarctic (covering approximately 970,000 square kilometers) and south Atlantic islands (covering approximately 5,000 square kilometers) are included.

The most densely inhabited areas and the main agricultural regions of the country are located on the wide temperate belt that stretches across central Argentina. The Republic's population is estimated at 36.6 million. Of a population of approximately 32.6 million in 1991 (the year of the most recent census), about 10.9 million people lived in the greater Buenos Aires area. Six other urban centers—Córdoba, Rosario, Mendoza, San Miguel de Tucumán, Mar del Plata and La Plata—each had a population of over 500,000. During the period from 1980 to 1990 (the last period for which figures are available), Argentina's population grew at an average annual rate of 1.4%. Approximately 79% of the population is urban, and approximately 96% of the population is literate.

The World Bank and other international organizations classify Argentina as a middle-income developing country. The following table sets forth comparative GDP figures and selected other comparative statistics for 1998.

|  | Argentina | Brazil | Chile | Mexico | Venezuela | United States |
|---|---|---|---|---|---|---|
| Per capita GDP | $ 7,740(1) | $ 4,630 | $ 4,990 | $ 3,840 | $ 3,530 | $ 29,240 |
| Life expectancy (in years) | 73 | 67 | 75 | 72 | 73 | 77 |
| Adult literacy rate | 96% | 83% | 95% | 90% | 91% | (2) |
| Infant mortality (as % of live births) | 1.9% | 3.3% | 1.0% | 3.0% | 2.1% | 0.7% |

(1)   Source for Argentine figure is INDEC and Ministry of the Economy. This figure is as of 1999.
(2)   According to UNESCO, illiteracy is less than 5%.
Source: The World Bank.

### Government and Political Parties

The Argentine Constitution, first adopted in 1853, provides for a tripartite system of government divided into an executive branch headed by the President, a legislative branch made up of a bicameral Congress and a judicial branch.

The Constitution was last amended on August 22, 1994. The changes:

- permitted the President to serve for a maximum of two consecutive terms,

- allowed direct elections for President, Vice-President and the mayor of Buenos Aires,

- shortened presidential terms from six years to four years and

- abolished the requirement that the President be Roman Catholic.

The President is responsible for the general administration of the country and has the power to veto laws in whole or in part. Congress may override a presidential veto by a two-thirds majority vote. The *Jefatura del Gabinete de Ministros* (the Chief of the Cabinet of Ministers) is responsible for implementing general administration of the country and for preparing the Government's annual budget, which is subject to approval by the President and

3

Congress. The President chooses the Chief of the Cabinet but the Chief of the Cabinet may be removed by an absolute majority vote of both houses of Congress.

The Congress is composed of the Senate and the Chamber of Deputies. There are 72 Senators (three for each province and for the federal capital). Two Senators from each province represent the party receiving the largest number of votes, and the third Senator represents the party receiving the second largest number of votes. Prior to 1994, Argentine Senators served nine-year terms and were selected by an electoral council. The 1994 constitutional amendments changed this system and provided for six-year staggered terms and elections, by popular vote, for one-third of the Senate seats every two years. As a transitional measure, the Constitution provided that Senators elected before the adoption of the 1994 amendments would serve out the remainder of their terms. Elections for seats occupied by Senators elected in 1986 were held in 1995 and elections for seats occupied by Senators elected in 1989 were held in 1998. Senators elected in these two elections will serve until 2001. In 2001, elections will be held for all Senate seats. Following the 2001 elections, a lottery will be held to determine the term length of each new Senator. One-third of the Senators will serve two-year terms, one-third will serve four-year terms and one-third will serve six-year terms. All Senators elected in subsequent elections will serve six-year terms. The Chamber of Deputies consists of 257 seats, which are allocated according to each province's population. Deputies serve for four-year staggered terms, resulting in elections, by popular vote, every two years for one half of the seats.

The judicial system is comprised of the federal and provincial trial courts, courts of appeal and the Supreme Court of Justice. The Supreme Court of Justice consists of nine members who are appointed for life by the President, subject to ratification by the Senate. Under a 1994 amendment to the Constitution, the President must select lower federal court judges from a list of nominees selected by an independent body comprised of lawyers and academics. In 1998 and 1999, Argentina instituted steps to implement this system, which was designed to reduce political influence in the appointment and dismissal of such judges. As of September 1, 1999, the President had not selected any lower federal court judges under this system.

Each province has its own constitution and the people of each province elect a governor, legislators and judges independently from the federal Government.

The three largest political parties in Argentina are:

- the *Partido Justicialista* or Peronist Party ("PJ"), which evolved out of former President Juan Perón's efforts to expand the role of labor in the political process in the 1940s,

- the *Unión Cívica Radical* or Radical Civic Union ("UCR"), founded in 1890 and

- the *Frente del Pals Solidario* or Front for a Country in Solidarity ("Frepaso") formed in 1994 by former members of the PJ and a small socialist party.

During 1997, members of the UCR and Frepaso formed a coalition called *Alianza* (the "Alliance"). The Alliance has a platform centered on remedying social problems, including reducing unemployment, increasing social assistance and improving education. The PJ has a liberal economic wing that supports deregulation of the economy and advocates free-market principles. The PJ also has a wing that is aligned with the party's traditional labor and social platform. Support for the PJ, the UCR and the Alliance is broadly based. Frepaso receives most of its support from the federal district of Buenos Aires. The fourth major party, *Acción por la República* or Movement for the Republic, was formed in April 1997 by the former Economy Minister, Domingo Cavallo. Smaller parties occupy various positions on the political spectrum, and some are active only in certain provinces.

4

The following table shows the party composition of the Argentine Chamber of Deputies and Senate following the elections in the years indicated.

### Party Composition of the Argentine Congress

| Party | Chamber of Deputies | | | Senate | | |
|---|---|---|---|---|---|---|
| | 1995 | 1997(2) | 1999(4) | 1992(5) | 1995 | 1998 |
| PJ .......................... | 130 | 119 | 101 | 30 | 40 | 39 |
| Alliance(1).............. | -- | -- | 125(1) | -- | -- | --(1) |
|    UCR................. | 70 | 68(3) | -- | 11 | 22 | 22(3) |
|    Frepaso............ | 28 | 38(3) | -- | -- | 1 | 1(3) |
| Others..................... | 29 | 32 | -- | -- | 1 | 1(3) |
|    Total................. | 257 | 257 | 257 | 7 | 9 | 9 |
| | | | | 48 | 72(6) | 72 |

(1)  Since the Chamber of Deputies elections in 1999, members of UCR and Frepaso have run as Alliance candidates instead of candidates of UCR or Frepaso.
(2)  Composition of the Chamber of Deputies as of December 10, 1997, when the Deputies elected in 1997 took office.
(3)  Includes members of the Alliance.
(4)  Composition of the Chamber of Deputies as of December 10, 1999, when the Deputies elected in 1999 took office.
(5)  Composition of the Senate following elections held in 1992. Subsequently two Senators from the PJ joined Frepaso.
(6)  The size of the Senate increased pursuant to the 1994 amendment of the Constitution.
Source: Information Office of Argentine Congress.

Members of the Alliance gained 19 seats in the Chamber of Deputies in elections held on October 24, 1999. The PJ lost 18 seats in the Chamber of Deputies in these elections. As a result, the Alliance holds 118 of the 257 seats in the Chamber of Deputies and the PJ holds 101. The next elections for the Chamber of Deputies are scheduled to take place in October 2001. The next Senate elections are expected to take place in October 2001.

Since 1983, Argentina has had three consecutively elected civilian Presidents. Raúl Alfonsín, elected in 1983, was the first civilian President in six decades to remain in office until the scheduled election of a successor. His UCR Government re-established civilian rule, including a functioning Congress. Carlos Menem, a member of the PJ, won two consecutive presidential elections, in May 1989 and May 1995. Fernando de la Rúa of the Alliance won the presidency in the October 1999 election and took office on December 10, 1999.

One of the primary goals of President de la Rúa's administration is to reduce Argentina's fiscal deficit. On December 29, 1999, Congress approved an Alliance-sponsored tax package designed to raise tax collections by an additional U.S.$2.0 billion for the year 2000. On December 28, 1999, Congress approved Argentina's year 2000 budget, which includes Alliance proposals to reduce expenditures by U.S.$1.4 billion and to limit federal tax transfers to the provinces.

Prior to Argentina's return to democracy in 1983, Argentina's political parties had difficulty resolving the intergroup conflicts that arose out of the Great Depression of the 1930s, the deepening social divisions that occurred under the Perón Government and the economic stagnation of the several decades preceding the 1990s. The military intervened in the political process on several occasions and ruled the country for a total of 22 years between 1930 and 1983. Poor economic management by the military and the loss of a brief war with the United Kingdom over the Malvinas (Falkland) Islands led to the end of the most recent military Government in 1983, which had ruled the country since 1976. Four uprisings by discontented factions within the military occurred after 1983, most recently in December 1990. These uprisings failed due to a lack of support from the public and the military as a whole.

## Foreign Affairs and International Organizations

Argentina has diplomatic relations with 139 countries and is a member of over 116 international organizations. Argentina is a charter member of the United Nations and currently serves as a member of its Security

Council, with a term expiring December 31, 2000. Argentina is a founding member of the Organization of American States and is also a member of the following international organizations:

- the International Bank for Reconstruction and Development, known as the World Bank,

- the International Monetary Fund, or the IMF,

- the International Finance Corporation, or the IFC,

- the Inter-American Development Bank, or the IADB and

- the World Trade Organization, or the WTO.

Argentina is a permanent member of the Interim Committee of the IMF (a policy advisory committee) and is a party to the General Agreement on Tariffs and Trade, or the GATT. In October 1997, the United States designated Argentina as a non-NATO ally.

Argentina has entered into 166 bilateral agreements with a variety of countries, including the United States, Canada, Germany, France, Italy, Spain, Switzerland, Sweden and the United Kingdom. These agreements cover a broad range of topics, including foreign direct investment, trade and tax matters. In addition, Argentina is in the process of negotiating a variety of other bilateral treaties.

In its relations with other Latin American nations, Argentina has emphasized cooperation in trade and investment issues. The most notable achievement in Argentina's relations with its neighbors is the signing of the Treaty of Asunción in March 1991, creating the Mercosur Common Market, or Mercosur. In addition to Argentina, the members of Mercosur are Brazil, Paraguay and Uruguay. Chile and Bolivia are associate members of Mercosur. Mercosur's objective is to gradually integrate the economies of member countries and harmonize their economic and fiscal policies, including the fixing of a common external tariff and the adoption of a common trade policy with respect to non-Mercosur countries. Mercosur has entered into a trade and cooperation agreement with the European Union, or the EU, that is automatically renewable on a yearly basis.

# THE ARGENTINE ECONOMY

## Introduction

The Argentine economy has undergone profound economic changes since the Menem administration began to implement free-market principles in 1989 under the convertibility plan. A cornerstone of the convertibility plan is Law No. 23,928, enacted by the Congress on March 27, 1991. This law, as amended and supplemented, is referred to in this annual report as the Convertibility Law. The Convertibility Law requires the Central Bank to sell U.S. dollars at a rate of one peso for one U.S. dollar and prohibits Argentina's monetary base from exceeding its international reserves. By limiting the Government's ability to expand the money supply, the Convertibility Law has greatly reduced inflation, which had previously reached hyperinflationary levels. The free-market principles underlying the convertibility plan include:

- the deregulation of the economy, including the deregulation of foreign investment and the removal of restrictions on capital movements,

- the liberalization of trade, including the lowering of trade barriers,

- social security reform, mainly through the transformation of the public system into a self-funding system,

- fiscal consolidation, including a significant reduction of the fiscal deficit,

- monetary reform, including the Convertibility Law and the establishment of Central Bank independence and

- the privatization of most state enterprises.

Set forth below is an overview of economic developments following Argentina's adoption of the convertibility plan.

### GDP

Between 1991 and 1999, Argentina's GDP grew at a cumulative rate of 53.0%. GDP grew in each year between 1991 and 1994, driven by political and economic stability, consumer confidence and increased investment. In 1995 GDP contracted 2.8% due to the capital flight, reduced demand and investment that affected Argentina and the Latin American region as a whole following the December 1994 devaluation of the Mexican Peso, referred to in this annual report as the Mexican Crisis. The reduction in economic activity led to increased unemployment and poverty rates in Argentina. A decrease in bank deposits and widespread demand for dollars by Argentines seeking to protect themselves against a possible devaluation placed stress on the banking system and caused a reduction in reserves. A number of banks subsequently collapsed, prompting banking regulatory and supervisory reforms discussed below in "Monetary System."

In 1996, the Argentine economy began to recover, with GDP increasing by 5.5%, primarily due to increased foreign and domestic investment and burgeoning consumer confidence. Although unemployment continued to be a problem during this year, the banking sector began to recuperate deposits. GDP grew 8.1% during 1997 as a result of continued foreign and domestic investment and an increase in personal consumption and domestic demand. GDP grew 3.9% during 1998, slowing from its previous pace due to a downturn in the manufacturing and automotive sectors during the second half of the year. This downturn was caused by the global economic crisis that started at the end of 1997 as a result of the Asian Crisis, in which various economies in Asia collapsed during the last quarter of 1997. This global economic crisis continued in 1998 with the Russian Crisis, in which Russia devalued the ruble and defaulted on its ruble-denominated debt.

Argentina's gross domestic product declined by 3.1% in 1999 as compared to 1998, due primarily to the January 1999 devaluation of the Brazilian *real*. This devaluation by Brazil, Argentina's largest trading partner, led to significantly decreased demand for Argentine goods in both Argentina and Brazil. Decreased demand had

particularly strong effects on Argentina's industrial production, which decreased by 6.4%, due largely to a downturn in the manufacturing and automotive sectors. Despite the recession, bank deposits increased slightly during 1999.

In recent months, improving economic conditions in Argentina and Brazil have led to increased demand for Argentine goods. During the first quarter of 2000, Argentine gross domestic product is estimated to have grown by 0.9% compared to the same period of 1999. In addition, during the first half of 2000, industrial production was 2.1% higher than in the first half of 1999. This improvements in industrial production was due to increased levels of activity in the automotive, fiber and aluminum sectors and, to a lesser extent, the steel, agrochemicals, industrial gas and paper sectors.

### Labor

Unemployment reached 18.4% in 1995 as a result of the economic contraction Argentina suffered that year, but also as an unintended effect of privatizations and greater economic efficiency. In order to lower unemployment, the Government has launched public works programs and has sought to reform labor laws and lower corporate social security taxes in an effort to stimulate job creation. As a result of these efforts and economic growth in 1996 and 1997, unemployment declined from a high of 18.4% in May 1995 to 12.4% in October 1998. As a result of the subsequent slowdown in the economy and the increase in the participation rate, unemployment rose to 14.5% in May 1999. The unemployment rate remained at 14.5% in August 1999, fell to 13.8% in October 1999 and increased to 15.4% in May 2000. This latest increase is due to a relatively constant participation rate and a decrease in the number of jobs.

The Government believes the problem of unemployment is exacerbated by outdated labor laws that discourage employers from hiring new workers and has endeavored to modify those laws. On September 2, 1998, the Congress approved a labor reform package, which President Menem vetoed in part in response to opposition from the IMF and sectors of the business community. In December 1998, the Congress approved a tax reform package that seeks to promote employment, increases the tax base and eliminates the incentive to finance growth through the issuance of debt instead of equity. On May 11, 2000, the Congress approved a labor reform law proposed by the Alliance. These reforms are discussed in greater detail under the heading "Employment and Labor" below.

### Inflation

Since the implementation of the convertibility plan, the annual inflation rate as measured by the Consumer Price Index, or CPI, has fallen sharply, declining from 1,343.9% in 1990 to -1.2% in 1999. As of July 30, 2000, the CPI had decreased 0.9% from levels recorded on July 30, 1999.

### Privatization and Liberalization of the Economy

Since 1990, Argentina has removed nearly all barriers to foreign investment and has substantially completed an ambitious program of privatizations. Between 1990 and June 30, 2000, the Government privatized, in whole or in part, 75 public sector entities and other assets, including the telephone company, the national airline, roads, railways, ports, water and electrical utilities, media, steel companies, the national gas company, the national oil company and the national mortgage bank. As of June 30, 2000, aggregate proceeds from these privatizations (excluding concessions) amounted to U.S.$15.7 billion in cash, and investors had tendered U.S.$15.4 billion in principal amount of debt instruments in debt-for-equity exchanges.

The Government has also instituted structural reforms to increase public sector revenues and reduce expenditures. The Government has implemented computerized tracking of tax compliance and other programs to reduce tax evasion, which nonetheless remains a persistent problem in Argentina. Argentina has modified the tax system to be more efficient and to create incentives for investment. The Government transferred most of the operations of the social security system from the public sector to the private sector in 1994. The Government has also made an effort to streamline its operations through privatizations and efficiency measures instituted in certain remaining public sector entities.

As part of its efforts to streamline the public sector, since 1991 the Government has sought to reduce provincial government deficits by ceasing lending to provincial banks that finance provincial deficit spending and by

encouraging the privatization of provincial enterprises such as regional banks and utilities. A number of Argentina's provincial governments have used deficit spending in past years to support large-scale public sector employment. The credit shortage and economic downturn sparked by the Mexican Crisis exacerbated the budgetary problems of these provincial governments. In the face of these problems, the Government succeeded in privatizing 10 provincial banks in 1995 and 1996, and in persuading eleven provinces (including Buenos Aires) to merge their social security systems with the national system between 1994 and 1995.

### Debt Management

Since the implementation of the convertibility plan, Argentina has re-established regular relations with creditors, gained access to global capital markets and actively managed its debt to improve maturity and yield profiles. In December 1992, Argentina and its commercial bank creditors signed a debt and debt service reduction package under the auspices of the 1992 Financing Plan, known as the Brady Plan. Since the Brady Plan, Argentina has worked with the IMF to establish and achieve economic goals for each year and to maintain various standby funding facilities. On March 10, 2000, the International Monetary Fund approved a three-year credit facility of approximately U.S.$7.4 billion to replace a $2.8 billion credit facility the IMF provided Argentina in 1998. The terms of the new credit facility require Argentina to meet certain targets with respect to levels of public indebtedness and the reduction of its fiscal deficit. As of June 30, 2000, Argentina had met all of these targets. Argentina has reserved this three-year credit facility for use in special or urgent circumstances and does not intend to draw down on this facility in the normal course of operations. In 1999, Argentina's public debt service obligations (total external interest payments and total external amortization payments) were equal to 5.2% of GDP and 52.5% of exports of goods and non-factor services.

### Financial System

The Government has taken various measures to preserve the liquidity and stability of the Argentine financial system, in particular since 1995, when the banking system suffered a liquidity crisis precipitated by the Mexican Crisis. In December 1996, the Central Bank entered into standby credit facilities in an aggregate amount of up to U.S.$6.1 billion (subsequently raised to U.S.$6.9 billion). These standby credit facilities are in the form of securities repurchase agreements with 13 major financial institutions and are designed to provide liquidity in the event of a banking crisis. The Central Bank does not expect to draw down on the facilities, but believes that having them at its disposal sends a positive message to investors about the Government's ability to manage any future liquidity crisis in the banking system. The Government has also opened the financial system to foreign investment, which has resulted in the entry of many foreign banking institutions, increasing the capital base and stability of the system. The Central Bank has also improved its supervisory controls over the banking system by imposing minimum capital and liquidity requirements. Total deposits (in pesos and dollars) in the banking system and gross international reserves have steadily increased since 1995.

### Revised Methodologies for Calculating Gross Domestic Product and Balance of Payments

During the first half of 1999, the Government undertook a comprehensive revision of its methodology for calculating GDP and balance of payments accounts in order to provide a more accurate measurement of the Argentine economy. The Republic revised its methodology with the assistance of the European Economic Community, the IMF, the United Nations, the Organization for Economic and Cooperative Development and the World Bank. This project was partially funded by the IADB. Set forth below is a brief explanation of the principal aspects of these methodological revisions.

### Gross Domestic Product

On June 11, 1999, the Ministry of Economy published a report announcing the revision of its methodology for calculating GDP and containing corresponding statistics. Under the revised methodology, Argentina:

- uses 1993 instead of 1986 as a base year to calculate GDP to better reflect the new structure of relative prices that resulted from the process of market liberalization, economic deregulation and privatization,

9

- assigns revised weights to different sectors of the economy in the calculation of GDP to more accurately reflect their current relative importance and

- seeks to measure Argentina's "informal economy."

The use of 1993 as the base year eliminates distortions caused by the hyperinflation that existed in Argentina during the 1970s and, in particular, the 1980s. After Argentina instituted the convertibility plan in 1991, which pegged the Argentine peso to the dollar, inflation levels stabilized. The new weighting of economic sectors reflects the shift of the Argentine economy from an agricultural and manufacturing base towards a more service-oriented economy. Under the prior methodology, the production of services represented 54.7% of GDP in 1993, but under the new methodology, the production of services represented 64.2% of GDP in that year. The sectors of the economy that are given less weight under the revised methodology include manufacturing and agriculture. Through the new methodology, Argentina also seeks to address the statistical problem of underestimating economic activity as a result of undercounting by the government due to inadequate census, geographic and other statistical data and/or underreporting by businesses or individuals in order to avoid taxation. Argentina has sought to reconcile statistics from different sources in order to arrive at an estimate of the informal economy, which was formerly left uncounted.

*Balance of Payments*

In April 1999, the Ministry of Economy published a report announcing its revised methodology for calculating the Republic's balance of payments and containing statistics that closely conform to international statistical norms recommended by the IMF. Under the new methodology, Argentina is able to more accurately measure its current account by:

- expanding its analysis of transactions involving non-residents,

- incorporating estimates regarding business, technical and personal services and

- using new sources of information, including account balances of private sector businesses.

The new methodology also provides more precise information regarding Argentina's capital account by:

- expanding the coverage of the non-financial services sector to include investments by non-residents in Argentine businesses and

- improving estimates of bank deposits and investment portfolios.

**History and Background**

Until the 1930s, Argentina's economy relied mainly on international trade. In the two succeeding decades, world trade declined as a result of the Great Depression and World War II. The decline in world trade led to economic isolation and the consequent stagnation of the Argentine economy. The Government adopted policies that were designed to generate economic growth through import substitution and state-led capitalism. Beginning in the 1940s, the Government nationalized many basic industries and services, including petroleum, coal, steel, electricity, telecommunications, railroads and airlines. Government involvement in the financial sector was also sizable. Despite the fact that world economic conditions improved in the 1950s as a new era of worldwide prosperity began, the Argentine economy remained closed and experienced very low growth in comparison with other developing countries.

During the period from 1975 to 1990, Argentina experienced high inflation rates and balance of payments deficits. Large subsidies to state-owned enterprises and an inefficient tax collection system led to high, persistent public sector deficits that were financed largely through increases in the money supply and external financings. Inflation accelerated on several occasions, developing into hyperinflation in 1989 and 1990, with prices rising at an annual rate in excess of 1000%.

During the 1980s and in 1990, the Government instituted several economic plans to stabilize the economy and foster real growth. After achieving initial success, the economic plans failed primarily because the Government was unable to sustain reductions in the public deficit. The uncertainties generated by high inflation, frequent changes in Government policy and financial market instability adversely affected real growth.

*Stabilization and Economic Reforms under the Menem Government*

In mid-1989, the Menem Government inherited an economy encumbered by hyperinflation and in deep recession. Relations with external creditors were strained, interest payments on commercial bank debts had been in arrears since April 1988, IMF and World Bank programs had lapsed and payments to the World Bank and the IADB were frequently late. The objectives of the new Government were to stabilize prices, reduce the public debt and improve relations with external creditors.

The Government's initial stabilization efforts included a devaluation of the austral and the establishment of a fixed exchange rate, wage and price controls and a sharp increase in public utility rates. The stabilization effort quelled hyperinflation, reducing the monthly inflation rate to 7.2% on average from September to November 1989.

The Government's efforts to eradicate hyperinflation proved inadequate, however, and foreign exchange markets declined sharply in anticipation of a new bout of hyperinflation. The Government adopted a new set of stabilization measures in December 1989 that abandoned attempts to control wages, prices and the exchange rate and sought to restrain the public deficit—the principal cause of Argentina's chronic inflation. The new measures featured:

- tax reforms,

- a tighter rein on the expenditures of public enterprises,

- restrictions on lending activities of the public sector banks,

- personnel cuts and

- a reliance on cash income generated by privatizations to reduce the public sector deficit.

The Government also eliminated all restrictions on foreign exchange transactions and froze fixed-rate, short-term bank deposits so that holders of seven- to 30-day deposits were permitted to withdraw no more than the equivalent of approximately U.S.$1,000 from their accounts. The balance on such accounts was made payable only in ten-year U.S. dollar-denominated Government bonds, known as Bonex 89. In addition, the Government provided for the compulsory exchange of certain bonds denominated in Argentine pesos for Bonex 89.

This stabilization effort temporarily succeeded in ending the period of hyperinflation. In late 1990, however, a deterioration in the finances of the social security system and of the provincial governments led to an expansion of credit to these entities by the Central Bank. The Central Bank loaned funds to the social security system to allow it to meet year-end payments and also funded provincial banks suffering deposit runs. In addition, provincial banks continued to lend to provincial governments to finance their deficits. This credit expansion led to a resurgence of price inflation and downward market pressure on the austral, culminating in a depreciation of the austral from 5,590 australes per dollar as of December 28, 1990 to 9,430 australes per dollar as of January 31, 1991. The Government responded by installing a new economic team, headed by Economy Minister Domingo Cavallo, which acted to reduce the public sector deficit by increasing public utility rates and taxes and by developing a new stabilization program.

*The Convertibility Plan and the Menem Government's Economic Policy*

The convertibility plan sought to address structural problems that had stunted development of the Argentine economy. Specifically, it aimed to reduce inflation and foster economic growth through tax reforms, privatizations and the opening of the economy to foreign investment and competition.

11

The convertibility plan is centered on two fundamental principles:

(1)    There is full international reserve backing for the monetary base at a fixed rate of one peso per U.S. dollar. The monetary base (consisting of currency in circulation and peso deposits of financial entities with the Central Bank) is not to exceed the Central Bank's gross international assets. Gross international assets include the Central Bank's holdings of:

- gold,

- foreign exchange (including short-term investments),

- U.S. dollar-denominated Government securities (in a percentage not to exceed one third of the Central Bank's unrestricted reserves) and

- net Asociación Latinoamericana de Integración ("ALADI") claims (except overdue claims),

all freely available and valued at market prices. Under this arrangement, the peso is fully convertible into the U.S. dollar and the money supply can be increased only when backed by increases in the level of international reserves.

(2)    The prohibition of financing of fiscal deficits through Central Bank lending and fiscal control to contain expenditures and foster tax revenues.

The convertibility plan has resulted in the simplification of fiscal and market regulations and the allocation of many state activities to the private sector, resulting in a reduction of state expenditures, an increase in the amount of Government revenues and an encouragement of domestic private sector initiative and foreign investment.

The IMF supported the establishment of the convertibility plan and designed the financial program for the Argentine public sector. On July 30, 1996, Dr. Roque Fernández, who had been the President of the Central Bank since 1991, replaced Mr. Cavallo, the original architect of the convertibility plan, as Economy Minister. Mr. Fernández continued to implement the convertibility plan, as has his successor, José Luis Machinea, who took office in December 1999.

**Deregulation of the Economy and Privatizations**

*Deregulation of the Economy*

Pursuant to the convertibility plan, Argentina initiated an ambitious plan to deregulate the domestic economy. This plan included the liberalization of trade and the reform of investment regulations. In order to create a free market economy in Argentina, the Government has removed most economic restrictions and regulations of foreign investment and has promoted competition. Set forth below is a review of the primary deregulation initiatives undertaken by the Government since the adoption of the convertibility plan.

In 1991, the Government passed legislation that:

- deregulated the domestic market for goods, services and transportation,

- eliminated many restrictions on imports and exports,

- abolished or simplified a number of regulatory agencies and

- allowed free wage bargaining in the private sector in certain cases.

In the financial sector, the Government passed legislation that:

- eliminated regulation of brokerage fees,

12

- abolished all stamp taxes relating to publicly offered securities and

- abolished all capital gains taxes on stocks and bonds held by non-resident investors.

In 1993, the Government eliminated restrictions on foreign direct investment and abolished a three-year waiting period for capital repatriation. The abolishment of the three-year waiting period allowed foreign investors to remit profits at any time, thereby granting foreign investors the same rights as local investors. As a result of these reforms and increased confidence in the Argentine economy, foreign banks have made significant investments in Argentina's financial sector. As of June 2000, nine of the ten largest private sector banks in Argentina were either foreign-owned or -controlled.

Argentina has also sought to eliminate trade barriers, primarily through its involvement in Mercosur. See "The Republic of Argentina–Foreign Affairs and International Organizations." Mercosur's objective is to gradually integrate the economies of member countries and harmonize their economic and fiscal policies, including the fixing of a common external tariff and the adoption of a common trade policy with respect to non-Mercosur countries. With the exception of the automotive sector, which is subject to different treatment, tariff barriers between the Mercosur member countries were eliminated on January 1, 1995. Non-tariff restrictions on trade are in the process of being eliminated for most goods.

The Mercosur member countries have signed the following agreements:

- in June 1991, an agreement with the United States that established procedures for consultation on trade and investment issues,

- in December 1995, an agreement with the EU for the development of free trade between their respective member countries by 2005,

- in March 1998, an agreement with the Andean Pact, which consists of Bolivia, Ecuador, Colombia, Peru and Venezuela, to work towards establishing free trade between the member countries of Mercosur and the member countries of the Andean Pact by the year 2000 (negotiations to implement this agreement are ongoing),

- in April 1998, an agreement with the Central American Common Market, which includes Costa Rica, El Salvador, Guatemala, Honduras and Nicaragua, to begin commercial negotiations and

- in June 1998, an agreement with Canada that establishes a framework for the negotiation of bilateral foreign investment agreements, cooperation in customs matters and identification of measures that distort or impede trade and investment, among other matters.

In May 1994, the Government reformed the social security system, allowing employees to invest their social security contributions in private pension funds. The reform of the social security system has limited the growth of government social security expenditures and has increased the national savings rate.

The Government has undertaken various measures to reform Argentina's labor laws, although it has encountered substantial public and political opposition to these measures. See "—Employment and Labor."

In addition to reforms in the social security system and the labor market, the Government has begun a comprehensive effort to liberalize the health system. In 1996, the Government began to restructure union-run health organizations in order to provide employees with more freedom to select health plans.

13

*Privatizations*

In 1989, the State Reform Law declared certain state enterprises eligible for privatization. Since then, the Government has privatized, in whole or in part, 75 public sector entities and other assets, including all airports, the national post office, the mint, Argentina's largest petrochemical plant and a number of hydroelectric plants. The privatization program has increased economic productivity and has served as an important conduit for direct foreign investment into Argentina, attracting investors from Asia, Europe, North America and Latin America. The privatization program has also decreased subsidies and transfers to public sector enterprises, which totaled U.S.$827 million in 1992. As a result of the privatization program, subsidies to public sector enterprises were eliminated by 1998. Transfers amounted to U.S.$54.8 million in 1998 and U.S.$32.9 million in 1999. The Government has realized increased tax revenues from newly privatized entities. Finally, the privatization program was the primary reason for the reduction in public sector employment in the period from 1989 to 1994 of over 240,000 employees (excluding the defense sector), which resulted in substantial public sector savings. In 1998 (the last year for which figures are available), the public sector employed 464,700 people, as compared with approximately one million people in 1991.

The following table sets forth the principal privatizations that have taken place between 1990 and June 30, 2000.

| Company | Date | Cash | Retired Debt |
|---|---|---|---|
| | | (millions of dollars) | |
| Telecommunications (ENTel) | | | |
| —Telefónica | 1990-1991 | $ 952.1 | $ 2,720.0 |
| —Telecom | 1990-1992 | 1,326.9 | 2,309.0 |
| Airlines | | | |
| —Aerolíneas Argentinas S.A. | Nov. 1990 | 190.1 | 1,313.8 |
| Airports(1) | Feb. 1998 | — | — |
| Petrochemicals | | | |
| —6 petrochemical companies | 1990-1995 | 410.7 | 131.1 |
| Carbochemicals | | | |
| —Carboquímica Argentina | Sept. 1993 | 0.3 | 0.8 |
| Oil | | | |
| —YPF (assets sales) oil fields, refineries, oil pipelines and ships | 1992-1994 | 272.7 | — |
| —YPF (concession of central areas and marginal areas) | 1990-1994 | 1,806.8 | — |
| —YPF (enterprise privatization) | July 1993 | 3,040.0 | 3,201.2 |
| —YPF (sale of 14.9% of common stock) | Jan. 1999 | 2,000.0 | — |
| —YPF (sale of 5.3% of common stock) | June 1999 | 842.0 | — |
| Electric Utilities | | | |
| —SEGBA—7 companies | 1992-1996 | 1,584.5 | 1,439.3 |
| —Agua y Energía Eléctrica—7 companies | 1992-1993 | 88.0 | 222.9 |
| —Transportadoras de Energía Eléctrica—4 companies | 1993-1994 | 36.0 | 318.9 |
| —Hydroelectric Power—8 companies | 1993-1995 | 621.9 | 578.9 |
| —Centrales Térmicas—2 companies | 1994 | 10.6 | — |
| —Transener | July 2000 | 70.0 | — |
| Postal office(1) (30-year operating concession) | Aug. 1997 | — | — |
| Gas (Gas del Estado) | | | |
| —8 distribution and 2 transportation companies | 1992-1998 | 1,552.4 | 3,116.2 |
| Steel mills | | | |
| —2 steel mills | 1992-1993 | 147.4 | 30.0 |
| Railways | | | |
| —11 railway and subway lines(1) | 1991-1994 | — | — |
| Highways | | | |
| —Vialidad Nacional(1) | Sept. 1990 | — | — |
| —3 toll roads(1) | Sept. 1993 | — | — |
| Water Utility (Obras Sanitarias de la Nación) | | | |

14

| | | | |
|---|---|---|---|
| —1 water utility(1) | Dec. 1992 | — | — |
| Grain Elevators and Port Facilities | | | |
| —6 grain elevator terminals(2) and 2 port facilities | 1992-1993 | 9.7 | — |
| Military and Naval Production | | | |
| —1 ship builder | Dec. 1991 | 59.8 | — |
| —6 arms manufacturers | 1993-1994 | 18.8 | 3.3 |
| Media | | | |
| —2 television stations(1) | Jan. 1990 | — | — |
| —28 radio stations(1) | Feb. 1991 | — | — |
| Hotel | | | |
| —Hotel Llao-Llao | May 1991 | 3.2 | 13.0 |
| Horse Racetrack | | | |
| —Hipodromo Argentino(1) | Sept. 1992 | — | — |
| Real estate | | | |
| —1,081 properties | 1991-1994 | 203.2 | — |
| Foundry | | | |
| —Forja | Aug. 1991 | 1.7 | — |
| Livestock market | | | |
| —Mercado de Hacienda de Liniers(1) | June 1992 | — | — |
| Ships | | | |
| —Buques ELMA | 1994 | 14.8 | — |
| Financial Entities | | | |
| —Caja Nacional de Ahorro y Seguro | April 1994 | 86.3 | — |
| —Banco Hipotecario | Feb. 1999 | 307.5 | — |
| Agriculture | | | |
| —CAP Cuatreros | May 1994 | 1.9 | — |
| Total | | $15,659.3 | $15,398.4 |

(1) Enterprises privatized through granting of concessions.
(2) Five grain elevators are under concession.
Sources: Ministry of Economy and Central Bank.

As of June 30, 2000, the Government retained share ownership in the following privatized companies.

| Enterprises | Percentage of Government Ownership |
|---|---|
| Railways | |
| Ferroexpreso Pampeano S.A. | 16.0% |
| Nuevo Central Argentino S.A. | 16.0 |
| Ferrosur Roca S.A. | 16.0 |
| Buenos Aires al Pacífico General San Martín S.A. | 16.0 |
| Ferrocarril Mesopotámico General Urquiza S.A. | 16.0 |
| Water and Electric Energy | |
| Central Térmica Guemes | 30.0 |
| Centrales Térmicas Patagónicas S.A.(1) | 13.0 |
| Central Dique S.A. | 49.0 |
| Hidroéléctrica Alicurá(1) | 19.5 |
| Hidroéléctrica Piedra del Aguila(1) | 26.0 |
| Centrales Térmicas Mendoza S.A. | 6.2 |
| Transnea S.A. | 30.0 |
| Transpa S.A. (1) | 6.0 |
| Hidroeléctrica Diamante S.A.(1) | 39.0 |
| Aerolíneas Argentinas S.A. | 5.0 |
| YPF | 0.1 |
| Camuzzi Gas Pampeana S.A. | 20.0 |
| Papel Prensa S.A.I.C.F. y de M. | 27.5 |

15

| | |
|---|---|
| Caja de Ahorro y Seguros S.A. ................................................................. | 30.0 |
| Banco Hipotecario ..................................................................................... | 49.0% |

(1)   In addition to the percentage of federal Government ownership listed above, these companies are also owned in part by provincial governments.

Source: Ministry of Economy.

Although the Government privatized the majority of its state enterprises between 1989 and 1994, several significant privatizations have occurred within the past few years.  On August 1, 1997, Argentina completed the privatization of the postal service through a competitive bidding process.  The Government awarded a 30-year concession to a consortium that will pay approximately U.S.$51.6 million every six months for the first 20 years of its operations and 1.0% of gross revenues for the remaining ten years.  On January 23, 1998, the Government selected the winning bidder for a concession to operate the 33 main airports in Argentina for a period of 30 years in exchange for U.S.$171 million in annual royalties.  On February 27, 1998, the Government raised U.S.$82.7 million from the sale of its remaining 20% stake in gas distributor Gas Natural BAN S.A.  On February 2, 1999, the Government sold 49% of the common stock of Banco Hipotecario Nacional, the national mortgage bank.  The proceeds of this privatization totaled U.S.$307.5 million.  On January 20, 1999 the Government sold a 14.99% stake in YPF, the national oil company, to Repsol S.A. for U.S.$2.0 billion.  On June 24, 1999, the Government sold an additional 5.3% stake in YPF to Repsol S.A. for U.S.$842.0 million.  Total proceeds from privatizations for 1999 were U.S.$3.1 billion (excluding the sale of tax receivables). On July 28, 2000, the Government sold a 25% stake of Transener for U.S.$ 70.0 million.

**Gross Domestic Product**

Between 1991 and 1999, Argentina's GDP increased 53.0%.  GDP grew in each year between 1991 and 1994, driven by political and economic stability, consumer confidence and increased investment.  In 1995, however, GDP contracted due to the effects of the Mexican Crisis.  The Argentine economy began to recover in 1996 and grew every year until 1999.  Argentina's GDP declined by 3.1% in 1999, due primarily to Brazil's economic difficulties and the January 1999 devaluation of the Brazilian *real*.  The downturn in the Brazilian economy led to a reduction in Argentine exports and imports of capital goods and other goods and services.  During 1999, the total supply of goods and services declined 4.0% compared with 1998, reflecting the decrease in Argentine economic activity as well as a 10.9% decrease in imports of goods and services, particularly capital goods.  Demand declined during 1999 as well, reflecting a 7.5% decrease in gross investment and a 1.2% decrease in exports of goods and services.  In recent months, however, improving economic conditions in Argentina and Brazil have led to increased demand for Argentine goods and services.  During the first quarter of 2000, Argentine gross domestic product is estimated to have grown by 0.9% compared to the same period of 1999.  See "The Argentine Economy— Introduction."  During the first quarter of 2000, gross investment declined 3.0% as compared with the first quarter of 1999, due primarily to decreases in investment in construction and capital goods.

After the Mexican Crisis of 1995, gross investment as a percentage of GDP increased each year between 1996 and 1998 due to increased investor confidence in the Argentine economy.  As a result of increased investment from 1995 to 1998, imports of goods and services as a percentage of GDP increased from 9.9% in 1995 to 13.4% in 1998, primarily due to increased demand for capital goods.  In 1999, however, gross investment as a percentage of GDP declined from 21.1% in 1998 to 20.2% due to increased interest rates caused by the Russian financial crisis and decreased exports to Brazil as a result of that country's economic difficulties.  In 1999, imports of goods and services as a percentage of GDP decreased to 12.3%, as demand for capital goods declined.  During 1995 to 1999, exports of goods and services as a percentage of GDP increased from 9.5% to 10.9%, largely as a result of increased productivity due to increased investment from the years from 1995 to 1998.

Consumption as a percentage of GDP decreased from 82.0% in 1995 to 81.3% in 1999.  During the years of GDP growth from 1995 to 1998, these decreases reflected increased spending on investment and increased savings instead of consumer goods.  During 1999, the decrease in consumption as a percentage of GDP was due primarily to an increase in the savings rate, which was caused by the economic uncertainty produced by the recession.

The following tables set forth the major components of GDP and expenditures for the periods indicated.

### Real GDP and Expenditures

| | At Constant 1993 Prices | | | | |
|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1998(1) | 1999(1) |
| | (millions of pesos except as noted) | | | | |
| GDP .................................... | 243,186 | 256,626 | 277,441 | 288,195 | 279,215 |
| Add: Imports of goods and services.............................. | 24,026 | 28,205 | 35,709 | 38,691 | 34,466 |
| Total supply of goods and services ............................. | 267,212 | 284,831 | 313,151 | 326,886 | 313,681 |
| Less: Exports of goods and services.............................. | 23,219 | 25,019 | 28,018 | 30,834 | 30,476 |
| Total goods and services available for domestic expenditures...................... | 243,993 | 259,812 | 285,133 | 296,052 | 283,205 |
| Allocation of total goods and services: | | | | | |
| Private consumption .................. | 155,259 | 165,279 | 179,748 | 201,476(2) | 192,655(2) |
| Value added tax on private consumption........................... | 11,867 | 13,008 | 14,233 | | |
| Public consumption................... | 32,339 | 33,041 | 34,104 | 33,737 | 34,256 |
| Gross investment (public and private)............................... | 44,528 | 48,484 | 57,048 | 60,839 | 56,294 |
| Total domestic expenditures... | 243,993 | 259,812 | 285,133 | 296,052 | 283,205 |
| Real GDP growth (%)................ | (2.8)% | 5.5% | 8.1% | 3.9% | (3.1)% |

(1)    Preliminary figures.
(2)    Includes value added tax.
Source: Ministry of Economy.

### GDP Evolution at Current Prices

| | Annual Average | | | | |
|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1998 | 1999 |
| Pesos (millions) ............................ | 258,032 | 272,150 | 292,859 | 298,131 | 283,133 |
| U.S. dollars(1) (millions)............... | 258,032 | 272,150 | 292,859 | 298,131 | 283,133 |
| Rate of exchange............................ | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 |

(1)    Converted at year end exchange rate.
Source: Ministry of Economy.

17

### Composition of Real GDP and Expenditures

| | At Constant 1993 Prices | | | | |
|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1998(1) | 1999(1) |
| GDP | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Add: Imports of goods and services | 9.9 | 11.0 | 12.9 | 13.4 | 12.3 |
| Total supply of goods and services | 109.9 | 111.0 | 112.9 | 113.4 | 112.3 |
| Less: Exports of goods and services | 9.5 | 9.7 | 10.1 | 10.7 | 10.9 |
| Total goods and services available for domestic expenditures | 100.3% | 101.2% | 102.8% | 102.7% | 101.4% |
| Allocation of total goods and services: | | | | | |
| Private consumption | 63.8 | 64.4 | 64.8 | 69.9(2) | 69.0(2) |
| Value added tax on private consumption | 4.9 | 5.1 | 5.1 | — | — |
| Public consumption | 13.3 | 12.9 | 12.3 | 11.7 | 12.3 |
| Gross investment (public and private) | 18.3 | 18.9 | 20.6 | 21.1 | 20.2 |
| Total domestic expenditures | 100.3% | 101.2% | 102.8% | 102.7% | 101.4% |

(1) Preliminary figures.
(2) Includes value added tax.
Source: Ministry of Economy.

### Principal Sectors of the Economy

The following table sets forth the composition of Argentina's GDP by economic sector for the periods indicated.

### Real GDP by Sector

| | At Constant 1993 Prices | | | | |
|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1998(1) | 1999(1) |
| | (millions of pesos) | | | | |
| Agriculture, livestock, fisheries and forestry | 13,791 | 13,632 | 13,695 | 15,103 | 15,082 |
| Mining and extractives (including petroleum and gas) | 4,670 | 4,882 | 4,915 | 5,028 | 5,068 |
| Manufacturing | 41,850 | 44,550 | 48,627 | 49,425 | 45,451 |
| Construction | 12,441 | 13,492 | 15,729 | 16,863 | 16,158 |
| Electricity, gas and water | 5,476 | 5,698 | 6,164 | 6,556 | 6,785 |
| Transportation, storage and communication | 18,098 | 19,350 | 21,519 | 23,249 | 22,775 |
| Commerce, hotels and restaurants | 38,804 | 41,866 | 46,423 | 47,859 | 44,640 |
| Financial services, insurance and real estate | 47,119 | 50,001 | 53,659 | 57,565 | 58,160 |
| Community, social and personal services(2) | 46,571 | 47,640 | 49,586 | 50,516 | 51,193 |
| | 228,820 | 241,111 | 260,317 | 272,164 | 265,312 |
| Plus import duties less adjustment for banking service | 14,366 | 15,515 | 17,124 | 16,031 | 13,903 |
| Total GDP | 243,186 | 256,626 | 277,441 | 288,195 | 279,215 |

(1) Preliminary figures.
(2) The community, social and personal services sector includes, among other items, public administration, defense, sanitation, education, medical services and entertainment.
Source: Ministry of Economy.

The following table sets forth the composition of Argentina's GDP by economic sector for the periods indicated.

**Real GDP by Sector**

| | At Constant 1993 Prices | | | | |
| --- | --- | --- | --- | --- | --- |
| | 1995 | 1996 | 1997 | 1998(1) | 1999(1) |
| | (percentage of GDP) | | | | |
| Agriculture, livestock, fisheries and forestry | 5.7% | 5.3% | 4.9% | 5.2% | 5.4% |
| Mining and extractives (including petroleum and gas) | 1.9 | 1.9 | 1.8 | 1.7 | 1.8 |
| Manufacturing | 17.2 | 17.4 | 17.5 | 17.1 | 16.3 |
| Construction | 5.1 | 5.3 | 5.7 | 5.9 | 5.8 |
| Electricity, gas and water | 2.3 | 2.2 | 2.2 | 2.3 | 2.4 |
| Transportation, storage and communication | 7.4 | 7.5 | 7.8 | 8.1 | 8.2 |
| Commerce, hotels and restaurants | 16.0 | 16.3 | 16.7 | 16.6 | 16.0 |
| Financial services, insurance and real estate | 19.4 | 19.5 | 19.3 | 20.0 | 20.8 |
| Community, social and personal services(2) | 19.2 | 18.6 | 17.9 | 17.5 | 18.3 |
| Plus import duties less adjustment for banking service | 5.9 | 6.0 | 6.2 | 5.6 | 5.0 |
| Total GDP | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

(1)  Preliminary figures.
(2)  The community, social and personal services sector includes, among other items, public administration, defense, sanitation, education, medical services and entertainment.
Source:  Ministry of Economy.

19

The following table sets forth the annual change in Argentina's real GDP by sector for the periods indicated.

**Real GDP Growth by Sector**

| | At Constant 1993 Prices | | | | |
|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1998(1) | 1999(1) |
| Agriculture, livestock, fisheries and forestry.................................... | 5.6% | (1.2)% | 0.5% | 10.3% | (0.1)% |
| Mining and extractives (including petroleum and gas).............. | 16.4 | 4.5 | 0.7 | 2.3 | 0.8 |
| Manufacturing......................................... | (7.2) | 6.5 | 9.2 | 1.6 | (8.0) |
| Construction........................................... | (12.2) | 8.4 | 16.6 | 7.2 | (4.2) |
| Electricity, gas and water...................... | 7.4 | 4.1 | 8.2 | 6.4 | 3.5 |
| Transportation, storage and communication...................................... | 1.7 | 6.9 | 11.2 | 8.0 | (2.0) |
| Commerce, hotels and restaurants ......... | (7.5) | 7.9 | 10.9 | 3.1 | (6.7) |
| Financial services, insurance and real estate ........................................... | (0.9) | 6.1 | 7.3 | 7.3 | 1.0 |
| Community, social and personal services.................................................. | 0.6 | 2.3 | 4.0 | 1.9 | 1.3 |

(1) Preliminary figures.
Source: Ministry of Economy.

*Agriculture, livestock, fisheries and forestry*

Argentina has a well-diversified, mechanized agricultural sector that benefits from a favorable climate and some of the world's richest soils. The country is self-sufficient in virtually all agricultural goods and is a major exporter of grains, meat and oil products. The growth in the agriculture, livestock, fisheries and forestry sector averaged 3.1% during the period from 1995 to 1998 in part due to increased foreign investment in the agricultural sector during this period. However, in 1999 this sector expanded 0.1%, due to the recession in the Argentine economy and decreases in commodity prices. Manufactured goods of agricultural origin as a percentage of total exports decreased from 35.7% in 1995 to 35.1% in 1999, primarily due to an increase in exports of industrial products.

In order to stimulate growth in agricultural exports, Argentina has actively sought a reduction in agricultural protectionism in the major industrialized countries. Argentina is a member of the Cairns group of grain-exporting countries (which also includes Australia, Canada, Chile, New Zealand and Uruguay) that sought to reduce agricultural subsidies during the Uruguay Round GATT negotiations. At the conclusion of these negotiations in 1994, an agreement was reached to reduce domestic subsidies by 20% and export subsidies to agricultural producers by 36% over a six-year period. Argentina has entered into a series of preliminary bilateral arrangements with the EU which, subject to further approvals, would more than double Argentine quotas for exports of premium meats to the EU. In addition, in August 1997 the United States lifted a 68-year ban on imports of fresh beef from Argentina. On August 2, 2000, Argentina suspended exports of Argentine beef to the U.S. following detection of the hoof and mouth virus in a small group of cattle. The U.S. immediately banned imports of Argentine beef. It is not possible to predict when exports of beef to the U.S. will resume.

Since 1991, as the Argentine infrastructure improved and the economy was liberalized, large investors have purchased prime land to create modern, large-scale farming operations. Investors directed a significant amount of capital towards milling, transportation, storage facilities and irrigation systems. The combination of a free market and the increased cost for many farm products has led to an increase in Argentina's agricultural exports from U.S.$4.8 billion in 1995 to U.S.$6.6 billion in 1998. However, the recent decrease in prices as a result of the 1997-1999 global economic crisis caused Argentina's agricultural exports to decline to U.S.$5.3 billion in 1999.

The forestry sector has also experienced significant growth. The Government has begun seeking additional investment in forestry by promoting the sector in such countries as the United States, Canada and Japan.

*Mining and Extractives (Including Petroleum and Gas Production) Sector*

The mining and extractives sector consists primarily of coal, petroleum and gas production. Argentina is the third largest oil and gas producer in Latin America after Venezuela and Mexico, and has significant gas reserves in relation to domestic consumption. Exports of fuel and energy accounted for 12.7% of Argentina's total exports in 1999. Several companies, including Yacimientos Petrolíferos Fiscales S.A., or YPF, are exploring oil fields in order to increase oil reserves and are planning to develop opportunities in the export markets. As part of this plan, YPF began operating an oil pipeline to Chile in February 1994. Proven recoverable petroleum reserves in Argentina increased from 358.1 million cubic meters in 1994 to 487.5 million cubic meters in 1999, primarily as a result of the acquisition of technology to improve the recoverability of petroleum reserves.

The mining and extractives sector grew 0.8% in 1999, primarily due to increased petroleum prices in the last quarter of 1999.

Historically, mineral mining in Argentina had been minimal due to economic instability and an unfavorable tax regime. In order to increase Argentina's development in mining, the Government reduced taxes for the development of mining operations, guaranteed fixed taxes for a 30-year period and instituted accelerated depreciation on mining equipment. These reforms, instituted in 1993, have resulted in foreign investments of more than U.S.$2.0 billion in mineral mining projects. Current mineral mining projects include Alumbrera (copper and gold), Pachón (copper and molybdenum), Cerro Vanguardia (gold and silver), Río Colorado (potassium) and El Salar de Hombre Muerto (lithium).

The following table shows the established reserves of petroleum and natural gas in Argentina as of the dates indicated.

### Proven Reserves

|                    | 1995    | 1996    | 1997    | 1998    | 1999    |
|--------------------|---------|---------|---------|---------|---------|
| Petroleum(1) ..................... | 379,402 | 413,436 | 416,734 | 437,758 | 487,492 |
| Natural gas(2) ..................... | 619,295 | 685,586 | 683,796 | 686,584 | 729,214 |

(1) In thousands of cubic meters.
(2) In millions of cubic meters.
Source: Secretariat of Energy.

*Manufacturing*

The manufacturing sector as a percentage of GDP remained at a level of approximately 17% to 18% throughout the period from 1995 to 1998 but fell to 16.3% of GDP in 1999 due to the recession. The manufacturing sector experienced growth each year during this period, except in 1995, when it contracted 7.2% as a result of the Mexican Crisis, and in 1999, when it contracted 8.0% due to the Asian and Russian Crises. This sector experienced a 6.5% growth rate in 1996 and a 9.2% growth rate in 1997, primarily due to growth of the non-metal minerals, machinery and equipment, and basic metal subsectors. The manufacturing sector experienced a 1.6% growth rate in 1998, primarily due to a 5.5% increase in the food, beverages and tobacco subsector and a 9.8% increase in the chemistry, plastics, coal and oil derivatives subsector. These increases were offset by a 6.7% decrease in the textiles and clothing subsector and a 6.5% decrease in the metal production subsector.

The largest components of the Argentine manufacturing sector are: (i) food and beverages, (ii) chemicals, plastics, coal and oil derivatives and (iii) machinery and equipment. Of these three sectors, machinery and equipment experienced the greatest impact of the Mexican Crisis, decreasing by 17.0% in 1995 as a result of decreased investment and reduced consumer demand.

21

*Construction*

A reduction in bank lending during 1995 led to a sharp decline in the construction sector in 1995. Construction rebounded by 8.4% during 1996, reflecting the economic recovery from the Mexican Crisis, and increased in 1997 by 16.6% due to the resumption of lending by private sector banks to finance residential purchases and continued improvement in the Argentine economy. The construction sector expanded by 7.2% in 1998 due to increased demand despite decreased lending by banks and economic uncertainty as a result of the global economic crisis. In 1999, the construction sector contracted 4.2%, as higher interest rates and economic uncertainty resulted in less construction of new buildings.

*Electricity, Gas and Water*

Electricity in Argentina is produced primarily from hydroelectric sources, gas, coal and nuclear plants. Argentina is a net exporter of energy. A combination of the developing cohesion among the Mercosur countries and foreign investment in oil, gas and electricity through privatizations has contributed to the steady growth in this sector from 1995 to 1999. The electricity, gas and water sector grew 3.5% in 1999, primarily as a result of increased demand.

*Services*

The services sector accounted for 63.3% of GDP in 1999. The following table shows the composition of the services sector for the periods indicated.

**Composition of Services Sector**

|  | 1995 | 1996 | 1997 | 1998(1) | 1999(1) |
|---|---|---|---|---|---|
|  | (percentage of total) | | | | |
| Transportation, storage and communication............................ | 12.0% | 12.2% | 12.6% | 13.0% | 12.9% |
| Commerce, hotels and restaurants................................. | 25.8 | 26.4 | 27.1 | 26.7 | 25.3 |
| Financial services, insurance and real estate .................................. | 31.3 | 31.5 | 31.3 | 32.1 | 32.9 |
| Community, social and personal services.................................. | 30.9 | 30.0 | 29.0 | 28.2 | 29.0 |
| Total ......................................... | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

(1)  Preliminary figures.
Source:  Ministry of Economy.

After a downturn in 1995, the services sector grew each year between 1996 and 1998 but decreased 1.4% in 1999. The financial services, insurance and real estate subsector grew 1.0% in 1999, as the continued liberalization of Argentine financial markets and an increased range of services offered by the financial sector. The transportation, storage and communications subsector decreased 2.0%, due to decreased demand. The commerce, hotels and restaurants subsector grew 6.7% in 1999, as a result of decreased demand. The community, social and personal services subsector has experienced less growth than the other services subsectors over the past three years because a significant portion of such services is provided by the Government, which has attempted to limit expenditure growth. However, in 1999, this sector grew 1.3%.

**Employment and Labor**

In 1999, approximately 63% of the Argentine labor force was employed in the services sector and 37% was involved in the production of goods. Approximately 18.4% of the labor force was employed in manufacturing,

22

13.7% in the public sector, 12.9% in commerce, 11.2% in social services, health and education, 6.9% in construction and 6.5% in agriculture.

The following table shows labor force, employment participation, unemployment and underemployment rates for the periods indicated.

## Participation and Unemployment Rates

|  | As of May 31, | | | | | |
|---|---|---|---|---|---|---|
|  | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 |
|  | (in thousands, unless otherwise indicated) | | | | | |
| **Greater Buenos Aires** | | | | | | |
| Labor force...................... | 5,177 | 4,963 | 5,193 | 5,322 | 5,501 | 5,409 |
| Employment(1) ................ | 4,131 | 4,069 | 4,310 | 4,577 | 4,643 | 4,544 |
| Participation rate(2).......... | 45.9% | 43.5% | 45.0% | 45.6% | 46.6% | 45.3% |
| Unemployment rate(3) ..... | 20.2% | 18.0% | 17.0% | 14.0% | 15.6% | 16.0% |
| Underemployment rate(4) | 10.7% | 12.6% | 12.7% | ·13.2% | 13.9% | 15.0% |
| **Major interior cities(5)** | | | | | | |
| Labor force...................... | 3,388 | 3,439 | 3,547 | 3,667 | 3,733 | 3,870 |
| Employment(1) ................ | 2,866 | 2,906 | 3,029 | 3,238 | 3,266 | 3,312 |
| Participation rate(2).......... | 38.1% | 38.0% | 38.6% | 38.8% | 38.5% | 39.0% |
| Unemployment rate(3) ..... | 15.4% | 15.9% | 14.9% | 12.0% | 12.9% | 14.5% |
| Underemployment rate(4) | 12.4% | 12.6% | 13.8% | 13.5% | 13.4% | 13.6% |
| **Total** | | | | | | |
| Participation rate(2).......... | 42.6% | 41.0% | 42.1% | 42.4% | 42.8% | 42.4% |
| Unemployment rate(3) ..... | 18.4% | 17.1% | 16.1% | 13.2% | 14.5% | 15.4% |
| Underemployment rate(4) | 11.3% | 12.6% | 13.2% | 13.3% | 13.7% | 14.5% |

(1)  To be considered employed, a person must have worked at least one hour with remuneration or fifteen hours without remuneration during the preceding week.
(2)  Labor force as a percentage of the total population.
(3)  Unemployed population as a percentage of the labor force.
(4)  Underemployed population as a percentage of the labor force. Workers are defined as underemployed if they work fewer than 35 hours per week.
(5)  Figures for 1995 are based on 24 major interior cities. Figures for 1996 to 2000 are based on 27 major interior cities.
Sources: INDEC and Ministry of Economy.

In the five year period between 1995 and 1999, unemployment was a persistent and significant problem for the Argentine economy. Unemployment increased significantly in 1995, due primarily to the slowdown of the Argentine economy resulting from the Mexican Crisis. As a result of improved economic conditions and the various labor reforms described below, unemployment has declined from a high of 18.4% in May 1995 to 15.4% in May 2000. The factors primarily responsible for unemployment during this period include:

- labor laws the Government believes discourage employers from hiring new employees,

- an increase in overtime rather than hiring of additional employees and increased participation in the labor market,

- a shift from labor intensive to capital intensive production and

- a decrease in certain Argentine production due to competition from imports.

23

In an effort to reduce unemployment, the Government has undertaken various legislative measures to provide for greater flexibility in the terms of labor contracts since 1995. Prior to these reforms, labor laws required that most workers be hired under employment contracts of indefinite duration and be entitled to generous severance payments which vested as soon as employment commenced. This policy discouraged employers from hiring new employees in times of economic uncertainty. The new labor laws were intended to alleviate this problem by introducing a variety of short-term contracts allowing temporary, part-time or "at will" employment in certain circumstances and providing partial or total exemptions from the required retirement contributions. Under current legislation, the role of unions has diminished. However, in most cases, employers are still required to make contributions to the union health care system, the foundation of organized labor's financial power.

In addition to labor reforms, the Government has taken a number of other measures to combat unemployment and stimulate hiring, including:

- during 1995, the passage of legislation providing: (i) mechanisms aimed at reducing labor-related accidents and (ii) private insurance schemes for accident-related compensation in order to reduce labor costs to employers and encourage hiring,

- in 1997, a series of "community projects" to provide temporary employment opportunities but only at low wages and

- in 1998, a plan called "Pro-Jobs," designed to stimulate private sector employment aimed at heads of households aged 38 years or older. The program provides a Government subsidy of U.S.$100 above the employee's monthly salary and exempts the employer from paying social security taxes.

In December 1996, the Government issued decrees aimed at decentralizing the collective bargaining process in order to encourage employers to hire more workers. The government decrees provided that if parties to a collective bargaining process are unable to reach a new agreement, the expiring collective bargaining agreement will become invalid and the Ministry of Labor will mediate the dispute. A general strike was held on December 26, 1996 to protest the decrees, and constitutional challenges to the decrees were raised in the courts by two political parties, UCR and Frepaso, and by the Federation of Labor Unions (*Confederación General del Trabajo* or the "CGT"). In each case, the courts declared the decrees unconstitutional.

On September 2, 1998, the Congress approved a labor reform package, which President Menem vetoed in part. The labor reform package that was passed includes:

- legislation that regulates work contracts for apprentices and interns, limits trial basis employment contracts to thirty days and guarantees trial basis employees the right to receive certain benefits,

- legislation that, in certain cases, shortens the required notification period for employee termination to a minimum of 15 days and adopts a new formula for calculating termination compensation,

- legislation that designates the Ministry of Labor as the mediator and arbiter in the re-negotiation of certain collective bargaining agreements and prevents those collective bargaining agreements from being automatically renewed if the parties cannot agree and

- legislation that requires principals to obtain from their contractors and subcontractors verification of, among other matters, social security payments and employee coverage for work-associated risks for each employee performing services for the principal.

In December 1998, the Congress approved a tax reform package designed to promote employment, increase the tax base and that creates an incentive for companies to finance growth through the issuance of equity instead of debt by taxing interest payments on debt. The tax reform package:

- extends the value-added tax to a number of activities previously exempted, such as advertising and cable television subscriptions,

24

- increases excise taxes,

- increases corporate and personal taxes from 33% to 35%,

- ends the deductibility of interest payments from income taxes and

- reduces the social security taxes paid by companies from 22% to 15.5% to offset the above tax increases.

On May 11, 2000, Congress approved a labor reform law proposed by the Alliance. The principal aspects of this law include:

- extending the trial period for newly-hired workers,

- ending the automatic renewal of collective labor agreements when employees and employers cannot agree on the terms of a new collective agreement,

- decentralizing negotiations of collective agreements in order to allow collective bargaining at the company level and

- reducing certain taxes on labor over four years.

The law also prohibits employers from decreasing basic wages and salaries during a transition period of two years and allows local labor unions to invite national labor organizations to participate in local labor negotiations. Because many of these reforms will be phased in over time and because the recent recession in Argentina has affected the unemployment rate, it is impossible to determine what effect these labor reforms have had on the unemployment rate.

A number of strikes occurred in Argentina in 1997, 1998 and 1999 to protest high unemployment and labor reform legislation. On June 9, 2000, a one-day general strike occurred to protest the economic and social policies of the Government. The Government does not believe these strikes have materially affected or will materially affect its ability to implement its policies or will materially affect the Argentine economy.

Poverty

Although there is an absence of national statistics with regard to poverty, it is estimated that at least 20% of Argentina's population lives in poverty. In certain provinces, the poverty rate is estimated at over 25%. Between May 1995 and October 1996, poverty rates in the greater Buenos Aires area rose due to increased unemployment. Poverty rates in the greater Buenos Aires area declined in May 1997, primarily as a result of decreased unemployment and general economic growth in Argentina. Between May 1997 and October 1998, the poverty rate in the greater Buenos Aires area remained relatively stable. During 1999, the poverty rate in the greater Buenos Aires area decreased slightly.

The measurement of poverty is based on a basket of goods and services (consisting primarily of food, clothing, transportation, health care, housing and education), which is considered the minimum necessary to sustain an individual. The basket is valued at market prices, and the resulting threshold is called the poverty line.

The following table sets forth the percentage of households and of the population in the greater Buenos Aires area with annual incomes below the poverty line for the periods indicated.

Poverty in the Greater Buenos Aires Area

| | Total Greater Buenos Aires Area | |
| | Households(1) | Population |
|---|---|---|
| May 1995 ............................. | 16.3 | 22.2 |
| October 1995...................... | 18.2 | 24.8 |
| April 1996 .......................... | 19.6 | 26.7 |
| October 1996...................... | 20.1 | 27.9 |
| May 1997 ............................ | 18.8 | 26.3 |
| October 1997...................... | 19.0 | 26.0 |
| May 1998 ............................ | 17.7 | 24.3 |
| October 1998...................... | 18.2 | 25.9 |
| May 1999 ............................ | 19.1 | 27.1 |
| October 1999...................... | 18.9 | 26.7 |
| May 2000 ............................ | 21.1% | 29.7% |

(1) Adjusted poverty line factor (adult equivalent of household).
Source: INDEC.

The Government has undertaken various measures to address unemployment, which is a principal cause of poverty in Argentina. See "—Employment and Labor." Although these measures provide additional employment opportunities, the new jobs offered are often part-time, at low pay and without health and other benefits. Accordingly, the percentage of the working poor has increased.

Environment

During the Menem administration, Argentina initiated various measures to regulate, monitor and improve environmental standards. Until recently, environmental protection legislation existed primarily at the provincial level even though the federal Government and the provincial governments have concurrent power over environmental matters. In 1991, a Secretariat of the Environment was established pursuant to a presidential decree that called for a balancing of economic development with the conservation of natural resources, the improvement of the environment and the prevention and mitigation of the effects of pollution. The new Constitution implemented in 1994:

- grants all residents of Argentina the right to a healthy environment,

- requires that priority be given to repairing damage to the environment in accordance with applicable law,

- prohibits actually or potentially toxic or radioactive waste from being brought into national territories and

- requires the Government to establish minimum standards of environmental protection to be implemented by the provinces. (As of June 30, 2000, the Government had not established these standards, but was actively working towards doing so.)

Among the significant environmental issues facing Argentina are the regulation and remediation of water and air pollution and the disposal of hazardous wastes. The Government has undertaken programs to improve drinking water and sewer services. A particular area of concern is the pollution of the Río de la Plata and other smaller rivers in the Buenos Aires area that flow into it. Also of particular concern is the pollution of rivers in other regions of Argentina, including the Matanza and Reconquista rivers. Industrial air emissions, primarily in the highly populated Buenos Aires area and other urban centers, have also become the focus of remediation efforts. In addition, development of the forestry industry, particularly in the Yacyretá region along the Argentina-Paraguay border, has raised concerns about the effects of deforestation (including ecological and flood management issues).

26

The Government has not yet determined the remediation costs relating to water and air pollution as well as to flooding along the Yacyretá region, but such costs may be material. The Government has arranged funding from international and multilateral organizations, including the IFC and the Fondo para las Americas (Fund for the Americas) in order to further environmental programs.

Local, provincial and national authorities are moving toward more stringent enforcement of environmental laws. The Government has adopted regulations that require certain industrial companies to meet more stringent environmental standards. These regulations are comparable in many respects to those in effect in the United States and in countries within the European Union. The regulations establish the general framework for environmental protection requirements, including the establishment of fines and criminal penalties for violation. However, the Government is only in the initial stages of formulating the additional regulations necessary to implement this environmental legislation. The Government has also established a national registry of producers and handlers of hazardous wastes and requires registered entities to pay annual fees based on their earnings and the volume of hazardous waste they handle.

As a condition to privatizing state entities, the Government has required purchasers to comply with certain environmental standards. The Government has generally retained ultimate responsibility for pre-privatization environmental costs. The Government does not expect that its environmental costs relating to privatized companies will be material.

27

### FOREIGN TRADE AND BALANCE OF PAYMENTS

**Balance of Payments**

In April 1999, the Ministry of Economy published a report that:

- announced the revision of its methodology for calculating the balance of payments and

- contained statistics that provide a more accurate reflection of Argentina's balance of payments and more closely conform to international statistical norms recommended by the IMF.

Under the revised methodology, the Republic uses additional sources of information and improved methods of estimation to more accurately reflect its current account and capital account balances. See "The Argentine Economy—Revised Methodologies for Calculating Gross Domestic Product and Balance of Payments—Balance of Payments."

Argentina's balance of payments registered a deficit in 1995 as a result of the Mexican Crisis, but registered a surplus each year between 1996 and 1999. The favorable balance of payments in recent years is attributable to increased capital inflows to Argentina recorded under the capital account, principally as a result of foreign investment. The surplus in the capital account has offset current account deficits attributable primarily to negative trade balances, financial services deficits and non-financial services deficits.

28

The following table sets forth data on Argentina's balance of payments.

## Balance of Payments (1)

| | As of December 31, | | | | | As of March 31, 2000(2) |
|---|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1998 | 1999(2) | |
| | (millions of dollars unless otherwise indicated) | | | | | |
| **Current Account** | | | | | | |
| Exports ..................................... | $ 21,161 | $ 24,043 | $ 26,431 | $ 26,434 | $ 23,333 | $ 5,685 |
| Imports ..................................... | 18,804 | 22,283 | 28,554 | 29,448 | 24,116 | 5,526 |
| Trade balance...................... | 2,357 | 1,760 | (2,123) | (3,014) | (783) | 159 |
| Non-financial services............ | (3,326) | (3,366) | (4,178) | (4,386) | (4,095) | (1,414) |
| Interest and dividends............. | (4,482) | (5,278) | (6,171) | (7,687) | (7,922) | (2,065) |
| Transfers.................................. | 513 | 416 | 436 | 389 | (507) | 105 |
| Total.................................... | (4,938) | (6,468) | (12,036) | (14,698) | (12,293) | (3,215) |
| | | | | | | |
| **Capital Account(3)** | | | | | | |
| Central Bank(4)...................... | 1,922 | 1,003 | (586) | (512) | (1,033) | (338) |
| Other financial entities(5)........ | 2,525 | (1,048) | (870) | 3,810 | 2,308 | (1,815) |
| Non-financial public sector(6)................................ | 5,717 | 8,880 | 7,932 | 9,260 | 10,903 | 3,995 |
| Non-financial private sector(7)............................... | (3,646) | 3,163 | 10,114 | 5,642 | 1,774 | 817 |
| | 6,518 | 11,998 | 16,590 | 18,200 | 13,952 | 2,662 |
| Errors and omissions ............... | (1,682) | (1,648) | (1,281) | (64) | (458) | 128 |
| | | | | | | |
| Change in gross international reserves(8)............................... | $ (102) | $ 3,882 | $ 3,273 | $ 3,438 | $ 1,201 | $ (425) |

(1)    With respect to the current account balance, both imports and exports are calculated on a free on board ("FOB") basis and the non-financial services account includes import freight and insurance fees paid to non-residents.
(2)    Preliminary figures.
(3)    Unless otherwise indicated, all capital account amounts in this annual report include errors and omissions.
(4)    Includes transactions between the Central Bank and foreign entities such as the IADB, the IMF and other foreign creditors.
(5)    Net assets or liabilities of financial entities (other than the Central Bank) with respect to foreign creditors.
(6)    Includes operations of the national government, provincial governments, municipal governments and decentralized governmental organizations with respect to foreign entities in the form of bonds, loans from international organizations, operations with the Paris Club and privatizations of State entities.
(7)    Includes operations of the private sector with respect to the issuance of bonds, loans from international organizations or banks, foreign direct investment (inflows) and payments on dollar-denominated bonds to Argentina residents (outflows).
(8)    Does not include the value of bonds issued by the Government and held as reserves by the Central Bank.
Source:  Ministry of Economy.

*Current Account*

The current account consists of:

- the trade balance,

- non-financial services (principally transportation, tourism and royalties),

- net payments of interest and dividends (which are called "financial services" in this report) and

- transfers (principally pension payments by foreign governments to residents of Argentina who have immigrated from abroad).

29

Argentina has not achieved a current account surplus since 1990. From 1991 to 1994, current account deficits were primarily the product of trade deficits attributable to several factors, including the implementation of trade liberalization measures and the relatively significant economic growth between 1991 and 1994 that led to increased demand for imported consumer and capital goods. Although trade deficits have contributed to the Republic's current account deficits since 1994 (most notably those recorded in 1997 and 1998), financial services deficits produced by the Government's need to service public debt have played an increasingly important role. In 1995, the current account deficit decreased by 54.9% to U.S.$4.9 billion, due largely to a trade surplus of U.S.$2.4 billion. However, the trade surplus was offset by a financial services deficit of U.S.$4.4 billion and a non-financial services debt of U.S.$3.3 billion. The current account deficit increased to U.S.$6.5 billion in 1996, due principally to a 17.8% increase in the financial services deficit to U.S.$5.3 billion and the deterioration of the trade balance as a result of an increase in imports during the economic recovery following the Mexican Crisis of 1995. In 1997, the current account deficit increased to U.S.$12.0 billion due to a 17.0% increase in the financial services deficit to U.S.$6.2 billion, a 24.1% increase in the non-financial services deficit to U.S.$4.2 billion and a U.S.$2.1 billion trade deficit produced by an increase in imports coupled with a more modest increase in exports. Exports increased only modestly that year due to a decline in prices of exported Argentine products and decreased demand. In 1998, the current account deficit increased to U.S.$14.7 billion due primarily to 24.5% increase in the in the financial services deficit to U.S.$7.7 billion and an increased trade deficit caused by the deterioration of prices for certain important Argentine exports such as wheat, soy and oil, as well as decreased demand from Brazil. During 1999, Argentina's current account deficit decreased 14.4% to U.S.$12.3 billion, primarily as a result of a 26.0% decrease in the trade deficit. The decreased trade deficit was caused primarily by decreased demand for imports, which was in turn caused by with the recession in Argentina.

During the first quarter of 2000, Argentina had a current account deficit of U.S.$3.2 billion, 8.0% lower than the current account deficit during the same period of 1999 because of increased volumes and prices of exports, particularly industrial exports.

### Capital Account

The capital account measures inflows and outflows of financial assets such as bonds, equity shares and loans.

In 1995, Argentina recorded a relatively small capital account surplus of U.S.$6.5 billion, attributable to the large outflow of capital caused by the Mexican Crisis. In 1996, the capital account surplus increased to U.S.$12.0 billion due to an increase in foreign direct investment and other capital inflows as international investors regained confidence in the Argentine economy. In 1997, the capital account surplus increased to U.S.$16.6 billion primarily because of increased foreign direct investment in Argentina and the issuance of long-term bonds by several Argentine companies. Argentina recorded a capital account surplus of U.S.$17.8 billion in 1998, due to the issuance of public and private bonds, foreign direct investment and the disbursement, in the fourth quarter of 1998, of IADB and World Bank loans to the Government. In 1999, Argentina's capital account surplus decreased 24.2% to U.S.$13.5 billion due to the private sector's reluctance to incur new debt during the recession. During the first quarter of 2000, Argentina had a capital account surplus (including errors and omissions) of U.S.$2.8 billion, 12.3% higher than the capital account surplus during the first quarter of 1999, due to the Government's issuance of debt.

## Foreign Trade

Argentina's foreign trade is dominated by the export of primary products and agricultural goods (including processed agricultural products) and the import of intermediate and capital goods, such as machinery and equipment, chemicals, vehicles and other transport products. Total exports from Argentina increased 24.9% between 1995 and 1998, from U.S.$21.2 billion in 1995 to U.S.$26.4 billion in 1998. Imports to Argentina on a CIF basis increased approximately 57.3% from 1995 to 1998, from U.S.$20.0 billion in 1995 to U.S.$31.4 billion in 1998. The increases from 1995 to 1998 are primarily due to improved economic conditions in Argentina and liberalized trading policies. Total exports (measured on an FOB basis) fell in 1999 by 11.8% to U.S.$23.3 billion due to decreased demand, particularly from Brazil as a result of the downturn of its economy and the increase in the cost of Argentine products caused by the devaluation of the Brazilian *real*. Total imports (measured on a CIF basis) in 1999 fell by 18.7% to U.S.$25.5 billion due to decreased demand in Argentina, particularly for capital goods. The decrease in exports in 1999 is due to the contraction of the Brazilian economy and the decrease of commodity prices. The decrease in imports in 1999 is attributable to the recession in Argentina. During 1999, exports to Mercosur

30

countries (30.2% of Argentina's total exports in that year) fell by 25.2%, primarily due to decreased exports to Brazil, and imports from Mercosur countries (24.6% of Argentina's total imports in that year) fell by 20.6% as compared to 1998, primarily due to recessionary conditions in Argentina.

During the first four months of 2000, exports increased by 13.0% as compared to the same period of 1999, to U.S.$8.0 billion (measured on an FOB basis), due to the recovery in the Argentine economy, particularly the oil and gas and industrial production sectors. Total imports during the first four months of 2000 remained flat as compared to the same period of 1999, at a level of U.S.$7.8 billion (measured on a CIF basis). During the same period, exports to Mercosur countries increased by 20.8% to U.S.$2.5 billion (measured on an FOB basis) due to increased demand as a result of improving economic conditions in Brazil, and imports from Mercosur countries increased by 9.9% to U.S.$2.1 billion (measured on a CIF basis) due to the recovery in the Argentine economy, in each case as compared to the same period of 1999.

The Government reduced import tariffs and eliminated most non-tariff barriers in early 1991. In 1992 and 1993, the Government further reduced import tariffs to an average of 15% on manufactured goods (20% on automobiles) and 10% on intermediate goods, with minor exceptions. As a result, Argentina's average tariff rate applicable to non-Mercosur countries was reduced from 18% to 10%. Export taxes, which had averaged 11%, were (with certain exceptions) eliminated in 1991. In response to the Mexican Crisis in 1995, however, the Government imposed an increase in import tariffs from non-Mercosur countries, including a 3% import surcharge (excluding capital goods, data processing and telecommunications equipment and fuels) and a 10% tariff on imports of capital goods, data processing equipment and telecommunications equipment. In August 1996, the tariff on imports of capital goods, data processing equipment and telecommunications equipment was increased from 10% to 14%. In January 1998, the 3% import surcharge was reduced to 0.5% but general import tariff rates were increased by three percentage points.

Beginning on January 1, 1995, most tariff barriers between the Mercosur nations were eliminated, and non-tariff restrictions on trade are in the process of being eliminated for most goods.

The following tables set forth the composition of Argentina's major exports and imports for the periods indicated.

## Exports by Groups of Products(1)

| | 1995 | | 1996 | | 1997 | | 1998 | | 1999(2) | |
|---|---|---|---|---|---|---|---|---|---|---|
| | (millions of dollars and percentage of total exports) | | | | | | | | | |
| **Primary products** | | | | | | | | | | |
| Cereal | $ 1,863 | 8.8% | $ 2,560 | 10.8% | $ 3,007 | 11.4% | $ 3,042 | 11.5% | $ 2,063 | 8.8% |
| Seeds and oilseeds | 885 | 4.2 | 964 | 4.0 | 339 | 1.3 | 1,052 | 4.0 | 870 | 3.7 |
| Fish | 498 | 2.4 | 609 | 2.6 | 614 | 2.3 | 526 | 2.0 | 505 | 2.2 |
| Fruits | 417 | 2.0 | 476 | 2.0 | 505 | 1.9 | 492 | 1.9 | 459 | 2.0 |
| Vegetables | 268 | 1.3 | 271 | 1.1 | 352 | 1.3 | 461 | 1.7 | 270 | 1.2 |
| Tobacco | 101 | 0.5 | 146 | 0.6 | 187 | 0.7 | 130 | 0.5 | 166 | 0.7 |
| Honey | 71 | 0.3 | 91 | 0.4 | 108 | 0.4 | 89 | 0.3 | 96 | 0.4 |
| Wool | 86 | 0.4 | 65 | 0.3 | 61 | 0.2 | 40 | 0.2 | 39 | 0.2 |
| Other | 628 | 3.0 | 637 | 2.7 | 533 | 2.0 | 771 | 2.9 | 723 | 3.1 |
| | 4,817 | 22.8 | 5,819 | 24.4 | 5,705 | 21.6 | 6,603 | 25.0 | 5,189 | 22.2 |
| **Manufactured goods of agricultural origin** | | | | | | | | | | |
| Residues | 1,254 | 5.9 | 2,367 | 9.8 | 2,404 | 9.1 | 2,006 | 7.6 | 2,049 | 8.8 |
| Oils and fats | 2,097 | 9.9 | 1,891 | 7.9 | 2,225 | 8.4 | 2,734 | 10.3 | 2,332 | 10.0 |
| Meat | 1,229 | 5.8 | 1,074 | 4.5 | 1,025 | 3.9 | 830 | 3.1 | 829 | 3.6 |
| Hides and skins | 937 | 4.4 | 889 | 3.7 | 980 | 3.7 | 812 | 3.1 | 779 | 3.3 |
| Vegetable and fruit products | 321 | 1.5 | 400 | 1.7 | 392 | 1.5 | 319 | 1.2 | 340 | 1.5 |
| Processed fish | 416 | 2.0 | 395 | 1.6 | 416 | 1.6 | 386 | 1.5 | 297 | 1.3 |
| Processed wool | 116 | 0.5 | 121 | 0.5 | 116 | 0.4 | 70 | 0.3 | 70 | 0.3 |
| Other | 1,158 | 5.5 | 1,357 | 5.6 | 1,547 | 5.9 | 1,605 | 6.1 | 1,486 | 6.4 |
| | 7,474 | 35.8 | 8,493 | 35.4 | 9,104 | 34.4 | 8,761 | 33.1 | 8,182 | 35.1 |
| **Manufactured goods of industrial origin** | | | | | | | | | | |
| Basic metals | 1,214 | 5.7 | 1,190 | 5.0 | 1,331 | 5.0 | 1,234 | 4.7 | 1,077 | 4.6 |
| Chemicals | 973 | 4.6 | 980 | 4.1 | 1,176 | 4.4 | 1,369 | 5.2 | 1,368 | 5.9 |
| Machinery and equipment | 983 | 4.6 | 962 | 4.0 | 1,230 | 4.7 | 1,109 | 4.2 | 1,052 | 4.5 |
| Transport equipment | 1,308 | 6.2 | 1,642 | 6.9 | 2,786 | 10.5 | 3,102 | 11.7 | 1,751 | 7.5 |
| Plastics | 341 | 1.6 | 340 | 1.4 | 349 | 1.3 | 380 | 1.4 | 369 | 1.6 |
| Textiles | 384 | 1.8 | 304 | 1.3 | 335 | 1.3 | 320 | 1.2 | 278 | 1.2 |
| Footwear | 102 | 0.5 | 73 | 0.3 | 105 | 0.4 | 68 | 0.3 | 36 | 0.2 |
| Other | 1,200 | 5.7 | 975 | 4.1 | 1,023 | 3.9 | 1,042 | 3.9 | 1,021 | 4.4 |
| | 6,504 | 30.9 | 6,466 | 27.1 | 8,335 | 31.5 | 8,625 | 32.6 | 6,952 | 29.8 |
| uel and energy | 2,169 | 10.3 | 3,089 | 13.0 | 3,287 | 12.4 | 2,451 | 9.3 | 3,010 | 12.9 |
| Total(3) | $21,162 | 100.0% | $23,815 | 100.0% | $26,430 | 100.0% | $26,441 | 100.0% | $23,333 | 100.0% |

(1)   Measured on an FOB basis.
(2)   Preliminary figures.
(3)   Total results may differ from those presented in the "Balance of Payments" table in this report due to differences in methodology used by each of the Ministry of Economy and INDEC in preparing the information presented in each table.
Source: INDEC.

### Imports by Groups of Products(1)

| | 1995 | | 1996 | | 1997 | | 1998 | | 1999(2) | |
|---|---|---|---|---|---|---|---|---|---|---|
| | (millions of dollars and percentage of total imports) | | | | | | | | | |
| lachinery and equipment | $ 6,449 | 32.3% | $ 7,552 | 31.8% | $ 9,953 | 32.7% | $10,243 | 32.6% | $ 8,135 | 31.9% |
| ehicles and transport products | 2,484 | 12.4 | 3,435 | 14.5 | 4,954 | 16.3 | 5,540 | 17.6 | 3,796 | 14.9 |
| bemicals | 3,027 | 15.2 | 3,729 | 15.7 | 4,033 | 13.2 | 4,131 | 13.2 | 3,916 | 15.4 |
| etals | 1,348 | 6.7 | 1,461 | 6.1 | 2,071 | 6.8 | 2,016 | 6.4 | 1,609 | 6.3 |
| astics and rubber | 1,308 | 6.6 | 1,519 | 6.4 | 1,926 | 6.3 | 1,882 | 6.0 | 1,556 | 6.1 |
| per | 896 | 4.5 | 936 | 3.9 | 1,138 | 3.7 | 1,270 | 4.0 | 1,119 | 4.4 |
| xtiles (including clothing) | 704 | 3.5 | 872 | 3.7 | 1,065 | 3.5 | 1,112 | 3.5 | 927 | 3.6 |
| tics and precision equipment | 601 | 3.0 | 708 | 3.0 | 871 | 2.9 | 869 | 2.8 | 785 | 3.1 |
| otwear, hats and mbrellas | 139 | 0.7 | 135 | 0.6 | 204 | 0.7 | 224 | 0.7 | 198 | 0.8 |
| nerals | 987 | 4.9 | 1,111 | 4.7 | 1,177 | 3.9 | 1,076 | 3.4 | 875 | 3.4 |
| ricultural | 380 | 1.9 | 456 | 1.9 | 746 | 2.5 | 589 | 1.9 | 488 | 1.9 |
| xd | 587 | 2.9 | 548 | 2.3 | 637 | 2.1 | 649 | 2.1 | 615 | 2.4 |
| s and oils | 32 | 0.2 | 40 | 0.2 | 54 | 0.2 | 66 | 0.2 | 30 | 0.1 |
| ther and hides | 45 | 0.2 | 69 | 0.3 | 82 | 0.3 | 99 | 0.3 | 101 | 0.4 |
| od and cork | 116 | 0.6 | 135 | 0.6 | 177 | 0.6 | 206 | 0.7 | 174 | 0.7 |
| er products | 866 | 4.3 | 1,055 | 4.4 | 1,362 | 4.5 | 1,431 | 4.6 | 1,185 | 4.6 |
| Total(3) | $19,969 | 100.0% | $23,761 | 100.0% | $30,450 | 100.0% | $31,404 | 100.0% | $25,508 | 100.0% |

(1)   Measured on a CIF basis.
(2)   Preliminary figures.
(3)   Total results may differ from those presented in the "Balance of Payments" table in this report due to differences in methodology used by each of the Ministry of Economy and INDEC in preparing the information presented in each table.
Source: INDEC.

Argentina's largest trading partners are Brazil and the United States, together accounting for 35.7% of exports and 41.3% of imports in 1999.  Argentina also conducts a substantial amount of trade with other member countries of ALADI and the EU.

The following table provides data on Argentina's geographic distribution of trade for the periods indicated.

## Geographic Distribution of Trade

| | 1995 | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|---|
| | | (percentage of total) | | | |
| **Exports** | | | | | |
| Brazil | 26.1% | 27.8% | 30.7% | 30.1% | 24.4% |
| United States | 8.6 | 8.2 | 8.3 | 8.3 | 11.3 |
| Germany | 3.1 | 2.4 | 1.9 | 2.1 | 2.7 |
| Italy | 3.5 | 3.0 | 2.8 | 2.8 | 3.0 |
| Japan | 2.2 | 2.2 | 2.1 | 2.5 | 2.3 |
| China | 1.4 | 2.6 | 3.3 | 2.6 | 2.2 |
| The Netherlands | 5.7 | 5.1 | 3.4 | 4.2 | 4.3 |
| Russia | 0.4 | 0.6 | 1.0 | 0.6 | 0.6 |
| Rest of ALADI | 19.7 | 19.3 | 18.7 | 19.0 | 19.7 |
| Rest of EU | 9.0 | 10.7 | 7.1 | 8.3 | 11.3 |
| Rest of world | 20.3 | 17.5 | 21.0 | 19.6 | 18.4 |
| Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| **Imports** | | | | | |
| Brazil | 20.8% | 22.4% | 22.7% | 22.5% | 21.9% |
| United States | 20.9 | 19.9 | 19.9 | 19.7 | 19.4 |
| Germany | 6.3 | 6.0 | 5.4 | 6.0 | 5.5 |
| Italy | 6.3 | 6.3 | 5.7 | 5.1 | 5.3 |
| Japan | 3.6 | 3.1 | 3.7 | 4.6 | 4.2 |
| China | 3.0 | 2.9 | 3.3 | 3.7 | 3.9 |
| The Netherlands | 1.1 | 0.9 | 0.8 | 0.8 | 1.0 |
| Russia | 0.4 | 0.4 | 0.4 | 0.6 | 0.7 |
| Rest of ALADI | 8.0 | 8.5 | 8.0 | 8.3 | 8.6 |
| Rest of EU | 16.5 | 18.9 | 15.3 | 15.6 | 19.3 |
| Rest of world | 13.1 | 10.2 | 14.6 | 13.2 | 10.3 |
| Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

Source: INDEC.

Trade between Argentina and the other Mercosur countries increased from U.S.$2.7 billion in 1990 to U.S.$13.3 billion in 1999. Argentina's exports to other Mercosur members decreased 25.2% in 1999, primarily as a result of a decline in Argentine automotive exports to Brazil. Sales to Brazil in 1999 represented approximately 80.8% of Argentina's Mercosur exports. Brazil is currently Argentina's main export market and trading partner.

Trends in the trading relationship between Argentina and Brazil, the two largest member countries of Mercosur, are difficult to ascertain because of differences in the economic policies adopted by both countries. Until the end of 1992, Argentina ran a trade deficit with Brazil, due to economic difficulties in Brazil which depressed both demand for Argentine exports to Brazil and the prices of Brazilian exports to Argentina. Beginning in 1993, Argentina's trade deficit with Brazil began to narrow, as improving economic conditions in Brazil, lower interest rates and stabilization of the Brazilian currency allowed Argentina to increase exports to that country. Argentina achieved a trade surplus with Brazil of approximately U.S.$1.3 billion in both 1995 and 1996, U.S.$1.1 billion in 1997 and U.S.$0.9 billion in 1998 due to continued stabilization of the Brazilian economy. Despite Brazil's devaluation of the *real* in January 1999, Argentina maintained a trade surplus of U.S.$0.1 billion in 1999.

In December 1994, Mercosur agreed to establish a common set of regulations for the automotive sector to be implemented by 2000. Argentina agreed to treat Brazilian automotive parts as if they were of local origin, and Brazil agreed not to impose duties or quotas on the import of vehicles from Argentina. In June 1995, however, Brazil announced that it intended to impose quotas on car imports from its Mercosur partners, including Argentina.

34

Brazil has agreed to exempt Argentina from such quotas pending the conclusion of negotiations between the two countries to resolve these issues. On June 30, 2000, Argentina and Brazil signed an agreement implementing a regulatory framework for trade in the automotive sector between the two countries. As part of that regulatory framework, the two countries established common automotive tariffs, most of which are set at 35%. This agreement will later be adopted by the other Mercosur countries.

On March 31, 1997, Brazil implemented restrictions requiring importers to pay cash for all imports, except for certain limited classes of imports and imports with financing terms greater than 360 days. Subsequently, Brazil granted Argentina and the other Mercosur countries a partial exemption from these restrictions for imports from these countries valued at no more than U.S.$40,000 that have financing terms of less than 90 days. In 1999, exports to Brazil constituted approximately 24.4% of Argentina's total exports, equivalent to 2.0% of GDP. Of those exports, approximately 21.7% were automobiles and automotive components, which are not subject to these trade restrictions. A large part of Argentina's exports to Brazil that remain subject to trade restrictions are products for which there is an international market.

The United States Trade Representative's Office announced in April 1997 the withdrawal of preferential treatment with respect to U.S.$260 million of Argentine goods that enters the United States duty-free under the Generalized System of Preferences program, resulting in the imposition of an additional tariff of approximately 5%. This measure was taken in response to the view of United States officials that Argentina inadequately protected intellectual property rights. In 1997, the United States Department of Commerce revoked countervailing duties on several products from Argentina, including leather, wool and steel cold-rolled flat products. In addition, in August 1997, the United States lifted a 68-year ban on imports of fresh beef from Argentina. On August 2, 2000, Argentina suspended exports of Argentine beef to the U.S. following detection of the hoof and mouth virus in a small group of cattle. The U.S. immediately banned imports of Argentine beef. It is not possible to predict when exports of beef to the U.S. will resume.

The Government plans to continue its liberalized trading policies and to maintain or expand trading relations with fellow Mercosur members, the EU and other nations in order to sustain the increase in foreign trade it has achieved in recent years. See "The Argentine Economy—Deregulation of the Economy and Privatizations."

**Foreign Investment**

As a part of the convertibility plan, the Government enacted structural reforms designed to make foreign investment in Argentina more attractive, such as the adoption of a legislative framework that ensures equal treatment of foreign and local investors, privatization of state enterprises and foreign access to all economic sectors. Foreign investments in Argentina generally do not require prior governmental authorization. Foreign investors are not required to register investments with the Government and can freely remit their profits and capital investments abroad.

The United States, Chile, France and Spain are the greatest sources of foreign investment in Argentina, accounting for more than 50% of foreign investment during the period from 1995 through 1998 (the most recent year for which figures are available). The sectors of the Argentine economy that are the main beneficiaries of foreign investment are manufacturing, electricity, gas and water, the petroleum industry, banking and communications. Foreign investment has increased significantly since the implementation of the convertibility plan in 1991. Foreign investment rose from approximately U.S.$5.3 billion in 1995 to U.S.$6.5 billion in 1996 and U.S.$8.1 billion in 1997. In 1998, however, foreign investment declined to U.S.$6.2 billion, primarily as a result of a reduction in capital flows to emerging markets in the wake of the economic crises in Asia and Russia. Foreign investment recovered in 1999, increasing to U.S.$23.6 billion (U.S.$15.2 billion of which was the result of Repsol S.A.'s acquisition of YPF). During the first quarter of 2000, foreign investment was U.S.$2.0 billion, lower than the level of U.S.$4.5 billion (U.S.$2.2 billion of which was due to Repsol S.A.'s acquisition of the Government's holdings of YPF) recorded in the corresponding period of 1999.

EXHIBIT B – 4

MONETARY SYSTEM

# MONETARY SYSTEM

**The Central Bank**

The Central Bank, which was founded in 1935, functions as an independent entity apart from the Government. In accordance with the *Ley de Entidades Financieras* ("Financial Institutions Law"), the Central Bank supervises and controls the Argentine banking system and manages Argentina's international reserves. Pursuant to the terms of the convertibility plan, Congress approved certain amendments to the Central Bank's charter in September 1992, providing that the Central Bank:

- must maintain the value of the currency as its principal objective,

- cannot finance the Government, except indirectly (through the purchase on the open market of Government securities, provided that holdings of such securities cannot exceed one third of the Central Bank's unrestricted reserves at any time and may not be increased by more than 10% in any one year),

- may only fund Argentina's banking sector for liquidity purposes and only on a temporary and secured basis and

- must have a Board of Directors that operates independently of the Government, except in certain matters of policy where the Central Bank's actions are subject to the approval of Congress.

The Central Bank requires financial institutions to submit periodic financial reports in order to monitor each institution's business practices. The Central Bank has the power to:

- authorize the establishment of branches of foreign financial institutions in Argentina,

- fix minimum capital, liquidity and solvency requirements,

- grant certain financial facilities to financial institutions in cases of temporary liquidity problems,

- approve bank mergers,

- approve certain capital increases and transfers of stock,

- grant and revoke banking licenses and

- promulgate other regulations that further the intent of the Financial Institutions Law.

In accordance with its powers under the Financial Institutions Law, the Central Bank promulgated a number of measures on January 12, 1995 to stem the substantial capital flight from the Argentine financial system following the Mexican Crisis. Pursuant to these measures:

- the Central Bank converts dollars into pesos, and vice versa, on a one-to-one basis (previously the Central Bank sold dollars at a strict one-to-one convertibility rate but purchased dollars at the prevailing bank rate, which at times had fallen to 0.998 peso per dollar),

- reserve requirements on bank deposits may be maintained in the currency of choice, eliminating the Central Bank's regulation of the denomination of reserves and

- reserve requirements on U.S. dollar and peso deposits were lowered and made equal (previously, these requirements had been more strict on peso accounts).

Subsequently, the Central Bank required that all banks provide an amount equivalent to 2% of their deposits to Banco de la Nación, the largest state-owned bank, in order to establish a fund to provide short-term loans to financially distressed financial institutions.

In April 1995, Congress amended the Central Bank's charter and the Financial Institutions Law in order to allow the Central Bank to:

- incur external indebtedness and extend the term and increase the amount of secured financial assistance that may be granted to financial institutions, both without commitment of international reserves,

- transfer or sell assets of financial entities experiencing liquidity problems,

- extend to 120 days the maximum duration of a bank suspension and

- increase to U.S.$5,000 the maximum level of deposits to be included in the preferred creditors list in the event of a bank closing.

At the same time, Congress also created a private deposit insurance program. Under this program, private banks contribute between 0.03% and 0.06% of their total deposits (as determined by the Central Bank) to an insurance fund. The insurance program covers sight deposits and 30-day time deposits up to Ps.10,000 and 90-day time deposits up to Ps.20,000.

In November 1995, Argentina moved from a reserve system based upon currency deposits held by the Central Bank to a liquidity system under which bank liabilities are backed by a portfolio of assets in the form of:

- deposits in foreign low-risk institutions,

- securities issued by member states of the Organization for Economic Cooperation and Development with an investment-grade rating or

- other instruments with low risk and high liquidity.

The present system has three advantages over the former deposit-based reserve system. First, it imposes reserve requirements on most bank liabilities (including negotiable obligations and short-term credits) and not merely on deposits, thus strengthening the stability of the system. Second, the system imposes the same reserve requirements on all types of deposits and eliminates the distortions created by the old system, which imposed different reserve requirements. Third, the present system is less costly to the banking sector because it allows reserves to be maintained in the form of productive assets rather than in non-interest bearing deposits with the Central Bank.

In December 1996, the Central Bank entered into the BCRA Repurchase Facility in the form of securities repurchase agreements with 13 major financial institutions, in an aggregate amount of up to U.S.$6.1 billion, which was raised to U.S.$6.7 billion in December 1997. The BCRA Repurchase Facility was decreased to U.S.$6.2 billion in April 1999, as several private banks reduced their participation in the facility. As of June 30, 2000, the facility had increased to U.S.$6.9 billion, as the World Bank's increase in its participation offset further decreases by private banks. The Central Bank does not expect to draw down on the facility, but believes that having the facility at its disposal sends a positive message to global investors with respect to the Government's ability to deal successfully with a liquidity crisis in the banking system.

**Financial Sector**

The Central Bank regulates the financial sector through the Superintendency of Financial Entities. Among the most important responsibilities of the Superintendency of Financial Entities are:

- implementing and enforcing Argentina's banking laws,

- establishing and enforcing accounting and financial reporting requirements for the banking sector,

- monitoring and regulating the lending practices of financial institutions and

- establishing and enforcing rules for financial institutions raising foreign exchange or issuing bonds.

As of December 31, 1999, the Argentine financial system consisted of 117 financial institutions, of which 16 were state-owned and 101 were privately owned. As a consequence of the Mexican Crisis, the total number of financial institutions decreased from 205 to 156 between December 31, 1994 and December 31, 1995. During this period, the Central Bank revoked the licenses of 16 banks and 33 banks were dissolved as a result of mergers. The effect of the Mexican Crisis continued through 1996, resulting in a decrease in the total number of financial institutions from 156 to 147. Due to increased competition and foreign investment in the financial sector, the total number of financial institutions in Argentina decreased to 120 as of May 30, 2000.

The following table presents data on the Argentine financial system as of the dates indicated.

### The Argentine Financial System

| Type of institution | As of December 31, 1998 | | | | | As of December 31, 1999 | | | | | As of May 30, 2000 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number | Loans | | Deposits | | Number | Loans | | Deposits | | Number | Loans | | Deposits | |
| | | $ billion | % | $ billion | % | | $ billion | % | $ billion | % | | $ billion | % | $ billion | % |
| Financial firms State-owned(1) | 16 | 27.9 | 35.6% | 27.3 | 34.7% | 16 | 29.0 | 37.0% | 27.5 | 34.1% | 16 | 29.0 | 37.4% | 29.2 | 34.2% |
| Private | 112 | 50.4 | 64.4% | 51.4 | 65.3% | 101 | 49.3 | 63.0% | 53.2 | 65.9% | 104 | 48.5 | 62.6% | 56.1 | 65.8% |
| Total | 128 | 78.3 | 100.0% | 78.7 | 100.0% | 117 | 78.3 | 100.0% | 80.7 | 100.0% | 120 | 77.5 | 100.0% | 85.3 | 100.0% |

National, provincial and municipal.
rce: Central Bank.

Commercial banks in Argentina offer customers demand deposits, savings accounts and fixed-rate deposits that pay interest at market rates in local and in foreign currency. Since the creation of U.S. dollar-denominated accounts in 1989, such accounts have attracted a growing share of deposits, reaching 59.4% of total deposits as of June 30, 2000.

Since 1989, the Government has privatized certain public financial institutions and reformed certain others. International trade financing was transferred from the Central Bank to Banco de Inversión y Comercio Exterior S.A. (BICE). Banco Nacional de Desarrollo, which financed industrial development, was absorbed by the largest state-owned bank, Banco de la Nación Argentina. The national savings bank, Caja Nacional de Ahorro y Seguros, was privatized in April 1994. Banco Hipotecario Nacional, which was active in financing housing construction, was transformed into a wholesale bank and was privatized on February 2, 1999. In addition, 16 provincial banks were privatized between 1990 and 1999. See "The Argentine Economy—Deregulation of the Economy and Privatizations—Privatizations."

As a result of the success of the convertibility plan, the efficiency and profitability of the financial sector improved and the sector expanded from 1991 to 1994 after declining throughout the late 1980s and 1990. In early 1995, due to a combination of the Mexican Crisis and uncertainty concerning the outcome of the May 1995 presidential elections, local and foreign investors withdrew approximately U.S.$7.0 billion from the financial system, causing total deposits to decrease from U.S.$43.9 billion on December 31, 1994, to U.S.$36.8 billion on May 12, 1995. This outflow of bank deposits led to sharp increases in interest and call money rates.

Wholesale banks and provincial banks, in particular, were adversely affected by the financial crisis of 1995. Wholesale banks had relied heavily on bond trading, and the fall of Argentine bond prices caused a considerable reduction in the value of their assets and a decline in their income from trading activities. The problems of the provincial banks were even greater. A combination of patronage employment practices and political mismanagement had left the majority of these banks in poor financial condition. The Government has reduced the

38

flow of its revenues to such banks to induce them to carry out necessary reforms as well as to minimize budget constraints at the federal level. At the same time, more financially sound banks have cut off provincial banks (as well as the wholesale banks which lend to them) from interbank lending, and provincial banks have experienced a flight of deposits to "quality" financial institutions.

In response to the outflow of deposits and resulting tightening liquidity as a result of the Mexican Crisis, the Government took several remedial measures. In March 1995, the Government created two fiduciary funds to support the transformation of the Argentine banking sector in an effort to overcome the effects of the Mexican Crisis. The first fund, known as the Provincial Fiduciary Fund, which had capital amounting to U.S.$ 1.2 billion as of June 30, 2000, was created to, among other things:

- make secured loans to provincial banks experiencing temporary liquidity or delinquent loan problems,

- provide liquidity to provincial banks through the purchase of assets at a discount,

- advance to the provinces up to 70% of the expected proceeds of the sale of any public company or asset and

- finance programs to reduce the staff of public entities in preparation for privatization.

The second fiduciary fund, known as the Banking Capitalization Fund, which had capital of U.S.$0.6 billion as of March 31, 2000, was established to help finance the transfer of viable assets and liabilities of struggling banks to stronger financial institutions. These funds received financing from the World Bank, the IADB and from the proceeds of the sale of Argentine bonds.

As a result of reforms of the banking system, increased confidence in the Argentine economy since 1995 and investments by foreign banks in the banking system, the Argentine financial system has recuperated liquidity. Total deposits grew to U.S.$54.8 billion as of December 31, 1996, U.S.$69.0 billion as of December 31, 1997, U.S.$78.5 billion as of December 31, 1998 and U.S.$78.7 billion as of December 31, 1999. As of June 30, 2000, the banking system appeared to have weathered the recent economic difficulties in Argentina and in other countries. Between October 22, 1997, the start of the Asian crisis, and June 30, 2000, total deposits grew 27.5%, from U.S.$66.2 billion to U.S.$84.4 billion (40.6% of which was in pesos and 59.4% of which was in U.S. dollars). The June 30, 2000 figure represents a 4.6% increase from June 30, 1999 and a 1.7% increase from May 31, 2000

39

**Liquidity and Credit Aggregates**

The followinsg tables set forth the composition of Argentina's monetary base (expressed in terms of the Central Bank's monetary liabilities) and international reserves for the periods indicated.

### Monetary Base and Central Bank International Reserves(1)

| | As of December 31, | | | | | As of June 30, 2000(5) |
|---|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1998 | 1999(5) | |
| | (millions of dollars) | | | | | |
| Currency including cash in vaults at banks | $ 13,050 | $ 14,030 | $ 15,966 | $ 16,370 | $ 16,493 | $ 13,749 |
| Other(2) | 3,355 | 4,139 | 6,435 | 8,323 | 9,814 | 11,986 |
| Monetary base(3) | $ 16,405 | $ 18,169 | $ 22,401 | $ 24,693 | $ 26,307 | $ 25,735 |
| | | | | | | |
| International reserves deposited in the Central Bank(4) | 17,042 | 19,296 | 24,308 | 28,524 | 27,831 | 27,374 |
| International reserves deposited in foreign banks | 1,383 | 3,510 | 6,962 | 5,488 | 5,758 | 6,370 |
| Total international reserves | $ 18,975 | $ 22,807 | $ 31,269 | $ 32,012 | $ 33,589 | $ 33,744 |

--------

(1)  All figures are at market value as of the date indicated.
(2)  Up to January 17, 1995, includes reserves required in pesos for peso deposits in commercial banks. From January 17, 1995 to August 31, 1995, includes reserves required in U.S. dollars for peso deposits. Since August 31, 1995, includes reserves required in U.S. dollars for peso deposits as well as Bank Liquidity Notes.
(3)  Up to January 17, 1995, includes currency in circulation plus reserve requirements in pesos for peso deposits. From January 17, 1995 to August 31, 1995, includes currency in circulation plus reserves required in U.S. dollars for peso deposits. Since August 31, 1995, includes the sum of currency in circulation, reserves required in U.S. dollars for peso deposits and Bank Liquidity Notes.
(4)  Excludes Government deposits in the Central Bank.
(5)  Preliminary figures.
Source: Central Bank.

### Liquidity and Credit Aggregates

| | As of December 31, | | | | | As of June 30, 2000 |
|---|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1998 | 1999 | |
| | (millions of dollars) | | | | | |
| Currency(1) | $ 11,154 | $ 11,730 | $ 13,325 | $ 13,496 | $  13,725 | $  11,403 |
| M1(2) | 16,651 | 19,909 | 23,208 | 23,782 | 22,847 | 21,312 |
| M2(3) | 21,317 | 25,731 | 30,706 | 32,454 | 30,396 | 30,010 |
| M3(4) | 53,750 | 64,488 | 81,825 | 90,290 | 92,383 | 45,810 |
| Loans | | | | | | |
| Private sector loans | 46,756 | 51,233 | 59,925 | 67,091 | 65,240 | 63,486 |
| Public sector loans | 5,632 | 6,358 | 7,010 | 9,316 | 11,992 | 13,113 |
| Total | $ 52,388 | $ 57,592 | $ 66,935 | $ 76,407 | $ 77,232 | $ 76,599 |

--------

(1)  Does not include cash in vaults at banks.
(2)  M1: Currency + peso-denominated demand deposits.
(3)  M2: M1 + peso-denominated savings deposits.
(4)  M3: M2 + total foreign currency denominated deposits, principally in dollars.
Source: Central Bank.

Argentina's monetary base grew each year from 1995 to 1999, from U.S.$16.4 billion in 1995 to U.S.$26.3 billion in 1999. Total international reserves at the Central Bank have also grown consistently in the past five years, from U.S.$19.0 billion in 1995 to U.S.$27.8 billion in 1999. Similarly, the narrow money aggregate M1 increased from 6.4% of GDP in 1995 to 8.1% of GDP in 1999. The broad money aggregate M3, which includes foreign currency denominated deposits, followed the same trend, increasing from 20.8% of GDP in 1995 to 32.6% of GDP in 1999. Foreign currency deposits are significant to system liquidity because of their size, high rate of growth and their ease of conversion between U.S. dollars and pesos. The recessionary conditions in Argentina in 1999 did not have a marked impact on Argentina's monetary base or international reserves. As of June 30, 2000, the monetary base (consisting of currency in circulation and money held at the Central Bank to meet liquidity requirements) was U.S.$25.7 billion, a 10.2% increase from the level recorded on June 30, 1999. On June 30, 2000, gross international reserves at the Central Bank (including approximately U.S.$1.5 billion of public bonds) stood at U.S.$27.4 billion, a 10.6% increase from the June 30, 1999 level.

As of August 31, 2000, the monetary base (consisting of currency in circulation, reserves required in U.S. dollars for peso deposits, Bank Liquidity Notes and repurchase agreements between the Central Bank and commercial banks) was U.S.$24.4 billion, representing a 6.2% increase from the level recorded on August 31, 1999. In addition, as of August 31, 2000, gross international reserves (including gold deposits and approximately U.S.$1.5 billion of public bonds) stood at U.S.$26.1 billion, representing a 6% increase over the level recorded on August 31, 1999.

Credit granted to non-financial institutions in 1999 increased by 4.9% over credit granted to these institutions in 1998 primarily as a result of an increase in credit granted to services and finances, construction and consumer institutions necessitated by the growth of the financial sector.

The following table sets forth credit granted to non-financial institutions for the periods indicated.

### Credit Granted to Non-Financial Institutions

|  | 1995 | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|---|
|  | (millions of dollars) | | | | |
| Agriculture, forestry, livestock and fisheries | $ 5,798 | $ 5,397 | $ 6,132 | $ 6,255 | $ 5,963 |
| Mining and extractives (including petroleum and gas) | 312 | 496 | 555 | 690 | 571 |
| Manufacturing industries | 11,012 | 12,380 | 13,358 | 12,644 | 11,741 |
| Electricity, gas and water | 1,262 | 1,329 | 1,509 | 1,661 | 1,456 |
| Construction | 2,552 | 2,596 | 2,561 | 2,785 | 2,944 |
| Wholesale and retail trade | 8,282 | 7,857 | 8,600 | 8,019 | 7,844 |
| Services and finances | 14,864 | 17,135 | 20,035 | 20,272 | 22,456 |
| Other | 15,402 | 16,754 | 21,118 | 24,211 | 27,320 |
| Total | $59,483 | $63,945 | $73,870 | $76,536 | $80,295 |

Source: Central Bank.

**Inflation**

Since the implementation of the convertibility plan, the annual inflation rate, as measured by the CPI, has fallen sharply, declining from 1,343.9% in 1990 to -1.2% in 1999.

As of July 30, 2000, the Consumer Price Index had decreased by 0.9% as compared to July 30, 1999 and the Wholesale Price Index had increased by 4.5% as compared to July 30, 1999, primarily due to increases in commodities prices.

The following table sets forth inflation rates for the periods indicated.

**Inflation**

| | Consumer Prices, increase (decrease) over previous period(1)(2) | Wholesale Prices, increase (decrease) over previous period(1)(2) |
|---|---|---|
| 1995 | 1.6 | 5.8 |
| 1996 | 0.2 | (2.1) |
| 1997 | 0.3 | 0.9 |
| 1998 | 0.7 | (6.3) |
| 1999 | (1.2) | (3.8) |
| 2000 | | |
| January | 0.8 | 1.2 |
| February | 0.0 | 0.9 |
| March | (0.5) | 0.5 |
| April | (0.1) | (1.2) |
| May | (0.4) | (1.1) |
| June | (0.2) | (0.6) |
| July | 0.4 | (0.2) |

(1)  Rate of change shown in percentages.
(2)  For annual figures, change in price index is from December to December.  For monthly figures, change in price index is from end of previous month.
Source:  INDEC.

**Foreign Exchange Rates and International Reserves**

In December 1989, a free exchange rate was established for all foreign currency transactions.  The Central Bank is an active participant in the foreign exchange market.  In order to regulate market liquidity and maintain Argentina's international reserves, the Central Bank maintains the peso-dollar exchange rate by selling, and since January 1995 purchasing, dollars at a one-to-one rate.  Major banks, exporters and importers are also key participants in this market.  Due to the ease of conversion between the peso and the dollar as a result of the Government's exchange rate policies, changes in U.S. interest rates constitute a significant factor in determining peso-dollar capital flows.

The following table shows the international reserves of the Central Bank as of the dates indicated.

### International Reserves(1)

| | As of December 31, | | | | | As of August 31, 2000 |
|---|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1998 | 1999 | |
| | (millions of dollars) | | | | | |
| **Assets** | | | | | | |
| Gold .................................. | $ 1,679 | $ 1,611 | $    120 | $    124 | $    121 | $      7 |
| Cash .................................. | 176 | 42 | 50 | 76 | 396 | 68 |
| Deposits(2)......................... | 1,496 | 1,166 | 161 | 631 | 651 | 1,204 |
| Demand deposits................ | 559 | 562 | 167 | 264 | 158 | 218 |
| Interest-bearing deposits .... | 12,032 | 16,334 | 22,267 | 25,124 | 25,986 | 23,147 |
| ALADI claims (net) ........... | 22 | 31 | 42 | 30 | 30 | (6) |
| Argentine Government notes ................................ | 2,543 | 1,793 | 1,826 | 1,618 | 1,424 | 1,457 |
| Other .................................. | 0 | 0 | 0 | 0 | 0 | 0 |
| Government deposits in the Central Bank.............. | — | — | (325) | (1,343) | (935) | 476 |
| Gross international reserves(3)........................ | 18,506 | 21,539 | 24,308 | 26,524 | 27,831 | 26,571 |
| Liabilities (monetary base) ... | 17,318 | 20,411 | 22,401 | 24,693 | 26,307 | 24,450 |
| Net international reserves.......................... | $ 1,188 | $ 1,128 | $ 1,907 | $ 1,831 | $ 1,523 | $ 2,120 |

(1) All figures are at market value as of the date indicated.
(2) Commercial bank deposits held at the Central Bank.
(3) Between 1995 and 1996, Government deposits in the Central Bank were included in gross international reserves. In 1997 and 1998, gross international reserves exclude Government deposits in the Central Bank. Figures as of August 31, 2000 include Government deposits in gross international reserves.

Source: Central Bank.

Argentina's gross international reserves at the Central Bank increased from U.S.$18.5 billion as of December 31, 1995 to U.S.$27.4 billion as of June 30, 2000, due largely to an increase in interest-bearing deposits.

## Securities Markets

Argentina has active Government bond and equities markets and a developing corporate bond market. The market capitalization of Argentina's securities markets as of December 31, 1999 was U.S.$49.2 billion for Government bonds, U.S.$5.0 billion for corporate bonds and U.S.$83.0 billion for equities, totaling U.S.$137.2 billion. In 1999, market capitalization increased by 57% compared to 1998. The increase in market capitalization is due to mergers and acquisitions and the listing in Argentina of the headquarters of the buyers' foreign companies.

The markets are regulated by the *Comisión Nacional de Valores* ("National Securities Commission" or "CNV"). The CNV regulates all agents that carry out transactions in public securities markets and has the authority to regulate and control the public offering of all securities other than the primary issue of Government securities. In addition, several rating agencies have been in operation in Argentina since November 1, 1992.

The Government has introduced substantial reforms in the capital markets to promote foreign investment. Beginning in 1989, the elimination of restrictions on foreign capital movements has liberalized the capital markets. The Government has devised a framework to permit the introduction of non-bank financial products into the capital markets, including projects for the creation of a futures and options market. To promote activity in the stock market, between 1991 and 1992 the Government ceased regulating brokerage fees and eliminated transfer taxes and stamp taxes on securities transactions. In addition, the Congress passed legislation in 1993 that allows greater flexibility in the investment portfolios of mutual funds by creating fixed-income funds as a new investment option.

43

*Government Bonds and Treasury Bonds*

The Argentine bond market is dominated by Government securities, especially Bocones and Brady Bonds and, since 1994, Bontes and Letes. Bonex, a U.S. dollar-denominated bond which was traded primarily in the over-the-counter market, dominated the Argentine bond market until approximately 1995. See "Public Sector Debt—Description of Debt and Debt Restructuring."

In 1994, the Government established a Treasury bonds market supervised and managed by the Treasury. Prior to the establishment of the Argentine Treasury bonds market, the short- to medium-term peso debt market was comprised exclusively of certificates of deposit. One of the Government's goals in establishing the Treasury bonds market was to set benchmarks for short-term interest rates. The Treasury established CRYL, a clearing house managed by the Central Bank, to handle all Treasury bond issues. The Government publishes an annual timetable for the regular public auction of Treasury bonds. Under the new Treasury system, short-term issues of three, six or twelve-month maturities are known as Letes and bonds of medium- and long-term maturity are known as Bontes. Letes and Bontes may be denominated in either pesos or U.S. dollars. As of June 30, 2000, there were U.S.$4.7 billion of Letes and U.S.$12.6 billion of Bontes outstanding.

*Corporate Bonds*

In July 1988, legislation was passed for the development of the corporate bond market in Argentina. Corporate bonds are issued in bearer or registered form and may be repaid in local or foreign currency, according to the terms and conditions of their issuance. Interest rates on corporate bonds may be fixed or floating and can vary substantially with market conditions and the creditworthiness of the issuer. Most corporate bonds are denominated in U.S. dollars.

*Equities*

The Argentine equities market is regulated by the CNV, the *Bolsas de Comercio* (Stock Exchanges) and the *Caja de Valores S.A.*, a clearing house. There are 12 stock exchanges in Argentina, seven of which are authorized to quote securities: Buenos Aires, La Plata, Córdoba, Mendoza, Santa Fe, Río Negro and Rosario. The oldest and largest is the Buenos Aires Stock Exchange, which was founded in 1854. The Argentine equities market, although exhibiting considerable volatility during the period of 1995 to 1999, increased from U.S.$37.1 billion as of December 31, 1995 to $83.0 billion as of December 31, 1999. The number of listed companies in Argentina declined from 144 as of December 31, 1995 to 115 as of August 31, 2000. This decline was due to foreign acquisitions that led to the delisting of the acquired company and to the disappearance of companies through local mergers. The volume of shares traded on the Buenos Aires Stock Exchange decreased from U.S.$35.3 million in 1996 to U.S.$14.2 million in 1999 due to the decrease in capital inflows in 1999.

The following table sets forth the market capitalization and traded volume in the Argentine capital markets as of the dates indicated.

44

**Argentine Capital Market**

| | As of December 31, | | | | |
|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1998 | 1999 |
| Shares................................. | 37.1 | 44.4 | 59.0 | 45.3 | 83.0 |
| Negotiable obligations................. | 2.9 | 3.5 | 3.8 | 4.3 | 5.0 |
| Public bonds | 32.4 | 39.5 | 42.7 | 37.8 | 49.2 |
| National................................ | 32.6 | 39.1 | 42.3 | 37.6 | 49.0 |
| Provincial............................ | 0.1 | 0.4 | 0.4 | 0.1 | 0.2 |
| Total market capitalization (billions of dollars)(1)............. | 72.4 | 87.3 | 105.4 | 87.4 | 137.2 |
| | | | | | |
| Shares(2)............................... | 18.4 | 35.3 | 42.8 | 31.8 | 14.2 |
| Public bonds(1)......................... | 213.2 | 460.0 | 398.8 | 202.3 | 188.2 |
| Negotiable obligations(2)............. | n/a | 0.6 | 0.6 | 0.5 | 0.6 |
| Total volume (millions of dollars)(2)............................. | 282.4 | 484.7 | 449.6 | 239.7 | 197.0 |

(1)  On the Buenos Aires Stock Exchange and the *Mercado Abierto Electrónico* (Electronic Open Market, currently a market for the trading of public and private bonds (commercial papers) but not equity).
(2)  On the Buenos Aires Stock Exchange.
Source:  CNV and Central Bank.

Individuals, pension funds and mutual funds constitute the largest groups of investors in Argentina's capital markets.  Investment by banks and insurance companies in the equity markets is limited by law.  Since the reform of the social security system in 1994, total assets managed by pension funds have grown significantly, reaching a level of U.S.$11.5 billion in 1998 and U.S.$16.8 in 1999.  While Argentina's mutual funds currently control only a small portion of the capital market, the total capitalization of mutual funds in Argentina increased from U.S.$ 0.6 billion in 1995 to U.S.$7.1 billion in 1999.  The development of mutual funds and the increase in the assets of Argentine institutional pension funds have created a broader market and increased the level of activity on the Buenos Aires Stock Exchange.  See "Public Sector Finances—Social Security Reform."

## PUBLIC SECTOR FINANCES

**Overview**

Argentina's public sector consists of the Government (including special accounts and independent institutions, such as public universities, whose budgets are not subject to approval by the Government), the social security system and non-financial public sector enterprises. Government transfers to provincial governments are included in public sector accounts. Public sector accounts do not include either revenue collected by the provincial governments (other than transfers from the Government) or provincial expenditures. The overall balance includes the net amount of interest paid by the Central Bank on foreign debt and interest earned on the Central Bank's international reserves.

The legal authority to impose taxes is shared by Congress, the provincial legislatures and, within certain limits, the municipalities. The precise distribution of taxing authority, however, is not clearly defined by law. The Supreme Court of Argentina, in interpreting the Argentine Constitution, has concluded that taxes on external trade may be levied only by the Government. The Supreme Court has also concluded that federal taxing authority generally is limited to certain indirect taxes and temporary direct taxes levied only under exceptional circumstances. Collection inefficiencies at the provincial level, however, have led the Government to assume most of the taxing authority. Federal taxes must be authorized by an act of Congress, although the executive branch is empowered to issue regulations and decrees necessary to implement such legislation. The Ministry of Economy is responsible for the collection of public revenues. The Ministry of Economy carries out this task mainly through the *Dirección General Impositiva* (the General Directorate of Taxes).

Currently, the federal Government imposes income and other taxes that the Constitution permits the provinces to impose, and then shares the revenue with the provinces. The shared taxes, or "co-participated taxes," include income taxes, the value-added tax and excise taxes. In 1994, the Government, the provinces and the city of Buenos Aires entered into a tax co-participation agreement, which provided for the creation of a federal agency to monitor compliance with the co-participation regime. This agency includes representatives of all the provinces and Buenos Aires. Originally scheduled to expire in December 1996, the co-participation agreement was initially extended to December 1999 and was later re-extended to December 2001. The Government is currently drafting a new co-participation bill but has not yet submitted it to the Congress.

The *Jefatura del Gabinete de Ministros* (the Chief of the Cabinet of Ministers) is responsible for the preparation of the Government's annual budget, which is subject to approval by the President and Congress. Once a budget is authorized, funds are provided to the various agencies and to the provinces on a quarterly basis. The *Auditoria General de la Nación* (National General Audit Agency) is responsible for supervising budgetary compliance by the Government and its agencies. The Public Sector Financial Administration Law prohibits the Government from borrowing to meet operating deficits, except in the case of national emergencies. If revenues are less than projected during the budget year, the Government adjusts expenditures to meet its target deficit.

**Public Sector Accounts**

The following tables sets forth a summary of public sector accounts (calculated on a cash basis) for the periods indicated in billions of dollars.

**Summary of Public Sector Accounts**

| | 1995 | 1996 | 1997 | 1998 | 1999 | As of June 30, 2000 |
|---|---|---|---|---|---|---|
| | | | (billions of dollars) | | | |
| **Revenues** | | | | | | |
| National administration taxes | $ 31.03 | $ 33.18 | $ 38.35 | $ 40.36 | $ 38.63 | $ 20.67 |
| Social security taxes(1) | 13.70 | 10.28 | 12.20 | 11.99 | 10.89 | 5.36 |
| Operating public enterprises | | | | | | |
|   Revenues | 1.09 | 0.05 | 0.05 | 0.06 | 0.04 | 0.03 |
|   Expenditures | 1.14 | 0.01 | 0.01 | 0.00 | 0.01 | 0.02 |
|     Total | (0.05) | 0.05 | 0.04 | 0.06 | 0.03 | 0.01 |
| Non-tax revenues | 3.21 | 2.54 | 3.23 | 3.59 | 5.09 | 2.25 |
| Capital revenues (excluding privatizations) | 0.08 | 0.37 | 0.43 | 0.41 | 0.20 | 0.19 |
|     Total revenues | 47.97 | 46.42 | 54.26 | 56.41 | 54.83 | 28.49 |
| **Expenditures (excluding interest payments)** | | | | | | |
| National administration wages | 6.64 | 6.75 | 7.22 | 6.76 | 7.12 | 3.38 |
| Goods and services | 2.06 | 2.14 | 2.24 | 2.37 | 2.28 | 0.90 |
| Social security(1) | 15.63 | 15.44 | 17.20 | 17.48 | 17.44 | 8.46 |
| Transfers to provinces | 12.43 | 13.34 | 15.18 | 15.83 | 15.64 | 7.97 |
| Other transfers(2) | 6.26 | 6.12 | 7.46 | 7.71 | 8.29 | 3.95 |
| Other expenditures | 0.20 | 0.01 | 0.01 | 0.00 | 0.00 | 0.00 |
| Capital spending | 3.22 | 3.56 | 3.79 | 3.77 | 3.18 | 1.40 |
|     Total expenditures | 46.44 | 47.37 | 53.10 | 53.92 | 53.95 | 26.06 |
| Primary balance before privatizations | 1.54 | (0.95) | 1.16 | 2.49 | 0.88 | 2.43 |
| Privatization proceeds | 1.17 | 0.37 | 0.31 | 0.10 | 2.58 | 0.00 |
| Primary balance after privatizations | 2.71 | (0.58) | 1.47 | 2.59 | 3.45 | 2.43 |
| Interest payments | (4.08) | (4.61) | (5.75) | (6.66) | (8.22) | (4.77) |
|     Overall balance | $ (1.37) | $ (5.19) | $ (4.28) | $ (4.07) | $ (4.77) | $ (2.33) |

(1)  The methodology for determining revenues and expenditures with respect to social security was modified between 1996 and 1997.
(2)  Includes transfers to the PAMI.
Source:  Ministry of Economy.

The following table sets forth a summary of the public sector accounts (calculated on a cash basis) as a percentage of GDP.

### Summary of Public Sector Accounts

| | 1995 | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|---|
| | (percentage of GDP) | | | | |
| **Revenues** | | | | | |
| National administration taxes.............. | 12.0% | 12.2% | 13.1% | 13.5% | 13.6% |
| Social security taxes(1)...................... | 5.3 | 3.8 | 4.2 | 4.0 | 3.9 |
| Operating public enterprises | | | | | |
| Revenues.................................. | 0.4 | 0.0 | 0.0 | 0.0 | 0.0 |
| Expenditures ............................. | 0.4 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total.................................. | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Non-tax revenues ............................... | 1.2 | 0.9 | 1.1 | 1.2 | 1.8 |
| Capital revenues (excluding privatizations) ................................ | 0.0 | 0.1 | 0.3 | 0.1 | 0.0 |
| Total revenues ............................... | 18.6% | 17.0% | 18.6% | 18.9% | 19.4% |
| **Expenditures (excluding interest payments)** | | | | | |
| National administration wages............. | 2.6% | 2.5% | 2.5% | 2.3% | 2.5% |
| Goods and services ............................. | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 |
| Social security(1) ............................ | 6.1 | 5.7 | 5.9 | 5.9 | 6.2 |
| Transfers to provinces........................... | 4.8 | 4.9 | 5.2 | 5.3 | 5.5 |
| Other transfers..................................... | 2.4 | 2.2 | 2.5 | 2.6 | 2.9 |
| Other expenditures............................... | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 |
| Capital spending................................. | 1.2 | 1.3 | 1.3 | 1.3 | 1.1 |
| Total expenditures...................... | 18.0% | 17.4% | 18.1% | 18.1% | 19.1% |
| Primary balance before privatizations...... | 0.6 | 0.4 | 0.4 | 0.8 | 0.3 |
| Privatization proceeds........................ | 0.5 | 0.1 | 0.1 | 0.0 | 0.9 |
| Primary balance after privatizations ........ | 1.1 | 0.2 | 0.5 | 0.9 | 1.2 |
| Interest payments ................................ | 1.6 | 1.7 | 2.0 | 2.2 | 2.9 |
| Overall surplus/deficit................... | (0.5)% | (1.9)% | (1.5)% | (1.4)% | (1.7)% |

(1) The methodology for determining revenues and expenditures with respect to social security was modified between 1996 and 1997.

Source: Ministry of Economy.

The public account recorded a U.S.$1.4 billion deficit in 1995, due primarily to decreased tax revenues as a result of the Mexican Crisis and increased interest payments. The deficit grew to U.S.$5.2 billion in 1996 primarily due to lower than anticipated tax revenues, particularly with respect to social security taxes. The public account deficit decreased to U.S.$4.3 billion in 1997, primarily due to increased tax revenues as a result of the growth of the economy and tax increases passed in 1996. The Government recorded a U.S.$4.1 billion deficit in 1998, primarily due to an increase in interest payments. In 1999, Argentina recorded a fiscal deficit, excluding privatization proceeds, of U.S.$7.1 billion (calculated by subtracting the Central Bank's surplus of U.S.$253 million from the deficit of U.S.$7.4 billion of the non-financial public sector). This U.S.$7.1 billion deficit, which exceeded the IMF target of U.S.$5.1 billion, was primarily due to decreased tax receipts caused by recessionary conditions in Argentina. Due to the recessionary conditions in Argentina, the IMF did not take action against Argentina for exceeding the IMF deficit target.

During the first half of 2000, Argentina recorded a fiscal deficit of U.S.$2.3 billion, within the IMF target of U.S.$2.7 billion for the first half of the year. The Republic met the IMF deficit target primarily because of revenues received under a tax amnesty program and the sale of bonds previously held as collateral under the Brady Plan, as described below.

48

The Government remains committed to reducing the fiscal deficit. In August 1999, the Congress approved the Fiscal Convertibility Law. The Fiscal Convertibility Law:

- limits growth in public expenditures to the GDP growth rate,

- requires a reduction in the deficit from a maximum of 1.9% of GDP in the year 1999 to a balanced budget in the year 2003 and

- establishes a fiscal stabilization fund to be used in the event of fiscal crises.

To aid its attempts to reduce the fiscal deficit, the Government on May 24, 2000 announced U.S.$0.9 billion (on an annualized basis) of spending cuts to be implemented over the following twelve months. The spending cuts include a U.S.$0.6 billion cut in public sector salaries, a U.S.$0.2 billion special pensions cut and a U.S.$0.1 billion spending cut related to the downsizing of certain government agencies. Approximately U.S.$0.5 billion of these cuts will be implemented during the year 2000.

*Revenues*

The Government's most important source of tax revenue is the value-added tax, a broadly based value-added tax on goods and services. The value-added tax is currently set at 21%. The second largest source of tax revenue is the various social security taxes, which include:

- payroll taxes based on employee wages and mandatory pension contributions (11% for employees and 17.6% (including PAMI) for employers),

- decree 1520/98, which set a schedule of reduction decreasing the tax rate to 11.6% in August 1999; in addition there are regional deductions which put the tax rate at the minimum of 2.93% to a maximum of 7.41%,

- the pensioner health system tax (3% for employees and 1.6% for employers),

- unemployment insurance (1.5% for employers) and

- employee health system tax (3% for employees and 5% for employers).

In addition, employers are required to pay 7.5% of wages for various family subsidies granted to their employees. Income tax, both personal and corporate, is the third most important source of tax revenue. Income tax has become a more important source of revenue due to reforms implemented in 1992 and 1993. These reforms led to:

- an increase in the tax rate on gross corporate profits from 20% to 30% and

- a change in the personal income tax rate from a progressive scale of 11% to 30% to a progressive scale of 6% to 33% of income.

In addition, in 1996, certain limitations to deductions from personal income tax were imposed and the tax rate on gross corporate profits was increased from 30% to 33%. In recent years, the Government has carried out tax reforms with the aim of increasing overall tax revenues while reducing or eliminating taxes that impede commercial transactions. Thus, the Government has phased out export duties, stamp taxes on stock transactions and taxes on foreign exchange transactions while greatly increasing value-added tax revenues.

In 1996, revenues from national administration taxes increased by U.S.$2.2 billion, while revenues from social security taxes fell by U.S.$3.4 billion, primarily due to structural reforms in the social security system, such as the private management of pension funds. In 1997, revenues from national administration taxes increased U.S.$5.2 billion due to improved macroeconomic conditions in Argentina, including increased foreign investment and decreased unemployment. In 1998, revenues from national administration taxes increased U.S.$2.0 billion, due to increased macroeconomic activity, an increase in imports and a change in the schedule of advance payments of

income tax and personal assets tax. In 1999, revenues from national administration taxes decreased U.S.$1.7 billion, primarily due to decreased economic activity caused by the recession, and revenues from social security taxes fell U.S.$1.1 billion, primarily due to a reduction in the employer payroll tax rate.

The following table sets forth the composition of tax revenue for the periods indicated.

## Composition of Tax Revenue

| | 1995 | 1996 | 1997 | 1998 | 1999 | As of June 30, 2000(2) |
|---|---|---|---|---|---|---|
| | | | (percentage of total) | | | |
| Value-added tax | 40.5% | 42.8% | 41.4% | 40.7% | 38.3% | 38.3% |
| Other taxes on goods and services | 13.0 | 12.0 | 13.9 | 13.2 | 17.5 | 16.8 |
| Social security taxes | 28.4 | 24.5 | 22.4 | 21.5 | 20.5 | 18.0 |
| Income taxes (corporate and personal) | 14.5 | 15.5 | 16.8 | 18.9 | 18.9 | 22.1 |
| Import and export taxes | 4.9 | 5.3 | 5.9 | 4.8 | 4.8 | 4.1 |
| Taxes on capital | 0.7 | 1.5 | 1.0 | 1.1 | 1.1 | 1.9 |
| Gross total | 102.6 | 101.7 | 101.3 | 101.2 | 101.2 | 101.2 |
| Drawbacks(1) | 2.6 | 1.7 | 1.3 | 1.2 | 1.2 | 1.2 |
| Net total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

_____

(1)  Drawbacks for 1998 are included in the gross total.
(2)  Preliminary figures.
Source: Ministry of Economy.

Under the August 1992 *Pacto Fiscal* (Fiscal Pact), the provinces pay 15% of their co-participation revenues to the national social security system, and the Government makes minimum monthly payments to each province as well as a special supplemental payment to certain poorer provinces. In December 1999, the Government and the provinces renewed the 1992 Fiscal Pact until December 31, 2001. Pursuant to the December 1999 renewal, payments to the provinces will be at least U.S.$1.36 billion per month in 2000 and in 2001 will equal the average of the monthly payments stipulated for 1998-2000 in a previous renewal of the Fiscal Pact.

On August 12, 1993, the Government and 16 provincial governments signed the *Pacto Federal* (Federal Pact) to coordinate tax reforms for the reduction of distortionary taxes. The signing provinces agreed to standardize taxes on real estate and automobiles and to abolish:

- stamp taxes,

- transfer taxes on fuel, gas and electricity,

- taxes on interest on time deposit and savings accounts,

- taxes on bank drafts and

- payroll taxes.

The signing provinces also agreed to take steps to deregulate their local economies and to privatize provincial banks and other public enterprises. In addition, the 1993 Federal Pact provides for the voluntary integration of provincial social security systems into the national social security system. Between 1994 and 1996, eleven provincial social security systems merged into the national system. Although the 1993 Federal Pact originally required provincial governments to enact the tax reforms listed above by June 30, 1995, the Congress has extended this deadline until December 31, 2001. Despite the signing of the Federal Pact by 16 provincial governments, the Republic can give no assurance as to the success of any provincial government in implementing these tax reforms.

50

Since the mid-1990's, the Congress has passed a number of tax increases for varying purposes. In February and March of 1995, the Government enacted measures designed to raise additional revenue in order to counter the substantial capital flight resulting from investor reaction to the Mexican Crisis. These measures included:

- an increase in the value-added tax from 18% to 21%,

- increases in duties on imports from non-Mercosur countries, including the reintroduction of a 3% tax on imports that had been eliminated by the Government at the end of 1994 and an imposition of a 10% import tariff on capital goods, computer and telecommunications products,

- a reduction of export subsidies, previously set at up to 15%, to up to 10%,

- a reduction from 1% to 0.5% of a "wealth" tax on equity of more than U.S.$100,000 coupled with a substantial expansion in the scope of this tax,

- a unification of employer social security contribution rates across sectors and

- improvements in the administration and collection of the value-added tax and income taxes.

In September of 1996, the Government approved revenue and spending measures to reduce the fiscal deficit (excluding privatizations) to less than U.S.$6 billion in 1996, and authorized the issuance of new indebtedness up to U.S.$4 billion. These measures included:

- establishing a uniform corporate income tax of 33% (an increase of 3%),

- changing personal income taxes from a scale of 11% to 30% to a scale of 6% to 33%,

- imposing an income tax on copyrights and

- increasing gas, oil and motor fuel taxes.

In December 1998, the Congress approved a tax reform law designed to promote employment, increase the tax base and eliminate the incentive to finance growth through the issuance of debt instead of equity. The tax reform package:

- extended the value-added tax to a number of activities thus far exempted, such as advertising and cable television subscriptions,

- increased excise taxes,

- increased corporate and personal income taxes from 33% to 35%,

- ended the deductibility from income taxes of interest payments and

- in exchange for these tax increases, reduced social security taxes paid by companies from 22% to 15.5%.

In December 1999, the Congress approved a package of tax increases expected to raise approximately U.S.$2.0 billion in additional revenue during 2000. The tax package raises income and personal-property taxes and introduces new taxes on soft drinks, alcoholic beverages, cigarettes, airport use and private medical services. The Government expects that the additional revenues raised by these taxes will be used to reduce the Republic's fiscal deficit for 2000.

A substantial strengthening of the tax administration has accompanied the Government's tax reforms. The Government has increased penalties for non-compliance, but tax evasion continues to be a significant problem. The Government has implemented new billing procedures in order to facilitate more effective control over the tax collection process. In addition, the Government has significantly improved auditing operations to make them more

51

efficient and has implemented systems that have been successful in monitoring increasing numbers of the largest taxpayers.

*Expenditures*

Government expenditures increased each year between 1995 and 1999. A primary objective of the Government is to maintain fiscal discipline. Measures to achieve this goal have included privatizations and the sale of concessions for certain public services in order to shift costs from the public to the private sector. This process has resulted in increased spending by the private sector on infrastructure and services. As a result, public expenditures in this area have declined from an average of 26.0% of total annual public expenditures between 1980 and 1988 to 22.0% of total public expenditures in 1999.

The following table sets forth the composition of public expenditures for the periods indicated.

## Composition of Public Sector Expenditures(1)

| Purpose of expenditure | 1995 | 1996 | 1997 | 1998 | 1999 | As of June 30, 2000(2) |
|---|---|---|---|---|---|---|
| | | | (percentage of total) | | | |
| General administration | 10.6% | 9.6% | 8.1% | 7.9% | 9.2% | 5.8% |
| Defense and security | 8.2 | 8.1 | 7.8 | 7.3 | 7.2 | 6.8 |
| Justice | 1.6 | 1.7 | 1.8 | 1.7 | 1.7 | 1.7 |
| Social programs | 63.7 | 64.3 | 62.6 | 63.0 | 59.6 | 62.3 |
| Social security | 48.8 | 41.1 | 39.4 | 41.3 | 39.7 | 41.4 |
| Culture, education, science and technology | 7.3 | 7.5 | 7.8 | 7.6 | 7.3 | 8.2 |
| Health | 2.4 | 8.7 | 7.5 | 6.6 | 6.3 | 6.0 |
| Housing | 2.4 | 2.2 | 2.4 | 2.2 | 1.7 | 2.1 |
| Social welfare | 2.6 | 3.9 | 4.6 | 4.3 | 3.9 | 3.9 |
| Labor | 0.2 | 0.8 | 1.0 | 0.8 | 0.7 | 0.6 |
| Public expenditure on economic infrastructure and services | 6.5 | 6.4 | 6.3 | 6.1 | 4.7 | 5.0 |
| Public debt | 9.5 | 10.0 | 13.5 | 14.1 | 17.6 | 18.4 |
| Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

(1) Includes actual expenditures made during the specified year and agreements made in the specified year to make expenditures in future years.
(2) Preliminary figures.
Source: Ministry of Economy.

As a result of various court rulings in favor of retirees, the Government adjusted social security benefit payments to compensate for inflation. This adjustment, plus the aggregate amount owed to retirees who had successfully brought claims for compensation, caused an increase in social security expenditures from U.S.$12.5 billion in 1993 to U.S.$15.2 billion in 1994. Annual social security expenditures grew to U.S.$15.6 billion in 1995 before falling slightly in 1996 to U.S.$15.4 billion. Social security expenditures increased to U.S.$17.2 billion in 1997 as a result of the transfer of certain social security payments from the provinces to the federal Government as a result of the merger of provincial social security systems into the national system. Since then social security expenditures have remained relatively constant at U.S.$17.5 billion in 1998 and U.S.$17.4 billion in 1999.

The increase in social security expenditures between 1993 and 1994 benefited mainly those retirees with higher social security incomes. Government funds became insufficient to cover this increase, and a policy to protect retirees with lower social security income became necessary. As a result, the *Ley de Solidaridad Previsional* (the Social Security Solidarity Law) was passed in March 1995. This law:

- required that pension payments be limited to the funds available in the social security system,

52

- gave priority to payment of current social security payments over the payment of compensation for back payments and

- established that if sufficient funds became available in the future, pensioners with lower social security incomes would be granted an increase.

## The 2000 Budget

On December 28, 1999, Congress passed the Republic's budget for the year 2000. The budget assumes real GDP growth of 2.0%, a 1.6% increase in prices of goods and services and a fiscal deficit (on a cash basis and including the surplus of the Banco Central) of U.S.$4.5 billion. This assumed deficit equals 1.5% of assumed real GDP and conforms to the Fiscal Solvency Law of 1999.

## Social Security Reform

On July 1, 1994, a law for the reform of the social security system went into effect. This law replaced the state-operated system and provided:

- a basic pension, provided by the Government, equivalent to 2.5 times the employee's average obligatory contributions, payable to individuals who made contributions for 30 years and

- an additional pension.

In May 1994, employees were given the opportunity to elect whether the additional pension would be provided by a private pension fund or the Government. Employees who entered the labor market after July 1, 1994, however, must invest in a private pension fund. Employees are obligated to contribute 11% of their wages to the private pension fund or to the state-operated system, as applicable. Employers continue to contribute 16% of each employee's wages to finance pension payments by the Government. The employer contribution is being reduced gradually in certain provinces as part of the Federal Pact. The social security reform has reduced Government revenues to the extent employees have chosen to contribute to a private pension plan. In addition to transferring the bulk of the operation of the social security system from the public sector to the private sector and introducing a simplified system expected to reduce the level of evasion, the reforms have had a significant effect on capital markets, which have benefited from investment by private pension funds. Assets held in private pension funds as of June 30, 2000 amounted to approximately U.S.$18.7 billion.

The following table illustrates the evolution of the amount of assets held in private pension funds as of December 31 of each year indicated and during the first two quarters of 2000.

### Assets Held in Private Pension Funds

| Date | Total funds (millions of dollars) |
|------|-----------------------------------|
| 1995 | $  2,497 |
| 1996 | $  5,326 |
| 1997 | $  8,827 |
| 1998 | $ 11,526 |
| 1999 | $ 16,787 |
| 2000 | |
| First quarter | $ 18,289 |
| Second quarter | $ 18,714 |

Source: Superintendencia de AFJP.

The growth in pension fund assets during these periods is due both to the increase in the number of employees participating in the pension system and to the ongoing contributions of participants.

## PUBLIC SECTOR DEBT

### Overview

Argentina's total gross public debt has increased from U.S.$87.1 billion (33.8% of GDP) in 1995 to U.S.$121.9 billion (43.1% of GDP) in 1999 as a result of an increase in the fiscal deficit, increased amortization payments and consolidation of previously incurred debt. As of June 30, 2000, 75.1% of the total gross public debt was owed to bondholders (including commercial bank bondholders), 20.0% to multilateral and governmental creditors and the rest to suppliers and other creditors. Argentina's public sector debt is financed primarily through the issuance of debt denominated in foreign currencies. As of June 30, 2000, total net public debt (net of total Government financial assets related to debt operations) was U.S.$121.9 billion and total gross public debt was U.S.$123.5 billion. As of June 30, 2000, U.S.$117.4 billion of total gross public debt was denominated in currencies other than the peso, principally in U.S. dollars.

Prior to 1993, Argentina experienced a number of external payment crises. As a result, Argentina negotiated various debt restructuring programs. Since 1993, Argentina has made all payments with respect to its domestic and foreign currency denominated debt on a timely basis. Argentina has instituted and intends to maintain various efforts to manage its debt portfolio in order to improve yield and maturity profiles. The Republic has used proceeds from certain debt issue to buy back outstanding debt through a variety of methods, including public auctions in Argentina and repurchases of debt securities in the international open markets. Nonetheless, Argentina's debt burden remains high.

The following table sets forth figures for Argentina's public sector debt for the periods indicated.

### Public Debt

|  | As of December 31, | | | | | As of June 30, 2000 |
|---|---|---|---|---|---|---|
|  | 1995 | 1996 | 1997 | 1998 | 1999 |  |
|  | (millions of dollars except as noted) | | | | | |
| Peso-denominated public debt(1) | $ 5,882 | $ 8,168 | $ 10,286 | $ 8,988 | $ 8,137 | $ 6,132 |
| Foreign currency denominated public debt | 81,209 | 88,937 | 90,815 | 103,389 | 113,740 | 117,390 |
| Collateral and other financial assets(2) | (3,543) | (3,450) | (2,984) | (6,852) | (2,483) | (1,669) |
| Net foreign currency denominated debt | 77,666 | 85,487 | 87,831 | 96,537 | 111,257 | 115,721 |
| Total net public debt | 83,548 | 93,655 | 98,117 | 105,505 | 119,394 | 121,853 |
| Total gross public debt | $ 87,091 | $ 97,105 | $101,101 | $112,357 | $121,877 | $123,522 |
| Total gross public debt as % of GDP | 33.8% | 35.7% | 34.5% | 37.7% | 43.1% | N/A |

(1) Figures for 1995 and 1996 include only public bonds denominated in pesos. Beginning in 1997, figures include all types of debt denominated in pesos.

(2) Figures for 1995 to 1997 include only collateral for Brady Bonds. Figures for 1998, 1999 and June 30, 2000 include collateral for Brady Bonds and other financial assets.

Source: Ministry of Economy.

The following table sets forth a summary of the foreign public debt of Argentina by currency of denomination.

**Summary of Public Debt Denominated in Foreign Currency, By Currency**

|  | As of December 31, | | | | | As of June 30, 2000 |
|---|---|---|---|---|---|---|
|  | 1995 | 1996 | 1997 | 1998 | 1999 | |
|  | (millions of dollars) | | | | | |
| U.S. Dollars | $54,854 | $58,547 | $ 65,923 | $ 71,848 | $ 80,692 | $ 79,146 |
| Euros | -- | -- | -- | -- | 23,743 | 31,929 |
| Deutsche Marks | 6,540 | 9,429 | 10,543 | 11,800 | -- | -- |
| Japanese Yen | 5,512 | 5,767 | 6,818 | 7,130 | 7,200 | 5,375 |
| Other | 14,303 | 15,194 | 7,532 | 12,638 | 2,105 | 940 |
| Total | $ 81,209 | $88,937 | $ 90,816 | $103,389 | $113,740 | $117,390 |

Source: Ministry of Economy.

55

The following table sets forth outstanding foreign debt for the dates indicated.

### Public Debt Denominated in Foreign Currencies

| | As of December 31, | | | | | As of June 30, 2000 |
|---|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1998 | 1999 | |
| | (millions of dollars) | | | | | |
| IMF | $ 6,120 | $ 6,279 | $ 5,908 | $ 5,420 | $ 4,472 | $ 3,757 |
| World Bank and IADB | 9,253 | 10,072 | 10,865 | 13,676 | 15,804 | 15,766 |
| Fonplata | 11 | 15 | 17 | 19 | 29 | 30 |
| FIDA | 0 | 0 | 0 | 7 | 7 | 6 |
| Paris Club(1) | 8,038 | 6,725 | 5,144 | 4,512 | 3,235 | 2,771 |
| Bonds | 52,458 | 60,673 | 64,554 | 73,706 | 83,588 | 88,224(2) |
| Other | | | | | | |
| Other bilaterals | 3,576 | 3,437 | 2,960 | 2,943 | 2,682 | 2,432 |
| Suppliers | 437 | 283 | 731 | 628 | 641 | 1,307 |
| Private banks | 1,316 | 1,452 | 1,423 | 628 | 641 | 4,640 |
| Total | 5,329 | 5,172 | 5,114 | 3,646 | 5,029 | 8,379 |
| Gross public debt(3) | 81,200 | 88,936 | 91,602 | 7,217 | 8,353 | 118,933 |
| Collateral and other financial assets(4) | (3,543) | (3,450) | (2,984) | 104,557 | 115,487 | |
| Net public debt | $ 77,666 | $ 85,486 | $ 88,618 | (6,852) | (10,937) | (9,822) |
| | | | | $ 97,705 | $104,550 | $109,111 |

(1) Does not include interest capitalized pursuant to an agreement in Round 5 of Paris Club negotiations, whereby the Paris Club creditors consented to capitalize interest on certain Paris Club indebtedness until March 1995. Such interest amounted to U.S.$519 million from the end of 1993 until March 1995 and U.S.$109 million from the end of 1994 until March 1995.

(2) Includes capitalized interest from Bocones and Botesos and coupons from Bonex for U.S.$30.5 million, which were payable but not redeemed as of June 30, 2000.

(3) Includes World Bank, IMF and IADB peso-denominated public debts, which could not be separated from foreign currency denominated public debt.

(4) The principal of the Par and Discount Bonds has been collateralized with U.S. Treasury Zero Coupon Bonds and Kreditanstalt für Wiederaufbau Zero Coupon obligations. In addition, 12 months of interest payments for the Par and Discount bonds denominated in U.S. dollars are fully collateralized while the Deutsche Mark Par and Discount Bonds are collateralized for less than 12 months of interest payments. Figures from 1998 on include collateral for Brady Bonds and other financial assets.

Source: Ministry of Economy.

56

The following table sets forth a list of Argentine public bonds denominated in foreign currencies outstanding as of June 30, 2000.

### Public Bonds Denominated in Foreign Currencies (1)

| | Public Sector Holdings (1) | Private Sector Holdings | Principal Amount | Amortizations | Outstanding Principal Amount |
|---|---|---|---|---|---|
| | | | (millions of dollars) | | |
| BONEX 92 ............................................. | $ 1,030.8 | $ 692.5 | $ 1,723.3 | $ 1,077.1 | $ 646.2 |
| BOCON 1st Series (Pensioners)(2) ......... | 139.3 | 2,509.0 | 3,517.5 | 2,780.3 | 737.1 |
| BOCON 2nd Series (Pensioners)(2)........ | 74.2 | 2,176.6 | 3,018.2 | 1,318.4 | 1,699.7 |
| BOCON 1st Series (Suppliers)(2)........... | 2.9 | 1,116.6 | 1,486.9 | 474.3 | 1,012.7 |
| BOCON 2nd Series (Suppliers)(2).......... | | 688.5 | 937.0 | | 937.0 |
| BOCON 3rd Series (Suppliers) .............. | | 360.7 | 360.7 | | 360.7 |
| BONHID(2)........................................... | 1.1 | 46.2 | 63.9 | 9.7 | 54.2 |
| Bontes................................................... | 266.5 | 12,353.8 | 12,620.3 | | 12,620.3 |
| Bonos-Pagare........................................ | | 1,525.2 | 1,525.2 | 190.4 | 1,334.8 |
| Ferrobonos............................................ | | 5.5 | 5.5 | | 5.5 |
| Government Floating Rate Bond............. | | 1,184.0 | 1,184.0 | | 1,184.0 |
| Par Bonds ............................................. | 624.9 | 4,204.4 | 4,829.3 | | 4,829.3 |
| Discount Bonds ..................................... | 126.9 | 1,464.5 | 1,591.4 | | 1,591.4 |
| Floating Rate Bonds ............................. | 508.1 | 5,803.9 | 6,312.0 | 1,139.4 | 5,172.6 |
| Global Bond 2027 ................................. | 0.0 | 3,535.1 | 3,535.1 | | 3,535.1 |
| Global Bond 2019 ................................. | | 1,433.5 | 1,433.5 | | 1,433.5 |
| Global Bond 2017 ................................. | 0.5 | 4,574.5 | 4,575.0 | | 4,575.0 |
| Global Bond 2009 ................................. | | 1,750.0 | 1,750.0 | | 1,750.0 |
| Global Bond 2006 ................................. | | 1,300.0 | 1,300.0 | | 1,300.0 |
| Global Bond 2005 ................................. | | 1,000.0 | 1,000.0 | | 1,000.0 |
| Global Bond 2003 ................................. | 117.0 | 1,933.0 | 2,050.0 | | 2,050.0 |
| Global Bond 2001 ................................. | | 1,200.0 | 1,200.0 | | 1,200.0 |
| Global Bond 2020 ................................. | | 1,250.0 | 1,250.0 | | 1,250.0 |
| Global Bond 2010 ................................. | | 1,000.0 | 1,000.0 | | 1,000.0 |
| Global Bond 2015 ................................. | | 2,402.7 | 2,402.7 | | 2,402.7 |
| Global Bond/Zero Cupon ....................... | | 1,248.2 | 1,248.2 | | 1,248.2 |
| Eurobonds and other external bonds....... | | 28,511.9 | 28,511.9 | | 28,511.9 |
| Spanish Bonds ...................................... | | 54.7 | 54.7 | | 54.7 |
| API and Now Money Notes.................... | | 4.0 | 4.0 | 0.1 | 3.8 |
| Pyme bond ............................................ | | 0.7 | 0.7 | | 0.7 |
| Letes .................................................... | | 4,693.0 | 4,693.0 | | 4,693.0 |
| Total(3)............................................ | $ 2,892.1 | $ 90,022.7 | $ 95,183.9 | $ 6,989.7 | $ 88,194.1 |

(1) Amounts held by Government agencies and the Central Bank.
(2) Public Sector Holdings and Private Sector Holdings do not equal the Principal Amount because the Principal Amount includes capitalized interest.
(3) Includes capitalized interest from Bocones and Botesos, but excludes U.S.$30.5 million of coupons from Bonex, which were payable but not redeemed.

Source: Ministry of Economy.

57

The following table summarizes the amortization schedule of Argentina's public sector foreign debt outstanding as of June 30, 2000.

### Amortization of Total Public Sector Foreign Currency Debt(1)

| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006-2029 |
|---|---|---|---|---|---|---|
| | | | (millions of dollars) | | | |
| **Bonds Denominated in European Currencies and Japanese Yen** | | | | | | |
| Eurobonds (Austrian Schillings) | $ 120 | | | $ 68 | | |
| Eurobonds (Swiss Francs) | | | 184 | | | |
| Eurobonds (Deutsche Marks) | | 482 | 662 | 722 | 843 | 2,107 |
| Par Bonds (Deutsche Marks) | | | | | | 137 |
| Discount Bonds (Deutsche Marks) | | | | | | 136 |
| Eurobonds (Spanish Pesetas) | | 113 | | | | |
| Eurobonds (Euros) | 801 | 801 | 1,837 | 2,402 | 1,319 | 5,118 |
| Eurobonds (British Pounds) | 152 | | | | | 303 |
| Eurobonds (Italian Lira) | 243 | | 243 | 790 | 486 | 1,022 |
| Eurobonds (Japanese Yen) | 847 | 471 | 188 | 1,035 | 471 | 386 |
| **Bonds Denominated in U.S. Dollars** | | | | | | |
| API | | | | | | |
| BOCON Prev. 1 | 298 | | | | | 2 |
| BOCON Prev. 2 | 751 | 569 | | | | |
| BOCON Prov. 1 | 148 | 148 | 148 | 148 | 148 | 197 |
| BOCON Prov. 2 | 75 | 78 | 78 | 78 | 78 | 450 |
| BOCON Prov. 3 | 39 | 52 | 52 | 52 | 52 | 77 |
| BONEX 92 | 215 | 222 | | | | |
| Spread adjusted notes | | 311 | | | | |
| Capitalizable | | | | | | 2561 |
| Spanish Bond | | | | | | 55 |
| BCRH | | | | | | |
| Bond Floating Rate Note | 6 | 6 | 6 | 6 | 6 | 19 |
| Bono 2029 | | | | | 1,000 | |
| Bonos-Pagare | | | | 4 | 4 | 100 |
| Bono YPF | 934 | 173 | | | | |
| Bonte 2001 | | 222 | 296 | 296 | 296 | 74 |
| Bonte 2002 | 1,271 | | | | | |
| Bonte 2003 | | 2,767 | | | | |
| Bonte 2003 | | | 1,694 | | | |
| Bonte 2004 | | | 1,091 | | | |
| Bonte 2005 | | | | 2,898 | | |
| Bonte 2027 | | | | | 1,772 | |
| Euroletra 2004 | | | | | | 1,128 |
| FRB | | | | 300 | | |
| Global Bond 2001 | 1,035 | 1,035 | 1,035 | 1,035 | 517 | |
| Global Bond 2003 | 1,200 | | | | | |
| Global Bond 2005 | | | 2,050 | | | |
| Global Bond 2006 | | | | | 1,000 | |
| Global Bond 2009 | | | | | | 1,300 |
| Global Bond 2010 | | | | | | 1,750 |
| Global Bond 2017 | | | | | | 1,000 |
| Global Bond 2015 | | | | | | 4,575 |
| Global Bond 2019 | | | | | | 2,403 |
| Global Bond 2020 | | | | | | 1,433 |
| Global Bond 2027 | | | | | | 1,250 |
| Discount | | | | | | 3,535 |
| Par | | | | | | 1,456 |
| Ferrobono | | | | | | 4,692 |
| Zero Coupon | | | | | | 6 |
| | 458 | 202 | 181 | 161 | | 0 |
| Total Bonds | 8,593 | 7,651 | 9,745 | 9,997 | 7,992 | 37,270 |
| **International Organizations** | | | | | | |
| Paris Club | 405 | 278 | 180 | 227 | 274 | 1,064 |
| Other bilaterals | 321 | 308 | 297 | 292 | 265 | 774 |

58

| Other Creditors | | | | | | |
|---|---|---|---|---|---|---|
| Provedores | 102 | 86 | 74 | 79 | 76 | 162 |
| Commercial Banks | 1,789 | 560 | 370 | 390 | 325 | 365 |
| BID | 417 | 1,507 | 1,148 | 506 | 467 | 2,917 |
| BIRF | 711 | 1,915 | 1,444 | 801 | 748 | 2,645 |
| FONPLATA | 6 | 5 | 4 | 3 | 3 | 6 |
| FIDA | 1 | 1 | 1 | 1 | 1 | 1 |
| FMI | 1,239 | 767 | 430 | 343 | 257 | 29 |
| Total Foreign Currency Debt | $ 13,585 | $ 13,079 | $ 13,693 | $ 12,637 | $ 10,408 | $ 45,233 |

(1)   Does not include debt pending consolidation nor guarantees given to debtors outside the non-financial public sector.
*Source:* Ministry of Economy.

## Debt Management Policy

Since 1996, Argentina has based its debt management policy on the following objectives:

- extending the debt amortization schedule,

- diversifying the sources of funding and increasing the base of investors,

- adopting a policy of pre-financing in order to reduce risks associated with the roll-over of existing debt maturities and

- developing the local market.

Argentina has engaged in several transactions designed to extend its debt amortization schedule and to reduce, in net terms, the amount of outstanding debt. In September 1997, Argentina participated in an exchange offer whereby it acquired:

- an aggregate original principal amount of approximately U.S.$1.77 billion in Par Bonds, U.S.$176.0 million in Discount Bonds and U.S.$305.0 million in Floating Rate Bonds in exchange for 9.75% Global Bonds due 2027 (the "2027 Bonds") and

- an aggregate original principal amount of approximately U.S.$25.0 million in Par Bonds and U.S.$114.0 million in Discount Bonds in exchange for cash.

In June 1998, Argentina participated in an exchange offer whereby it acquired an aggregate original principal amount of approximately U.S.$825.7 million in Par Bonds and U.S.$43.2 million in Discount Bonds in exchange for U.S.$685.1 million in 2027 Bonds.

In May 1999, Argentina participated in an exchange offer in which it acquired an aggregate original principal amount of approximately U.S.$3.8 billion of mainly local bonds and Floating Rate Bonds in exchange for an aggregate original principal amount of U.S.$2.4 billion in 11.25% Bontes due 2004 and approximately U.S.$1 billion in 9.5% Bontes due 2001.

In June 2000, Argentina participated in an exchange offer in which it acquired an aggregate principal amount of approximately U.S.$1,904.4 million in Par Bonds, U.S.$1,082.1 million in Discount Bonds and U.S.$316.9 million in Floating Rate Bonds in exchange for a combination of a U.S. dollar amount in cash and an aggregate principal amount of approximately U.S.$2.4 billion in 11.75% Global Bonds due 2015.

## Description of Debt and Debt Restructuring

Argentina experienced a number of external payment crises between the 1930s and the early 1990s, reflecting, among other things:

- adverse changes in terms of trade,

- relatively large debt burdens and

- the failure of the domestic economy to adjust rapidly and fully to international shocks such as the rapid increase in real interest rates experienced in the 1980s.

Total foreign indebtedness expanded significantly under the military regimes of the late 1970s and early 1980s. At the end of 1983, when the civilian Government of Raúl Alfonsín took office, total foreign debt was U.S.$45 billion, more than double the level in the late 1970s. During the 1980s, private sector foreign debt was effectively assumed by the Government when the Government was unable to honor the terms of foreign exchange insurance programs initiated in 1981.

### Commercial Banks

In 1985 and in 1987, Argentina negotiated the restructuring of U.S.$34.7 billion of debt owed to commercial bank creditors. In addition to the banks extending new loans in the aggregate amount of approximately U.S.$3 billion, two small bond issues emerged from this restructuring: "new money bonds" and "alternative participation instruments" (APIs), of which an aggregate total of approximately U.S.$3.8 million was outstanding as of June 30, 2000. Interest payments to bank creditors ceased in April 1988 and resumed on a partial basis until the refinancing of medium- and long-term commercial bank debt constructed under the Brady Plan (as described below).

Since 1990, approximately U.S.$15.4 billion of Government debt, primarily commercial bank debt, has been tendered in connection with privatizations. See "The Argentine Economy—Deregulation of the Economy and Privatizations—Privatizations."

### The Brady Plan

In April 1992, Argentina announced a new refinancing agreement under the Brady Plan relating to medium- and long-term debt owed to commercial banks. The Brady Plan applied to an estimated U.S.$28.5 billion of debt, including an estimated U.S.$9.2 billion of interest in arrears. The Brady Plan effected a reduction of approximately U.S.$3 billion in the face amount of Argentina's foreign debt, as well as a reduction of 35% in the net present value of interest payments.

Over 96% of the commercial bank debt was refinanced pursuant to the Brady Plan. The Brady Plan provided for the issuance of Par Bonds, Discount Bonds and Floating Rate Bonds and a cash payout of U.S.$700 million in exchange for previously outstanding commercial bank debt of U.S.$28.5 billion, which included U.S.$9.2 billion of interest in arrears. The Par Bonds:

- were issued in an aggregate principal amount of U.S.$12.5 billion and DM284 million,

- have a 30-year maturity and

- pay interest at fixed rates rising from 4% to 6% in the seventh year, in the case of the U.S. dollar Par Bonds, and at a constant fixed rate of 5.87% for the Deutsche Mark Par Bonds.

The Discount Bonds:

- were issued in an aggregate principal amount of U.S.$4.1 billion and DM282 million,

- have a 30-year maturity and

- pay interest at the rate of LIBOR for the relevant currency plus 0.813%.

The payment of the principal amount on the Par Bonds and the Discount Bonds at maturity is secured with U.S. Treasury and *Kreditanstalt für Wiederaufbau* Zero Coupon obligations. Interest payments for both the Par Bonds and the Discount Bonds denominated in U.S. dollars were collateralized up to an amount equivalent to 12 months' interest. Interest payments for the Deutsche Mark Par and Discount Bonds were collateralized up to an amount equivalent to less than 12 months' interest. The Floating Rate Bonds:

- were issued in a total amount of U.S.$8.5 billion,

- carry an interest rate of 0.813% over six-month LIBOR and

- pay principal over a 12-year period.

As of June 30, 2000, U.S.$4.8 billion in aggregate original principal amount of Par Bonds, U.S.$1.6 billion in aggregate original principal amount of Discount Bonds and U.S.$5.2 billion in aggregate original principal amount of Floating Rate Bonds remained outstanding.

### IMF, IADB and World Bank

The IMF, the IADB and the World Bank have provided financial support conditional on the Government's compliance with stabilization and reform policies. The IMF has established performance criteria aimed at strengthening the fiscal situation and long-term solvency of Argentina. These criteria include limiting the expansion of domestic credit, limiting the accumulation of new debt denominated in foreign currencies and maintaining or increasing net international reserves. Generally, the World Bank and the IADB have made funding conditional on compliance with IMF criteria as well as other conditions.

### IMF

The Government has entered into several agreements with the IMF since 1990. See "Public Sector Finances—Public Sector Accounts." The total outstanding amount of Argentina's indebtedness to the IMF as of June 30, 2000 was U.S.$3.8 billion. The IMF reviews compliance with loan facilities on a quarterly basis. The first, third and fourth standby agreements were not fully disbursed due to non-compliance with performance criteria. Under the first four standby agreements, a total of 4.8 billion in Special Drawing Rights ("SDRs") was disbursed. The fifth standby agreement authorized drawings of up to SDR 780 million to support the Government's stabilization and reform program through June 1992. On March 31, 1992, the IMF approved a three-year SDR 2.48 billion extended fund facility that replaced the fifth standby agreement.

The sixth standby agreement was approved by the IMF on April 12, 1996 and authorized drawings up to SDR 720 million over the following 21 months. On September 16, 1996, the Government and the IMF agreed to a performance waiver with respect to the federal deficit target for 1996 and established new deficit targets for 1996 and 1997 of U.S.$6 billion and U.S.$4.5 billion, respectively.

On December 20, 1996, the Government entered into its seventh standby agreement with the IMF, which established new targets for net interest expenditures, a reduction of net domestic assets and new fiscal targets.

On February 4, 1998, the IMF approved the 1998 Extended Fund Facility for Argentina for the period 1998 through 2000 in the amount of U.S.$2.8 billion. Among other targets, the accord between the IMF and Argentina required that Argentina not exceed a public fiscal deficit of U.S.$3.85 billion for 1998. In addition, the agreement provided that if the twelve-month cumulative trade deficit of Argentina exceeded U.S.$5.0 billion, the Government, in consultation with the IMF, would take appropriate corrective fiscal and credit policy measures. During January 1998, Argentina recorded a trade deficit of U.S.$0.9 billion, raising the cumulative twelve-month merchandise trade deficit to approximately U.S.$5.4 billion. As a result, representatives of the IMF met with the Government in late March and early April 1998 but decided that no specific corrective measures needed to be taken at that time. Representatives of the IMF and the Government met in July 1998 and decided once again that no specific corrective measures needed to be taken at that time. Argentina met the fiscal targets agreed with the IMF under the 1998 Extended Fund Facility. Argentina reserved the 1998 Extended Fund Facility for use in special or urgent circumstances and did not draw down on this facility.

A letter of intent for 1999 was submitted to the board of directors of the IMF in January 1999. According to that letter, the Government expected a fiscal deficit, excluding privatization proceeds, of U.S.$2.95 billion during 1999. In May 1999, the IMF and Argentina agreed to amend the letter of intent for 1999. The amended letter established the following targets for 1999:

- a fiscal deficit of the Federal Government not to exceed U.S.$5.1 billion,

- a ceiling of U.S.$37.6 billion on non-interest expenditures of the Federal Government,

- a reduction in the Central Bank's domestic assets by no less than U.S.$0.7 billion,

- a limit on the increase in the public sector debt to no more than U.S.$6.2 billion and

- a limit on the increase in short term public sector debt to no more than U.S.$1 billion.

On March 10, 2000, the International Monetary Fund approved a three-year credit facility of approximately U.S.$7.4 billion for Argentina. This credit facility replaces the U.S.$2.8 billion 1998 Extended Fund Facility. The terms of the U.S.$7.4 billion credit facility require Argentina to meet certain quarterly targets with respect to levels of public indebtedness and the reduction of its fiscal deficit. As of June 30, 2000, Argentina had met all such targets. Argentina has reserved this three-year credit facility for use in special or urgent circumstances and does not otherwise intend to draw down on this facility in the normal course of operations.

*World Bank*

The World Bank approved loans to Argentina totaling U.S.$1.3 billion in 1995, U.S.$946 million in 1996 and U.S.$1.2 billion in 1997 to support a variety of projects, including:

- structural reforms of the health system,

- environmental protection,

- improvement of provincial roads,

- the transfer of provincial social security systems to the national system and

- measures to combat unemployment.

As of August 31, 1998, the World Bank had approved an additional U.S.$392 million in loans for provincial structural reforms and improvement of agricultural production. As of August 31, 1998, the World Bank had disbursed approximately U.S. $4.5 billion of these loans to Argentina. During 1999 and the first half of 2000, the World Bank disbursed an additional U.S.$1.9 billion to Argentina.

On November 10, 1998, the World Bank approved two loans to Argentina in an aggregate principal amount of approximately U.S.$3 billion. Argentina may draw down the first loan, in the amount of U.S.$2.5 billion, in three installments. Argentina drew down U.S.$1 billion in the third quarter of 1998 and drew down an additional U.S.$1 billion during the third quarter of 1999 and may draw down the remaining U.S.$500 million during the third quarter of 2000. Argentina has applied the proceeds of this loan towards meeting the financing requirements of the Argentine Treasury and to enhance the standby repurchase facility of Central Bank by providing it with additional funds to be used towards meeting margin calls. In addition, during 1999, the World Bank approved loans to Argentina of U.S.$689 million. As of September 21, 2000, U.S.$27.9 million of these loans had been disbursed.

*IADB*

During 1994, the IADB approved loans to Argentina in excess of U.S.$1.1 billion to refinance projects relating to water, utilities, energy, sanitation, agricultural development, education and health. During 1995, the IADB granted loans in the amount of U.S.$1.3 billion, U.S.$500 million of which was used to support a fiduciary fund to finance reforms in the financial sector. In 1996 and 1997, the IADB approved approximately U.S.$470 million and U.S.$1.1 billion in loans, respectively, primarily to combat unemployment and to support social security reforms in the provincial areas and financial and social reforms of provincial governments. As of August 31, 1998, the IADB had approved an additional U.S.$636 million in loans to Argentina, primarily to finance environmental protection, urban renewal projects and reform of the judicial system. As of August 31, 1998, the IADB had disbursed approximately U.S.$2.3 billion of these loans to Argentina. During 1999 and the first half of 2000, the IADB disbursed to Argentina an additional U.S.$1.4 billion.

62

In December 1998, the IADB approved a loan to Argentina in an aggregate principal amount of U.S.$2.0 billion. The IADB disbursed U.S.$1.0 billion of that loan during the fourth quarter of 1998, an additional U.S.$600 million during the third quarter of 1999 and the remaining U.S.$400 million during the third quarter of 2000. Argentina applied the proceeds of this loan towards meeting the financing requirements of the Argentine Treasury. In addition, during 1999, the IADB approved loans to Argentina of U.S.$698.5 million. During the first half of 2000, the IADB approved loans to Argentina of U.S.$105 million. As of June 30, 2000, only U.S.$7.7 million of these loans had been disbursed.

*Paris Club*

Argentina restructured debt due to the Paris Club, a group of sovereign creditors, in four separate agreements in 1985, 1987, 1989 and 1991. For the bulk of these agreements, new maturities averaged 10 years, with average grace periods of approximately five and one-half years. On July 21, 1992, Paris Club creditors agreed to reschedule part of the principal and interest payments falling due from July 1992 to March 1995. Argentina will repay the U.S.$2.7 billion rescheduled under this arrangement over a 13-year period, which began in May 1996, with a rising amortization schedule. The amounts rescheduled under the 1992 agreement and the previous agreements totaled an aggregate amount of U.S.$9.0 billion. As of June 30, 2000, Argentina had U.S.$2.8 billion in debt outstanding to Paris Club creditors and had made all payments to Paris Club creditors on a timely basis.

*Bonex*

Bonex are 10-year, LIBOR based, U.S. dollar denominated bonds that pay interest semi-annually and principal annually. Argentina has always paid scheduled interest and principal payments on Bonex fully and promptly. Bonex are quoted on the Buenos Aires Stock Exchange and the over-the-counter market and may be transferred freely within and outside Argentina. The approximately U.S.$0.6 billion Bonex outstanding as of June 30, 2000 consists entirely of Bonex 92, the proceeds of which were allocated primarily to the Central Bank as well as to other public sector entities for capitalization purposes.

*Euro and Other External Bonds*

During 1999, Argentina raised U.S.$11.9 billion of debt issued in the form of external bonds, including U.S. dollar-denominated global bonds, euro-denominated bonds and yen-denominated bonds.

Between January 1, 2000 and September 18, 2000, Argentina issued (or received commitments for) U.S.$18.9 billion of debt (including U.S.$5.4 billion of debt issued under exchange offers), including:

- U.S.$6.3 billion of U.S. dollar-denominated global bonds (including U.S.$2.4 billion of debt issued under an exchange offer);

- U.S.$4.9 billion of euro-denominated bonds;

- U.S.$1.1 billion of yen-denominated bonds; and

- U.S.$6.6 billion of debt issued in the domestic market in the form of *Bonos del Tesoro* (including U.S.$3.0 billion *Bonos del Tesoro* issued under an exchange), *Pagare-Bonos* and a net increase in the stock of *Letras de Tesorería*.

The following table sets forth outstanding Eurobonds and other external bonds as of September 28, 2000 issued by Argentina in foreign markets since 1995.

## Outstanding Eurobonds and Other External Bonds

| Year | Principal Amount (millions) |
|------|-----------------------------|
| **1995** | |
| 9.25% Notes due 2000 ................................................ | DM 1,000 |
| 10.5% Bonds due 2002 ................................................ | DM 1,000 |
| **1996** | |
| 10.25% Bonds due 2003 ................................................ | DM 1,000 |
| 9.25% Global Bonds due 2001 ................................................ | U.S.$ 1,000 |
| 13.25% Bonds due 2001(1) ................................................ | ITL 500,000 |
| 7.4% Bonds due 2006(1) ................................................ | Yen 23,000 |
| 11.25% Bonds due 2006 ................................................ | DM 1,000 |
| 9.0% Bonds due 2001(1) ................................................ | ATS 1,750 |
| 5.5% Bonds due 2001(1) ................................................ | Yen 90,000 |
| 11.75% Bonds due 2011 ................................................ | DM 1,000 |
| 11.5% Bonds due 2001 ................................................ | GBP 100 |
| 12.0% Bonds due 2016 ................................................ | DM 375 |
| 9.0% Bonds due 2003 ................................................ | DM 375 |
| 1.0% Bonds due 2006 ................................................ | U.S.$ 1,000 |
| 1.0% Bonds due 2003(1) ................................................ | ITL 500,000 |
| 1.0% Bonds due 2005(1) ................................................ | Yen 50,000 |
| 11.75% Bonds due 2026(1) ................................................ | DM 500 |
| 7.0% Bonds due 2003 ................................................ | SFr. 200 |
| 5.0% Bonds due 2002 ................................................ | Yen 50,000 |
| 8.5% Bonds due 2005 ................................................ | DM 1,000 |

| Year | Principal Amount (millions) |
|------|------------------------------|
| **1997** | |
| 10.0% Bonds due 2007(1) ............................................ | ITL 600,000 |
| 11.75% Bonds due 2017 .............................................. | U.S.$ 2,000 |
| 11.75% Bonds due 2007(1) ........................................... | ARP 500 |
| 7.0% Bonds due 2004 ................................................ | DM 1,500 |
| 7.0% Bonds due 2004(1) ............................................. | ATS 1,000 |
| 7.5% Bonds due 2002 ................................................ | ESP 20,000 |
| 4.4% Bonds due 2004(1) ............................................. | Yen 50,000 |
| Floating Rate Bonds due 2004(1) .................................... | ITL 500,000 |
| 10.0% Bonds due 2007(1) ............................................ | GBP 200 |
| 8.75% Bonds due 2002(1) ............................................ | ARP 500 |
| Reopening of 8.375% Global Bonds due 2003 .......................... | U.S.$ 500 |
| 10.0% Bonds due 2007(1) ............................................ | ITL 750,000 |
| 9.75% Bonds due 2027 ............................................... | U.S.$ 2,250 |
| 9.25% Bonds due 2004(1) ............................................ | ITL 750,000 |
| 9.0% Bonds due 2004(1) ............................................. | ITL 375,000 |
| 3.0% Bonds due 2009 ................................................ | DM 1,000 |
| 3.0% Notes due 2000(1) ............................................. | ITL 300,000 |
| 9.5% Bonds due 2002 ................................................ | U.S.$ 500 |
| **1998** | |
| 8.75% Notes due 2003(1) ............................................ | EURO 400 |
| Step-Down Notes due 2008(1) ........................................ | DM 1,500 |
| Reopening of 9.75% Bonds due 2027 .................................. | U.S.$ 500 |
| Step-Down Notes due 2009(1) ........................................ | ITL 750,000 |
| Step-Down Notes due 2008 ........................................... | NLG 500 |
| Step-Down Notes due 2008 ........................................... | FRR 1,500 |
| Reopening of 11.75% Global Bonds due 2017 .......................... | U.S.$ 750 |
| Floating Rate Adjustable Notes due 2005 ............................ | U.S.$ 1,000 |
| 8.125% Bonds due 2008 .............................................. | EURO 750 |
| Reopening of 9.25% Global Bonds due 2001 ........................... | U.S.$ 200 |
| Zero Coupon Bonds due 2028 ......................................... | EURO 750 |
| Reopening of 9.75% Global Bonds due 2027 ........................... | U.S.$ 685 |
| Step-Up Notes due 2010 ............................................. | DM 1,000 |
| Floating Rate Bonds due 2005(1) .................................... | ITL 1,000,000 |
| 7.875% Bonds due 2005 .............................................. | DM 750 |
| 8.5% Bonds due 2010(1) ............................................. | EURO 500 |
| Reopening of 8.375% Global Bonds due 2003 .......................... | U.S.$ 300 |
| Reopening of 11.375% Global Bonds due 2017 ......................... | U.S.$ 250 |
| Step-Down Notes due 2003(2) ........................................ | DM 500 |
| Reopening of 11.375% Global Bonds due 2006 ......................... | U.S.$ 300 |
| Reopening of 7.0% Bonds due 2003 ................................... | CHF 100 |
| 11.0% Global Bonds due 2005(3) ..................................... | U.S.$ 1,000 |
| Reopening of 11.375% Bonds due 2017 ................................ | U.S.$ 375 |
| **1999** | |
| 11.375% Bonds due 2017 ............................................. | U.S.$ 200 |
| 8.0% Bonds due 2002 ................................................ | EURO 100 |
| Reopening of 8.0% Bonds due 2002 ................................... | EURO 50 |
| 12.125% Bonds due 2019 ............................................. | U.S.$ 1,000 |
| Step-Down Bonds due 2008 ........................................... | EURO 350 |
| 8.875% Bonds due 2029 .............................................. | U.S.$ 125 |
| 5% Bonds due 2004 .................................................. | EURO 300 |
| Reopening of 9.5% Bonds due 2004 .................................. | EURO 100 |
| Step-Down Bonds Due 2008 ........................................... | EURO 250 |
| Floating Rates Notes due 2004(1) ................................... | U.S.$ 300 |
| 9.0% Bonds due 2006 ................................................ | EURO 450 |
| 9.0% Bonds due 2009 ................................................ | EURO 500 |

65

| Year | Principal Amount |
|------|------------------|
| | (millions) |
| 9.0% Bonds due 2009 .................................................... | EURO 150 |
| 11.75% Bonds due 2009 .................................................. | U.S.$ 1,000 |
| 11.75% Bonds due 2009 .................................................. | U.S.$ 500 |
| 11.75% Bonds due 2009 .................................................. | U.S.$ 250 |
| Step Down Bonds due 2004(1) ......................................... | EURO 250 |
| Step Down Bonds due 2004(1) ......................................... | EURO 150 |
| 7.125% Notes due 2002(1) .............................................. | EURO 200 |
| 8.5% Bonds due 2004 .................................................... | EURO 250 |
| 8.5% Bonds due 2004 .................................................... | EURO 100 |
| Floating Rate Notes due 2003 ......................................... | EURO 100 |
| 8.5% Bonds due 2004 .................................................... | EURO 200 |
| 3.5% Bonds due 2009(1) ................................................. | JPY 18,000 |
| 8.5% Bonds due 2001 .................................................... | EURO 250 |
| Reopening of 8.5% Bonds due 2001 .................................. | EURO 100 |
| Reopening of 8.5% Bonds due 2004 .................................. | EURO 100 |
| Reopening of 8.5% Bonds due 2001 .................................. | EURO 100 |
| Reopening of 8.75% Bonds due 2003(1) ............................ | EURO 200 |
| Floating Rate Bonds due 2004(1) .................................... | EURO 200 |
| 7.3% Bonds due 2001 .................................................... | EURO 150 |
| 7.3% Bonds due 2001 .................................................... | EURO 150 |
| 9.25% Bonds due 2002 ................................................... | EURO 250 |
| 9.25% Bonds due 2003 ................................................... | EURO 250 |
| 9.75 Bonds due 2003 .................................................... | EURO 250 |
| 10% Bonds due 2004 ..................................................... | EURO 300 |
| 10% Bonds due 2004 ..................................................... | EURO 100 |
| Zero Coupon Bonds of various maturities ......................... | U.S.$ 1,500 |
| 11.375% Bonds due 2017 ............................................... | U.S.$ 500 |
| **2000** | |
| 10% Bonds due 2005(1) ................................................. | EURO 250 |
| Reopening of 10% Bonds due 2005(1) .............................. | EURO 400 |
| 8.125% Bonds due 2004(1) ............................................ | EURO 500 |
| 9% Bonds due 2005(1) ................................................... | EURO 750 |
| 9% Bonds due 2004(1) ................................................... | EURO 500 |
| 10.25% Bonds due 2007(1) ............................................ | EURO 750 |
| 9% Bonds due 2003 ...................................................... | EURO 1,000 |
| 10.25% Bonds due 2030 ................................................. | U.S.$ 1,250 |
| Reopening of 12.125% Bonds due 2019 ............................ | U.S.$ 433 |
| 11.375% Bonds due 2010 ............................................... | U.S.$ 1,000 |
| 11.75% Bonds due 2015 ................................................. | U.S.$ 2,402 |
| 10% Bonds due 2007(1) ................................................. | EURO 500 |
| 9.25% Bonds due 2004(1) .............................................. | EURO 500 |
| 5.125% Bonds due 2004 ................................................. | JPY 60,000 |
| Reopening of 9.25% Bonds due 2004(1) ........................... | EURO 500 |

(1) Issues made under the Republic's U.S.$15 billion Medium-Term Note Programme.
(2) The bond has a put option at the fifth year, but if that option is not exercised, the bond will mature on November 19, 2008.
(3) Each bond has a warrant that allows the investor to buy an equal amount of 9.75% Global Bonds due 2027.
Source: Ministry of Economy.

*Bocones*

In accordance with the Debt Consolidation Law (Law 23,982), since 1991 the Government has issued six series of Bocones to pensioners and various private creditors in payment of amounts owed to such creditors. As of June 30, 2000, U.S.$7.9 billion dollars in Bocones (U.S.$4.4 billion in dollar-denominated Bocones and U.S.$3.5 billion in peso-denominated Bocones) were outstanding. In August 1997, the Government authorized the issuance of a new series of Bocones on the same terms and conditions as set forth in the Debt Consolidation Law as reparation to the families of those who disappeared under the military Government and those who were imprisoned by the military Government during the period from 1976 through 1983. U.S.$0.5 billion of this series was outstanding as of June 30, 2000.

*Botes and Botesos*

In 1990 and 1991, the Government issued several floating rate bonds with maturities of five and ten years in connection with the rescheduling of domestic debt. As of June 30, 2000, no Botes or Botesos remained outstanding.

*Bontes, Letes, Bonos-Pagaré and Domestic Syndicated Loans*

In April 1996, the Government implemented new measures designed to improve the functioning of the Argentine Treasury market, which was established in August 1994. The measures established a clearing house to handle all Treasury bill and Treasury bond transactions and a timetable for the regular public auction of Treasury bills and Treasury bonds. Under the new Treasury system, short-term issues of three-, six- or twelve-month maturities are known as Letes and bonds of medium- and long-term maturity are known as Bontes. Letes and Bontes may be denominated in either pesos or U.S. dollars. As of June 30, 2000, there were U.S.$4.7 billion of Letes and U.S.$12.6 billion of Bontes (including U.S.$6.4 billion issued under exchanges in 1999 and 2000) outstanding.

In July 1999, the Republic began issuing Bonos-Pagaré, debt instruments that have two-year maturities and that are sold at monthly public auctions. As of June 30, 2000, there were U.S.$1.1 billion of Bonos-Pagaré outstanding.

On January 12, 1998, the Government entered into a three-year loan agreement with a syndicate of eleven domestic banks that have participated in the development of the domestic treasury market, for an amount of U.S.$2.0 billion, which amount was fully disbursed on January 14, 1998. This loan will be fully repaid in January 2001.

*Debt Service*

Argentina's amortization of its total gross public debt increased from U.S.$5.4 billion in 1995 to U.S.$16.4 billion, including U.S.$4.2 billion of Letes, in 2000. Because the majority of Argentina's debt consists of foreign debt, changes in overseas interest rates can have a significant impact on Argentina's cost of funding and access to capital markets. Argentina's foreign debt remains high in relation to exports. Although lower inflation coupled with deregulation and trade liberalization have increased Argentina's export competitiveness, continuing current account deficits require high capital inflows, including new indebtedness.

## DEBT RECORD

Prior to 1993, Argentina defaulted on and rescheduled its payments on some loans from governmental creditors, some loans from commercial banks and some bonds issued as part of previous debt restructuring with commercial banks. Since 1993, however, Argentina has made all payments with respect to its domestic and foreign currency denominated debt on a timely basis.

## TABLES AND SUPPLEMENTAL INFORMATION
### Foreign Currency Denominated Debt
### Direct Debt

| Lender | Interest Rate | Issue Date | Final Maturity | Currencies | Principal Amount | |
|---|---|---|---|---|---|---|
| | | | | | Face Value | Outstanding as of June 30, 2000 |
| | | | | | (SDR) | (millions of dollars) |
| International Monetary Fund .......... | Various | 3/31/92 | Various | SDR | 4,020 | $ 3,080 |
| International Monetary Fund .......... | Various | 12/4/95 | Various | SDR | 612 | 677 |
| Total .............................. | | | | | 4,632 | $ 3,757 |

| Lender | Interest Rate | Issue Date | Final Maturity | Currencies | Principal Amount | |
|---|---|---|---|---|---|---|
| | | | | | Face Value | Outstanding as of June 30, 2000 |
| | | | | | (SDR) | (millions of dollars) |
| World Bank | (a) | 5/06/86 | 6/15/01 | USD | 350 | $ 29 |
| World Bank | (a) | 9/12/86 | 9/01/01 | USD | 19 | 2 |
| World Bank | (a) | 11/26/86 | 10/15/00 | USD | 16 | 4 |
| World Bank | (a) | 6/26/87 | 9/01/01 | USD | 14 | 17 |
| World Bank | (a) | 7/29/87 | 8/15/02 | USD | 496 | 103 |
| World Bank | (a) | 12/21/87 | 5/15/02 | USD | 61 | 8 |
| World Bank | (a) | 6/30/88 | 9/15/02 | USD | 72 | 14 |
| World Bank | (a) | 2/23/89 | 9/01/03 | USD | 28 | 98 |
| World Bank | (a) | 11/14/88 | 9/15/03 | USD | 300 | 105 |
| World Bank | (a) | 11/18/88 | 6/15/03 | USD | 15 | 19 |
| World Bank | (a) | 11/18/88 | 11/15/03 | USD | 20 | 42 |
| World Bank | (a) | 11/29/88 | 8/15/03 | USD | 22 | 10 |
| World Bank | (a) | 11/29/88 | 5/15/03 | USD | 120 | 30 |
| World Bank | (a) | 2/23/89 | 9/01/03 | USD | 28 | 8 |
| World Bank | (a) | 2/15/91 | 10/15/07 | USD | 200 | 124 |
| World Bank | (a) | 4/08/91 | 3/01/08 | USD | 300 | 200 |
| World Bank | (a) | 4/08/91 | 3/01/08 | USD | 23 | 15 |
| World Bank | (a) | 8/13/91 | 9/15/08 | USD | 23 | 16 |
| World Bank | (a) | 8/13/91 | 3/15/08 | USD | 34 | 22 |
| World Bank | (a) | 8/14/91 | 9/15/08 | USD | 325 | 246 |
| World Bank | (a) | 1/07/93 | 11/15/09 | USD | 170 | 137 |
| World Bank | (a) | 2/02/93 | 1/15/10 | USD | 300 | 254 |
| World Bank | (a) | 2/16/93 | 5/01/08 | USD | 400 | 320 |
| World Bank | (a) | 8/30/93 | 11/01/08 | USD | 100 | 85 |
| World Bank | (a) | 2/02/93 | 3/15/08 | USD | 450 | 360 |
| World Bank | (a) | 7/14/94 | 7/01/04 | USD | 15 | 14 |
| World Bank | (a) | 6/10/94 | 6/15/03 | USD | 1 | 1 |
| World Bank | (a) | 11/21/94 | 3/15/09 | USD | 9 | 6 |
| World Bank | (a) | 11/29/94 | 1/15/09 | USD | 106 | 106 |
| World Bank | (a) | 12/29/94 | 12/31/02 | USD | 1 | 0 |
| World Bank | (a) | 3/24/95 | 3/01/10 | USD | 300 | 300 |
| World Bank | (a) | 3/24/95 | 11/15/09 | USD | 170 | 125 |
| World Bank | (a) | 5/05/95 | 8/01/10 | USD | 500 | 500 |
| World Bank | (a) | 10/18/95 | 5/15/10 | USD | 210 | 121 |
| World Bank | (a) | 10/18/95 | 10/15/10 | USD | 30 | 28 |
| World Bank | (a) | 10/18/95 | 2/15/13 | USD | 166 | 160 |
| World Bank | (a) | 12/05/95 | 2/15/08 | USD | 152 | 145 |
| World Bank | (a) | 12/05/95 | 10/1/10 | USD | 165 | 88 |
| World Bank | (a) | 12/05/95 | 4/15/10 | USD | 225 | 133 |
| World Bank | (a) | 1/19/96 | 9/15/10 | USD | 101 | 49 |
| World Bank | (a) | 3/26/96 | 10/01/10 | USD | 39 | 25 |
| World Bank | (a) | 4/26/96 | 7/15/11 | USD | 25 | 24 |
| World Bank | (a) | 4/26/96 | 7/15/11 | USD | 100 | 100 |
| World Bank | (a) | 4/26/96 | 9/15/10 | USD | 250 | 242 |
| World Bank | (a) | 6/06/96 | 9/15/10 | USD | 16 | 7 |
| World Bank | (a) | 8/07/96 | 11/15/10 | USD | 116 | 47 |
| World Bank | (a) | 9/04/96 | 3/30/03 | USD | 1 | 1 |
| World Bank | (a) | 10/15/96 | 12/15/05 | USD | 1 | 1 |
| World Bank | (a) | 12/17/96 | 2/15/12 | USD | 300 | 300 |

70

| Lender | Interest Rate | Issue Date | Final Maturity | Currencies | Principal Amount | |
|---|---|---|---|---|---|---|
| | | | | | Face Value | Outstanding as of June 30, 2000 |
| | | | | | (SDR) | (millions of dollars) |
| World Bank................... | (a) | 2/21/97 | 2/15/11 | USD | 11 | 3 |
| World Bank................... | (a) | 4/17/97 | 4/15/12 | USD | 20 | 11 |
| World Bank................... | (a) | 4/17/97 | 2/15/12 | USD | 200 | 322 |
| World Bank................... | (a) | 4/17/97 | 10/01/11 | USD | 20 | 50 |
| World Bank................... | (a) | 4/17/97 | 9/15/11 | USD | 300 | 318 |
| World Bank................... | (a) | 7/07/97 | 9/15/12 | USD | 200 | 200 |
| World Bank................... | (a) | 9/23/97 | 7/15/12 | USD | 100 | 40 |
| World Bank................... | (a) | 9/23/97 | 6/15/12 | USD | 15 | 11 |
| World Bank................... | (a) | 12/10/97 | 6/15/12 | USD | 200 | 57 |
| World Bank................... | (a) | 11/21/97 | 11/15/12 | USD | 75 | 50 |
| World Bank................... | (a) | 11/21/97 | 11/15/12 | USD | 75 | 75 |
| World Bank................... | (a) | 1/20/98 | 11/15/12 | USD | 100 | 100 |
| World Bank................... | (a) | 1/20/98 | 11/15/12 | USD | 50 | 35 |
| World Bank................... | (a) | 1/20/98 | 3/15/12 | USD | 125 | 8 |
| World Bank................... | (a) | 6/5/98 | 9/15/12 | USD | 75 | 33 |
| World Bank................... | (a) | 6/5/98 | 2/15/13 | USD | 42 | 8 |
| World Bank................... | (a) | 10/20/98 | 8/15/13 | USD | 284 | 198 |
| World Bank................... | (a) | 11/11/98 | 4/15/03 | USD | 2,275 | 1,775 |
| World Bank................... | (a) | 10/20/98 | 5/15/13 | USD | 1 | 1 |
| World Bank................... | (a) | 10/20/98 | 3/15/13 | USD | 40 | 25 |
| World Bank................... | (a) | 1/28/99 | 4/15/13 | USD | 18 | 0 |
| World Bank................... | (a) | 3/29/99 | 3/15/14 | USD | 30 | 4 |
| World Bank................... | (a) | 7/15/99 | 4/15/14 | USD | 10 | 3 |
| World Bank................... | (a) | 8/25/99 | 10/15/13 | USD | 90 | 15 |
| World Bank................... | (a) | 10/26/99 | 2/15/14 | USD | 30 | 1 |
| World Bank................... | (a) | 11/29/99 | 6/15/14 | USD | 5 | 0 |
| Total ........................... | | | | | 11,204 | $ 7,325 |

| Lender | Interest Rate | Issue Date | Final Maturity | Currencies | Principal Amount | |
|---|---|---|---|---|---|---|
| | | | | | Face Value | Outstanding as of June 30, 2000 |
| | | | | | (SDR) | (millions of dollars) |
| Inter American Development Bank | 0.075 | 2/21/67 | 2/21/17 | CAD | 46 | 0 |
| Inter American Development Bank | 3.00 | 4/15/78 | 4/19/03 | ARP | 11 | 2 |
| Inter American Development Bank | 3.00 | 5/26/79 | 5/24/09 | ARP | 33 | 9 |
| Inter American Development Bank | 9.25 | 3/27/82 | 3/24/02 | Various | 116 | 20 |
| Inter American Development Bank | 4.00 | 3/27/82 | 3/24/02 | ARP | 15 | 3 |
| Inter American Development Bank | 9.25 | 3/21/84 | 3/21/04 | USD | 42 | 17 |
| Inter American Development Bank | 4.00 | 3/21/84 | 3/21/04 | ARP | 49 | 19 |
| Inter American Development Bank | 4.00 | 9/24/84 | 9/24/09 | Various | 29 | 20 |
| Inter American Development Bank | 4.00 | 3/21/84 | 3/21/04 | ARP | 9 | 4 |
| Inter American Development Bank | 4.00 | 9/24/84 | 3/24/00 | USD | 41 | 16 |
| Inter American Development Bank | 4.00 | 3/21/84 | 3/21/04 | ARP | 17 | 7 |
| Inter American Development Bank | 3.00 | 9/24/84 | 9/24/09 | ARP | 15 | 11 |
| Inter American Development Bank | 4.00 | 9/24/84 | 9/24/04 | ARP | 29 | 14 |
| Inter American Development Bank | 8.35 | 12/23/85 | 7/06/05 | Various | 33 | 18 |
| Inter American Development Bank | 4.00 | 1/20/87 | 1/20/12 | ARP | 1 | 1 |
| Inter American Development Bank | 7.53 | 1/20/87 | 1/21/12 | USD | 93 | 89 |
| Inter American Development Bank | 6.23 | 3/10/88 | 3/10/13 | USD | 97 | 33 |
| Inter American Development Bank | 7.76 | 3/10/88 | 3/10/88 | USD | 94 | 11 |
| Inter American Development Bank | (b) | 12/20/89 | 1/06/15 | USD | 4 | 4 |
| Inter American Development Bank | (b) | 3/22/91 | 3/22/13 | USD | 32 | 36 |
| Inter American Development Bank | (b) | 3/22/91 | 3/22/11 | USD | 155 | 191 |
| Inter American Development Bank | (b) | 11/15/91 | 11/15/11 | USD | 252 | 253 |
| Inter American Development Bank | (b) | 5/30/91 | 1/06/16 | USD | 54 | 63 |
| Inter American Development Bank | (b) | 4/07/92 | 10/07/13 | Various | 23 | 24 |

72

72

| Lender | Interest Rate | Issue Date | Final Maturity | Currencies | Principal Amount | |
|---|---|---|---|---|---|---|
| | | | | | Face Value | Outstanding as of June 30, 2000 |
| | | | | | (SDR) | (millions of dollars) |
| Inter American Development Bank | (b) | 4/07/92 | 4/07/12 | Various | 233 | 231 |
| Inter American Development Bank | (b) | 4/07/92 | 4/07/13 | Various | 2 | 3 |
| Inter American Development Bank | 4.00 | 4/07/92 | 4/07/17 | ARP | 1 | 1 |
| Inter American Development Bank | 3.00 | 4/07/92 | 4/07/17 | ARP | 11 | 14 |
| Inter American Development Bank | (b) | 12/29/92 | 12/29/12 | Various | 310 | 338 |
| Inter American Development Bank | (b) | 12/29/92 | 12/29/12 | USD | 272 | 289 |
| Inter American Development Bank | 4.00 | 7/08/93 | 7/08/13 | USD | 16 | 21 |
| Inter American Development Bank | 4.00 | 9/22/93 | 3/21/99 | ARP | 19 | 5 |
| Inter American Development Bank | (b) | 3/21/94 | 3/21/14 | USD | 74 | 63 |
| Inter American Development Bank | (b) | 11/21/93 | 3/21/14 | USD | 4 | 5 |
| Inter American Development Bank | (b) | 9/15/94 | 12/06/14 | Various | 97 | 117 |
| Inter American Development Bank | 3.00 | 9/15/94 | 12/06/19 | ARP | 15 | 18 |
| Inter American Development Bank | (b) | 1/11/95 | 1/11/15 | Various | 36 | 40 |
| Inter American Development Bank | 4.00 | 6/05/95 | 6/05/20 | ARP | 23 | 23 |
| Inter American Development Bank | 4.00 | 6/05/95 | 6/05/20 | USD | 14 | 11 |
| Inter American Development Bank | (b) | 6/05/95 | 6/05/10 | Various | 582 | 688 |
| Inter American Development Bank | (b) | 6/28/95 | 6/28/15 | Various | 349 | 378 |
| Inter American Development Bank | (b) | 4/05/95 | 4/05/15 | USD | 233 | 249 |
| Inter American Development Bank | (b) | 3/26/96 | 9/26/15 | USD | 97 | 36 |
| Inter American Development Bank | (b) | 12/19/96 | 12/19/11 | USD | 248 | 319 |
| Inter American Development Bank | (b) | 9/10/96 | 9/10/16 | USD | 25 | 9 |
| Inter American Development Bank | (b) | 2/20/97 | 2/20/22 | USD | 79 | 12 |
| Inter American Development Bank | (b) | 3/16/97 | 3/16/17 | USD | 78 | 10 |
| Inter American Development Bank | (b) | 8/4/97 | 8/4/17 | USD | 81 | 19 |
| Inter American Development Bank | (b) | 8/4/97 | 8/4/17 | USD | 287 | 144 |

73

| Lender | Interest Rate | Issue Date | Final Maturity | Currencies | Principal Amount | |
|---|---|---|---|---|---|---|
| | | | | | Face Value | Outstanding as of June 30, 2000 |
| | | | | | (SDR) | (millions of dollars) |
| Inter American Development Bank | 3.00 | 3/16/98 | 9/16/27 | ARP | 13 | 3 |
| Inter American Development Bank | 3.00 | 3/16/98 | 9/16/27 | USD | 13 | 4 |
| Inter American Development Bank | (b) | 2/11/98 | 2/11/18 | USD | 8 | 2 |
| Inter American Development Bank | (b) | 3/16/98 | 3/16/18 | USD | 202 | 6 |
| Inter American Development Bank | (b) | 7/22/98 | 1/22/17 | USD | 64 | 59 |
| Inter American Development Bank | 3.00 | 12/9/98 | 12/9/23 | APP | 8 | 11 |
| Inter American Development Bank | (b) | 8/8/98 | 8/8/23 | USD | 300 | 20 |
| Inter American Development Bank | 3.00 | 12/9/98 | 6/9/23 | ARP | 7 | 10 |
| Inter American Development Bank | (b) | 1/13/99 | 1/13/24 | USD | 6 | 1 |
| Inter American Development Bank | (b) | 11/1/99 | 11/1/19 | USD | 109 | 7 |
| Total .......................... | | | | | 29,202 | 4,105 |
| Paris Club Round 3............. | Various | 1989 | 2000 | Various | 3,338 | 147 |
| Paris Club Round 4............. | Various | 1991 | 2002 | Various | 1,263 | 546 |
| Paris Club Round 5(c) ........ | Various | 1992 | 2008 | Various | 2,733 | 2,078 |
| Total .......................... | | | | | 7,334 | 2,771 |
| FONPLATA ..................... | Various | 1983-95 | 2001-7 | USD/ARP | 26 | 30 |
| Total .......................... | | | | | 26 | 30 |
| FIDA | | | | SDR | 7 | 6 |
| Others | Various | Various | Various | USD | 2,620 | $ 2,807 |

## TABLES AND SUPPLEMENTAL INFORMATION
### Foreign Currency Denominated Debt
### Direct Debt
### Foreign Currency Denominated Bonds

| Lender | Interest Rate | Issue Date | Final Maturity | Currencies | Principal Amount Face Value (millions of dollars) | As of June 30, 2000 (millions of dollars) |
|---|---|---|---|---|---|---|
| **Fixed Rate** | | | | | | |
| API................................. | 4.00% | 3/15/88 | 3/15/13 | USD | $      4 | $      4 |
| Par Bonds..................... | 4.00-6.00% | 3/31/93 | 3/31/23 | USD | 12,489 | 4,692 |
| Par Bonds..................... | 5.87% | 3/31/93 | 3/31/23 | DM | 149 | 137 |
| Eurobond..................... | 8.25% | 8/02/93 | 8/02/00 | USD | 100 | 100 |
| Global Bond.................. | 8.375% | 12/20/93 | 12/20/03 | USD | 2,050 | 2,050 |
| Global Bond.................. | 10.95% | 11/01/94 | 11/01/99 | USD | 750 | 750 |
| Eurobond..................... | 7.10% | 12/15/94 | 12/15/99 | YEN | 124 | 124 |
| Eurobond..................... | 9.25% | 8/29/95 | 8/28/00 | DMK | 658 | 658 |
| Eurobond(1)................... | 10.117% | 9/06/95 | 9/06/00 | USD | 951 | 951 |
| Eurobond..................... | 10.50% | 11/14/95 | 11/14/02 | DMK | 695 | 482 |
| Global Bond.................. | 9.25% | 2/23/96 | 2/23/01 | USD | 1,200 | 1,200 |
| Eurobond..................... | 7.40% | 4/04/96 | 4/04/06 | YEN | 74 | 75 |
| Eurobond..................... | 9.00% | 4/18/96 | 4/18/01 | ATS | 167 | 120 |
| Eurobond..................... | 7.40% | 4/25/96 | 4/25/06 | YEN | 76 | 75 |
| Eurobond..................... | 7.40% | 5/15/96 | 5/15/06 | YEN | 66 | 66 |
| Eurobond..................... | 11.75% | 5/20/96 | 5/20/11 | DMK | 650 | 524 |
| Eurobond..................... | 10.25% | 2/06/96 | 2/06/03 | DMK | 680 | 482 |
| Eurobond..................... | 13.25% | 3/06/96 | 3/06/01 | ITL | 321 | 243 |
| Eurobond..................... | 11.50% | 8/14/96 | 8/14/01 | GBP | 155 | 152 |
| Eurobond..................... | 9.00% | 9/19/96 | 9/19/03 | DMK | 248 | 181 |
| Eurobond..................... | 12.00% | 9/19/96 | 9/19/16 | DMK | 248 | 181 |
| Eurobond..................... | 11.25% | 4/10/96 | 4/10/06 | DMK | 662 | 481 |
| Global Bond.................. | 11.00% | 10/09/96 | 10/09/06 | USD | 1,300 | 1,300 |
| Eurobond..................... | 11.00% | 11/05/96 | 11/05/03 | ITL | 328 | 243 |
| Eurobond..................... | 6.00% | 11/12/96 | 3/24/05 | JPY | 448 | 471 |
| Eurobond..................... | 11.75% | 11/13/96 | 11/13/26 | DMK | 332 | 241 |
| Eurobond..................... | 7.00% | 12/04/96 | 12/04/03 | CHF | 115 | 184 |
| Eurobond..................... | 5.50% | 5/07/96 | 3/27/01 | JPY | 842 | 847 |
| Eurobond..................... | 5.00% | 12/20/96 | 12/20/02 | JPY | 440 | 471 |
| Eurobond..................... | 8.50% | 12/23/96 | 12/23/05 | DMK | 642 | 482 |
| Eurobond..................... | 10.00% | 1/03/97 | 1/03/07 | ITL | 392 | 292 |
| Global Bond.................. | 11.375% | 1/30/97 | 1/30/17 | USD | 4,575 | 4,575 |
| Eurobond..................... | 7.00% | 3/18/97 | 3/18/04 | DMK | 890 | 722 |
| Eurobond..................... | 7.00% | 3/18/97 | 3/18/04 | ATS | 83 | 68 |
| Treasury Bond ............. | 8.75% | 5/6/97 | 5/09/02 | USD | 2,767 | 2,767 |
| Eurobond..................... | 7.50% | 5/23/97 | 5/23/02 | ESP | 139 | 113 |
| Eurobond..................... | 4.40% | 5/27/97 | 5/27/04 | JPY | 432 | 471 |
| Eurobond..................... | 10.00% | 6/25/97 | 6/25/07 | GBP | 333 | 303 |
| Eurobond (Step-Down). | 10.00-7.625% | 8/11/97 | 8/11/07 | ITL | 464 | 365 |
| Global Bond.................. | 9.75% | 9/19/97 | 9/19/27 | USD | 3,535 | 3,535 |
| Eurobond (Step-Down). | 9.25-7.00% | 10/21/97 | 3/18/04 | ITL | 433 | 365 |

75

75

| Lender | Interest Rate | Issue Date | Final Maturity | Currencies | Principal Amount | |
|---|---|---|---|---|---|---|
| | | | | | Face Value | As of June 30, 2000 |
| | | | | | (millions of dollars) | (millions of dollars) |
| Eurobond (Step-Down). | 9.00-7.00% | 10/24/97 | 3/18/04 | ITL | 216 | 182 |
| Eurobond ................ | 8.00% | 10/30/97 | 10/30/09 | DMK | 580 | 482 |
| Eurobond ................ | 8.00% | 12/22/97 | 12/22/00 | ITL | 171 | 146 |
| Eurobond ................ | 8.75% | 2/04/98 | 2/04/03 | EURO | 648 | 565 |
| Eurobond (Step-Down). | 11.00-8.00% | 2/26/98 | 2/26/08 | EURO | 796 | 722 |
| Eurobond (Step-Down). | 10.375-8.00% | 3/12/98 | 3/12/09 | ITL | 416 | 365 |
| Eurobond (Step-Down). | 10.00-8.00% | 4/3/98 | 2/26/08 | EURO | 236 | 214 |
| Eurobond (Step-Down). | 10.00-8.00% | 4/3/98 | 2/26/08 | EURO | 237 | 215 |
| Eurobond ................ | 8.125% | 4/21/98 | 4/21/08 | EURO | 829 | 706 |
| Zero Coupon ................ | | 5/28/98 | 5/28/28 | EURO | 830 | 706 |
| Eurobond (Step-Up)...... | 8.00-9.00% | 7/6/98 | 7/6/10 | DMK | 530 | 482 |
| Eurobond ................ | 7.875% | 7/29/98 | 7/29/05 | DMK | 422 | 361 |
| Eurobond ................ | 8.50% | 7/30/98 | 7/30/10 | EURO | 554 | 471 |
| Bontes ................ | 9.9375% | 9/19/98 | 9/19/27 | USD | 1,131 | 1,128 |
| Eurobond (Step-Down). | 14.00-9.00% | 11/19/98 | 11/19/08 | DMK | 299 | 241 |
| Global Bond................ | 11.00% | 12/4/98 | 12/4/05 | USD | 1,000 | 1,000 |
| Eurobond ................ | 8.00% | 2/25/99 | 2/25/02 | EURO | 164 | 141 |
| Eurobond (Step-Down). | 15.00-8.00% | 2/26/99 | 2/26/08 | EURO | 386 | 330 |
| Eurobond ................ | 9.50% | 3/4/99 | 3/4/04 | EURO | 435 | 377 |
| Global Bond................ | 12.125% | 2/25/99 | 2/25/19 | USD | 1,433 | 1,433 |
| Eurobond ................ | 8.875% | 3/1/99 | 3/1/29 | USD | 125 | 125 |
| Eurobond (Step-Down). | 14.00-8.00% | 4/6/99 | 2/26/08 | EURO | 268 | 235 |
| Global Bond................ | 11.75% | 4/7/99 | 4/7/09 | USD | 1,750 | 1,750 |
| Eurobond (Step-Down). | 10.50-7.00% | 5/10/99 | 3/18/04 | EURO | 426 | 377 |
| Eurobond ................ | 9.00% | 5/26/99 | 5/26/09 | EURO | 683 | 612 |
| Eurobond ................ | 7.125% | 6/10/99 | 6/10/02 | EURO | 206 | 188 |
| Treasury Bond ................ | 11.25% | 5/24/99 | 5/24/04 | USD | 2,898 | 2,898 |
| Treasury Bond ................ | 9.50% | 5/24/99 | 5/24/01 | USD | 1,271 | 1,271 |
| Eurobond ................ | 9.00% | 9/19/96 | 9/19/03 | DMK | 209 | 209 |
| Eurobond ................ | 9.00% | 4/26/99 | 4/26/06 | EURO | 477 | 477 |
| Eurobond (Step-Down). | 10.50% | 5/19/99 | 3/18/04 | EURO | 412 | 412 |
| Eurobond ................ | 3.50% | 8/11/99 | 8/11/09 | JPY | 156 | 169 |
| Eurobond ................ | 8.50% | 9/03/99 | 9/03/01 | EURO | 583 | 518 |
| Eurobond. ................ | 7.30% | 10/14/99 | 5/14/01 | EURO | 317 | 283 |
| Global Bond (Zero Coupon) ................ | | 10/15/99 | 10/15/04 | USD | 1,500 | 1,248 |
| Eurobond ................ | 9.25% | 10/21/99 | 10/21/02 | EURO | 528 | 471 |
| Letes................ | 9.66% | 11/12/99 | 11/10/00 | USD | 529 | 529 |
| Eurobond ................ | 9.75% | 11/26/99 | 11/26/03 | EURO | 255 | 235 |
| Eurobond ................ | 10.00% | 12/07/99 | 12/07/04 | EURO | 408 | 377 |
| Eurobond ................ | 5.40% | 12/17/99 | 12/17/03 | JPY | 194 | 188 |
| Eurobond ................ | 10.00% | 1/07/00 | 1/07/05 | EURO | 653 | 612 |
| Letes................ | 8.19% | 1/14/00 | 7/14/00 | USD | 355 | 355 |
| Eurobond ................ | 10.25% | 1/26/00 | 1/26/07 | EURO | 752 | 706 |
| Global Bond................ | 12.00-12.50% | 2/03/00 | 2/01/20 | USD | 1,250 | 1,250 |
| Letes................ | 8.40% | 2/11/00 | 8/11/00 | USD | 350 | 350 |
| Bontes ................ | 12.125% | 2/21/00 | 5/21/05 | USD | 1,979 | 1,772 |
| Bontes ................ | 11.75% | 2/21/00 | 5/21/03 | USD | 1,896 | 1,694 |
| Global Bond................ | 11.375% | 3/15/00 | 3/15/10 | USD | 1,000 | 1,000 |

76

| Lender | Interest Rate | Issue Date | Final Maturity | Currencies | Principal Amount | |
|---|---|---|---|---|---|---|
| | | | | | Face Value | As of June 30, 2000 |
| | | | | | (millions of dollars) | (millions of dollars) |
| Letes.............................. | 8.15% | 3/17/00 | 3/16/01 | USD | 506 | 506 |
| Letes.............................. | 7.80% | 3/17/00 | 9/15/00 | USD | 356 | 356 |
| Eurobond ...................... | 8.125% | 4/04/00 | 10/4/04 | EURO | 479 | 471 |
| Letes.............................. | 7.02% | 4/14/00 | 7/14/00 | USD | 250 | 250 |
| Letes.............................. | 8.10% | 4/14/00 | 10/13/00 | USD | 376 | 376 |
| Letes.............................. | 7.21% | 4/28/00 | 7/28/00 | USD | 255 | 255 |
| Letes.............................. | 7.96% | 5/12/00 | 8/11/00 | USD | 250 | 250 |
| Letes.............................. | 8.47% | 5/12/00 | 11/10/00 | USD | 350 | 350 |
| Eurobond ...................... | 9.00% | 5/24/00 | 5/24/05 | EURO | 681 | 706 |
| Letes.............................. | 8.68% | 5/26/00 | 8/25/00 | USD | 254 | 254 |
| Eurobond ...................... | 5.125% | 6/14/00 | 6/14/04 | JPY | 563 | 565 |
| Global Bond.................. | 11.75% | 6/15/00 | 6/15/15 | USD | 2,403 | 2,403 |
| Letes.............................. | 7.39% | 6/16/00 | 9/15/00 | USD | 254 | 254 |
| Letes.............................. | 7.99% | 6/16/00 | 12/15/00 | USD | 352 | 352 |
| Eurobond ...................... | 9.00% | 6/20/00 | 6/20/03 | EURO | 1,000 | 942 |
| Bonos A Tasa Capitalizable .............. | | 6/29/00 | 6/29/20 | USD | 1 | 1 |
| Letes.............................. | 7.55% | 6/20/00 | 9/29/00 | USD | 256 | 256 |
| Total.............................. | | | | | $ 86,504 | $ 69,689 |

## TABLES AND SUPPLEMENTAL INFORMATION
### Foreign Currency Denominated Debt
### Direct Debt

| Lender | Interest Rate | Issue Date | Final Maturity | Currencies | Principal Amount | |
|---|---|---|---|---|---|---|
| | | | | | Face Value (millions of dollars) | As of June 30, 2000 (millions of dollars) |
| **Floating Rate** | | | | | | |
| Bonex 87 ..................................... | Floating | 9/07/87 | 9/07/97 | USD | 1,000 | 11 |
| Bonex 89 ..................................... | Floating | 12/28/89 | 12/28/99 | USD | 4,642 | 11 |
| BOCON Prev. 1 (2) ...................... | Floating | 4/01/91 | 4/01/01 | USD | 6,278 | 737 |
| BOCON Prov. 1.............................. | Floating | 4/01/91 | 4/01/07 | USD | 3,061 | 1,012 |
| BOCON Prov. 2 (2) ...................... | Floating | 12/28/94 | 12/28/10 | USD | 960 | 937 |
| Ferrobono..................................... | Floating | 10/01/91 | 12/31/23 | USD | 400 | 6 |
| BOCON Prev. 2 (2) ...................... | Floating | 9/01/92 | 9/01/02 | USD | 5,001 | 1,700 |
| Bonex 92(1) ................................. | Floating | 9/15/92 | 9/15/02 | USD | 4,000 | 655 |
| BOCON Regalías | | | | | | |
| Hidrocarburíferas .................. | Floating | 12/02/92 | 12/02/08 | USD | 3,054 | 54 |
| Discount Bonds.............................. | Floating | 3/31/93 | 3/31/23 | USD | 4,136 | 1,456 |
| Discount Bonds.............................. | Floating | 3/31/93 | 3/31/23 | DM | 169 | 136 |
| Floating Rate Bonds....................... | Floating | 3/31/93 | 5/31/05 | USD | 8,467 | 5,173 |
| Spanish Bonds ............................... | Floating | 3/31/93 | 3/31/08 | USD | 55 | 55 |
| Eurobond ...................................... | Floating | 8/15/96 | 8/15/99 | USD | 500 | 500 |
| FRN ............................................. | Floating | 5/27/97 | 5/27/04 | ITL | 297 | 243 |
| SPAN ........................................... | Floating | 12/16/97 | 11/30/02 | USD | 500 | 311 |
| FRAN........................................... | Floating | 4/13/98 | 4/10/05 | USD | 1,000 | 1,000 |
| Eurobond ...................................... | Floating | 7/08/98 | 7/8/05 | ITL | 558 | 486 |
| Eurobond ...................................... | Floating | 4/06/99 | 4/6/04 | USD | 300 | 300 |
| Bocon Prev. 3 (2)........................... | Floating | 12/28/98 | 12/28/10 | USD | 114 | 114 |
| National Government | | | | | | |
| Floating Rate Bonds............... | Floating | 1/14/98 | 2/20/01 | USD | 813 | 267 |
| Bonte 03....................................... | Floating | 7/21/98 | 7/21/03 | USD | 1,091 | 1,091 |
| Floating Rate Bond 2006 ........... | Floating | 2/03/99 | 2/03/06 | USD | 2,000 | 1,184 |
| Eurobond ...................................... | Floating | 4/06/99 | 4/06/04 | USD | 300 | 300 |
| Bocon 3......................................... | Floating | 4/15/99 | 4/15/07 | USD | 383 | 361 |
| Floating Rate Bond 2001 ........... | Floating | 7/14/99 | 7/14/01 | USD | 352 | 341 |
| Badlar Bond.................................. | Floating | 7/14/99 | 7/14/01 | USD | 74 | 74 |
| Floating Rate Bond 2004 ........... | Floating | 12/22/99 | 12/22/04 | EURO | 105 | 94 |
| Floating Rate Bond 2001 ........... | Floating | 11/02/99 | 11/02/01 | USD | 480 | 470 |
| Badlar Bond.................................. | Floating | 11/02/99 | 11/02/01 | USD | 11 | 11 |
| Eurobond ...................................... | Floating | 12/22/99 | 12/22/04 | EURO | 202 | 188 |
| Floating Rate Bond 2002 ........... | Floating | 4/24/00 | 4/24/02 | USD | 197 | 173 |
| Total................................. | | | | | $ 49,593 | $ 18,535 |

(1) Includes Bonex held by the Central Bank and the social security system.
(2) Outstanding amount includes capitalized interest according to terms and conditions of the bonds.

78

78

### TABLES AND SUPPLEMENTAL INFORMATION
#### Peso Denominated Debt
#### Direct Debt

| Lender | Interest Rate | Issue Date | Final Maturity | Currencies | Principal Amount | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | | Face Value | Outstanding as of June 30, 2000 |
| | | | | | (millions of dollars) | (millions of dollars) |
| Bocon Prev. 1 (1)........ | Floating | 4/01/91 | 4/01/01 | Pesos | $ 2,682 | $ 210 |
| Bocon Prov. 1 (1)........ | Floating | 4/01/91 | 4/01/07 | Pesos | 9,706 | 2,756 |
| Bocon Prev. 2 (1)........ | Floating | 9/01/92 | 9/01/02 | Pesos | 2,762 | 566 |
| Eurobond ................. | 11.75% | 2/12/97 | 2/12/07 | Pesos | 500 | 500 |
| Eurobond ................. | 8.75% | 7/10/97 | 7/10/02 | Pesos | 500 | 428 |
| National Government Bonds ...................... | Floating | 1/14/98 | 2/20/01 | Pesos | 155 | 7 |
| Bocon Prov. 2 (1)........ | Floating | 12/28/94 | 12/28/10 | Pesos | 4 | 4 |
| Bocon Prov. 3 ............ | Floating | 1/15/99 | 4/01/07 | Pesos | 152 | 117 |
| Total...................... | | | | | $ 16,461 | $ 4,589 |

(1)    Outstanding amount includes capitalized interest according to terms and conditions of the bonds.

## TABLES AND SUPPLEMENTAL INFORMATION
### Foreign Currency Denominated Debt
### Indirect Debt

| Lender | Interest Rate | Issue Date | Final Maturity | Currencies | Principal Amount | |
|---|---|---|---|---|---|---|
| | | | | | Amount Disbursed | Outstanding as of June 30, 2000 |
| | | | | | (millions of dollars) | (millions of dollars) |
| World Bank............... | (a) | 12/21/87 | 5/15/02 | USD | $  61 | $  8 |
| World Bank............... | (a) | 11/29/88 | 5/15/03 | USD | 120 | 12 |
| World Bank............... | (a) | 6/30/88 | 9/15/02 | USD | 72 | 141 |
| World Bank............... | (a) | 11/18/88 | 6/15/03 | USD | 150 | 45 |
| World Bank............... | (a) | 11/29/88 | 8/15/03 | USD | 120 | 299 |
| World Bank............... | (a) | 11/18/88 | 11/15/01 | USD | 200 | 42 |
| World Bank............... | (a) | 3/30/89 | 4/01/04 | USD | 7 | 3 |
| World Bank............... | (a) | 8/13/91 | 11/15/07 | USD | 100 | 21 |
| World Bank............... | (a) | 8/13/91 | 3/15/08 | USD | 34 | 22 |
| World Bank............... | (a) | 9/19/92 | 5/15/09 | USD | 20 | 17 |
| World Bank............... | (a) | 11/16/92 | 11/01/09 | USD | 300 | 261 |
| World Bank............... | 7.43 | 10/01/93 | 6/01/08 | USD | 340 | 289 |
| World Bank............... | (a) | 11/29/94 | 1/15/09 | USD | 106 | 106 |
| World Bank............... | (a) | 10/18/95 | 8/15/10 | USD | 333 | 500 |
| World Bank............... | (a) | 4/26/96 | 9/15/09 | USD | 250 | 242 |
| World Bank............... | (a) | 6/06/96 | 9/15/10 | USD | 16 | 7 |
| World Bank............... | (a) | 10/20/98 | 5/15/13 | USD | 450 | 102 |
| World Bank............... | (a) | 11/16/98 | 5/15/13 | USD | 119 | 64 |
| World Bank............... | (a) | 1/28/99 | 4/15/13 | USD | 18 | 3 |
| World Bank............... | (a) | 3/29/99 | 3/15/14 | USD | 30 | 37 |
| World Bank............... | (a) | 7/15/99 | 4/15/14 | USD | 10 | 27 |
| World Bank............... | (a) | 8/25/99 | 10/15/13 | USD | 91 | 152 |
| World Bank............... | (a) | 10/26/99 | 2/15/14 | USD | 30 | 8 |
| World Bank............... | (a) | 11/29/99 | 6/15/14 | USD | 5 | 5 |
| Total............... | | | | USD | 2,912 | 1,905 |
| | | | | | | |
| Inter American Development Bank | (b) | 1/17/77 | 1/05/06 | USD | 196 | 17 |
| Inter American Development Bank | 3.00 | 4/15/78 | 4/19/03 | ARP | 27 | 5 |
| Inter American Development Bank | 7.50 | 11/06/79 | 11/06/99 | USD | 210 | 6 |
| Inter American Development Bank | 8.25 | 1/30/81 | 1/06/01 | USD | 90 | 10 |
| Inter American Development Bank | 8.25 | 5/15/81 | 1/06/01 | USD | 48 | 7 |
| Inter American Development Bank | 4.00 | 5/15/81 | 1/06/01 | ARP | 4 | 3 |
| ..ter American Development Bank | 9.25 | 9/16/82 | 9/16/02 | Various | 37 | 8 |
| ..ter American Development Bank | 3.00 | 9/16/82 | 9/16/07 | ARP | 15 | 6 |

| Lender | Interest Rate | Issue Date | Final Maturity | Currencies | Principal Amount | |
|---|---|---|---|---|---|---|
| | | | | | Amount Disbursed | Outstanding as of June 30, 2000 |
| | | | | | (millions of dollars) | (millions of dollars) |
| Inter American Development Bank | (b) | 12/06/85 | 5/24/05 | Various | 60 | 25 |
| Inter American Development Bank | 7.97 | 9/17/85 | 9/17/05 | USD | 40 | 14 |
| Inter American Development Bank | 3.00 | 12/23/85 | 01/06/06 | ARP | 11 | 4 |
| Inter American Development Bank | (b) | 9/17/85 | 9/17/05 | USD | 40 | 14 |
| Inter American Development Bank | 7.78 | 4/9/87 | 1/9/07 | USD | 75 | 4 |
| Inter American Development Bank | (b) | 11/18/88 | 11/18/14 | USD | 70 | 54 |
| Inter American Development Bank | (b) | 11/18/88 | 11/18/03 | USD | 106 | 37 |
| Inter American Development Bank | (b) | 11/17/88 | 11/17/08 | Various | 250 | 157 |
| Inter American Development Bank | (b) | 4/02/90 | 4/06/10 | Various | 250 | 174 |
| Inter American Development Bank | 3.00 | 5/30/91 | 8/05/16 | Various | 29 | 28 |
| Inter American Development Bank | (b) | 1/26/94 | 7/26/13 | USD | 130 | 125 |
| Inter American Development Bank | (b) | 2/14/94 | 3/21/14 | Various | 278 | 212 |
| Inter American Development Bank | (b) | 1/17/94 | 3/21/09 | USD | 30 | 31 |
| Inter American Development Bank | (b) | 12/30/93 | 3/21/14 | USD | 150 | 87 |
| Inter American Development Bank | (b) | 6/5/95 | 6/5/20 | Various | 250 | 153 |
| Inter American Development Bank | (b) | 8/4/97 | 8/4/17 | USD | 350 | 248 |
| Inter American Development Bank | (b) | 12/1/97 | 11/19/17 | USD | 96 | 57 |
| Inter American Development Bank | (b) | 2/05/98 | 2/05/18 | USD | 250 | 33 |
| Inter American Development Bank | (b) | 10/18/99 | 10/18/24 | USD | 250 | 15 |
| Total............................ | | | | | $ 36,227 | $ 1,399 |

(a)  Floating World Bank rate + 0.5%.
(b)  Floating IADB rate.
(c)  The figure in the amount of debt was refinanced between 1992 and 1995.

81

EXHIBIT C

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064

TELEPHONE (212) 373-3000
FACSIMILE (212) 757-3990

LLOYD K. GARRISON (1946-1991)
RANDOLPH E. PAUL (1946-1956)
SIMON H. RIFKIND (1950-1995)
LOUIS S. WEISS (1927-1950)
JOHN F. WHARTON (1927-1977)

WRITER'S DIRECT DIAL NUMBER

212 373-3260
WRITER'S DIRECT FACSIMILE

212 492-0260
WRITER'S DIRECT E-MAIL ADDRESS

wrieman@paulweiss.com

1615 L STREET, NW
WASHINGTON, DC 20036-5694
TELEPHONE (202) 223-7300
FACSIMILE (202) 223-7420

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101
FACSIMILE (81-3) 3597-8120

UNIT 3601, FORTUNE PLAZA OFFICE TOWER A
NO. 7 DONG SANHUAN ZHONGLU
CHAO YANG DISTRICT
BEIJING 100020
PEOPLE'S REPUBLIC OF CHINA
TELEPHONE (86-10) 5828-6300
FACSIMILE (86-10) 6530-9070/9080

12TH FLOOR, HONG KONG CLUB BUILDING
3A CHATER ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2536-9933
FACSIMILE (852) 2536-9622

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, U.K.
TELEPHONE (44 20) 7367 1600
FACSIMILE (44 20) 7367 1650

MATTHEW W. ABBOTT
MARK H. ALCOTT
ALLAN J. ARFFA
ROBERT A. ATKINS
JOHN F. BAUGHMAN
LYNN B. BAYARD
DANIEL J. BELLER
MITCHELL L. BERG
MARK S. BERGMAN
BRUCE BIRENBOIM
H. CHRISTOPHER BOEHNING
ANGELO BONVINO
RICHARD S. BORISOFF
HENK BRANDS
JOHN F. BREGLIO
JAMES L. BROCHIN
RICHARD J. BRONSTEIN
PATRICK S. CAMPBELL*
JEANETTE K. CHAN
YVONNE Y. F. CHAN
DOUGLAS A. CIFU
LEWIS R. CLAYTON
JAY COHEN
KELLEY A. CORNISH
CHARLES E. DAVIDOW
DOUGLAS R. DAVIS
THOMAS V. DE LA BASTIDE III
ARIEL J. DECKELBAUM
JAMES M. DUBIN
LESLIE GORDON FAGEN
MARILYN LINER
PETER L. FELCHER
PETER E. FISCH
ROBERT C. FLEDER
MARTIN FLUMENBAUM
ANDREW J. FOLEY
HARRIS B. FREIDUS
KENNETH A. GALLO*
MICHAEL E. GERTZMAN
PAUL D. GINSBERG
ERIC S. GOLDSTEIN
ERIC GOODISON
CHARLES H. GOOGE, JR.
ANDREW G. GORDON
BRUCE A. GUTENPLAN
GAINES GWATHMEY, III
ALAN S. HALPERIN
CLAUDIA HAMMERMAN
GERARD E. HARPER
BRIAN S. HERMANN
ROBERT M. HIRSH
MICHELE HIRSHMAN
JOYCE S. HUANG
JEH CHARLES JOHNSON
MEREDITH J. KANE
ROBERTA A. KAPLAN
BRAD S. KARP

JOHN C. KENNEDY
ALAN W. KORNBERG
DANIEL J. KRAMER
DAVID M. LANDAU
JOHN E. LANGE
DANIEL J. LEFFELL
JEFFREY D. MARELL
JULIA TARVER MASON
MARCO V. MASOTTI
EDWIN S. MAYNARD
DAVID W. MAYO
TOBY S. MYERSON
JOHN E. NATHAN
CATHERINE NYARADY
ALEX YOUNG H. OH
JOHN J. O'NEIL
KELLEY D. PARKER
ROBERT P. PARKER*
MARC E. PERLMUTTER
MARK F. POMERANTZ
VALERIE E. RADWANER
CAREY R. RAMOS
CARL L. REISNER
WALTER RIEMAN
RICHARD A. ROSEN
ANDREW N. ROSENBERG
STEVEN B. ROSENFELD
PETER J. ROTHENBERG
RAPHAEL M. RUSSO
JEFFREY D. SAFERSTEIN
JEFFREY B. SAMUELS
DALE M. SARRO
TERRY E. SCHIMEK
KENNETH M. SCHNEIDER
ROBERT B. SCHUMER
JAMES H. SCHWAB
STEPHEN J. SHIMSHAK
DAVID R. SICULAR
ROBERT SILVERMAN
STEVEN SIMKIN
JOSEPH J. SIMONS
MARILYN SOBEL
TARUN M. STEWART
ERIC ALAN STONE
AIDAN SYNNOTT
ROBYN F. TARNOFSKY
JUDITH R. THOYER
DANIEL J. TOAL
MARK A. UNDERBERG
LIZA M. VELAZQUEZ
MARIA T. VULLO
LAWRENCE G. WEE
THEODORE V. WELLS, JR.
JORDAN E. YARETT
KAYE N. YOSHINO
ALFRED D. YOUNGWOOD
TONG YU
T. ROBERT ZOCHOWSKI, JR.

*NOT ADMITTED TO NEW YORK BAR

December 14, 2007

Deutsche Bank Trust Companies Americas,
    as Fiscal Agent
Corporate Trust Agency Services
60 Wall Street
New York, NY 10005-2858

*14 Dec 07*
*Norma Jean Clark*

### NOTICE OF ACCELERATION

Ladies and Gentlemen:

    We are counsel to Aurelius Capital Partners, LP and Aurelius Capital
Master, Ltd.

    Aurelius Capital Partners, LP is the beneficial owner of the following debt
securities in the stated principal amounts (the "ACP Debt Securities"), issued by the
Republic of Argentina (the "Republic") pursuant to a Fiscal Agency Agreement dated as
of October 19, 1994 (the "Fiscal Agency Agreement") between the Republic and Bankers
Trust Company, as fiscal agent. (Deutsche Bank is the successor fiscal agent.)

    (i)    $17,850,000 in original principal amount of the
           Global Bonds due June 19, 2018, bearing interest at
           12.25%, ISIN No. US040114GG96 (the "2018
           Global Bonds"). The 2018 Global Bonds were
           issued pursuant to the Fiscal Agency Agreement
           and a prospectus supplement dated May 24, 2001.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Deutsche Bank Trust Companies Americas,
as Fiscal Agent                                                                                        2

(ii)    $13,303,000 in original principal amount of the
Global Bonds due June 19, 2031, bearing interest at
12%, ISIN No. US040114GH79 (the "2031 Global
Bonds"). The 2031 Global Bonds were issued
pursuant to the Fiscal Agency Agreement and a
prospectus supplement dated May 24, 2001.

Aurelius Capital Master, Ltd. is the beneficial owner of the following debt
securities in the stated principal amounts (the "ACM Debt Securities"), issued by the
Republic pursuant to the Fiscal Agency Agreement.

(i)     $9,150,000 in original principal amount of the 2018
Global Bonds.

(ii)    $16,622,000 in original principal amount of the
2031 Global Bonds.

The ACP Debt Securities and the ACM Debt Securities are collectively
referred to herein as the Debt Securities.

In December 2001, the Republic of Argentina declared a moratorium on
the payment of principal and interest with respect to all of its external debt, including the
Debt Securities. Since that time, the Republic has failed to make any payments of
interest when due or at any time thereafter on any of the Debt Securities, although
numerous such payments of interest have become due and payable with respect to each
such Debt Security. Under Section 12 of the Fiscal Agency Agreement and the related
Global Securities, the declaration of a moratorium on the payment of principal of, or
interest on, the Republic's external debt constitutes an Event of Default. Under Section
12 of the Fiscal Agency Agreement and the related Global Securities, the Republic's
failure to pay interest on securities issued pursuant to the Fiscal Agency Agreement when
due and for a period of thirty days thereafter constitutes an Event of Default. The Events
of Default that have occurred with respect to each of the Debt Securities are continuing.

In accordance with the Fiscal Agency Agreement and the related Global
Securities, Aurelius Capital Partners, LP and Aurelius Capital Master, Ltd. hereby
declare the principal amounts set forth above of the Debt Securities, which are
beneficially owned by either of Aurelius Capital Partners, LP and Aurelius Capital
Master, Ltd., to be due and payable immediately. Aurelius Capital Partners, LP and
Aurelius Capital Master, Ltd. demand immediate payment of such principal together with
all accrued and unpaid interest thereon, including capitalized interest.

The amounts of Debt Securities set forth above are in addition to, and
separate and distinct from, the original principal amounts of the 2018 Global Bonds and

Confidential

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Deutsche Bank Trust Companies Americas,
as Fiscal Agent                                                                     3

the 2031 Global Bonds held by Aurelius Capital Partners, LP and Aurelius Capital
Master, Ltd. that were the subject of our prior Notice of Acceleration dated March 29,
2007, and addressed to you.

   In accordance with the Fiscal Agency Agreement and the related Global
Securities, Aurelius Capital Partners, LP and Aurelius Capital Master, Ltd., are acting
pursuant to authorizations received from Goldman, Sachs & Co., the participant holding
the interests of Aurelius Capital Partners, LP and Aurelius Capital Master, Ltd. in the
Debt Securities.  Goldman, Sachs & Co., in turn, acted pursuant to authorizations
received from Cede & Co., the holder of record of the Debt Securities and the nominee of
the Depository Trust Company, the Depositary for the Debt Securities.

   Please arrange for immediate payment in accordance with the Fiscal
Agency Agreement and the related Global Securities.

    Very truly yours,

    Walter Rieman

BY HAND

ACII 000003

## AFFIDAVIT OF DELIVERY BY HAND

STATE OF NEW YORK    )
                     :    ss.:
COUNTY OF NEW YORK   )

Dytonia Reed, being duly sworn, deposes and says:

1.    I am over 18 years of age and am employed by Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of Americas, New York, New York 10019.

2.    On December 14, 2007, I personally delivered the original of the annexed Notice of Acceleration dated December 14, 2007, to the following:

> Deutsche Bank Trust Companies Americas, as Fiscal Agent
> Corporate Trust Agency Services
> 60 Wall Street
> New York, NY 10005-2858

3.    More specifically, I personally delivered the Notice of Acceleration to Norma Jean Clark at Deutsche Bank Trust Companies Americas at the address stated above. Ms. Clark opened the envelope in my presence, reviewed the Notice of Acceleration, stated that "it comes to me," and acknowledged receipt of the Notice of Acceleration in writing on the attached copy of that document.

_Dytonia Reed_
Dytonia Reed

Sworn to before me this
_14_ day of December, 2007

_[signature]_
Notary Public

AUSTIN KWAME WILKINSON
Notary Public, State of New York
No. 01WI6061848
Qualified in Kings County
Certificate Filed in New York County
Commission Expires Nov. 13, 2008

Confidential

EXHIBIT D

**CONFIDENTIAL – FILED UNDER SEAL**

EXHIBIT E

**CONFIDENTIAL – FILED UNDER SEAL**

EXHIBIT F

CONFIDENTIAL – FILED UNDER SEAL

EXHIBIT G

CEDE & CO.
c/o The Depository Trust Company
55 Water Street
New York, NY 10041

Cede & Co. is the nominee of The Depository Trust Company ("DTC"), and Cede & Co. is the holder of record, as of even date herewith, of the following debt securities issued by the Republic of Argentina pursuant to a Fiscal Agency Agreement between the Republic of Argentina and Bankers Trust Company, as Fiscal Agent, dated as of October 19, 1994 (the "Fiscal Agency Agreement"):

$22,232,000 in original principal amount of the Global Bonds due June 19, 2018, bearing interest at 12.25%, CUSIP No. 040114GG9, together with all accrued and unpaid interest thereon, including capitalized interest.

The debt securities listed above are referred to herein as the "ACP Debt Securities."

DTC is informed by its participant, Goldman Sachs & Co. ("Participant"), which is also the custodian of the ACP Debt Securities, that the ACP Debt Securities, which were credited to Participant's DTC account as of December 6, 2007, are held for the account of Aurelius Capital Partners, LP.

At the request of Participant, on behalf of Aurelius Capital Partners, LP, Cede & Co., as the nominee of DTC, the Depositary, and as holder of record of the ACP Debt Securities, hereby authorizes the Participant to take the following actions:

With respect to the ACP Debt Securities, which were held for the account of Aurelius Capital Partners, LP as of December 6, 2007, to provide notice to the Republic of Argentina that the principal amounts of the ACP Debt Securities, or any of them, are due and payable immediately pursuant to the Fiscal Agency Agreement and the related Global Securities, and to commence and prosecute litigation, arbitration, or other dispute resolution procedures against the Republic of Argentina relating to breaches of the obligations of the Republic of Argentina as set out in the documents relevant to the ACP Debt Securities, which actions Cede & Co., as holder of the ACP Debt Securities, is entitled to take.

This authorization is contemplated by the documents controlling the ACP Debt Securities, including the Fiscal Agency Agreement, which provides in relevant part:

"The Republic [of Argentina] understands that under existing industry practices if . . . an owner of a beneficial interest in such Global Security desires to take any action which a holder is entitled to take under the Fiscal Agency Agreement, the Depositary for such Global Security would authorize the Participants holding relevant interests to take such action, and such Participants would authorize

CONFIDENTIAL

AC II  000059

2

beneficial owners owning through such Participants to take
such action."

While Cede & Co. is furnishing this authorization as the holder of record
of the ACP Debt Securities, it does so solely at the request of Participant and only as a
nominal party for Aurelius Capital Partners, LP, which we understand to be the true party
in interest. Cede & Co. has no interest in this matter other than to take those steps which
are necessary to ensure that Aurelius Capital Partners, LP is not denied its rights as the
holder of the account in which beneficial ownership of the ACP Debt Securities is held,
and Cede & Co. assumes no further responsibility in this matter.

Very truly yours,

CEDE & CO.

By: _____
     Partner          Peter J. Gleeson, partner

Dated December □□, 2007

CONFIDENTIAL

AC II  000060

**CEDE & CO.**
c/o The Depository Trust Company
55 Water Street
New York, NY 10041

Cede & Co. is the nominee of The Depository Trust Company ("DTC"), and Cede & Co. is the holder of record, as of even date herewith, of the following debt securities issued by the Republic of Argentina pursuant to a Fiscal Agency Agreement between the Republic of Argentina and Bankers Trust Company, as Fiscal Agent, dated as of October 19, 1994 (the "Fiscal Agency Agreement"):

$21,542,000 in original principal amount of the Global Bonds due June 19, 2031, bearing interest at 12%, CUSIP No. 040114GI17, together with all accrued and unpaid interest thereon, including capitalized interest.

The debt securities listed above are referred to herein as the "ACP Debt Securities."

DTC is informed by its participant, Goldman Sachs & Co. ("Participant"), which is also the custodian of the ACP Debt Securities, that the ACP Debt Securities, which were credited to Participant's DTC account as of December 6, 2007, are held for the account of Aurelius Capital Partners, LP.

At the request of Participant, on behalf of Aurelius Capital Partners, LP, Cede & Co., as the nominee of DTC, the Depositary, and as holder of record of the ACP Debt Securities, hereby authorizes the Participant to take the following actions:

With respect to the ACP Debt Securities, which were held for the account of Aurelius Capital Partners, LP as of December 6, 2007, to provide notice to the Republic of Argentina that the principal amounts of the ACP Debt Securities, or any of them, are due and payable immediately pursuant to the Fiscal Agency Agreement and the related Global Securities, and to commence and prosecute litigation, arbitration, or other dispute resolution procedures against the Republic of Argentina relating to breaches of the obligations of the Republic of Argentina as set out in the documents relevant to the ACP Debt Securities, which actions Cede & Co., as holder of the ACP Debt Securities, is entitled to take.

This authorization is contemplated by the documents controlling the ACP Debt Securities, including the Fiscal Agency Agreement, which provides in relevant part:

"The Republic [of Argentina] understands that under existing industry practices if . . . an owner of a beneficial interest in such Global Security desires to take any action which a holder is entitled to take under the Fiscal Agency Agreement, the Depositary for such Global Security would authorize the Participants holding relevant interests to take such action, and such Participants would authorize

CONFIDENTIAL

AC II  000061

2

beneficial owners owning through such Participants to take
such action."

While Cede & Co. is furnishing this authorization as the holder of record
of the ACP Debt Securities, it does so solely at the request of Participant and only as a
nominal party for Aurelius Capital Partners, LP, which we understand to be the true party
in interest. Cede & Co. has no interest in this matter other than to take those steps which
are necessary to ensure that Aurelius Capital Partners, LP is not denied its rights as the
holder of the account in which beneficial ownership of the ACP Debt Securities is held,
and Cede & Co. assumes no further responsibility in this matter.

Very truly yours,

CEDE & CO.

By: _____
Partner    Peter J. Gleeson, partner

Dated December __, 2007

CONFIDENTIAL

AC II  000062

CEDE & CO.
c/o The Depository Trust Company
55 Water Street
New York, NY 10041

Cede & Co. is the nominee of The Depository Trust Company ("DTC"),
and Cede & Co. is the holder of record, as of even date herewith, of the following debt
securities issued by the Republic of Argentina pursuant to a Fiscal Agency Agreement
between the Republic of Argentina and Bankers Trust Company, as Fiscal Agent, dated
as of October 19, 1994 (the "Fiscal Agency Agreement"):

$15,268,000 in original principal amount of the Global Bonds due
June 19, 2018, bearing interest at 12.25%, CUSIP No.
040114GG9, together with all accrued and unpaid interest thereon,
including capitalized interest.

The debt securities listed above are referred to herein as the "ACM Debt Securities."

DTC is informed by its participant, Goldman Sachs & Co. ("Participant"),
which is also the custodian of the ACM Debt Securities, that the ACM Debt Securities,
which were credited to Participant's DTC account as of December 6, 2007, are held for
the account of Aurelius Capital Master, Ltd.

At the request of Participant, on behalf of Aurelius Capital Master, Ltd.,
Cede & Co., as the nominee of DTC, the Depository, and as holder of record of the ACM
Debt Securities, hereby authorizes the Participant to take the following actions:

With respect to the ACM Debt Securities, which were held for the
account of Aurelius Capital Master, Ltd. as of December 6, 2007, to provide notice
to the Republic of Argentina that the principal amounts of the ACM Debt
Securities, or any of them, are due and payable immediately pursuant to section 12
of Fiscal Agency Agreement, and to commence and prosecute litigation, arbitration,
or other dispute resolution procedures against the Republic of Argentina relating to
breaches of the obligations of the Republic of Argentina as set out in the documents
relevant to the ACM Debt Securities, which actions Cede & Co., as holder of the
ACM Debt Securities, is entitled to take.

This authorization is contemplated by the documents controlling the ACM
Debt Securities, including the Fiscal Agency Agreement, which provides in relevant part:

"The Republic [of Argentina] understands that under
existing industry practices if . . . an owner of a beneficial
interest in such Global Security desires to take any action
which a holder is entitled to take under the Fiscal Agency
Agreement, the Depositary for such Global Security would
authorize the Participants holding relevant interests to take

CONFIDENTIAL

AC II  000063

2

such action, and such Participants would authorize beneficial owners owning through such Participants to take such action."

While Cede & Co. is furnishing this authorization as the holder of record of the ACM Debt Securities, it does so solely at the request of Participant and only as a nominal party for Aurelius Capital Master, Ltd., which we understand to be the true party in interest. Cede & Co. has no interest in this matter other than to take those steps which are necessary to ensure that Aurelius Capital Master, Ltd. is not denied its rights as the holder of the account in which beneficial ownership of the ACM Debt Securities is held, and Cede & Co. assumes no further responsibility in this matter.

Very truly yours,

CEDE & CO.

By: _____
Partner    Peter J. Gleeson, partner

Dated December __, 2007

AC II 000064

CEDE & CO.
c/o The Depository Trust Company
55 Water Street
New York, NY 10041

Cede & Co. is the nominee of The Depository Trust Company ("DTC"),
and Cede & Co. is the holder of record, as of even date herewith, of the following debt
securities issued by the Republic of Argentina pursuant to a Fiscal Agency Agreement
between the Republic of Argentina and Bankers Trust Company, as Fiscal Agent, dated
as of October 19, 1994 (the "Fiscal Agency Agreement"):

$21,883,000 in original principal amount of the Global Bonds due
June 19, 2031, bearing interest at 12%, CUSIP No. 040114GH7,
together with all accrued and unpaid interest thereon, including
capitalized interest.

The debt securities listed above are referred to herein as the "ACM Debt Securities."

DTC is informed by its participant, Goldman Sachs & Co. ("Participant"),
which is also the custodian of the ACM Debt Securities, that the ACM Debt Securities,
which were credited to Participant's DTC account as of December 6, 2007, are held for
the account of Aurelius Capital Master, Ltd.

At the request of Participant, on behalf of Aurelius Capital Master, Ltd.,
Cede & Co., as the nominee of DTC, the Depositary, and as holder of record of the ACM
Debt Securities, hereby authorizes the Participant to take the following actions:

With respect to the ACM Debt Securities, which were held for the
account of Aurelius Capital Master, Ltd. as of December 6, 2007, to provide notice
to the Republic of Argentina that the principal amounts of the ACM Debt
Securities, or any of them, are due and payable immediately pursuant to section 12
of Fiscal Agency Agreement, and to commence and prosecute litigation, arbitration,
or other dispute resolution procedures against the Republic of Argentina relating to
breaches of the obligations of the Republic of Argentina as set out in the documents
relevant to the ACM Debt Securities, which actions Cede & Co., as holder of the
ACM Debt Securities, is entitled to take.

This authorization is contemplated by the documents controlling the ACM
Debt Securities, including the Fiscal Agency Agreement, which provides in relevant part:

"The Republic [of Argentina] understands that under
existing industry practices if . . . an owner of a beneficial
interest in such Global Security desires to take any action
which a holder is entitled to take under the Fiscal Agency
Agreement, the Depositary for such Global Security would
authorize the Participants holding relevant interests to take

CONFIDENTIAL

AC II  000065

2

such action, and such Participants would authorize
beneficial owners owning through such Participants to take
such action."

While Cede & Co. is furnishing this authorization as the holder of record
of the ACM Debt Securities, it does so solely at the request of Participant and only as a
nominal party for Aurelius Capital Master, Ltd., which we understand to be the true party
in interest. Cede & Co. has no interest in this matter other than to take those steps which
are necessary to ensure that Aurelius Capital Master, Ltd. is not denied its rights as the
holder of the account in which beneficial ownership of the ACM Debt Securities is held,
and Cede & Co. assumes no further responsibility in this matter.

Very truly yours,

CEDE & CO.

By: _____
    Partner    Peter J. Gleeson, partner

Dated December __, 2007

CONFIDENTIAL                                                                AC II  000066

EXHIBIT H

Goldman, Sachs & Co. | One New York Plaza, 44th Floor | New York, NY 10004
Tel: 212-902-1000

Goldman
Sachs

December 7, 2007

Aurelius Capital Partners, LP
53 Forest Avenue
2nd Floor
Old Greenwich, CT 06870

> Re:   Certain debt securities (as listed below)
>        issued by the Republic of Argentina

Ladies and Gentlemen:

Goldman, Sachs & Co. ("Goldman Sachs") is a Participant of The Depository Trust Company ("DTC"). As of the date of this letter, Goldman Sachs, as custodian, holds the following debt securities issued by the Republic of Argentina pursuant to a Fiscal Agency Agreement between the Republic of Argentina and Bankers Trust Company, as Fiscal Agent, dated as of October 19, 1994 (the "Fiscal Agency Agreement"):

> (a)   $22,232,000 in original principal amount of the Global Bonds due June 19, 2018, bearing interest at 12.25%, ISIN No. US040114GG96, together with all accrued and unpaid interest thereon, including capitalized interest.
>
> (b)   $21,542,000 in original principal amount of the Global Bonds due June 19, 2031, bearing interest at 12%, ISIN No. US040114GH79, together with all accrued and unpaid interest thereon, including capitalized interest.

The debt securities listed above, which are held for the account of Aurelius Capital Partners, LP, are referred to herein as the "ACP Debt Securities." As of the date of this letter, the ACP Debt Securities are registered in the name of Cede & Co., which is a nominee of DTC, and have been credited to Goldman Sachs's participant account at DTC.

CONFIDENTIAL

AC II  000067

Aurelius Capital Partners, LP                                    2

Cede & Co., in letters dated December 6, 2007, authorized Goldman
Sachs:

> With respect to the ACP Debt Securities, which
> were held for the account of Aurelius Capital Partners,
> LP as of December 6, 2007, to provide notice to the
> Republic of Argentina that the principal amounts of the
> ACP Debt Securities, or any of them, are due and
> payable immediately pursuant to the Fiscal Agency
> Agreement and the related Global Securities, and to
> commence and prosecute litigation, arbitration, or other
> dispute resolution procedures against the Republic of
> Argentina relating to breaches of the obligations of the
> Republic of Argentina as set out in the documents
> relevant to the ACP Debt Securities, which actions Cede
> & Co., as holder of the ACP Debt Securities, is entitled
> to take.

Having received such authorization from Cede & Co., Goldman Sachs, in
turn, hereby authorizes Aurelius Capital Partners, LP to provide the above-described
notice and to commence and prosecute the above-described litigation, arbitration, or other
dispute resolution procedures against the Republic of Argentina.

We are informed by Aurelius Capital Partners, LP that this authorization is
contemplated by the documents controlling the ACP Debt Securities, including the Fiscal
Agency Agreement, dated as of October 19, 1994, between the Republic of Argentina
and Bankers Trust Company, as fiscal agent, which provides in relevant part:

> "The Republic [of Argentina] understands that under
> existing industry practices if . . . an owner of a beneficial
> interest in such Global Security desires to take any action
> which a holder is entitled to take under the Fiscal Agency
> Agreement, the Depositary for such Global Security would
> authorize the Participants holding relevant interests to take
> such action, and such Participants would authorize
> beneficial owners owning through such Participants to take
> such action."

While Goldman Sachs is furnishing this authorization as a Participant
authorized by Cede & Co., the holder of record of the ACP Debt Securities, it does so
solely at the request of Aurelius Capital Partners, LP and only as a nominal party for
Aurelius Capital Partners, LP, which we understand is the true party in interest. Goldman
Sachs has no interest in this matter other than to take those steps which are necessary to
allow Aurelius Capital Partners, LP to exercise its rights as the account holder on our

CONFIDENTIAL                                    AC II  000068

Aurelius Capital Partners, LP                                                    3

books of the ACP Debt Securities, and Goldman Sachs assumes no further responsibility in this matter.

In consideration of, and as a condition to, Goldman Sachs so instructing DTC on behalf of Aurelius Capital Partners, LP, Goldman Sachs has requested that Aurelius Capital Partners, LP agree, and Aurelius Capital Partners, LP does hereby agree, to indemnify and hold harmless Goldman Sachs and its affiliates, officers, directors, employees, and agents from and against any and all losses, claims, damages, liabilities, obligations, awards, judgments, and costs (including reasonable attorneys' fees, court costs, cost of collection, or cost of investigation/preparation) incurred in connection with issuing the instruction, except that Aurelius Capital Partners, LP will not be liable for any losses, claims, damages, liabilities, obligations, awards, judgments, and costs that are determined to be the direct result of acts or omissions on the part of Goldman Sachs constituting fraud, gross negligence, or willful misconduct.

Very truly yours,

GOLDMAN, SACHS & CO.

By: _Kara Saylor_
Name:
Title:

Agreed and accepted:

AURELIUS CAPITAL PARTNERS, LP

By:  Aurelius Capital GP, LLC, its General Partner

By: _____
Name:  Mark D. Brodsky
Title:   Chairman

CONFIDENTIAL                                              AC II  000069

Goldman, Sachs & Co. | One New York Plaza | New York, New York 10004
Tel: 212-902-1000

Goldman
Sachs

December 7, 2007

Aurelius Capital Master, Ltd.
c/o GlobeOp Financial Services (Cayman) Limited
Westwind Building, 3rd Floor
Harbour Drive, George Town,
P.O. Box 10201 APO
Grand Cayman, KYI-1002
Cayman Islands, British West Indies

    Re:   Certain debt securities (as listed below)
          issued by the Republic of Argentina

Ladies and Gentlemen:

    Goldman, Sachs & Co. ("Goldman Sachs") is a Participant of The
Depository Trust Company ("DTC"). As of the date of this letter, Goldman Sachs, as
custodian, holds the following debt securities issued by the Republic of Argentina
pursuant to a Fiscal Agency Agreement between the Republic of Argentina and Bankers
Trust Company, as Fiscal Agent, dated as of October 19, 1994 (the "Fiscal Agency
Agreement"):

        (a)    $15,268,000 in original principal amount of the Global Bonds due
              June 19, 2018, bearing interest at 12.25%, ISIN No.
              US040114GG96, together with all accrued and unpaid interest
              thereon, including capitalized interest.

        (b)    $21,883,000 in original principal amount of the Global Bonds due
              June 19, 2031, bearing interest at 12%, ISIN No. US040114GH79,
              together with all accrued and unpaid interest thereon, including
              capitalized interest.

CONFIDENTIAL

AC II  000070

Aurelius Capital Master, Ltd.                                    2

      The debt securities listed above, which are held for the account of Aurelius Capital Master, Ltd., are referred to herein as the "ACM Debt Securities." As of the date of this letter, the ACM Debt Securities are registered in the name of Cede & Co., which is a nominee of DTC, and have been credited to Goldman Sachs's participant account at DTC.

      Cede & Co., in letters dated December 6, 2007, authorized Goldman Sachs:

      With respect to the ACM Debt Securities, which were held for the account of Aurelius Capital Master, Ltd. as of December 6, 2007, to provide notice to the Republic of Argentina that the principal amounts of the ACM Debt Securities, or any of them, are due and payable immediately pursuant to the Fiscal Agency Agreement and the related Global Securities, and to commence and prosecute litigation, arbitration, or other dispute resolution procedures against the Republic of Argentina relating to breaches of the obligations of the Republic of Argentina as set out in the documents relevant to the ACM Debt Securities, which actions Cede & Co., as holder of the ACM Debt Securities, is entitled to take.

      Having received such authorization from Cede & Co., Goldman Sachs, in turn, hereby authorizes Aurelius Capital Master, Ltd. to provide the above-described notice and to commence and prosecute the above-described litigation, arbitration, or other dispute resolution procedures against the Republic of Argentina.

      We are informed by Aurelius Capital Master, Ltd. that this authorization is contemplated by the documents controlling the ACM Debt Securities, including the Fiscal Agency Agreement, dated as of October 19, 1994, between the Republic of Argentina and Bankers Trust Company, as fiscal agent, which provides in relevant part:

      "The Republic [of Argentina] understands that under existing industry practices if . . . an owner of a beneficial interest in such Global Security desires to take any action which a holder is entitled to take under the Fiscal Agency Agreement, the Depositary for such Global Security would authorize the Participants holding relevant interests to take such action, and such Participants would authorize beneficial owners owning through such Participants to take such action."

CONFIDENTIAL

AC II 000071

To:Goldman Sachs   Co  P.6/6

Aurelius Capital Master, Ltd.                                                    3

Sachs has no interest in this matter other than to take those steps which are necessary to allow Aurelius Capital Master, Ltd. to exercise its rights as the account holder on our books of the ACM Debt Securities, and Goldman Sachs assumes no further responsibility in this matter.

In consideration of, and as a condition to, Goldman Sachs so instructing DTC on behalf of Aurelius Capital Master, Ltd., Goldman Sachs has requested that Aurelius Capital Master, Ltd. agree, and Aurelius Capital Master, Ltd. does hereby agree, to indemnify and hold harmless Goldman Sachs and its affiliates, officers, directors, employees, and agents from and against any and all losses, claims, damages, liabilities, obligations, awards, judgments, and costs (including reasonable attorneys' fees, court costs, cost of collection, or cost of investigation/preparation) incurred in connection with issuing the instruction, except that Aurelius Capital Master, Ltd. will not be liable for any losses, claims, damages, liabilities, obligations, awards, judgments, and costs that are determined to be the direct result of acts or omissions on the part of Goldman Sachs constituting fraud, gross negligence, or willful misconduct.

Very truly yours,

GOLDMAN, SACHS & CO.

By: _____
Name:
Title:

Agreed and accepted:

AURELIUS CAPITAL MASTER, LTD.

By:  Aurelius Capital Management, LP, solely as investment manager
     and not in its individual capacity

By: _____
Name:  Mark D. Brodsky
Title:   Chairman

CONFIDENTIAL                                              AC II  000072